**FILED**

APR 08 2021 DB

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN.

| | |
|---|---|
| **ANDY L. ALLMAN**<br>Petitioner | )<br>)<br>) **Docket No. 3:21-cv-00267**<br>) **From the Tennessee Court of Criminal** |
| **vs.** | ) **Appeals No. M2021-00196-CCA-R8-CO**<br>) **Sumner County Criminal Court Cases:**<br>) **No. 2017-CR-548** |
| **SONNY WEATHERFORD,**<br>**SHERIFF OF SUMNER**<br>**COUNTY, TN**, and<br>**HERBERT H. SLATERY, III,**<br>**TENNESSEE STATE**<br>**ATTORNEY GENERAL**<br>Respondents | ) **No. 2017-CR-875**<br>) **No. 2020-CR-133**<br>)<br>)<br>)<br>)<br>)<br>) |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## AND IMMEDIATE RELIEF
## PURSUANT TO 28 U.S.C. 2241

Comes now the Petitioner, Andy L. Allman, and files this amended petition pursuant to the Pro

Se Handbook for Actions Filed Under 28 U.S.C. 2241 with the Court for a Writ of Habeas

Corpus to set aside or vacate the State's Order Revoking Bond and incarcerating him prior to

trial. Petitioner received the Pro Se Handbook for Actions Filed Under 28 U.S.C. 2241 on April

7, 2021. Petitioner has no access to the internet or the Court's website. Petitioner also seeks

immediate relief as he is suffering, and continues to suffer, irreparable harm. Petitioner would

show:

1

a. Petitioner is currently in custody at the Sumer County Jail, Gallatin, Tennessee as a pre-trial detainee, I.D. #109621, pursuant to an Order enter by the Sumner County Criminal Court on April 7, 2020, revoking Petitioner's bond.

b. This Petition is filed pursuant to 28 U.S.C. 2241, *Hill v. Hall*, 3:19-CV-00452 at pages 11-12 (M.D. Tenn. October 7, 2019, J. Aleta Trauger).

c. Petitioner is being held in violation of his First Amendment, Fifth Amendment, Sixth Amendment and Eighth Amendment rights under the United States Constitution as well as violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

d. Respondent Sonny Weatherford is the Sherriff of Sumner County, Tennessee and in charge of the Sumner County Jail and is the person detaining petitioner in violation of his rights. (*See Hill* at 1; 28 USC 2242; 28 USC 2243). Respondent Attorney General Herbert H. Slatery, III, a proper respondent pursuant to T.C.A. 8-6-109(b)(2).

e. A *de novo* review of the State proceedings is required. *Hill* at pages 11 – 12; *Phillips v. Court of Common Pleas*, 668 F. 3d 804,809 (6th Cir. 2012).

f. Petitioner would show that the exhibits attached hereto were attached as exhibits to his Motion to Review filed in the Trial Court and in the Court of Criminal Appeals to his Tenn. R. App. 8 Motions with the exception of exhibits G – M.

2

## I. Introduction

1. Trial in cases 2017-CR-548 and 2017-CR-875 was set for November 30, 2020 but has been continued, for the third time since January 1, 2020, until November 1, 2021.[1] (Exhibit A-Sumner County Criminal Court Docket Sheets) Since the revocation hearing on April 2, 2020, even more charges of theft against the Petitioner have been dismissed. Petitioner faces fewer charges than he did. *See* paragraph 109.

2. In order to reach bond revocation, the Trial Court found Petitioner had committed two charges in indictment 2020-CR-133, under *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015), even though the State failed to prove the same by a preponderance of the evidence. The Trial Court also injected into its analysis the conditional pleas of disbarment and restitution schedules, that lacked credibility or reliability, and the criminal contempt proceedings, i.e. criminal charges, riddled with a lack of probable cause, brought by the Tennessee Board of Professional Responsibility. This forced Petitioner into the position of having to prove his innocence, a burden shifting, denying him due process and equal protection under the Fourteenth Amendment. Petitioner's rights were further violated by the State's withholding of vital and exculpatory evidence in violation of *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015) and *Brady v. Maryland,* 373 U.S. 83 (1963) and a denial of due process and equal protection under the Fourteenth Amendment of the United States Constitution. Petitioner's Fourteenth Amendment right to equal protection and due process have been violated by the State's refusal to consider non-financial conditions of release other than incarceration pursuant to *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015). The State

---

[1] Petitioner's trial dates on the 2017-CR-548 and 2017-CR-875 indictments were March 16, 2020, August 24, 2020, October 5, 2020, and November 30, 2020. (Exhibit A – Sumner County Criminal Court Docket Sheets)

Case 3:21-cv-00267   Document 7   Filed 04/08/21   Page 3 of 56 PageID #: 645

refused to consider the merits of Petitioner's Motion to Review pursuant to Tenn. R. App. 8. Petitioner is suffering continuous irreparable harm and is in need of immediate relief. (Exhibit G -Trial Court and Court of Criminal Appeals Orders denying Motion to Review.)

## II. Procedural Background

3. The Trial Court entered an Order revoking Petitioner's bond on April 7, 2020, after a hearing on April 2, 2020. The State charged him on March 5, 2020, through an indictment (2020-CR-133), with one (1) count of falsely representing himself out as a lawyer in violation of T.C.A. 23-3-108 and one (1) count of theft in violation of T.C.A. 39-14-103 in a case involving alleged victim Mario Herrera. The Trial Court set a $2.5 million bond, an unattainably high bond, prior to his arrest and without a bond hearing, violating Petitioner's Fifth and Eighth Amendment rights as well as a denial of due process and equal protection under the Fourteenth Amendment of the United States Constitution.

4. On September 25, 2020, Petitioner filed a Motion for Ex Parte Pre-Trial Conference raising violations of his Sixth Amendment rights and a Motion for Hybrid Representation and Furlough to prepare for trial and participate in his defense as co-counsel. (Exhibit B - Petitioner's Motion for Ex Parte Pre-Trial Conference, Motion for Hybrid Representation, Order Granting Hybrid Representation, Amended Order Granting Hybrid Representation, State's Motion to Reconsider, Petitioner's Response to Motion to Reconsider, and Order Denying Motion to Reconsider). At the Ex Parte Pre-Trial Conference on October 5, 2020, the Trial Court found sufficient evidence warranting post-conviction relief on Sixth Amendment grounds (effective assistance of counsel) and granted Petitioner hybrid representation and furlough. *State v. Franklin,* 714 S.W. 2d 252 (Tenn. 1986) (Transcript of In-Court Proceedings 10/5/2020 pages 4, 9-11, Transcript of Ex-

4

Parte Proceeding 10/5/20 pages 7 -21).[2]  While Petitioner was granted 15 days of furlough, this has not been sufficient time allowing the unhampered preparation of a defense pursuant to *Stack v. Boyle,* 342 U.S. 1,4,8 (1951) (Transcript of In-Court Proceedings 10/5/2020 pages 4, 9-11). In granting the Motion for Hybrid Representation, the Court ordered that Petitioner **"be granted the right of hybrid representation for co-counsel participation in his defense."** Petitioner's Sixth Amendment issue has not improved. (*See* Footnote 4)

5. On December 15, 2020, Petitioner filed his Motion to Review the bond revocation Order in the Trial Court pursuant to Tenn. R. App. P. 8. (Exhibit C – Defendant's Motion to Review filed in the Trial Court and exhibits hereinafter referred to as "Motion to Review). Without a hearing where Petitioner could be present to offer proof and make argument, the Court denied his Motion.  Petitioner was set to introduce proof in support of his Motion to Review that had been withheld from Petitioner by the State until three (3) months after the revocation hearing. Withholding of the material prevented Petitioner from using the same at the revocation hearing in violation of *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015) and *Brady v. Maryland,* 373 U.S. 83 (1963). (*See* Footnote 4)

6. The Trial Court entered an order December the 18, 2020 denying Petitioner's Motion to Review and served the same on the State and Attorney Gary Copas. (Exhibit G- Trial Court and Court of Criminal Appeals Orders denying Motion to Review). Petitioner first became aware of this order on March 19, 2021, when he received the Response filed by the State Attorney General in opposition to his Tenn. R. App. 8 Motion filed in the Court of Criminal Appeals. The Trial Court's Order was attached. Petitioner, however, had received information on February 10, 2021

---

[2] Petitioner has filed a Motion to File the Transcript Under Seal with this Court pursuant to local Rule 5.03.

from the Sumner County Court Clerk's Office that his Motion to Review was set for hearing January 14, 2021, reset to January 28, 2021, and reset again for November 1, 2021, as reflected on the Court's docket sheets (Exhibit A – Sumner County Criminal Court Docket Sheets). On January 27, 2021, Attorney Gary Copas, emailed Petitioner's wife that the motions hearing would be reset after the resetting of the trial date. (Exhibit L – Gary Copas email).

7. On January 28, 2021, the Trial Court held a conference with the State and Petitioner's Attorney, Gary Copas. Petitioner was not allowed to attend this hearing. It appears from the Sumner County Criminal Court docket sheets that the Trial Court consolidated all three (3) cases and set a new trial date of November 1, 2021. Nothing in the conference or hearing of January 28, 2021 was discussed with Petitioner either prior or after.

8. Petitioner filed his Motion to Review in the Tennessee Court of Criminal Appeals pursuant to Tenn. R. App. 8 on February 22, 2021.[3] (Exhibit H -Petitioner's Motion to Review pursuant to Tenn. R. App. Hereafter referred to as "Tenn. R. App. 8 Motion"). The State Attorney General filed its response in opposition on March 15, 2021, The Court of Criminal Appeals denied Petitioner's Motion within 48 hours. Petitioner received the State Attorney General's response on 3/19/21 and was thus prevented from filing a reply. The Tennessee Court of Criminal Appeals denied the Motion holding:

> Referring to the Trial Court's order of December 18, 2020, "the granting of hybrid representation makes no allowance for the Defendant to file **ANY** motions or other pleadings before this Court" and that Petitioner is represented by Counsel, Gary Copas, with regard to the Tenn. R. App. 8 Motion in the Court of Criminal Appeals. Neither the Trial Court nor Appellate Court reviewed the merits of his motions.

---

[3] In his Tenn. R. App 8 Motion in the Court of Criminal Appeals, Petitioner argued that the Trial Court had not ruled on his Motion to Review, Petitioner was unaware of the Order denying the same until March 19, 2021.

The State's finding that petitioner was represented by counsel, Gary Copas, at the Tenn. R. App. 8 stage in the Court of Criminal Appeals is without factual basis and contrary to the evidence submitted to the Trial Court in the October 5, 2020 Ex Parte Proceedings. In that proceeding, Petitioner made as an exhibit, the attorney client litigation contract between he and counsel, Gary Copas. (Exhibit M – Attorney-Client Contract, Exhibit 1 of Transcript of the Ex Parte Proceedings 10/5/2020 pages 7-8). The contract makes clear that Mr. Copas represents the Petitioner in the Trial Court proceedings only and that any work performed on the appellate level would be by separate arrangement. Petitioner and counsel did not enter into an agreement for counsel to represent Petitioner on the issue of Tenn. R. App. 8 or this Petition for Writ of Habeas Corpus. Petitioner has been working on the Tenn. R. App. 8 Motion and petition for Writ of Habeas Corpus himself keeping Mr. Copas apprised of the same. (Exhibit I - Text messages and emails to Gary Copas). Mr. Copas's appellate involvement was only for the Tenn. R. App. 10 brief. Petitioner lacks the resources to hire Mr. Copas for the Tenn. R. App. 8 Motions and habeas corpus proceeding (Transcript of In-Court Proceedings 10/5/20 pages 16 – 18; Transcript of Ex-Parte Proceedings 10/5/20 pages 12 – 19; Transcript of Proceedings 4/2 – 3/20 pages 186, 235).

9. Petitioner has fairly presented his claims through one complete round of State Appellate review and has given the State the opportunity to correct the constitutional violations by making it aware of the federal constitutional questions. *Winford v. Ngo,* 548 U.S. 81,92 (2006): *Duncan v. Henry,* 513 U.S. 364,365 (1995); *Snowden v. Singletary*, 135 F. 3d 732,735 (11th Cir. 1998); *Blee v. Kemna*, 534 U.S. 362 (2002).

10. Petitioner has been left no other option but to seek immediate relief from this Court as he is suffering continued irreparable harm. Relief in this type of case must be speedy if it is to be

effective. *Stack v. Boyle,* 342 U.S. 1,4,8 (1951). Petitioner has exhausted his State remedies. *Adams v. Holland*, 330 F. 3d 398, 403 (6th Cir, 2003).

## A. Procedural timeline for bond revocation

11. According to the State, Petitioner was indicted on March 5, 2020 by the Sumner County Grand Jury, indictment No. 2020-CR-133, with a presentment for one (1) count of representing himself as a lawyer in violation of T.C.A. 23-1-108 and one (1) count of theft over $10,000 in violation of T.C.A 39-14-103, indictment No. 2020-CR-133, relating to a former client of Petitioner named Mario Herrera. (State's Motion to Revoke Bond) The Trial Court set a $2.5 million bond. This bond was set prior to Petitioner's arrest and with no bond hearing.

12. At the time of his arrest on said indictment, Petitioner had been released on bonds totaling $225,000 for indictments Nos. 2017-CR-875 and 2017-CR-548 in Sumner County. Petitioner had been out on these bonds for more than two (2) years without issue or violation of conditions. These two indictments list charges against Petitioner alleging theft of retainer fees, client's funds, knowingly, willfully, and intentionally holding himself out as a lawyer, and practicing law without a license.

13. On April 2nd and 3rd, 2020, 24 days after the State seized his materials and files, hearings were held on State's Motion to Revoke Bond, Petitioner's Motion to Reduce Bond, Petitioner's Motion for Continuance of Revocation Hearing under *Brady v. Maryland,* 373 U.S. 83 (1963), Petitioner's Motion for Immediate Release due to the COVID-19 pandemic, immediate relief from the $2.5 million bond and Petitioner's Motion for Immediate Release, or house arrest. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Declaration of Gary Copas paragraph 20-21, Exhibit 1).

14. On April 9, 2020, the Trial Court entered an order denying all of Petitioner's motions including for immediate release or for alternative confinement, such as house arrest, before hearing any proof, and granted State's motion to revoke for "the reasons more particularly stated on the record". (Exhibit D - Order Revoking Bond 4/7/2020) The Trial Court denied Petitioner's request for house arrest before hearing any proof stating, "this is not the ordinary theft of property case where I would consider house arrest". (Transcript of Proceedings 4/2-3/2020 pages 11-13).

15. Of the two (2) counts in No. 2020-CR-133, only the count accusing Petitioner of unlawfully and falsely holding himself out as a lawyer in violation of T.C.A. 23-3-108 allegedly occurred while he was released on bond for No. 2017-CR-875 and No. 2017-CR-548. (Transcript of Proceedings 4/2-3/2020 page 27).

### III. Grounds in support of Habeas Corpus and Immediate Relief

16. Petitioner seeks a Writ of Habeas Corpus from this Court setting aside and vacating the order of revocation and for his immediate release on own recognizance or house arrest based upon his First, Fifth, Sixth, Eighth and Fourteenth Amendment rights prohibiting deprivation of liberty without due process including but not limited to a:

    a. Violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), because the State withheld from Petitioner, and denied access to the Petitioner, material evidence to impeach and rebut evidence presented by the State at the revocation hearing including, but not limited to, Mario Herrera audio recording #2, entire Mario Herrera File, and Petitioner's Client Files;

    b. Violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and *State v Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015), in its ruling revoking Petitioner's bond using the disbarment pleas, restitution schedules, and the criminal contempt proceedings

brought by the Tennessee Board of Professional Responsibility; the records of which had been seized by the State prior to the revocation hearing and not returned to Petitioner until three (3) months after the revocation hearing. (Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Declaration of Gary Copas pages 10 – 12 Exhibit 1) (Exhibit E – Receipt of Tennessee Bureau of Investigation of seized property)

c.  Violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Eighth Amendment of the United States Constitution, T.C.A.40-11-115, 40-11-116 and 40-11-118 denying Petitioner's Ex Parte motion for immediate relief from the patently excessive and unconstitutional $2.5 million bond set without a bond hearing, and denying Petitioner's Motion for immediate release on own recognizance or alternative confinement such as house arrest. *See Pugh v. Rainwater,* 557 F. 2d 1189, 1190 (5th Cir. 1977); *O'Donnell v. Harris County, Texas,* 2017 W.L. 1735456 (S.D. Texas April 28, 2017); *State v. Brown,* 338 P. 3d 1276, 1292 (N.M. 2014); *United States v. Leathers,* 412 F. 2d 169, 171 (D.C. Cir. 1969) (Transcript of Proceedings 4/2-3/2020 pages 6-11). The State used an excessive bond and revocation order as a proxy for pre-trial detention;

d.  Violation of his Fourteenth Amendment right and *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015), where vital evidence, especially exculpatory evidence (i.e. Mario Herrera audio recording #2, entire Herrera file, and Petitioner's client files), on his laptops, hard drives and USB drives were withheld from him denying him a meaningful opportunity to be heard and present the evidence, the right to confront and cross examine witnesses with the evidence, the right to make meaningful arguments in his defense, and that the State failed to prove by a preponderance of evidence the commission of a crime;

e.  Violations of Petitioner's Sixth and Fourteenth Amendment rights and right to a fair trial necessitating the Trial Court's granting of hybrid representation but not granting release on own recognizance or house arrest to sufficiently prepare for trial given the undisputed complexities and volume of witnesses in the case *sub judice. Stack v. Boyle,* 342 U.S 1 (1951). (Transcript of Proceedings 4/2-3/2020 page 223-226, Exhibits 2 & 3) (*See* Exhibit B - Motion for Hybrid Representation and its Exhibits, Transcript of the Ex Parte Proceedings 10/5/2020 pages 3 - 21).

f.  The Trial Court's denial of Petitioner's right to be present and give argument in a hearing in support of his Motion to Review, despite Petitioner's status under hybrid representation as "co-counsel" to participate in his defense, wherein the Court consolidated the three (3) cases, in violation of the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment and his First Amendment and Sixth Amendment, as well as his right to the unhampered preparation of defense. *Stack v. Boyle*, 342 U.S 1 (1951); *State v. Burgins*, 464 S.W. 3d 298, 310-311 (Tenn. 2015); *Faretta v. California*, 422 U.S 806, 816 1975, *citing Snyder v. Massachusetts,* 291 U.S. 97 (1934); *Winburn v. Nagy*, 956 F. 3d 909 (6th Circuit 2020); *Lewis v. Casey*, 518 U.S. 343 (1996) (Exhibit A - Sumner County Criminal Court Docket Sheets)

g. The Trial Courts denial of Petitioner's right to introduce evidence at a hearing in support of his Motion to Review, withheld by the State at the revocation hearing, and to make meaningful argument on the same in violation of First and Sixth Amendments and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. This included the documents listed in the Trial Courts Order of December 18, 2020 that it claimed had never been introduced into evidence and would not be considered. These documents were attached to his original Motion to Review in the Trial Court as exhibits. The State Courts through their Orders have created a temporary, if not permanent, ban on Petitioner's right to seek redress in this Court by not allowing permitting Petitioner a meaningful opportunity to exhaust his State Court remedies. *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015).[4] *Winburn v. Nagy*, 956 F. 3d 909 (6th Circuit 2020); *Lewis v. Casey*, 518 U.S. 343 (1996).

h. Violation of due process and equal protection under the Fourteenth Amendment by failing to show that **non-financial conditions** of release could reasonably assure the safety of the community and Petitioner's appearance at trial. And further that, that Petitioner posed an immitigable risk of flight or danger to the public that outweighs his liberty interest in continued pre-trial release and not implementing these non-financial conditions. *U.S. v. Salerno*, 481 U.S. 739 (1987); *Riggins v. Nevada,* 504 U.S. 127, 135 (1992); *Morrissey v. Brewer,* 408 U.S. 471 (1972); *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015).

i. The State's denial of Petitioner's right to file motions and pleadings in either court Pro Se or under hybrid representation that was granted to alleviate the continuing violation of his Sixth Amendment. This prohibition has created a temporary, if not permanent, ban on Petitioners right to seek redress in this Court violating his First Amendment, Sixth Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Winburn v. Nagy*, 956 F. 3d 909 (6th Circuit 2020); *Lewis v. Casey*, 518 U.S. 343 (1996).

j. The State's violation of Petitioner's due process requiring an inquiry into the arrestee's ability to pay and consideration of alternative conditions of release, including express findings on the record why he does not qualify for non-financial alternative conditions for release. *Hill* at 24: *citing Caliste v. Cantrell*, 329 F. Sup. 3d 296, 314-315 (E. D. LA. 2018).

---

[4] Petitioner was prepared to introduce into evidence, client and government records, at a hearing in support of paragraphs 51 (a) and (c), 53, 54, 55, 56 57 and 58 of Petitioner's Motion to Review in the Trial Court and Paragraphs 79, 82-91, 111 of this petition *sub judice* that were withheld from Petitioner by the State  and the continued violation of his Sixth Amendment to the United States Constitution. The Court can consider documentary evidence which may not meet evidentiary requirement applicable to criminal trials. *State v. Wade*, 863 S.W. 2d 406, 409 (1993); *citing Morrissey v. Brewer*, 408 U.S. 471 at 489 (1972). Reliable hearsay is admissible. *State v. Burgins*, 464 S.W. 3d 298, 310-311 (Tenn. 2015).

k. The case *sub judice* has now been continued to November 1, 2021.

17. In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. *United States v. Salerno,* 481 US 739,750 (1987).

18. It is the well settled law of the Supreme Court that an Order resulting in pre-trial detention must meet exacting procedural and substantive restrictions grounded in our Constitution. *United States v. Mantecon-Zayas*, 949 F 2d 548,550 (1st Circuit 1991), *See United States v. Salerno*, 481 US 739,750 (1987).

19. When the State creates the liberty interest, the Due Process Clause requires fair procedures for its vindication and Federal Courts will review the application of these constitutionally necessary procedures. *Warthout v. Cook*, 562 U.S. 216, 220 (2011); *See Lack v. Romano*, 471 U.S. 606, 610 (1985).

### IV. The State's definition and application of hybrid representation is vague, unprecedented, and arbitrary, and denies the Petitioner the ability to protect his constitutional rights specifically his right to equal protection and due process under the Fourteenth Amendment and his Sixth Amendment right when the State unreasonably restricted use of hybrid representation without notice or a hearing.

20. The State's position denying Petitioner's Tenn. R. App. 8 Motion is based upon a theory that Petitioner failed to comply with Tenn. R. App. 8(a) because he failed to file the requisite Motion to Review in the Trial Court. The State is not arguing that a Motion to Review was not filed, but that Petitioner was not allowed to file such motion in the Trial Court under hybrid representation. The Court of Criminal Appeals also held that Petitioner is prohibited from filing his Tenn. R. App. 8 Motion in the Court of Criminal Appeals since it erroneously believes he is represented by Counsel and hybrid representation does not apply.

12

21. The State's position is premised upon the Trial Court's language, in its Order of December 18, 2020, "the granting of hybrid representation makes no allowances for the Defendant to file **ANY** motions or other pleadings before this court". The Trial Court, however, did not set such a restriction in its original Order, or Amended Order, granting hybrid representation. The reasoning for this is based upon the Trial Court's finding of a violation of petitioner's Sixth Amendment. (Transcript of the Ex Parte Proceedings 10/5/2020 pages 3-21). Petitioner's hybrid representation and Sixth Amendment rights are so interwoven that the Federal law holding is integral to the State's disposition of the issue. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1986).

22. The granting of hybrid representation should be exercised only in exceptional circumstances. *State v. Burkhart,* 638 S.W. 2d at 359*; State v. Franklin,* 714 S.W. 2d 252 (Tenn. 1986) "What constitutes exceptional circumstances cannot be defined; they must be determined on a case by case basis." *Id.* Hybrid representation is defined as "simultaneous representation by counsel and Pro Se." *State v. Franklin*, 714 S.W. 2d at 259. While the granting of hybrid representation is a matter of grace from the Court, the Court exists to protect the constitutional rights of those who appear before it. *State v. Franklin* ,714 S.W. 2d at 261: *citing Botempo v. Fenton*, 692 F. 2d 954, 958 (3rd Cir. 1982).

23. However, Petitioner filed, himself and over his own signature, a Motion for Ex Parte Status Conference and for hybrid representation raising Sixth Amendment issues at the Trial Court level. The Trial Court granted hybrid representation specifically ordering that Petitioner "be granted the right of hybrid representation for co-counsel participation in his defense." (Exhibit B-Trial Court's Order granting hybrid representation). Subsequently, Petitioner filed yet another pretrial motion, himself and over his own signature, to alter or amend the order granting hybrid representation to correctly reflect the Trial Court granted such pursuant to *State v. Franklin,* 714

13

S.W. 2d 252 (Tenn. 1986), and the five factor test enunciated therein. The Trial Court granted all three of these motions without ever taking the position the Petitioner was not allowed to file them.

24. Additionally, on October 30, 2020, the State filed a motion to reconsider hybrid representation arguing that Petitioner should only be allowed to participate for a limited purpose at the trial of this case and that the Trial Court's grant of hybrid representation was an illegal expansion of the doctrine. (Exhibit B - State's Motion to Reconsider). Petitioner researched, drafted, and filed a memorandum of law, himself and over his own signature, in opposition to the motion to reconsider. (Exhibit B – Petitioner's Response to Motion to Reconsider) Petitioner argued that the right to a defense belongs to the defendant and a lawyer is there to assist in making that defense. *State v. Franklin*, 714 S.W. 2d 252 (Tenn. 1986). Petitioner gave oral arguments at the hearings of all four (4) motions without objection from the Trial Court and prevailed on all motions.

25. Under hybrid representation the defendant has the right to examine and cross examine witnesses, make an unsworn statement on evidence presented to the jury, present arguments in his own behalf **"or otherwise participate in his defense"** along with his counsel. *State v. Franklin*. 714 S.W. 2d 252, 259 (Tenn. 1986) (Quoting *State v. Whitlow*, 510 P. 2d 1354 (1973); *State v. Burkhart*, 541 S.W. 2d 365, 368, 370 (Tenn. 1976); See also *McKaskle v. Wiggins*, 104 S. Ct. 944, 953; *State v. Melson*, 638 S.W. 2d 342, 359 (Tenn. 1982); *People v. Rodriguez*, 470 N.Y. 2d 64,66-67 (1983); *People v. Hazen*, 463 N.Y.S. 2d 657, 660 (1983). All of these pre-trial motions and pleadings were filed by the Petitioner and not "through" counsel. At no time did the Trial Court raise the issue of the Petitioner not being allowed to file these pleadings or give oral arguments.

14

26. The Trial Court, in its order of December 18, 2020, takes the position for the first time that the Defendant is not allowed to file pre-trial motions or pleadings. As has been shown above, there is no factual basis for this position nor offer of any legal authority. This ties the Petitioner's hands to be able to ensure he receives a fair trial and adequate representation after the Trial Court has already found the violation of his Sixth Amendment warranting post-conviction relief. The State's stripping Petitioner of the very means it gave him to protect his Sixth Amendment right was arbitrary, unprecedented, and manifestly unfair making it inadequate and reviewable by the Federal Court. *Judd v. Haley,* 250 F. 3d 1308, 1313 (11th Cir. 2001); *Card v. Duggin,* 911 F. 2d 1494, 1517 (11th Cir. 1990) (Transcript of the Ex Parte Proceedings 10/5/2020 pages 3 – 21).

27. As is clearly set out in the transcripts of the In-Court Proceedings and Ex Parte Proceedings from October 5, 2020, filed with this Court, Defendant's Sixth Amendment is in peril because Counsel, Gary Copas, is unable to effectively communicate with Petitioner, prepare and file pre-trial pleadings to protect his rights and unable to fully prepare for trial. It is undisputed that this is a complex case with volumes of documentation and over 50 witnesses. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits). At this juncture, denying Petitioner the ability to participate in his defense clearly violates the Petitioner's Sixth Amendment right and denies him equal protection and due process under the Fourteenth Amendment.

28. The Trial Court expressly found Petitioner was not seeking to disrupt the proceedings with his Motion for Hybrid Representation (Transcript of In-Court Proceedings 10/5/20 page 9). Once the Trial Court affirmatively found this, Petitioner's Sixth Amendment right and liberty interest took precedent. These two things are intertwined ensuring he has the opportunity to an

unhampered preparation of a defense leading to a fair trial, not just fair trial. *Stack v. Boyle,* 342 U.S. 1,4,8 (1951); *State v. Franklin* 714 S.W. 2d 252 (Tenn. 1986).

29. Petitioner filed his Motion to Review in the Court of Criminal Appeals pursuant to Tenn. R. App. 8 on February 22, 2021. The Appellate Court entered an order on February 26, 2021 finding that the Petitioner was pursuing this review "Pro Se." (Exhibit J - Order of the Court of Criminal Appeals February 26, 2021.)

30. The cases relied upon by both sides so far are factually specific to a defendant requesting participation at trial to protect their constitutional rights by giving a closing statement. That was their choice, there is no indication that these defendants' Sixth Amendment right was being violated continually for almost a year prior to trial. The Petitioner's has and the first *voir dire* question has yet to be asked. Implicit in the rulings were the trial courts' case by case analysis for the protection of each defendant's rights.

31. Hybrid representation is given as a matter of grace by the trial court to protect a defendant's constitutional rights in exceptional circumstances as justice so requires. Hybrid representation is not to be given for this particular task or that particular task, but to allow a defendant to "otherwise participate" in his defense and help cure whatever constitutional defects may exist once he has met the five factors in *State v Franklin,* 714 S.W. 2d 252 (Tenn. 1986). Petitioner has satisfied these five factors.

32. Habeas Corpus is warranted when the State Courts themselves have violated Petitioner's Constitutional rights by banning him from filing pre-trial motions and pleadings and refusing him a hearing on his Motion to Review where he could offer evidence in support thereof that had been withheld from him during the bond revocation hearing by the State. This created a

16

temporary, if not permanent, ban on Petitioner's right to seek redress in this Court given the State Court remedy exhaustion requirement. *Winburn v. Nagy*, 956 F. 3d 909 (6th Circuit 2020); *Lewis v. Casey*, 518 U.S. 343 (1996). Petitioner has lost, and continues to lose, the opportunity for an unhampered preparation of his defense in violation of the Sixth Amendment and Fourteenth Amendment to The United States Constitution. A subsequent fair trial, or even a series of them, would not necessarily revive the lost opportunities. *Turner v. State*, 858 S. 2d 201, 208 (Sixth Circuit 1988). A subsequent fair trial and conviction does not remedy this deprivation. *Rose v. Mitchell*, 443 U.S. 545, 561 (1979); *State v, Kraus*, 397 N.S. 2d 671, 674 (Iowa 1986); *Accord United States XEX Rel Caruso v. Zelinsky*, 689 F. 2d 435, 438 (Third Circuit 1982).

### V. The State's withholding of vital and exculpatory evidence, Mr. Herrera's entire client file and audio recording #2, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015), denied Petitioner due process and equal protection under the Fourteenth Amendment of the United States Constitution , the ability to meet the case against him, and resulted in the Court's revocation of bond, a deprivation of Petitioner's liberty.

33. At the time of the revocation hearing the State was in possession of documents pertaining to the case of Mario Herrera which the T.B.I. had seized from the Petitioner's home and audio recordings of conversations between Petitioner and Mr. Herrera which the Tennessee Bureau of Investigation had obtained from Mr. Herrera. The State did not provide Petitioner with this exculpatory evidence despite knowing it was in possession of the same. This evidence shows legal work performed by Petitioner on behalf of Mario Herrera up to December 2014 and Mr. Herrera's agreement that he owed money to Petitioner for legal services. Petitioner performed domestic relations legal services for Mr. Herrera and was paid a fee in January 2015. The State alleges this was theft. (Transcript of Proceedings 4/2-3/2020 pages 6-11, 119,121,130-131, 145, 151-156; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows:

Declaration of Gary Copas paragraphs 19,20,21 Exhibit 1; Transcript of Conversation between Petitioner and Mario Herrera audio recording #2 page 2 line 7 – line 25 Exhibit 2. This audio recording was not disclosed by the State to the Petitioner prior to the hearing. *Id* at pages 151 – 156).

34. This withholding by the State also denied Petitioner the ability to defend against adverse witnesses, make arguments, present evidence, and adequately prepare. *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015); citing *McClellan v. Board of Regents,* 921 S.W.2d 684, 688 (1966); *Memphis Light Gas and Water Division v. Craft,* 436 U.S. 1, 14 (1978).

35. The Fifth Amendment to the United States Constitution prohibits the deprivation of liberty without due process of law, be it substantive or procedural. A bond revocation denies a defendant his liberty. *Hill v. Hall*, 3:19-CV-00452 at pages 11-14 (M.D. Tenn. October 7, 2019, J. Aleta Trauger); *State v. Burgins,* 464 S.W.3d 298 (Tenn. 2015). The State never held that the Petitioner did not qualify for bond when new charges were filed, it simply set an unattainably excessive bond holding petitioner until the State could revoke his bond. The State had ample opportunity to return Petitioner's material prior to the deprivation of his liberty.

36. An arrestee's liberty interest may rise from the Due Process Clause itself and the laws of the State. *Hill* at page 14; *citing Fields v. Henry County*, 701 F.3d 180, 185 (6th Cir. 2012). At its essence, procedural due process requires a defendant have the opportunity to meet the case against him. *Hill* at page 14; *citing Shumaker v. City of Harwell,* 795 F.3d 553,559 (6th Cir. 2015). Substantive due process, however, protects the defendant from deprivation of liberty, regardless of the adequacies of the procedures used. *Hill* at page 15; *citing Inre City of Detroit,* 841 F.3d 684, 699 (6th Cir. 2016). Government action that burdens the exercise of defendant's

liberty is subject to strict scrutiny and will only be upheld if it is narrowly tailored to a compelling governmental interest. *Does v. Munoz*, 507 F. 3d 961, 964 (6th Cir. 2007); *Plyer v. Doe*, 457 U.S. 202.

37. *Brady v. Maryland*, 373 U.S. 83 (1963) is in place to prevent a defendant from being denied his liberty without due process. *State v. Burgins*, 464 S.W. 3d 298, (Tenn. 2015) also makes clear that the State cannot infringe upon the liberty interest without providing an opportunity to be heard at a meaningful time and in a meaningful manner. *Burgins citing State v. AAA Aaron's Action Agency Bail Bonds*, 993 S.W. 2d 81, 85 (Tenn. Crim. App. 1998); *Fields v. Henry County, Tennessee*, 701 F. 3d 180, 185 (Sixth Cir. 2012). This includes providing an effective opportunity to be heard, defend against any adverse witnesses, make arguments, and present evidence; in other words a meaningful opportunity to meet the case against him. *Burgins citing Inre*; *BGJ*, 215 S.W. 3d 396, 399 (Tenn. 2006) (quoting *Goldberg v. Kelly*, 397 U.S. 354, 267 (1970).

38. Furthermore, *Brady* material need not be admissible nor material to constitute a violation. *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F. 3d 263, 278 (3d Cir. 2016); *Harrington v. Richter*, 562 U.S. 86 (2011). To be considered *Brady* material, the withheld evidence must be:

> 1. Favorable to the accused because it is either favorable or impeaching;

> 2. Suppressed by the State willfully or inadvertently; and,

> 3. Material such that the prejudice occurred. *Dennis* at 284-285

39. In this context, materiality is simply "the reasonable probability 'of a different result'". Materiality does **not require** demonstration by a preponderance of the evidence that disclosure of withheld evidence would have resulted in a different outcome. *Id.*; *United States v. Bagley*, 473 U.S. 667, 676 (1985); *United States v. Agurs*, 427 U.S. 97 (1976); *Moore v. Illinois*, 408 U.S. 786 (1976); *Giglio v. United States*, 405 U.S. 150 (1972); *Giles v. Maryland*, 386 U.S. 66 (1967).

40. *Brady v. Maryland*, 373 U.S. 83 (1963) applies to collateral reviews of judgments or orders in post revocation proceedings that have deprived a defendant of his liberty. *United States v. Garrett*, 238 F. 3d 293,302 (5th Cir. 2000) Cert. denied 533 U.S. 917 (2001). The purpose of Brady is to make certain that a defendant will not be denied access to evidence which would ensure a fair trial. *Wilson v. Beard*, 589 F. 3d 651, 659 (3rd Cir. 2009). Revocation hearings depriving one of liberty involve significant values within the protection of the due process clause of the Fourteenth Amendment. *Morrissey v. Brewer*, 408 U.S. 471, 480-482 (1972).

41. The State bears a burden to structure a fair trial or hearing for defendants which demands the state to freely disclose material helpful to the defense. *Dennis* 834 F. 3d at 306 (3rd Cir. 2016); *citing Brady v. Maryland*, 373 U.S. at 87-88 (1963). The State has a duty to disclose favorable evidence that would impeach a government witness. *Giglio v. United States*, 405 U.S. 150 (1972). A prosecution that "withholds evidence" which might exculpate a defendant, impeach a government witness, or reduce the penalty shapes the trial or hearing that deprives one of liberty. *Brady* at 87-88. Doing so establishes a prosecutor as the architect of a proceeding violative of due process even if his/her actions are not "the result of guile." *Id.*

20

42. Exculpatory evidence need not show innocence conclusively but merely goes to the heart of a defendant's guilt or innocence as well as **maybe altering the factfinder's judgement of the credibility of a crucial prosecution witness.** *United States v. Starusko*, 729 F. 2d 256, 260 (3d Cir. 1984); *citing Giglio v. United States*, 405 U.S. 150, 154 (1972). Withholding exculpatory evidence leaves a defendant powerless to cross examine. *Dennis* at 293 – 294; *Kyles v. Whitley*, 514 U.S. 419, 445 (1995).

### A. The State failed to prove by a preponderance of the evidence theft pursuant to T.C.A. 39-14-13

43. The Trial Court revoked Defendant's bond even though it had heard no evidence as to the work done by Petitioner but stated: "and there's no way any fee for what he did would amount to the $59,000 he took". Petitioner was paid a fee from his trust account of $54,269.03 on December 15, 2014. (Transcript of Proceedings 4/2 - 4/3/2020 page 241 line 9 -10, Exhibit C – Petitioner's Motion to Review and it's attached exhibits as follows: Herrera Fee Check Exhibit 3).

44. Petitioner handled Mr. Herrera's divorce issues, real property and tool issues, child support and visitation issues. (Transcript of Proceedings 4/2 – 3/2020 pages 120 – 121, 134 – 135) An Agreed Final Order was entered December 12, 2014 in the divorce court resolving all issues between Mr. Herrera and his ex-wife to that point. (Exhibit C- Petitioner's Motion to Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

45. Mr. Herrera agreed with all of the terms of this Agreed Final Order including the disbursement by the Clerk and Master to Petitioner and Mr. Herrera the sales proceeds from the sale of the marital residence to pay Petitioner for the legal services he rendered to Herrera.

(Transcript of Proceedings 4/2 – 3/2020 pages 136, 138-139, 144-145; Exhibit C -Petitioner's Motion to Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

46. The State held in its possession the entire Herrera file and audio recordings of conversations between Petitioner and Mario Herrera wherein he, Herrera, acknowledges owing money for services rendered but that he, Herrera, didn't think that much work had been done. (Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Declaration of Gary Copas paragraphs 19, 20, 21 Exhibit 1; Transcript of Conversations between Petitioner and Mario Herrera audio recording #2 page 4 line 8 – page 6 line 13 Exhibit 2. This audio recording was not disclosed by the State to the Petitioner prior to the revocation hearing. Transcript of Proceedings 4/2-3/2020 page 151- 156).

47. Mr. Herrera testified he understood money would be dispersed by the Clerk & Master when this Agreed Final Order was entered (Transcript of Proceedings 4/2 – 3/2020 page 139) and, further, that the money for Petitioner's services would come from the sale proceeds of the marital residence, *to wit*:

Q: Well, I mean, there was a discussion that he was going to prepare a bill, was there any - - any statements made for what the bill would be for?

A: He mentioned for him being my lawyer all this time.

Q: All the time that he had been your lawyer that is what the bill would be for?

A: Yes

Q: Okay

A: Him being my lawyer

22

Q: Correct. When - - at the time he said he'd prepare a bill, was there any - - and again, you said you didn't - - you couldn't afford an attorney previously. Was there any discussion as to how that bill would be paid?

A: That's when he mentioned Mr. Powers that he was going to get Mr. Powers the bill. That way it comes off that amount of money.

Q: Okay. So your understanding was the bill would be paid off of the sales money, but you would have to go through Mr. Powers to do it? That's your understanding?

A: Yes.

(Transcript of Proceedings 4/2 – 3/2020 page 144 -145).

It is important to note that Petitioner continued doing work for Mr. Herrera between January 2015 and September 2016 and Herrera admits that Petitioner told him that he, Petitioner, would have to prepare a bill to send to the receiver (Transcript of Proceedings 4/2 – 3/2020 page 144 - 145). Russ Willis testified that if a client called Petitioner during his suspension, it was not improper for Petitioner to say the receiver had to be contacted. (Transcript of Proceedings 4/2-3/2020 page 73).

48. The State has failed to prove by a preponderance of the evidence, pursuant to *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015), theft pursuant to T.C.A. 39-14-103. The uncontradicted evidence, including the exculpatory audio recordings and case file of Mr. Herrera withheld from Petitioner prior to the hearing, shows:

      a. Petitioner performed legal services for Mr. Herrera prior to his suspension and Mr. Herrera was satisfied with the results; (Transcript of Proceedings 4/2-3/2020 Pages 120 – 121, 134 – 135, 233).

23

b. An Agreed Final Order was filed in his domestic relations case, the terms of which he agreed to; (Transcript of Proceedings 4/2-3/2020 page 136; Exhibit C -Petitioner's Motion for Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

c. This Order set forth that proceeds from the sale of the marital residence, held by the Clerk and Master, would be disbursed to Petitioner and Mr. Herrera to meet his legal fees; (Transcript of Proceedings 4/2-3/2020 pages 144 – 145; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

d. The Clerk disbursed the check to Petitioner and Mr. Herrera pursuant to the Agreed Final Order that was then deposited into Petitioner's trust account from which he was paid; (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Herrera Fee Check Exhibit 3).

e. Mr. Herrera admits he owed Petitioner for his services, but now some four (4) years later, and just after he received a letter from the State alleging he owed over $21,000 in back child support, didn't think that much work had been done. At most, the State has produced by a preponderance of the evidence a fee dispute. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #2 page 4 line 8 – page 6 line 13 Exhibit 2. This audio recording was not disclosed by the State to the Petitioner prior to the revocation hearing; Transcript of Proceedings 4/2-3/2020 pages 144 -145, 151–156, 177-178).

49. T.C.A. 39-14-103 defines theft as: "A person commits theft of property if, with the intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property **without the owner's effective consent**." (emphasis added)

50. Mr. Herrera attempted to testify that all the work done by Petitioner prior to September 16, 2016 was free. Under cross-examination he admitted it wasn't, *to wit;*

Q: Was there any other – – did anybody else – – – you're saying his mother said it would be free. Did Mr. Allman ever say it would be free?

A: No. They never said it was free, no, sir, but she was saying, you know he would help me out. (Transcript of Proceedings 4/2 – 3/2020 pages 151 - 156; Exhibit C - Petitioner's

24

Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #2 page 4 line 8 – page 5 line 24 Exhibit 2. This audio recording was not disclosed by the State to the Petitioner prior to the hearing. Transcript of Proceedings 4/2 – 3/2020 pages 151 - 156)

51. Tennessee Bureau of Investigation agent Gray testified that the check made out to Petitioner and Mr. Herrera from the Clerk and Master of Sumner County was deposited into Petitioner's trust account. (Transcript of Proceedings 4/2 – 3/2020 pages 181 – 182).

### B. The State failed to prove by a preponderance of the evidence Petitioner represented himself as a lawyer pursuant to T.C.A. 23-10-108

52. The State further alleges that Petitioner's communications with Mr. Herrera after September 2016 constitutes a violation of TCA 23-3-108, representing himself as a lawyer. The State was in possession of audio recordings between Petitioner and Mario Herrera, that took place **prior to Petitioner's indictment**, wherein he, Herrera, states:

**"…. if you are a lawyer, which now you're not…"**

(Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 14 line 23 - 24 Exhibit 5).

53. Mr. Herrera acknowledges being told by Petitioner about his suspension and receivership. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 5 lines 6 – 10, page 13 lines 17 – 24 Exhibit 5).

54. Tennessee Bureau of Investigation agent, Reilly Gray, testified at the revocation hearing that charges were brought against Petitioner for unlawfully and falsely holding himself out to be a lawyer to Mario Herrera in violation of T.C.A. 23-3-108 because Petitioner had been in communication with Mario Herrera and that Petitioner was not supposed to have any communications with his clients at all after his suspension in September 2016 from the practice of law. (Transcript of Proceedings 4/2-3/2020 pages 204 - 205).

55. This is clearly contradicted by the direct instructions of Russ Willis, Disciplinary Counsel for the Tennessee Board of Professional Responsibility, given in October 2016 that if Petitioner did not communicate with his clients after his suspension and give them whatever information they needed that Petitioner would be subject to further disciplinary actions. Will Hawkins testified by affidavit that he was Petitioner's attorney in the fall of 2016 and had continuous contact with Russ Willis while handling the Board matters for the Petitioner and more specifically that:

> On or about October 6, 2016, Mr. Willis told me that many of Mr. Allman's clients were contacting him (Mr. Willis), and that he (Mr. Willis) was telling them to call Mr. Allman. Mr. Willis explained that, after the clients would not be able to reach Mr. Allman, they would call Mr. Willis again. Mr. Willis asked me to tell Mr. Allman to talk to his clients, calm them down, and give them the information they needed. Mr. Willis stated that, if Mr. Allman did not talk to his clients, more investigations would be opened against him. I advised Mr. Allman of Mr. Willis's instructions on October 6, 2018.[5]

(Transcript of Proceedings 4/2-3/2020 page 91; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Affidavit of Will Hawkins paragraph 1-3 Exhibit 6).

---

[5] Paragraph 10 states that Mr. Hawkins informed Petitioner of this on October 6, 2018. This is in error in that Mr. Hawkins informed Petitioner of this on October 6, 2016, the same day Mr. Willis communicated it to him. Furthermore, Mr. Hawkins had withdrawn from the representation of the Petitioner by January 2017. (Transcript of Criminal Contempt Proceedings 8/8/2018 pages 20-26, Exhibit 7)

Russ Willis testified at the Criminal Contempt Hearing that Mr. Hawkins' affidavit was accurate. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/18 pages 9-10, 21-26 Exhibit 7).

56. Furthermore, on January 4, 2017, a receivership for Petitioner's law practice was put into place by the Sumner County Chancery Court. At the hearing the Receiver testified that he had a conflict which negated his ability to initiate or participate in the entering of attorney-client agreements for substitute counsel since Petitioner would be owed fees at the resolution of his clients' cases that received settlement or verdict. Furthermore, according to the testimony of the Receiver and the Petitioner, the Receiver was sending every client of Petitioner a letter informing them of the receivership and why it was necessary, and that Petitioner would need to keep the Receiver apprised of who had retained counsel and who had not. Both of these issues required ongoing direct contact between Petitioner and his clients. Russ Willis, attorney for the Board of Professional Responsibility, was present and did not object. Russ Willis did testify at the April 2nd and 3rd revocation hearing that the Petitioner had made the good faith effort to contact all of his clients of the suspension as required by the suspension order. The Chancery Court also ordered the Receiver to **"notify all clients represented by attorney Andy L. Allman of the appointment of the Receiver attorney."** (Emphasis added) (Transcript of Proceedings 4/2-3/2020 pages 51,73-74; Exhibit C - Petitioner's Motion Review and it's attached exhibits as follows: Transcript of Receivership Proceedings 1/4/2017, Pages 2, 6-8, 15-16 Exhibit 8; Affidavit of Will Hawkins paragraphs 1-10 Exhibit 6; Order for Appointment of Receiver Attorney Exhibit 9).

57. Also found in the transcripts of the audio recordings, Petitioner had the following exchange with Mr. Herrera:

Mario: Well, yesterday I was driving. I didn't pay too much attention to what you told me. But you told me my petition, what? What happened with my – – yesterday.

Andy: No, nothing. I said I was sending Patrick up there to look at the file and get copies of the **appeal you sent in** and asked them what the next steps are to get this rolling. (Emphasis added)

Mario: Okay.

Andy: But I just tried to call Patrick not 10 minutes ago and I left him a voicemail to call me.

(Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 2 line 21 – page 3 line 4 Exhibit 5).

58. On the recording, Petitioner informs Mr. Herrera that he, Petitioner, was going to send Mr. Parker to go and look at Mr. Herrera's child support file and get copies of the appeal Mr. Herrera sent in and find out the next steps. (Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 2 line 21- page 3 line 4 Exhibit 5).

59. Agent Gray testified that the text messages between Petitioner and Mario Herrera constituted holding himself out as a lawyer. These text messages show Petitioner gathering documents to assist Patrick Parker and prepare time slips for work Petitioner performed between January 2015 and September 2016 to prepare a bill. (Transcript of Proceedings 4/2 – 3/2020 pages 144-145, 200 – 203; Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows:

Transcript of Conversation between Petitioner and Mario Herrera audio recording #2 page 2 line 6 – line 25, page 4 line 8 – 16 Exhibit # 2. This audio recording was not disclosed by the State to the Petitioner prior to the hearing. Transcript of Proceedings 4/2 – 3/2020 pages 151 – 156).

60. T.C.A. 23-3-108 defines falsely representing self as a lawyer as "it is unlawful for any person, either directly or indirectly, falsely to advertise the person as, or hold the person out as, a lawyer."

61. Clearly Petitioner had not performed any legal services for Herrera during his suspension, was reaching out to engage Patrick Parker to handle, and Herrera knew Mr. Parker was an attorney who worked for Petitioner. (Transcript of Proceedings 4/2 – 3/2020 page 142-143, 204; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 2 line 21 – page 3 line 4, page 14 line 17 – page 15 line 21 Exhibit 5).

62. In view of the foregoing, Petitioner has been denied disclosure of evidence, especially exculpatory evidence, a meaningful opportunity to be heard and present this evidence, the right to confront and cross exam witnesses, and the right to make meaningful arguments in his defense in violation of *State v. Burgins,* 464 S.W.3d 298 310-311 (Tenn. 2015).

63. The State failed to prove by a preponderance of the evidence, under *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015), that the Petitioner held himself out as a lawyer to Mr. Herrera or communicated with him about his case in violation of T.C.A. 23-1-108. The uncontradicted proof is that Petitioner was communicating with his clients at the direction of Russ Willis with the Board of Professional Responsibility under the threat of more disciplinary action being taken against him if he did not and that the Petitioner provided no legal services to

29

Herrera after his suspension. Mr. Herrera acknowledges on the recording that Petitioner told him of the suspension, and further, the Receiver was ordered by the Chancery Court to notify all of Petitioner's clients about the Receivership and why it was necessary.

### VI. Even if the State had proven the commission of a crime by a preponderance of the evidence, due process and equal protection requires release on own recognizance, or house arrest, pursuant to the analysis under *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015),  T.C.A 40-11-115, T.C.A. 40 – 11-116 and T.C.A. 40 – 11- 118.

64. **Bail revocation implicates substantial liberty interest** protected under the Fourteenth Amendment and article I, section 8 of the Tennessee Constitution. *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015); *Morrissey v. Brewer*, 408 U.S. 471 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973). A liberty interest rises to this level when a person, once deprived of that interest, will be "condemned to suffer grievous loss." *Burgins citing Morrisey,* 408 U.S. at 481.

65. The question is not merely the 'weight' of the persons interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Id.* The liberty interest of a defendant in **continued pre-trial release** includes "many of the core values of unqualified liberty and it's termination inflicts 'grievous loss' on the [Defendant] and often on others." *See id* at 482. (Emphasis added)

66. Even if the State had proven its case by a preponderance of the evidence, the Trial Court should have implemented non-financial alternatives pursuant to T.C.A. 40-11-115, 40 – 11-116 and 40 – 11- 118 such as release on own recognizance, house arrest, into the care of some qualified person or organization, or imposing reasonable restrictions on activities, movements, associations and/or residences of Petitioner as it did in granting Petitioner's furloughs. *State v. Burgins,* 464 S.W. 3d 298 310-311 (Tenn. 2015).

67. Under the United States Constitution, a State may detain a person prior to trial only if after robust procedures, it finds that the defendant poses severe risk to the public or the risk of flight cannot be mitigated with less restrictive alternatives. *United States v. Salerno*, 481 US 739,750 (1987) The least restrictive conditions of release should be set to protect both a defendant's fundamental liberty interest and State's interest in assuring his presence at court and protecting the public safety. *Hill* at 8. There is simply no evidence Petitioner poses a flight risk or severe risk to the public.

68. If the State's position is that pre-trial release is not an option because the Petitioner is too dangerous or is a risk of flight, it must satisfy this Court that no condition, or combination of conditions, could possibly assure his appearance at trial or the safety of the public. *Salerno* 481 US 750. A combination of conditions includes GPS monitoring device, reporting to Community Corrections, house arrest, orders preventing contact with persons, no use of phone, etc. as used during Petitioner's previous furloughs. There is simply no showing that Petitioner poses a severe risk of threat to the safety of individuals or the community or is a risk of flight that no condition of relief can dispel. *Salerno* at 755.

**VII.  The Trial Court's use of the conditional pleas, restitution schedules and, criminal contempt proceedings from the Tennessee Board of Professional Responsibility, along with the State's withholding of vital and exculpatory evidence, Petitioner's laptops, hard drives and USB drives, in violation of *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015) and *Brady v. Maryland,* 373 U.S. 83 (1963) denied Petitioner due process and equal protection under the Fourteenth Amendment of the United States Constitution and thus deprived him of his liberty.**

69. The Trial Court also used the criminal contempt proceedings, i.e. criminal charges, filed against Petitioner by the Tennessee Board of Professional Responsibility to revoke bond. (Transcript of Proceedings 4/2 – 3/2020 pages 239 – 240).  The State was in possession of

Petitioner's laptops, hard drives, and USB drives during the revocation hearing that they did not provide to Petitioner prior to the revocation hearing. These items contain material cited to in this Section VII, such as: Alex Little letter to Sandy Garrett, Special Master's Report, emails between Special Master and Gary Blackburn, response of the Tennessee Board of Professional Responsibility to Special Master's Report, Petitioner's client files, and transcripts of the criminal contempt proceedings. (Exhibit E – Receipt of Tennessee Bureau of Investigation of seized property)

70. On July 17, 2017, the Tennessee Board of Professional Responsibility filed petitions for criminal contempt against Petitioner. The Board's petition included criminal charges alleging Petitioner "willfully, knowingly and intentionally held himself out as an attorney to the public, engaged in unauthorized practice of law, failed to notify his clients of his suspension, and failed to return unearned fees" (i.e. theft of retainer fees). The Board amended its petition in October 2017. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Special Master's Report and emails between Gary Blackburn and the Special Master Exhibit 10).

71. On January 22, 2018, the Board tried Petitioner in front of Special Master Matt Sweeney *in absentia* of Petitioner and his Counsel violating Petitioner's clearly established due process right to be present at his own trial and his duly established Sixth Amendment right through the Fourteenth Amendment that in all "criminal prosecutions, the accused shall have a right… to be confronted with the witnesses against him". Article 1 Section 9 of the Tennessee Constitution; *State v. Muse*, 962 S.W. 2d 764 (1998); *Watson et. Al. v. State*, 61 S.W. 2d 176 (1933); *Pointer v. Texas,* 380 U.S. 400 (1965); *Boykin v. Alabama*, 365 U.S. 238 (1969). Petitioner never waived his rights. The Special Master convicted Petitioner of 139 charges of criminal conduct and sentenced him to 480 days incarceration. (Exhibit C - Petitioner's Motion for Review and it's

attached exhibits as follows: Special Master's Report and emails between Gary Blackburn and the Special Master Exhibit 10). The Trial Court relied on this in revoking Petitioner's bond. (Transcript of Proceedings 4/2 – 3/2020 page 239-240).

72. The Tennessee Supreme Court set aside this conviction finding multiple constitutional violations and ordered a new trial. On August 3, 2018, Petitioner's Counsel, Alex Little, sent a letter to Sandy Garrett, Chief Disciplinary Counsel to the Board of Professional Responsibility. Attached to the letter was a motion to disqualify Russ Willis as prosecuting attorney and the affidavit of Will Hawkins. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Alex Little letter to Sandy Garrett 8/3/18 Exhibit 11). Petitioner provided to the Board the affidavit of Will Hawkins **memorializing Mr. Willis's own statements** that if Petitioner did not communicate with his clients and give them what they wanted after he was suspended, he, Willis, would "open more investigations against him". (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/2018 pages 7 – 10, 20 – 26 Exhibit 7; Transcript of Criminal Contempt Proceedings 8/30/2018 pages 8 – 12 Exhibit 12; Affidavit of Will Hawkins Exhibit 6).

73. This letter explained in detail how the Board was seeking to:

1. Prosecute and jail Petitioner for doing what the Board had instructed him to do in relation to communication with his clients;

2. Prosecute and jail Petitioner for failing to timely notify his clients of his suspension even though Russ Willis had suspended the notice requirement under Rule 28;

33

3. Prosecute and jail Petitioner even though the communications, which were exculpatory, between Russ Willis and Will Hawkins had been destroyed by the Board of Professional Responsibility;

4. Use the criminal contempt proceeding to obtain a quick "conviction resulting in jail time for Mr. Allman.";

5. Prosecute and jail Petitioner without probable cause;

6. Prosecute and jail Petitioner based upon unsupported allegations that Petitioner failed to return unearned fees; and

7. Prosecute and jail Petitioner for willfully failing to remove indicia as an attorney while also taking the position that he could not set foot in his office and the fact that Russ Willis knew there were licensed attorneys still in the office working on cases.

(Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Alex Little letter to Sandy Garrett 8/3/18 Exhibit 11).

74. This letter concludes by informing Mrs. Garrett that if the Board did not dismiss the criminal contempt petition, Petitioner's Counsel would file:

1. A motion to recuse Russ Willis;

2. A motion to dismiss based upon entrapment, estoppel, and prosecutorial misconduct;

3. An injunction in Federal Court seeking notice of procedures;

4. A Rule 11 motion seeking attorney's fees for the frivolous charges.

(Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Alex Little letter to Sandy Garrett 8/3/18 Exhibit 11).

34

75. All criminal charges against Petitioner, with the exception of two, were dismissed, the Board citing it had no probable cause to prosecute Petitioner. Petitioner entered a no contest plea to two charges regarding Wanda Kelley and Lisa Smelser in lieu of a trial. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/2018 pages 7 – 10, 20 – 26 Exhibit 7; Transcript of Criminal Contempt Proceedings 8/30/2018 pages 8 – 12 Exhibit 12; Response of Board of Professional Responsibility to Special Masters Report Exhibit 13; Affidavit of Will Hawkins Exhibit 6).

76. The State seized from Petitioner his laptops, hard drives and USB drives containing these client records on March 9 and 10, 2020 and did not provide them to him prior to the hearing in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *State v. Burgins*, 464 S.W. 3d 298, 310-311 (Tenn. 2015) and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Trial Court's use of these proceedings from the Tennessee Board of Responsibility not only required Petitioner to prove his innocence but to do so without his evidence.

77. The State's prosecution of Petitioner under indictments 2017-CR-548 and 2017-CR-875 for willfully, knowingly, and intentionally holding himself out as an attorney to the public, theft of retainer fees and engaging in the unauthorized practice of law is for essentially the same conduct. Exhibit F – Indictments 2017-CR-548 and 2017-CR-875).

78. In addition, the Trial Court used the conditional pleas to disbarment of Petitioner along with restitution schedules prepared by the Tennessee Board of Professional Responsibility in revoking his bond. Russ Willis testified at the receivership hearing and the hearing on April 2nd and 3rd that the Board in no way made a determination as to whether a crime had been committed in

relation to the disbarment and restitution schedules. In fact, when asked by the Court at the April 2nd and 3rd hearing, Russ Willis testified not to any criminal intent on behalf of Petitioner, but that Petitioner's practice experienced such an explosive growth due to successful results that he, Petitioner, simply became overwhelmed. (Transcript of Proceedings 4/2-3/2020 pages 59-61, 67-69, 81-82, 86-88, 235-236, Exhibits 2 and 3 to the transcript; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of the Receivership Proceedings 1/4/2017 page 5 Exhibit 8).

79. The names on the restitution schedules came from the multiple disciplinary petitions filed by the Board. These petitions alleged Petitioner:

1. Willfully, willingly, and intentionally held himself out as an attorney to the public;

2. Engaged in the unauthorized practice of law;

3. Failed to notify his clients of his suspension; and

4. Failed to return unearned fees, i.e. theft of retainer fees.

(Certified copies of these petitions were filed with the Trial Court on 4/2/2020.)

80. The restitution schedules, and Russ Willis's testimony regarding the same, are neither reliable nor accurate. Mr. Willis's testimony, relied upon by the Court, was two-fold, *to wit*;

1. Clients listed on the schedules are owed the monies listed as they did not receive legal services; and

2. These clients lost their ability to bring their causes of action. (Transcript of Proceedings 4/2-3/2020 page 59, 77-87, 239 -240).

Mr. Willis had access to these clients' files. (Transcript of Proceedings 4/2-3/2020 page 72-80)

81. Based on Mr. Willis's testimony, the Trial Court revoked Petitioner's bond on the conclusion that these clients had not received legal services they had contracted for and had lost the ability to pursue their causes of action; i.e. theft of retainer fees. The Restitution Schedules list as owing the entire amount of the flat fee paid to Petitioner by each client.

82. Petitioner has attached hereto the restitution schedules with a copy of the docket sheet of the United Stated District Court for the Middle District of Tennessee attached. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Restitution Schedules and Docket Sheet Exhibit 14). The records of just the United States District Court, Middle District of Tennessee, alone show this to be inaccurate. This docket sheet shows clients whose cases were handled or pending both before and after Petitioner's suspension. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Restitution Schedules and Docket Sheet Exhibit 14).

83. Beside each client entry on the restitution schedules is a designation. (*See* Footnote 4) Those designations are as follows:

   a. A numeric value of 1 – 80 "USDC MD" is assigned to 80 clients on the restitution schedules on the right-hand side such as 1 USDC MD. That same numeric value as assigned to each client can be found on the attached docket sheet with a corresponding numeric value. For example, Melinda Murphy is given a numeric value of one (1) on the restitution schedules and her case can be found on page 18 of the docket sheet with the corresponding numerical value of one (1). Clients with a numeric value of between 1 and 80 received legal services pursuant to their Attorney-Client Contract with Petitioner and their cases had been prosecuted, or were being prosecuted, in the United States District Court. These legal services included prosecuting their charge with the EEOC and/or exhausting other administrative remedies.

   b. Some client entries have a County name on the left side of the client entry (such as "Sumner County") and a civil docket number on the right side of the entry. For example, Leslie Willis is shown as "Sumner Cty" and "2014-cv-779." This shows clients who received, or were receiving, legal services pursuant to their Attorney-

Client Contract with Petitioner and their cases were being prosecuted, or had been prosecuted, in State Court.

c. Some client entries have the acronym "EEOC" on the left side of the entry and a file number on the right side of the entry. For example, Tabitha Ellis is shown as "EEOC" and "429-2013-01443." This shows clients whose cases had been, or were being, prosecuted in the Equal Employment Opportunity Commission and they were receiving legal services pursuant to their Attorney-Client contract with Petitioner.

d. Clients Reginald Radford and Reese Bailey are designated "USDC WD KY." This shows both clients receiving legal services pursuant to their Attorney-Client Contract with Petitioner and their cases were prosecuted, or being prosecuted, in the United States District Court of Kentucky for the Western District. These services included prosecuting their claims in the EEOC.

e. Entries of "In House" signify Petitioner working within the internal Human Resource or EEO process of the client's employer. Entries of "Unemployment Hearing" shows Petitioner handling client's unemployment application and appeals hearings. Again, legal services pursuant to their Attorney-Client Contract with Petitioner. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Restitution Schedules and Docket Sheet Exhibit 14).

84. As further evidence of unreliability, the restitution schedules list monies owed to clients that they already received years prior to the drafting of the schedules. These clients are designated with a check mark (✓). Examples are Jeanette Wiseman, Joseph E. Bennett, Reginald Radford, Patrick Chandler, Leslie Jones, Rollow Mickle, Mathew Frederick, Duane Kilby, James Welch, Kelley Dean and Mark Weakley (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Client Contracts and Cancelled Checks, Exhibit 15[6]).[7,8]

---

[6] The checks for Bennett, Kilby and Dean and contracts for Mickle, Chandler, Jones, Kilby and Weakley are not included. Petitioner is trying to acquire these documents but is limited in his ability to do so due to his incarceration and lack of access to his records.

[7] The parties have stipulated to the authenticity of Petitioner's bank records.

[8] Both Pat Chandler and Leslie Jones sued Petitioner civilly for malpractice and fraudulent misrepresentation. Both cases were dismissed upon Petitioner's Motions for Summary Judgement. (*Leslie Jones v. Andy Allman*, Davidson County Circuit Court No. 15C2922, 588 S.W. 3d 649 (TN. Ct. App. 2019) (Cert. Denied 11/19/19); *Chandler v. Allman*, Davidson County Circuit Court No. 16C562).

38

85. Some of the more eggregious examples of unreliability are Mark Weakley (#60 on the Restitution Schedules and Docket Sheets), Joseph Bennett (#13 on the Restitution Schedules and Docket Sheets), Anita Taylor (#75 on the Restitution Schedules and Docket Sheets), Jeanette Wiseman (#6 on the Restitution Schedules and Docket Sheets), Patrick Chandler (#31 on the Restitution Schedules and Docket Sheets), Reginald Radford (USDC WD KY on the Restitution Schedules and Docket Sheets), Rollow Mickle (#32 on the Restitution Schedules and Docket Sheets), James Welch (#48 on the Restitution Schedules and Docket Sheets) and Kelley Dean (#54 on the Restitution Schedules and Docket Sheets) (*See* Footnote 4).

86. Petitioner settled Mr. Weakley's case for $143,000 in 2014. Mr. Weakley received $100,000 of the settlement proceeds and Petitioner receieved $43,000, less than the agreed 1/3 pursuant to the Attorney-Client Contract between the two. The restitution schedule shows Petitioner owing Mr. Weakley $148,000. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Client Contracts and Cancelled Checks Exhibit 15).

87. Petitioner settled Anita Taylor's case for $80,000 in 2014. Ms. Taylor received her 2/3 of the settlement proceeds and Petitioner receieved 1/3 pursuant to the Attorney-Client Contract between the two. The restitution schedule shows Petitioner owing Ms. Taylor $4,500. (*See* Footnote 4).

88. Petitioner settled Antonio Carney's case (#53 on the Restitution Schedules and Docket Sheets) for $25,000. Mr. Carney received his 2/3 of the settlement proceeds and Petitioner receieved 1/3 pursuant to the Attorney-Client Contract beween the two. The restitution schedule shows Petitioner owing Mr. Carney $4,500.00. (*See* Footnote 4).

89. Petitioner settled Tiffany Tarpley's case (# 25 on the Restitution Schedules and Docket Sheets) for $22,000. Ms. Tarpley received her 2/3 of the settlement proceeds and Petitioner receieved 1/3 pursuant to the Attorney-Client Contract beween the two. The restitution schedule shows Petitioner owing Ms. Tarpley $3,500. (*See* Footnote 4).

90. Petitioner settled Gordon Medina's case (# 7 on the Restitution Schedules and Docket Sheets) for $20,000. Mr. Medina received his 2/3 of the settlement proceeds and Petitioner receieved 1/3 pursuant to the Attorney-Client Contract beween the two. The restitution schedule shows Petitioner owing Mr. Gordon $4,500. (*See* Footnote 4).

91. Clients Bennett, Wiseman, Chandler, Radford, Mickle, Welch and Dean not only had legal services performed under the Attorney-Client Contract with the Petitioner but a majority, if not all, of their flat fee retainers were refunded to them years prior to the restitution schedules being drafted. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Restitution Schedules and Docket Sheet Exhibit 14, Client Contracts and Cancelled Checks Exhibit 15) (*See* Footnote 4).

92. The State seized from Petitioner his laptops, hard drives and USB drives containing these client records on March 9 and 10, 2020 and did not provide them to him prior to the hearing in violation of *Brady v. Maryland,* 373 U.S. 83 (1963); *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015) and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Trial Court's use of these proceedings from the Tennessee Board of Responsibility not only required Petitioner to prove his innocence but to do so without his evidence.

93. Russ Willis admitted the money paid by the clients to initiate their cases was a "flat fee." (Transcript of Proceedings 4/2-3/2020 Page 87) Willis further testified that from the Board's

perspective a lawyer takes a fee "and then doesn't do any work. That looks like an unfair fee and a fraudulent, maybe misrepresentation type of thing." (Transcript of Proceedings 4/2 -3/2020 Page 79) The overwhelming amount of documentation presented herein shows clearly that Mr. Willis's implication that Petitioner engaged in fraudulent misrepresentations with all of the individuals on the restitution schedule is without merit.

94. The Petitioner's Counsel objected to these restitution schedules as the Board had not done its due diligence in investigating the complaints and petitions for discipline. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Emails between Russ Willis and Alex Little Exhibit 16; Transcript of Criminal Proceedings 8/8/18 page 9 – 10 Exhibit 7; Alex Little letter to Sandy Garrett Exhibit 11).

## VIII.  The conditional guilty pleas of disbarment, even if admissible in Petitioner's criminal trial, are not *res judicata* or even conclusive on the issue of theft and holding himself out as a lawyer.

95. The Trial Courts revocation of bond based upon the conditional pleas of disbarment and restitution schedules was a denial of due process and equal protection under the Fourteenth Amendment of the United States Constitution. Petitioner objected to the admission of this evidence. It's reliance on these shifted the burden of proof to Petitioner to prove his innocence.

96. Although the guilty plea does not operate as *res judicata*, it can still be competent evidence as an admission against interest in a **civil case**[9]. *Grange Mut. Cas. Co. v. Walker*, 652 S.W.2d 908, 910 (Tenn. Ct. App. 1983). Thus, a guilty plea in a criminal proceeding will be

---

[9] Petitioner has very limited access to research but has found no case where a guilty plea in a civil proceeding was admitted in a criminal case to prove the crime charged. Petitioner offers argument of pleas in a criminal proceeding admitted in a civil proceeding in support of his

admissible into evidence in a civil case to be weighed together with other evidence. *Id.* The

*Grange* court's reference to weighing the evidence implies (but does not explicitly hold) that the

defendant could offer an explanation of the reasons for the guilty plea. In *Allstate Ins. Co. v.*

*Connor,* No. 15, 1991 Tenn. App. LEXIS 219 (Tenn. Ct. App. Apr. 8, 1991),

however, the court of appeals directly considered a defendant's explanation of a guilty plea.

The court held that defendant's attempt **to explain the basis of his guilty plea** is another

factor or piece of evidence for the court to consider. *Id.* at 9. Thus, a defendant would have an

opportunity to explain his guilty plea in any civil matter encompassing the same facts and

theories. The Trial Court, however, is set to admit Petitioner's conditional guilty pleas and

restitution schedules from a civil process into Petitioner's criminal case to prove theft. Petitioner

has objected to their admission. If the conditional guilty pleas were admitted into evidence at

trial in the case *sub judice*, Petitioner would be guaranteed the ability to explain and challenge

them given his due process and equal protection rights.

97. Generally, a conviction by the criminal court "may work an estoppel in a subsequent civil

action where the issues have been determined in a previous criminal prosecution. A plea of

guilty, however, is generally not conclusive on the issues in a subsequent civil action."

*Grange Mut. Cas. Co. v. Walker,* 652 S.W.2d 908, 910 (Tenn. Ct. App. 1983); *See* also *Akers*

*v. Prime Succession of Tenn., Inc.,* 387 S.W.3d 495, 507 (Tenn. 2012) (Citing *Grange*

favorably). Accordingly, the "doctrine of *res judicata* is clearly not applicable" in a civil

case where there has been a prior guilty plea on the same issues. *Grange, 652* S.W. 2d at

---

position that he would be allowed to offer evidence in his criminal trial about the conditional
pleas and restitution schedule.

910. As such it cannot be even plausibly argued that they would be *res judicata* or even conclusive on the issues in the case *sub judice*.

98. Pleas before the Board of Professional Responsibility have been treated similarly in civil litigation. In *Roy v. Diamond*, 16 S.W.3d 738 (Tenn. Ct. App. 1999), defendant's attorney appealed a jury verdict which awarded plaintiffs compensatory and punitive damages in a legal malpractice action. The Court of Appeals affirmed the judgment and found that the trial court did not abuse its discretion in allowing evidence from a disciplinary proceeding. Defendant asserted that allowing plaintiff's attorney to introduce findings of fact and judgment from a disciplinary proceeding unfairly prejudiced defendant and was "tantamount to a directed verdict in favor of plaintiffs." The court noted that under TRE 402, **all relevant evidence is generally admissible**. TRE 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence...more probable or less probable than it would be without the evidence. TRE 401. The standard is lenient. While violation of the Code is relevant evidence of a breach of the standard of care, it does not, standing alone, suffice to prove civil liability.

99. It suffices even less in the criminal law forum where the Trial Courts utmost responsibility is to ensure a fair trial and prevent violations of the Fifth and Sixth Amendments as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Court is now set to admit this evidence, disbarment pleas and the restitution schedules, driving the jury to find theft beyond a reasonable doubt and incarcerate Petitioner depriving him of his liberty.[10] If the 401 standard is lenient in the civil context, the evidentiary gates shall be flung from their hinges

---

[10] The Trial Court has granted the State's request to introduce these restitution schedules at the trial of this cause.

Case 3:21-cv-00267   Document 7   Filed 04/08/21   Page 43 of 56 PageID #: 685

allowing Petitioner to address and explain the basis of the conditional pleas and restitution schedules.

100. It is a foregone conclusion in American jurisprudence that defendants enter pleas for a myriad of reasons other than guilt such as lack of resources to post bail or engage in prolonged and protracted litigation, economics, prevent loss of homes, businesses, and families, as well as preserving their constitutional rights which would otherwise be negated in the civil discovery process. The Tennessee Board of Professional Responsibility was forcing Petitioner to have a separate trial for each individual listed in the restitution schedules. *Bandy v. United States*, 81 S. Ct. 197 (1960); *O'Donnell v. Harris County, Texas* 2017 W.L. 1735456 (S.D. Texas April 28, 2017); Timothy R. Schnacke, NATIONAL INSTITUTE OF CORRECTIONS, MONEY AS A CRIMINAL JUSTICE STAKEHOLDER 50 (2014); Josh Bowers, *Punishing the Innocent*, 156 U. Pa. L. Rev. 1117,1162 (2008).

101. Petitioner and his Counsel filed multiple motions with the Board of Professional Responsibility and the Supreme Court to stay the criminal contempt proceedings and the disciplinary petitions given the current criminal charges and the Petitioner's constitutional rights as well as the lack of resources to fight on every litigious front. The Board opposed all of these motions. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Special Master's Report and emails between Gary Blackburn and the Special Master Exhibit 10).

## IX. The Trial Court's finding that the Petitioner had engaged in the disorderly process warranting the revocation of his bond is without factual basis

102. The court also held that under *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015), the Petitioner had engaged in conduct resulting in the obstruction of the orderly and expeditious

progress of the trial or other proceedings and his bail should be revoked. (Transcript of

Proceedings 4/2 – 3/2020 pages 9 – 10).

103. The court stated:

> "The court is aware of how many different attorneys we've paraded through here.
> I think we had four when he was dealing with the Board. We had one of those
> same attorneys here and three others John Pellegrin; Alex Little, who is also one
> of the members in front of the board; David Raybin in Nashville, and I think
> briefly here, and then now we've got Mr. Copas."

(Transcript of Proceedings 4/2 – 3/2020 page 229).

104. The record is clear that the only representation prior to Mr. Copas was John Pellegrin, only

for the arraignments of the 2017 indictments, and then Alex Little.

105. The court further found that Petitioner had obstructed the progress of the proceedings due to

the toxic attorney – client situation with Mr. Little. (Transcript of Proceedings 4/2 – 3/2020 page

9 – 10).

106. There is no proof in the record of such toxic attorney – client relationship.  The

uncontradicted testimony of Petitioner on 10/5/2020 was that Petitioner could no longer afford

Mr. Little's services. (Transcript of In-Court Proceedings 10/5/2020 pages 16 - 18) *(See* Footnote

2).


**X.  The Trial Court's implicit finding that the Petitioner was a risk of flight and a risk of
danger to the public warranting the revocation of his bond and pre-trial detention is
without factual basis**

107. The risk of flight is also nonexistent. Petitioner voluntarily surrendered himself for

indictments 2017-CR–548 and 2017–CR–875 and has voluntarily appeared at every hearing he

has been allowed to attend. The Petitioner has also completed 15 days of furlough without

incident and was scheduled for an additional 7 days of furlough beginning November 22, 2020 to

45

prepare for trial on November 30, 2020. The Petitioner had requested house arrest at the revocation hearing on April 2-3, 2020 to prepare for trial given the size and complexity of the case, the Trial Court denying the same before hearing any proof. (Transcript of Proceedings 4/2-3/2020 pages 11-15).

108. The undisputed proof in the record can be found in the testimony of Nancy Corley and Jim Edwards, two distinguished members of the Bar, and letters in support of release. (Transcript of Proceedings 4/2 – 3/2020 pages 94 – 98, 103 – 107; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Letters in Support of Release Exhibit 17. These letters were admitted without objection.).

109. Petitioner has shown the exact opposite of fleeing. Since 2016 he has fought to defend himself with:

- 11 of the 14 pending civil cases against him dismissed (three are still pending);
- 58 counts encompassing 137 charges of criminal conduct brought by the Tennessee Board of Professional Responsibility dismissed for lack of probable cause[11];
- 68 claims of fraud and theft brought in the Tennessee Lawyers Fund for Client Protection denied;
- Four (4) cases of theft in Sumner County Criminal Court dismissed in January 2020; and
- Eight (8) cases of theft in Sumner County Criminal Court dismissed in November 2020

---

[11] The Board's petition included criminal charges alleging Petitioner "willfully, knowingly and intentionally held himself out as an attorney to the public, engaged in unauthorized practice of law, failed to notify his clients of his suspension, and failed to return unearned fees." (Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Special Master's Report, Exhibit 10; Response of Tennessee Board of Professional Responsibility to Special Master's Report Exhibit 13; Transcript of Criminal Contempt Proceedings 8/30/18 page 17)

(Transcript of Proceedings 4/2 -3/2020 page 95; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/18 pages 9-10, 20-26 Exhibit 7; Special Master's Report Exhibit 10; Transcript of Criminal Contempt Proceedings 8/30/2018 pages 8 – 12 Exhibit 12; Letter of Sonia Allman Exhibit 17 - admitted without objection at the revocation hearing; Order of Dismissal January 2020 Exhibit 18; Order of Dismissal November 2020 Exhibit 19; Exhibit B - Motion for Hybrid Representation and it's exhibits as follows: Hendersonville Standard news article Allman 'Maintains His Innocence' 4/16/19 quoting Petitioner's civil attorney, Jim Edwards).

110. The spirit of pre-trial release is to enable (persons) to stay out of jail until a trial court has found him guilty, thus permitting the unhampered preparation of a defense. *Stack v. Boyle,* 342 U.S. 1,4,8 (1951).

111. Furthermore, Petitioner has started a new company, Human Resource and Labor Consultants, LLC. (Transcript of Proceedings 4/2 – 3/2020 page 208) This company provided employee handbooks, employment protocol and human resource consulting for four companies. (Transcript of Proceedings 4/2 – 3/2020 page 208). In addition, Petitioner has been assisting Counsel who took over Petitioner's prior clients, achieving settlements in his former cases that have been funding the receivership. Petitioner has devoted almost a full-time schedule to the assistance of Counsel who took over his cases and has helped recover approximately $900,000 in settlements for his former clients. (Transcript of Proceedings 4/2 – 3/2020 page 210) (*See* Footnote 4).

112. The purpose of bail revocation is to ensure the defendant's appearance at trial and protect public safety. Revocation is only appropriate in cases where the Court finds that the imposition

of additional bail conditions isn't sufficient to ensure the defendant's appearance at trial or protect the public's safety. *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015). Otherwise, it is simply pre-trial punishment in violation of Petitioner's Fifth Amendment, Eighth Amendment and Fourteenth Amendment rights and a denial of the Petitioner's right to the unhampered preparation of a defense. *Stack v. Boyle,* 342 U.S. 1,4,8 (1951).

113. The facts in *Burgins* bear this out. Ms. Burgins was originally charged with simple possession of marijuana. While out on bail she was charged with:

1. Attempted first degree murder;
2. Employing a firearm during the commission of a dangerous felony;
3. Attempted especially aggravated assault;
4. Attempted carjacking; and
5. Aggravated assault.

114. The Court reasoned that the number of extremely violent subsequent charges made her a high risk of flight and a violent danger to the public.

115. The exact opposite is now before this Court. Since January 2017, 149 charges of theft and knowingly, willfully, and intentionally holding himself out as a lawyer have been dismissed, eight (8) of which have been dismissed since the revocation hearing.

116. Petitioner currently faces even less charges than he did when the Court revoked his bond in April 2020. The Petitioner has not attempted to flee but has stood and defended. The record is filled with the undisputed evidence from two (2) distinguished members of the bar and family that he is of no risk of flight or harm to the public.

48

**XI. Immediate release upon his own recognizance, or at the very least house arrest, is necessary to protect Petitioner's Fifth, Sixth and Fourteenth Amendment Rights and his right to the unhampered preparation of his defense and a fair trial**

117. On October 9, 2020 Petitioner wrote to Jail Administrator, Sonya Trout, to discuss accommodations for trial preparations and trial. Petitioner requested to secure a room to house his case materials, laptops/USB drives, hard drives, internet access for research, simple office supplies and copier/printer capability given the extensive amount of documentation and witnesses to be used at trial. (Exhibit K - Petitioner's letter to Sonya Trout 10/9/20). Petitioner and Sonya Trout met on October 9, 2020 wherein she denied Petitioner's request and stated that it was "best to furlough to home during these times." This letter was provided to the Trial Court and made an exhibit on the record at the November 2, 2020 pretrial conference.

118. Petitioner's incarceration only serves to deny him his right to an unhampered preparation of a defense in violation of *Stack v. Boyle*, 342 U.S. 1,4,8 (1951). The Trial Court already found Petitioner's Sixth Amendment right to be in peril and has granted his Motion for Hybrid Representation. (Transcript of In-Court Proceedings 10/5/2020 pages 4, 9-11, Transcript of Ex-Parte Proceeding 10/5/20 pages 19-21). Petitioner was prepared to introduce evidence at a hearing on his Motion to Review showing his Sixth Amendment right is still in peril. (*See* Footnote 4).

119. *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015) is clear, before incarceration, that the Court should implement **non-financial conditions** of release that ensure Petitioner's appearance at trial and the public's safety even if the Petitioner's bond is revoked. These conditions were put in place during all of Petitioner's furloughs and were successful. Petitioner lacks the resources to post yet another bond. (Transcript of In-Court Proceedings 10/5/2020 pages 16-18; Transcript of

49

Ex-Parte Proceedings 10/5/2020 pages 12,19; Transcript of Proceedings 4/2 – 3/2020 pages 186, 235). (*See* Footnote 4).

120. Pursuant to T.C.A. 40-11-118 (b) factors, Petitioner should be released on his own recognizance, or at the very least house arrest, pending trial:

    a. Petitioner has been a lifelong resident in the community. (Transcript of Proceedings 4/2 – 3/2020 pages 94 – 98, 103 – 107; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Letters in Support of Release Exhibit 17. These letters were admitted without objection.);

    b. Petitioner has always been employed or been an employer in the community and had started a new company prior to April 2020.

    c. Petitioner has deep family ties in the community dating back to June 6, 1969, the date of his birth;

    d. Petitioner has no mental impairment and his reputation and character have been affected by what is before the Court and been published by the news media and on social media;

    e. Petitioner has no prior criminal record, has never missed a court date, and has not attempted to flee;

    f. Petitioner's revocation charge is a non-violent offense and the record now shows a weak probability of conviction;

    g. Two distinguished members of the bar and numerous family members vouch for Petitioner's reliability. (Transcript of Proceedings 4/2 – 3/2020 pages 94 – 98, 103 – 107; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Letters in Support of Release Exhibit 17. These letters were admitted without objection.);

    h. Over 85% of all charges of theft and knowingly, willfully, and intentionally holding himself out as a lawyer have been dismissed. (*See* paragraph 92)

121. Denial of a defendant's liberty in the form of pre-trial detention requires a showing that no conditions of release can reasonably assure the safety of the community, or any person, and that

the detainee poses an immitigable risk of flight or danger to the community that outweighs the defendant's interest in pre-trial liberty. *U.S. v. Salerno,* 481 US 739 (1987). Post revocation, Petitioner has completed 15 days of furlough on house arrest with GPS monitoring and daily reporting to Community Corrections to prepare for trial without fleeing or being a danger to the public.[12] There is no evidence justifying Petitioner's pre-trial detention.

122. The fundamental tradition in this country is that one charged with crimes is not, in ordinary circumstances, imprisoned until after a judgement of guilt. *Bandy v. United States*, 81 S. Ct. 197 (1960). Long-term pre-trial incarceration creates serious and long-lasting adverse effects on a defendant; effects that should be mitigated in light of the constitutional principle that a defendant is innocent until proven guilty. *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015); *See Tidwell v. State,* 922 S.W. 2d 497 (Tenn. 1996); *State v. Shelton,* 851 S.W. 2d 134 (Tenn. 1993). "Imprisoned, a man may have no opportunity to investigate his case, to cooperate with his counsel, to earn the money that is still necessary for the fullest use of his right to appeal." *Bandy v. United States,* 81 S. Ct. 197, 198 (1960). "The right to release is heavily favored and requirement of security for bond may be dispensed with... for there may be other deterrents to jumping bail: long residence in a locality, the ties of family and friends, and the efficiency of modern police. All these in a given case may offer a deterrent at least equal to that of the threat of forfeiture. *Id.* The Trial Court found these factors weighed in Petitioner's favor at the revocation hearing. (Transcript of Proceedings 4/2 – 3/2020 page 235).

---

[12] Petitioner had been approved for another 7 days of furlough from November 22 – 28, 2020, the week prior to his last trial date of November 30, 2020. This furlough was cancelled when the Trial Court continued the trial *sua sponte* without Petitioner's attendance at the hearing. Petitioner was not permitted to attend the conference with the State and counsel, Gary Copas, when this decision was made. The Trial Court was going to require Petitioner be incarcerated during the trial despite his status as "co-counsel" under hybrid representation.

51

123. As Justice Douglas noted 60 years ago, pre-trial detention compromises a person's ability to participate in his or her defense leading to worse outcomes at every phase of the criminal process. *Bandy v. United States*, 81 S. Ct 197,198 (1960) (Douglas, J. in chambers). This is especially true in the case *sub judice* as the Trial Court has already found Petitioner's Sixth Amendment right in jeopardy. (Transcript of in-Court Proceedings 10/5/2020 pages 4, 9 – 11; Transcript of Ex-Parte proceedings 10/5/2020 pages 19-21) (*See* Footnote 4).

124. Defendants jailed prior to trial risk losing their businesses and homes, creating a perversion of the criminal justice system where innocent people plead guilty just to get out of jail. *O'Donnell v. Harris County, Texas* 2017 W.L. 1735456 (S.D. Texas April 28, 2017); Timothy R. Schnacke, NATIONAL INSTITUTE OF CORRECTIONS, MONEY AS A CRIMINAL JUSTICE STAKEHOLDER 50 (2014); Josh Bowers, *Punishing the Innocent*, 156 U. Pa. L. Rev. 1117,1162 (2008).

125. The State should have ordered pre-trial release opting for the preference of alternative conditions such as house arrest, GPS monitoring, daily reporting with Community Corrections, and even release on own recognizance. *See State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015)*; State v. Brown,* 338 P. 3d 1276,1292 (N.M. 2014). Some of these were implemented and were successful during Petitioner's furloughs.

126. The right to pre-trial liberty is unquestionably a fundamental right. *United States v. Salerno*, 481 US 739,750 (1987); *United States v. Montalvo-Murrillo*, 495 U.S. 711,716 (1990) (Holding that pre-trial release is a "vital liberty interest"); *Foucha v. Louisiana*, 504 U.S. 71,80 (1992) (Freedom from bodily restraint has always been at the core of the liberty protected by the

Due Process Clause); *Zadvydas v. Davis*, 533 U.S. 678,690 (2001) (Freedom from imprisonment...lies at the heart of liberty.).

127. Due process also demands use of "less intrusive alternatives" than pre-trial incarceration before a defendant can be deprived his liberty interest. *See Riggins v. Nevada,* 504 U.S. 127,135 (1992).

128. Respectfully, the Trial Court, at the revocation hearing, failed to scrutinize and implement alternative non-financial conditions such as GPS monitoring, Community Corrections reporting requirements, counseling, stay away orders, restrictions on contact with people, house arrest, prohibiting access to phones, etc. *See State v. Burgins,* 464 S.W. 503d 298, 310 – 311 (Tenn. 2015). These alternatives were put into place during all of Petitioner's furloughs and he has not fled, or attempted to flee, nor been of any harm to the public. Non-financial pre-trial release has been and will be a success. Petitioner has made clear that he has no intention of fleeing from the charges and claims filed against him but has defended over the past four (4) years. (*See* paragraph 109).

129. Failure to consider and implement alternative non-monetary measures other than imprisonment are contrary to the fundamental fairness required by the Fourteenth Amendment. *Bearden v. Georgia*, 461 U.S. 660, 672-3 (1983). *Hill* at page 22; *Weatherspoon v. Oldham*, 2018 W.L. 1053548 at page 7 (W.D. Tenn. 2-26-18).

130. In its ruling, the Trial Court gave great weight and deference to the Board's petition for criminal contempt, suspension, petitions for discipline, restitution schedules and the testimony of Russ Willis in revoking Petitioner's bond and not implementing non-monetary pretrial release

alternatives. (Transcript of Proceedings 4/2 –3/2020 pages 239-240). As has been shown, the Court's reliance may have been misplaced, another truth exists.

131. The Trial Court also relied upon the "strength" of proof in the theft of retainer fee cases relying on the restitution schedules. In addition to what has been shown relating to the restitution schedules regarding retainer fee cases, eight (8) more charges of theft of retainers have been dismissed since the revocation hearing, meaning half of all retainer fee cases have now been dismissed. The Petitioner faces fewer charges now that he did in April 2020. (Transcript of Proceedings 4/2 – 3/2020 page 237).

## RELIEF SOUGHT

Petitioner seeks, and respectfully prays this Court for an order granting all relief necessary to protect his rights to a fair trial, including without limitation:

1. A finding Petitioner was denied a fair hearing in the revocation of his bond and the setting aside of the revocation order pursuant to *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015), *Brady v. Maryland,* 373 U.S. 83 (1963), Due Process and Equal Protection Clauses of the Fourteenth Amendment, and violations of Petitioner's First, Fifth, Sixth and Eighth Amendment rights under the United States Constitution;

2. A finding the bail setting of 2.5 million dollars under case number 2020-CR-133 to be unconstitutional and void pursuant to the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Fifth and Eighth Amendments of the United States Constitution. *See Pugh v. Rainwater,* 557 F. 2d 1189, 1190 (5th Cir. 1977); *O'Donnell v. Harris County, Texas,* 2017 W.L. 1735456 (S.D. Texas April 28, 2017);

*State v. Brown,* 338 P. 3d 1276, 1292 (N.M. 2014); *United States v. Leathers,* 412 F. 2d 169, 171 (D.C. Cir. 1969);

3. An order for the immediate release of the Petitioner on his own recognizance, or an immediate release to house arrest with GPS monitoring and daily reporting to Community Corrections, until a jury's verdict for the reasons stated above to allow the unhampered preparation of his defense pursuant to *Stack v. Boyle,* 342 U.S. 1 (1951); *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015).

4. For an interlocutory order of release to house arrest with GPS monitoring and daily reporting to Community Corrections to prepare for trial pending disposition of this Petition.

5. A finding that the State failed to prove by a preponderance of evidence the commission of a crime while Petitioner was released on bail;

6. To make all rulings on the questions presented for review necessary to guarantee a fair trial and to protect all rights of the Petitioner under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution; and,

7. Make additional findings raised in this Petition necessary to secure a fair trial for the Petitioner. *Manning v State,* 500 S.W. 2d 913 (Tenn. 1953); *Silber v. United States,* 370 U.S. 717 (1962).

Respectfully submitted,

_____

Andy L. Allman
Defendant
117 W. Smith Street
Gallatin, TN 37066

## **Declaration Under Penalty of Perjury**

I declare under penalty of perjury that I have read this petition or had it read to me, and
the information in this petition is true and correct. I understand that a false statement of a
material fact may serve as the basis for prosecution for perjury.

4·8-2021                                    _____
_____                            Andy L. Allman
Date