1    IN THE CRIMINAL COURT FOR SUMNER COUNTY, TENNESSEE

2                        AT GALLATIN

3

4    STATE OF TENNESSEE            )
                                  )
5                                 )   NO.  CR875-2017
     vs.                          )        CR133-2020
6                                 )        CR548-2017
                                  )
7    ANDY LAMAR ALLMAN            )

8    _____
9

10

11                  TRANSCRIPT OF PROCEEDINGS

12                       April 2, 2020

13                      VOLUME I OF II

14

15

16   _____

17

18        THE HONORABLE DEE DAVID GAY PRESIDING

19

20

21

22

23                  LORI C. BICE, LCR
                  Criminal Justice Center
24                  117 W. Smith Street
                Gallatin, Tennessee 37066
25                   (615) 414-8993

```
 1              A P P E A R A N C E S:

 2

 3    FOR THE STATE:

 4              Thomas Boone Dean
                Assistant District Attorney General
 5              Office of the District Attorney General
                113 West Main Street, Third Floor
 6              Gallatin, Tennessee 37066

 7              Katherine Brown Walker
                Assistant District Attorney General
 8              Office of the District Attorney General
                113 West Main Street, Third Floor
 9              Gallatin, Tennessee 37066

10

11    FOR THE DEFENDANT:

12              Gary D. Copas
                Attorney at Law
13              P.O. Box 190137
                Nashville, Tennessee 37219

14    -----------------------------------------------------

15                    I N D E X
                                                      PAGE
16
      WITNESSES
17
      RUSSELL WILLIS
18      Direct Examination by General Dean          32
        Cross-Examination by Mr. Copas              58
19      Redirect Examination by General Dean        85
        Recross-Examination by Mr. Copas            86
20
      NANCY CORLEY
21      Direct Examination by Mr. Copas             94
        Cross-Examination by General Dean           98
22
      JIM EDWARDS
23      Direct Examination by Mr. Copas            104
        Cross-Examination by General Dean          107
24

25
```

```
 1                    I N D E X
                                              PAGE
 2
     WITNESSES
 3
     MARIO HERRERA (via telephone)
 4     Direct Examination by General Dean        118
       Cross-Examination by Mr. Copas            129
 5     Redirect Examination by General Dean      149
       Recross-Examination by Mr. Copas          151
 6
     MARK SMITH (via telephone)
 7     Direct Examination by General Dean        159
       Cross-Examination by Mr. Copas            161
 8
     RIELLY GRAY
 9     Direct Examination by General Dean        167
       Cross-Examination by Mr. Copas            189
10
     RULING                                      230
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lori Copas, LCR

```
 1                    E X H I B I T S

 2      No.               Description                Page

 3       1        Transcript                          26

 4       2        Order of Enforcement                36

 5       3        Amended Order of Enforcement        86

 6       4        Affidavit                           93

 7       5        Letters                             93

 8       6        Chancery Court transaction list    164

 9       7        Agreed Final Order from Chancery   165
10                Court

11       8        CPA report                         167

12       9        Money Flow Chart from estate of    175
                  Brenda Sue Ingram
13
        10        Money Flow Chart from estate of    175
14                Jane Ellen Denney

15      11        Copy of check/deposit              189

16      12        Copy of text messages              205

17      13        Dismissal order                    207

18      14        Secretary of State information     207
                  on Human Resource/Labor
19                Consultants, LLC

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    (The following proceedings came on to
 3         be heard on Thursday, April 2, 2020, beginning at
 4         approximately 1:50 p.m., before the Honorable Dee
 5         David Gay, Judge, to wit:)
 6                    THE COURT:  Let's take the cuffs off.
 7                    GENERAL DEAN:  Judge, as far as I know
 8         we will not need -- this is not a plea.  So we will
 9         not need probation or community corrections or
10         anyone.
11                    THE COURT:  You may be excused.
12                    GENERAL DEAN:  Theoretically, after
13         the bond hearing we might need one of them, but I
14         assume they could come back.
15                    THE COURT:  Yeah.  Everybody can be
16         excused in probation or community corrections.  If
17         we ultimately need you, we'll send for you.  We've
18         got to watch our numbers in court here.
19                    Okay.  Before we get started here, I
20         want to make a couple of preliminary observations to
21         kind of get us set on the right track.  In looking
22         over and reviewing these cases, we had the first
23         charges come out of the August grand jury in 2017.
24         Other charges followed in December of 2017.  That's
25         a long time ago for criminal court in Sumner County.
```

```
 1    We've had -- we just set our fourth trial date.  The
 2    first trial date was November 5th, 2018.  The second
 3    trial date was February 19, 2019.  At that time
 4    Mr. Little made a motion to withdraw.  The motion
 5    was granted.  Mr. Copas was employed and we set a
 6    third trial date, and right before the third trial
 7    date we had new charges.
 8              Mr. Copas, last Friday I arraigned
 9    your client on new charges in Case No. 133-2020.  I
10    assume that you're representing him and that case
11    has been set today separately to tag along with the
12    other two cases.
13              So first of all, I want to leave the
14    impression with you that this case is old, and we
15    need to get moving.  And I understand some present
16    difficulties but, gee whiz, we've got to move on
17    this case.
18              Now, let me tell you why we're here
19    today.  We have on the docket a motion to revoke the
20    bond and a motion to reduce the bond.
21              And, Mr. Copas, I completely agree
22    with you on what you said about the motion to revoke
23    the bond under the Supreme Court order and other
24    matters, but you remember that I asked if you were
25    going to file a motion to reduce the bond which you
```

have.

Now, I don't want to have two separate hearings, a motion to revoke the bond and a motion to reduce the bond. It doesn't seem to be effectively using the Court's time. So the only reason we're hearing a motion to revoke is because we've got a motion to reduce the bond. And if we did not have the motion to reduce -- revoke the bond, all we would be hearing is the motion to reduce the bond. Do you still want to continue this?

MR. COPAS: That is correct, Your Honor. I did meet with my client and got a waiver of appearance on the arraignment and signed --

THE COURT: That's fine. That's fine.

MR. COPAS: But the motion I filed to reduce the bond was in the recent case just filed, the 2020 case.

THE COURT: Right. I understand.

MR. COPAS: The reason I've got that there, Your Honor, is that there's so many issues raised and I'm very, very much disturbed by the fact that I don't have access to the client file in this case. The case that has been brought here just recently, I don't have access to any records at all

| | |
|---|---|
| 1 | of his on that, and there should be in those records |
| 2 | some admissions there that I could use to impeach |
| 3 | this witness, Mr. Mario -- |
| 4 | THE COURT: Okay. So "admissions," |
| 5 | are you meaning credibility issues of the victim? |
| 6 | MR. COPAS: Credibility, Your Honor, |
| 7 | and I think there's enough here -- enough issues |
| 8 | here to be presented to this case today that no |
| 9 | matter if I get an adverse outcome, I have -- I feel |
| 10 | like I have a right to file a motion to the Court of |
| 11 | Appeals on the -- this bond issue, this revocation, |
| 12 | and in the event I get some relief with the Court of |
| 13 | Appeals, which I have in past got relief, I would at |
| 14 | least like to have a bond that I can come back and |
| 15 | address to get him off of this 2.5 -- |
| 16 | THE COURT: Okay. Well, what we've |
| 17 | got now, we've got a 2.5 million dollar bond. Do |
| 18 | you want to continue this case? Because I'm not |
| 19 | going to take up two separate bond motions. There's |
| 20 | no need to, because the issues that you raise in a |
| 21 | motion to reduce the bond, 40-11-118, the Supreme |
| 22 | Court in Burgins wants me to consider those as well. |
| 23 | So what are you asking me to do? |
| 24 | And I -- you know, you talk about |
| 25 | appealing the case before I've even ruled. I mean, |

| | |
|---|---|
| 1 | that's kind of intimidating -- or trying to be |
| 2 | intimidating to the Court. I mean, I know that's -- |
| 3 | I know that's a possibility every time I sit on this |
| 4 | bench. |
| 5 | MR. COPAS: Your Honor -- |
| 6 | THE COURT: Hold on just a second. |
| 7 | Let me read you Burgins. |
| 8 | MR. COPAS: I've appealed things for |
| 9 | dear, dear friends and companions -- |
| 10 | THE COURT: No. That doesn't bother |
| 11 | me that you appeal, but, I mean, we haven't even |
| 12 | started the case yet. We haven't even decided what |
| 13 | we're going to do today, but you had said in your |
| 14 | memo -- or your motion about not being ready and due |
| 15 | process. |
| 16 | Let me direct you to what Burgins says |
| 17 | on -- in page -- it's 464 S.W.3d 310, and the Court |
| 18 | -- it says the Court must conduct an evidentiary |
| 19 | hearing in which the State is required to prove by a |
| 20 | preponderance of the evidence those factors that are |
| 21 | set out in 40-11-141(b). Preponderance of the |
| 22 | evidence, and there's about three separate grounds |
| 23 | there that we won't go over. |
| 24 | I think, one, we have a situation and |
| 25 | note that it's not a conviction that's alleged. |

Toxic

 1  It's a charge while somebody is out on bond.  And, I
 2  mean, it's a no-brainer.  He's been charged, he's in
 3  this court, and you represent him.
 4          A second factor that I'm concerned
 5  about is the fact that we've got a situation here
 6  where we've set this for trial four times now.
 7  After the second trial was set we had to reset the
 8  trial because the attorney-client situation was
 9  toxic.  Now we had to reset that trial because of
10  the new charges against your client.  So there's an
11  argument about the obstruction of the orderly and
12  expeditious progress of the trial in the
13  proceedings.
14          So we've got two possible grounds
15  there by a preponderance of evidence, and the
16  Burgins court says regarding the evidence, Moreover,
17  requirements for the revocation proceedings shall be
18  somewhat flexible in that the trial court shall be
19  able to consider factual testimony and documentary
20  proof supporting the grounds for revocation of
21  pretrial bail.  In addition to documentary proof,
22  the state must present testimony from a
23  corroborating witness or witnesses as to the facts
24  supporting allegations contained in documents.
25  Hearsay evidence may be admitted when the trial

| | |
|---|---|
| 1 | court finds that it is reliable. |
| 2 | So we'll have a hearing and follow |
| 3 | these rules here. I just kind of need to know what |
| 4 | you want to do. |
| 5 | MR. COPAS: Well, Your Honor, we've |
| 6 | got the trial set in August is my understanding. |
| 7 | THE COURT: Yes, sir, we do. It's the |
| 8 | fourth trial date. |
| 9 | MR. COPAS: And what I'm here today on |
| 10 | is not impairing that at all. In fact, it's -- let |
| 11 | me say this, Your Honor. The last thing I filed -- |
| 12 | I don't know if the Court's got it, but I -- after |
| 13 | looking at the Supreme Court order I thought, well, |
| 14 | I ought to at least file something to give the |
| 15 | Court, you know, at least ask the Court to exercise |
| 16 | its discretion sua sponte, if you will, and address |
| 17 | the matters I brought up on the $2.5 million bond -- |
| 18 | bail bond that was set. |
| 19 | And what I laid out in that motion was |
| 20 | some compromise, middle ground, where we could |
| 21 | satisfy the Court's interest and the State's |
| 22 | interest and that would be by house arrest under the |
| 23 | strictest restrictions that the State would like to |
| 24 | impose in that regard. And what that does, Your |
| 25 | Honor, is it does at least -- it enables me to make |

| | |
|---|---|
| 1 | sure I'm ready come August.  If I have to deal with |
| 2 | what I'm dealing with now -- |
| 3 | And the other thing, Your Honor, is, |
| 4 | gee, I mean, I -- when I walked in there my last |
| 5 | visit, they said they brought in an inmate that had |
| 6 | a fever.  It -- I just want to make sure I take all |
| 7 | steps I can that we don't end up with some virus |
| 8 | situation in jail that, you know, my client is one |
| 9 | of the recipients of it and -- |
| 10 | THE COURT:  Well, let me assure you |
| 11 | that the courts here are doing all that we can to |
| 12 | reduce the population in the jail during this |
| 13 | pandemic.  And I look at each case individually. |
| 14 | Sometimes we set lower bonds.  Sometimes we set ROR. |
| 15 | I just reduced a bond on a probation violation to |
| 16 | ROR.  We are looking to release people serving |
| 17 | sentences early.  We are looking to release people |
| 18 | that have serious physical health issues.  We're |
| 19 | always looking for ways to release and take each |
| 20 | case on an individual basis. |
| 21 | And I'll be glad to consider what you |
| 22 | want to do, but I can't -- I'm not going to do |
| 23 | anything without hearing evidence so that I can be |
| 24 | fully informed about what's going on here and a |
| 25 | basis for setting the bond or revoking a bond.  I'm |

1  not going to do anything without a hearing.  I think

2  I would be irresponsible because there are a lot of

3  allegations here, Mr. Copas, and you're going to

4  have to understand this is not the ordinary theft of

5  property case where I would consider house arrest,

6  but if you want me to do that, we're going to have

7  some kind of a hearing.  I'm not serving the people

8  of Sumner County without doing that.

9               MR. COPAS:  Well, Your Honor, having

10  heard that, my understanding of the Burgins case is

11  that what the -- what that case does is under proper

12  procedure it opens the door for the Court to

13  exercise its discretion any way it sees fit.

14               THE COURT:  It does.

15               MR. COPAS:  It does.  And you can --

16               THE COURT:  It does.  I mean, I can

17  choose -- I --

18               MR. COPAS:  I mean, you can do

19  anything you want.

20               THE COURT:  I can do anything I want

21  to do all the way up to revoking the bond, but

22  again -- you are absolutely correct in the law about

23  that.  I mean, I've got -- we've got Mr. Allman in

24  jail now and his constitutional right to bail needs

25  to be enforced and the logical way to do that is to

```
 1  hear a motion to reduce the bond, and I do that.  I
 2  was doing that earlier today, and we've reset that
 3  case.
 4           But that's what the Supreme Court
 5  speaks to when we're talking about jail cases and
 6  constitutional rights.  Now, that's where we are.
 7           MR. COPAS:  Okay.  Your Honor, I --
 8  you know, looking through the lens of practicality,
 9  if you will, if the bond is reduced from 2.5
10  million, it may be reduced to an amount to where it
11  would effectively -- would not work out anyway, and
12  if the Court would entertain us coming back on house
13  arrest --
14           THE COURT:  I mean, we can do it now.
15           MR. COPAS:  Well, I've -- Your Honor,
16  I mean, that's -- I'm ready for that.  I mean, when
17  you say now, I'm ready to do it today if we could do
18  that after the hearing.
19           THE COURT:  Okay.  So you want to have
20  a hearing and order that I can consider house
21  arrest.  That's the only issue that you want to take
22  up?
23           MR. COPAS:  Well, of course, I --
24           THE COURT:  I'm going to hear
25  testimony from everybody and whether or not we have
```

```
 1   a motion to revoke in the future or whatever, we're
 2   going to have that testimony because evidently we've
 3   got witnesses here ready to go.  Again, this is a
 4   matter that has a lot of parts and I don't know a
 5   lot about a lot of the parts, and I'm not going to
 6   make any decision until I am satisfied that I know
 7   all the factors in setting a bond or revoking a
 8   bond.  So I'll do whatever you want to do.
 9              MR. COPAS:  Your Honor, let me confer
10   with my client just a --
11              THE COURT:  Sure.
12              Generals, I haven't forgotten about
13   you over there.  I haven't forgotten about you over
14   there.
15              GENERAL DEAN:  We're fine.  I'm just
16   trying to make sure I've got appropriate separation
17   between myself and co-counsel.
18              THE COURT:  I understand.
19              GENERAL DEAN:  She has a measuring
20   tape with her, Judge.
21              GENERAL WALKER:  It's not related to
22   the --
23              GENERAL DEAN:  She got it out of her
24   purse and showed me.  So she's very serious about
25   this distance thing.
```

```
 1              MR. COPAS:  Your Honor, he wants -- my
 2   client would like to hear everything and for the
 3   Court to entertain the house arrest at --
 4              THE COURT:  Okay.  So we're going to
 5   hear all the evidence.  And the only request that
 6   you're making is house arrest?
 7              MR. COPAS:  Well, of course, I'll be
 8   -- I mean, I take it Mr. Herrera is going to be --
 9              THE COURT:  I don't know.
10              GENERAL DEAN:  Judge, I have three
11   anticipated witnesses.  One is Russ Willis from the
12   Board of Professional Responsibility.  He is here in
13   person.  The second is Mr. Herrera, but Mr. Herrera
14   is in Florida, and the only way I can connect with
15   him is by telephone conference.
16              THE COURT:  Okay.
17              GENERAL DEAN:  That's his
18   availability, which we believe falls within the
19   mandate of the COVID-19 --
20              THE COURT:  It does.  It does.
21              GENERAL DEAN:  -- extraordinary order.
22              Thirdly, we have TBI Agent Rielly
23   Gray.  Those are my three anticipated witnesses,
24   Your Honor.
25              THE COURT:  Okay.  Now, what issue do
```

1   you want me to consider?

2          MR. COPAS:  I guess we should proceed

3   with the reduction, Your Honor, and --

4          THE COURT:  Okay.  We'll consider the

5   motion to reduce bond.  Is that what you want to do?

6          MR. COPAS:  I'm sorry.  To revoke.

7          THE COURT:  Do you want to hear both?

8          MR. COPAS:  Right.  Hear the proof on

9   both.

10          THE COURT:  Okay.

11          MR. COPAS:  And, Your Honor, frankly,

12  what I want to do is -- I guess Your Honor has done

13  spoke to that, is I want to get all the proof in the

14  record I can.

15          THE COURT:  I understand.

16          MR. COPAS:  And then --

17          THE COURT:  That's what I'm after

18  because I don't know what we're dealing with here.

19          MR. COPAS:  And, of course, there are

20  two collateral motions I've got to order --

21  everything they took out of the residence --

22          THE COURT:  Yeah, and what I'm going

23  to do -- you know, the Supreme Court order speaks to

24  constitutional rights, but while we're here and

25  we've got such a massive amount of things that you

| 1 | need, I thought we'd go ahead and take that up too |
| 2 | while we're here so we don't have to set another |
| 3 | court date. |
| 4 | MR. COPAS: Well, let me -- also, one |
| 5 | announcement on the one about the TBI that I made, |
| 6 | the State has given me the assurance on the motion |
| 7 | and order they just presented that I will get access |
| 8 | to everything that was taken out of that house on |
| 9 | that search warrant and that -- what the State is |
| 10 | saying is if the TBI is retaining anything |
| 11 | whatsoever, then I will have access to that also |
| 12 | under their order that they produced. |
| 13 | GENERAL DEAN: Judge, I submitted a |
| 14 | motion and an order to Jennifer just earlier today |
| 15 | and I think she might have brought it in there. |
| 16 | THE COURT: She did. Hold on just a |
| 17 | second. |
| 18 | GENERAL DEAN: And that was my attempt |
| 19 | based on some past experience the TBI has had and |
| 20 | ways they've dealt with issues of privileged |
| 21 | information being perhaps seized by a governmental |
| 22 | agency and how to basically put together what I call |
| 23 | a clean team, and it is a group of agents, including |
| 24 | at least one attorney, who look at everything that |
| 25 | was seized and they only provide to the case agent |

1 and the district attorney's office things that are

2 relevant and not privileged. So anything that's

3 privileged they would screen from us.

4 Then the order provides, depending on

5 the type of material, what will happen to it. The

6 electronics would be mirrored and then the originals

7 would be returned to the defendant and counsel.

8 Documents would be copied. The copies would be

9 given to attorney and -- excuse me, opposing

10 counsel. And then there are apparently some tape

11 recordings, cassette tapes. Those would be

12 transferred into a digital format and then digital

13 copies given to opposing counsel.

14 THE COURT: So basically what you're

15 telling me is everything that's not privileged will

16 be turned over to the defense.

17 GENERAL DEAN: Everything will be

18 turned over to the defense.

19 THE COURT: Oh, I mean -- okay.

20 Everything is turned over to the defense. The

21 privileged material is not turned in to you.

22 GENERAL DEAN: And I've gone a little

23 further than the standard, Judge, because Mr. Copas

24 gave me a heads-up that he had had conversations

25 with Mr. Allman who may be getting stuff together to

| | |
|---|---|
| 1 | give to Mr. Copas. So what I put in that order was |
| 2 | language not only to shield communications between |
| 3 | attorney and counsel, but if they see anything that |
| 4 | Mr. Allman has put together that appears to be |
| 5 | prepared for -- |
| 6 | THE COURT: Gotcha. |
| 7 | GENERAL DEAN: -- litigation, that he |
| 8 | might have been going to send to opposing counsel, |
| 9 | there's no reason for us to -- the case agent and -- |
| 10 | THE COURT: Sure. And I think |
| 11 | Mr. Copas mentioned that last time, that Mr. Allman |
| 12 | was in the process of preparing -- |
| 13 | GENERAL DEAN: Yes, sir. |
| 14 | THE COURT: -- maybe memos about |
| 15 | witnesses or so forth, and of course that will not |
| 16 | be given to the State. |
| 17 | And, also, I assume everything is |
| 18 | everything, and they will not come up with missing |
| 19 | anything that they've got on the search warrants; |
| 20 | is that correct? |
| 21 | GENERAL DEAN: Opposing counsel should |
| 22 | get everything. |
| 23 | THE COURT: Okay. And that takes care |
| 24 | of Brady, Giglio, and everything. If they've got |
| 25 | everything, that takes care of the due process. |

```
 1                    Now, all I've got, General, is a
 2   motion.
 3                    GENERAL DEAN:  Oh, I'm sorry, Judge.
 4                    THE COURT:  Do you agree with this
 5   order?
 6                    MR. COPAS:  Yes, Your Honor.
 7                    THE COURT:  Okay.  I think it's great.
 8   That just --
 9                    MR. COPAS:  I mean, I --
10                    THE COURT:  Yeah, I mean, it gives you
11   everything.
12                    MR. COPAS:  If there's any holes in
13   it, we can always come back and --
14                    THE COURT:  Yeah, if there are any
15   holes in that, we can always come back.
16                    GENERAL DEAN:  And, Judge, there is a
17   safety net in there.  If they -- may I approach,
18   Your Honor?
19                    THE COURT:  Yes, sir.
20                    GENERAL DEAN:  If they -- did I send
21   you the motion and the order?
22                    MR. COPAS:  Uh-huh.
23                    GENERAL DEAN:  I thought I had.
24                    MR. COPAS:  Well, let me say this.
25   When I took it off my computer, I said I don't see
```

```
 1   the order, but when I looked at it, the order was
 2   right behind --
 3              GENERAL DEAN:  Yeah, I did it as one
 4   document.
 5              THE COURT:  Okay.  I'll go ahead and
 6   sign the order.  It sounds great.
 7              GENERAL DEAN:  Judge, it also has a
 8   safety net.  If they run into something they don't
 9   know what to do with, then they can bring it to you
10   for in camera review --
11              THE COURT:  Okay.
12              GENERAL DEAN: -- to give them
13   direction on any particular --
14              THE COURT:  Very good.
15              GENERAL DEAN:  -- aspect of it.  And
16   we can get them -- TBI has approved this.  So as
17   soon as Your Honor signs it and I can get it to
18   them, they can start going through this stuff, and
19   as soon as they're through with any part, we can
20   start --
21              THE COURT:  Very good.
22              MR. COPAS:  Your Honor --
23              THE COURT:  Give it to Jennifer and
24   she can stamp it and then you can send it out.
25              MR. COPAS:  -- I guess in continuing
```

| | |
|---|---|
| 1 | with this -- I guess I may be waiving my continuance |
| 2 | motion, but I am not waiving any issues I raised in |
| 3 | that motion -- |
| 4 | THE COURT: Sure. I understand. I |
| 5 | understand. I understand. |
| 6 | Okay. We are here now to hear the |
| 7 | Burgins motion, and let me kind of read into the |
| 8 | record what we're doing. Burgins deals with |
| 9 | 40-11-141, release prior to trial. And section (b) |
| 10 | states, If the defendant is released upon personal |
| 11 | recognizance and unsecured personal appearance bond |
| 12 | or any other bond approved by the court and the |
| 13 | defendant violates a condition of release, is |
| 14 | charged with an offense committed during the |
| 15 | defendant's release, or engages in conduct which |
| 16 | results in the obstruction of the orderly and |
| 17 | expeditious progress of the trial or other |
| 18 | proceedings, then the court may revoke and terminate |
| 19 | the defendant's bond and order the defendant held |
| 20 | without bail. |
| 21 | Now, in Burgins, State vs. Burgins, |
| 22 | 464 S.W.3d 298, our Supreme Court upheld the |
| 23 | constitutionality of that statute and imposed some |
| 24 | due process requirements, some of which I have |
| 25 | mentioned, and if the State proves by a |

preponderance one of those grounds in the statute,
then the court has the authority either to revoke
the bond or increase the bond amount, and -- I agree
with Mr. Copas -- in some instances decrease the
bond.  And there's a motion to reduce the bond here
that I will hear today, including house arrest for
the defendant.

Burgins requires that I look at
40-11-118 in making that ultimate decision if I find
by a preponderance of the evidence that one of the
conditions has been violated.  And also in reducing
a bond 40-11-118 is extremely relevant and comes
into play.  So that will be the process that we
follow and what we're doing.

General, would you like to make -- or
I'll go first with you, Mr. Copas, and give you two
opportunities to make an argument on every case.  Do
you have any opening statement you'd like to make?

MR. COPAS:  Your Honor, I have filed
with the Court a transcript of the proceedings in
chancery court --

THE COURT:  I've read that.

MR. COPAS:  -- where the receiver was
appointed.

THE COURT:  I've read that.

1     MR. COPAS:  And I -- the Court having
2  announced that he's read -- the Court's read that,
3  then it will be part of the consideration when we
4  hear the proof and --
5                THE COURT:  Sure.  Let me do this.
6                MR. COPAS:  And, Your Honor, I --
7                THE COURT:  Go ahead.
8                MR. COPAS:  I guess, Your Honor, if I
9  may, in the process of doing that -- and I did make
10 copies of any relevant pages of that for the State
11 to see when I go through it, but it raises some --
12 what I consider defenses, if you will, that's
13 relevant to this charge that's been brought about
14 this money.  And it appears to me in everything that
15 I -- to date everything I've been able to get ahold
16 of -- of course, I have not seen the file.  I have
17 not seen any documentation otherwise -- that we have
18 a fee dispute here on this money and this money was
19 -- that there was a sizeable -- it's a divorce case.
20                The order that the State's presenting
21 here is a post-divorce situation that came up
22 afterwards, but we've got a lot of activity in that
23 case that is not going to be before the Court today
24 to show how much of a lien that the attorney had
25 having not received any money whatsoever from this

|   |   |
|---|---|
| 1 | client.  And so that's going to be my approach on |
| 2 | it, Your Honor, is to try to undermine the fact that |
| 3 | this is fee money to some extent and -- |
| 4 | THE COURT:  Okay.  See, there's so |
| 5 | many moving parts here it's hard for me to kind of |
| 6 | comprehend everything, but let me go ahead. |
| 7 | General, have you seen a transcript of |
| 8 | the receivership proceedings? |
| 9 | GENERAL DEAN:  Yes.  Mr. Copas |
| 10 | provided that yesterday or the day before. |
| 11 | THE COURT:  Mr. Copas, I'll make that |
| 12 | Exhibit Number 1 for you. |
| 13 | MR. COPAS:  Thank you, Your Honor. |
| 14 | THE COURT:  All right. |
| 15 | (Exhibit 1 received into evidence.) |
| 16 | THE COURT:  Okay.  General, opening |
| 17 | statement? |
| 18 | GENERAL DEAN:  Your Honor has already |
| 19 | mentioned 40-11-118, the bond factors.  You |
| 20 | mentioned 40-11-141.  I'm not sure if the Court |
| 21 | mentioned 40-11-148. |
| 22 | THE COURT:  I don't think I did, |
| 23 | General. |
| 24 | GENERAL DEAN:  That is the statute |
| 25 | that says that when someone commits a crime while on |

1 bail for another crime, it specifies that the amount
of bond must be particularly high. It specifies an
amount not less than twice that customarily set. It
doesn't say twice. It says not less than twice. So
I think there's a statutory recognition of the
problem of someone committing a crime while on bail.

Now, I want to be clear that what he
has been charged with recently is a theft, but the
theft occurred many years ago. It was before he was
arrested. The charge that is ongoing after he made
bond on the first two cases we have would be the
part about pretending to be an attorney.

Mr. Allman's incorrigibility as far as
no one seems to be able to stop him from pretending
to be an attorney -- the Supreme court, the Board of
Professional Responsibility, being charged with
felonies by this court, nothing seems to stop him,
and that's one of the themes that the State is going
to go back on. We think that factors in pretty
strongly on his trustworthiness to appear in court,
on the risk of danger to the community. He
flagrantly ignores legal mandates and there's no
indication that he will come to court if it doesn't
suit him or that he will stop doing what he's been
doing since he was suspended in September of 2016.

1               One of the bond factors is reputation

2       and character.  At this point Mr. Allman is infamous

3       among the community.

4               His financial condition, his law

5       practice, as Your Honor was just discussing with

6       opposing counsel, had to go into receivership.  His

7       license was suspended and then he was disbarred.

8       His employment status at this point, therefore, has

9       to be concerning to the Court.  It certainly is to

10      the State.  And those are some of the factors that

11      we want to explore here.

12              We have indictments -- the old two

13      indictments include two counts for holding himself

14      out as an attorney and taking retainer fees from

15      people.  Then we've got Mr. Herrera which involves

16      him continuing to act like he's going to help

17      Mr. Herrera in a legal capacity and continuing to

18      lie to Mr. Herrera about Mr. Herrera's $59,000 that

19      Mr. Allman stole years before which he now has

20      decided is a fee.  Interesting that he didn't tell

21      Mr. Herrera that.  He told Mr. Herrera the money was

22      in escrow.  Oh, your money is safe; it's in escrow;

23      the receiver has it.  Oh, but now it's a fee.

24      Mr. Allman will say whatever he wants to say to try

25      to dance around the fact that he has stolen,

according to the disbarment orders, more than a
million dollars from people within the Middle
Tennessee area.

            We believe that Mr. Allman's actions,
including those while on bond and including in
particular those after the Board and the Supreme
Court order ordered him to stop practicing law,
shows that he is not to be trusted to obey any
lawful authority including this Court.  We can't
believe he'll come to court if it doesn't suit him,
and we can't believe that he is going to stop
preying on the public as a -- holding himself out to
be an attorney and continuing to take money from
people and hide the various thefts that he's already
committed as he did with Mr. Herrera.

            THE COURT:  Thank you, General.

            MR. COPAS:  Your Honor, on the ...

            COURT REPORTER:  Will you go to the
microphone, please?

            THE COURT:  Go over to the microphone.

            MR. COPAS:  I'm sorry.

            On the issue of whether -- the
conditions of the bond will be or house arrest or
whatever, Your Honor, I do have witnesses in that
regard, just people in the community, if you will,

```
 1   to respond to what's been said about --
 2              THE COURT:  Are they here?
 3              MR. COPAS:  Yes, Your Honor.
 4              THE COURT:  Okay.  Good.
 5              MR. COPAS:  And the family, which I --
 6   they've all given me letters which I'm just going to
 7   present to the Court and --
 8              THE COURT:  Yeah, they're admissible.
 9              MR. COPAS:  -- and that's -- all
10   family people like to be heard if you know what I
11   mean, Your Honor.
12              THE COURT:  I understand.
13              MR. COPAS:  And the -- what's really
14   disturbing to me is that the State is going to come
15   in here and say there's no proof of any kind of
16   attorney fee when the records that they've been
17   holding will show -- have that proof, and that's
18   very disturbing to me, Your Honor.
19              THE COURT:  Now, are you referring to
20   all the counts or just the count on the new case?
21              MR. COPAS:  On the new case.
22              THE COURT:  Okay.  Okay.
23              MR. COPAS:  Just on that.  And anyway
24   I just want -- I'm not waiving that objection --
25              THE COURT:  I understand.
```

```
 1              MR. COPAS:  -- but I'm very disturbed

 2   by it.  Thank you.

 3              And the other thing, Your Honor, there

 4   is a document in rebuttal, when we get to that point

 5   on our side of the proof, that's in the possession

 6   of my client, and I would like to be able to

 7   retrieve that after --

 8              THE COURT:  Sure.

 9              MR. COPAS:  -- we get this proof here.

10              THE COURT:  Sure.

11              Okay.  General, call your first

12   witness.

13              GENERAL DEAN:  Judge, the State calls

14   Russ Willis.

15              It should be clear, Judge, while the

16   witness approaches, the check Mr. Allman wrote to

17   himself of Mr. Herrera's money does say Herrera fee,

18   but my point was he didn't tell that to Mr. Herrera.

19   So if I misstated that, I apologize.

20              THE COURT:  Okay.

21   ///

22   ///

23   ///

24   ///

25   ///
```

```
 1                    RUSSELL WILLIS,
 2     after having first been duly sworn, was examined and
 3     testified as follows:
 4                    DIRECT EXAMINATION
 5     BY GENERAL DEAN:
 6     Q.       You know lawyers typically make very bad
 7     witnesses.
 8     A.       I understand that.
 9     Q.       Could you state your name, please?
10     A.       It's Russell Willis.
11     Q.       And where do you work, sir?
12     A.       I work for the Tennessee Board of
13     Professional Responsibility.
14     Q.       And did you have any involvement in the --
15     dealing with the complaints that came in about
16     Mr. Allman over the years?
17     A.       Yes, sir.  I've been the primary
18     disciplinary counsel that's handled the disciplinary
19     cases, the contempt case, the receivership case, and
20     the temporary suspension case.
21     Q.       Of the complaints that you have worked
22     through, about how many did you deal with?
23     A.       Are you talking about disciplinary
24     complaints?
25     Q.       Yes.
```

```
 1  A.         Approximately 208 are contained within the
 2  three disciplinary cases that we've brought.  There
 3  is a fourth disciplinary case that's pending that
 4  has an additional 14 that has not been resolved yet.
 5             THE COURT:  Okay.  How many in the
 6  three cases, did you say?
 7             THE WITNESS:  Approximately 208.
 8             THE COURT:  Okay.  And then how many
 9  is the fourth?
10             THE WITNESS:  That has currently 14
11  matters.
12             THE COURT:  Okay.  Thank you, sir.
13             Go ahead.
14  BY GENERAL DEAN:
15  Q.         Now, you mentioned the three disciplinary
16  complaints that have been resolved.  Why are there
17  three?  How does it happen that you come up with
18  that many?
19  A.         In this particular case we received a
20  number of complaints early on.  Those were handled
21  by the investigative division of the Board.  When
22  they get through investigating those particular
23  cases, then those cases are presented to the Board
24  for whatever disposition the Board feels is
25  appropriate.  If they are deemed to be something
```

1    that should be a part of a formal disciplinary case,

2    a more significant case, then they are filed as a

3    formal disciplinary matter by the litigation

4    department which is where I work.

5         So in Mr. Allman's case, we had a few cases

6    coming in, looked at those.  I believe the first

7    initial group was about seven or eight.  The Board

8    recommended a petition be filed.  We filed the

9    initial petition based upon those seven cases.  Then

10   we received more cases, did more investigation.  The

11   Board wanted those part of a petition.  We then

12   filed a supplemental petition in that first case,

13   then the second supplemental, and then a third

14   supplemental.

15   Q.        So it's basically just add complaints to

16   the existing disciplinary complaint?

17   A.        Correct.  So the very first full

18   disciplinary case I had had a total of 79 complaints

19   in it, and that formal petition contained the

20   initial petition, a first supplemental, a second

21   supplemental, and a third supplemental case.

22   Q.        So what makes you file a separate petition?

23   A.        Cases get moving forward and they become

24   ripe to try and then other matters come to our

25   attention, and instead of holding up the initial

1  case, we simply file a second case.  That's one
2  criteria.
3          The other issue in this case was that when
4  we got to a large number, it became very difficult
5  to figure out how to try that matter.  So instead of
6  adding more to the 79 cases, we chose to file a
7  separate petition.  So that played a part in it too.
8  Q.      And I guess the same process basically
9  leads you at some point to cut off Petition Number 2
10 and begin Petition Number 3?
11 A.      Correct.  And what happens in these cases,
12 Judge, is as we -- as these matters become public,
13 more clients -- more former clients consider that
14 maybe they weren't treated how they should have been
15 treated and they may make a complaint.  Some of
16 those are looked at and not brought forward.  Some
17 of them are looked at on their face and moved
18 forward in the investigation and they ultimately
19 become a part of a petition.
20 Q.      Did you bring a copy of the disciplinary
21 complaints in this case?
22 A.      Yes, sir.  I brought a certified copy of
23 all of the petitions I have mentioned earlier, both
24 disciplinary ones, the criminal contempt, and the
25 temporary suspension.

```
 1              GENERAL DEAN:  Judge, since these are
 2    certified -- I mean, I guess I could have the
 3    witness identify them.
 4    BY GENERAL DEAN:
 5    Q.        Would you look through those as well as the
 6    other two documents, sir?
 7    A.        Yes, sir.  I -- we have a petition with a
 8    docket number for the Board of 2016-2564.  That is
 9    the first petition I filed.  We have a Petition
10    Number 2017-2765.  That's the second petition that I
11    filed.  We have a third petition, 2018-2830.  That
12    is the third one.  Then I have the order of
13    temporary suspension which has a Board Docket Number
14    of 2016-2628.  And then we have the criminal
15    contempt petition which has a Board Docket Number of
16    2017-2748.
17              GENERAL DEAN:  Judge, I'd ask that
18    these be made exhibits to this proceeding.
19              THE COURT:  Granted.  We'll make this
20    Collective Exhibit Number 2.
21              (Exhibit 2 received into evidence.)
22    BY GENERAL DEAN:
23    Q.        So let's talk about the disciplinary
24    petitions.  What was the result of those petitions?
25    What ultimately happened?
```

| | |
|---|---|
| 1 | A.         The second petition I filed, I believe, is |
| 2 | the petition that I actually tried.  The other two |
| 3 | petitions were negotiated out with a conditional |
| 4 | guilty plea signed by Mr. Allman.  All three |
| 5 | resulted in a disbarment in each of those cases and |
| 6 | restitution ordered in all three cases. |
| 7 | Q.         So there are -- |
| 8 | THE COURT:  When was that? |
| 9 | THE WITNESS:  Well, I've got -- the |
| 10 | orders are all dated and they have the dates in |
| 11 | there.  Are you looking for the order -- dates of |
| 12 | the orders? |
| 13 | THE COURT:  Yes. |
| 14 | THE WITNESS:  All right. |
| 15 | THE COURT:  When was he disbarred and |
| 16 | ordered to make restitution? |
| 17 | THE WITNESS:  All right.  Under the |
| 18 | first matter -- the first petition which was |
| 19 | 2017-2765, the order of enforcement, which is the |
| 20 | Supreme Court order that effectively enters the |
| 21 | disbarment, that was dated June 19, 2018. |
| 22 | THE COURT:  Okay. |
| 23 | THE WITNESS:  The second matter which |
| 24 | was entered by the Supreme Court, the second |
| 25 | disbarment, was in Board Case Number 2018-2830, and |

1   that was entered on July 13, 2018.

 2              THE COURT:  How can somebody be

 3   disbarred two times?

 4              THE WITNESS:  I think it's much sort

 5   of like the criminal process system where if you

 6   have a complaint, we have to deal it; we have to

 7   resolve it in some manner.  And when someone comes

 8   in and tells us that they have a particular issue

 9   with a lawyer and it's a serious matter and it gets

10   to a formal disciplinary petition, we have to

11   resolve it in some way, and so that leads us to the

12   entry of another sanction.

13              THE COURT:  Gotcha.  Okay.  Thank you.

14   BY GENERAL DEAN:

15   Q.       So there were three disciplinary petitions

16   that have been dealt with so far, and so --

17              THE COURT:  He's talked about two.

18              THE WITNESS:  Right.

19              THE COURT:  What about the third one?

20              GENERAL DEAN:  Okay.  I'm sorry.

21              THE WITNESS:  The third case is the

22   2016-2564 case, and that was an order entered by the

23   Supreme Court disbarring Mr. Allman on July 30,

24   2018.

25              THE COURT:  Okay.  Sorry to butt in

1  here, General.

2              So what does that mean?  You've got

3  three disbarments.  What's the sanction here?  I

4  mean, he can't practice law for how long?

5              THE WITNESS:  Well, that's --

6  certainly the sanction is he is no longer a member

7  of the bar and cannot practice for a minimum of five

8  years.

9              THE COURT:  Okay.

10             THE WITNESS:  At the end of that

11  five-year period then he is -- if he wants to, he

12  can file a petition for reinstatement, and it's his

13  burden to prove that he has a requisite capacity to

14  come back and practice.

15             THE COURT:  Okay.  Go ahead, General.

16             THE WITNESS:  Let me also say the

17  other benefit of these cases is we ask for

18  restitution because it does play into the Tennessee

19  Lawyers' Fund which is a separate department, and

20  the Lawyers' Fund, before they can act on any claim

21  filed by a former client or a client, they have to

22  have filed a claim with us, with the Board, and the

23  resolution of that is reported to the Lawyers' Fund.

24             THE COURT:  How much was restitution?

25             THE WITNESS:  We have restitution that

```
 1  totals $1,154,335.35.
 2            THE COURT:  Okay.  Now, when was that
 3  ordered, at the first disbarment or the third?
 4            THE WITNESS:  Well, each disbarment
 5  carried its own --
 6            THE COURT:  Okay.
 7            THE WITNESS: -- amount of restitution.
 8            THE COURT:  How much of that has been
 9  paid?
10            THE WITNESS:  By Mr. Allman?
11            THE COURT:  Yeah.
12            THE WITNESS:  I am unaware of any
13  amount that's been paid by Mr. Allman.  I will tell
14  this Court that the Lawyers' Fund has received a
15  number of claims.  They have acted on a number of
16  those claims.  I think they're paying out at
17  approximately .32 or .35 cents on the dollar.
18            THE COURT:  So you've got the Lawyers'
19  Fund paying off his restitution?
20            THE WITNESS:  Yes, sir.
21            THE COURT:  Is that basically what --
22  okay.  And can you give me a guess about how much of
23  that has been paid?
24            THE WITNESS:  I'm going to be very
25  general because I don't --
```

```
 1                    THE COURT:  Sure.  We understand.

 2                    THE WITNESS:  Make sure I've got the

 3    right numbers.  I believe there is a statutory or

 4    policy limit per lawyer.  It's a total, I think, of

 5    $250,0000.

 6                    THE COURT:  Okay.

 7                    THE WITNESS:  And then there's a per

 8    claim limit of $100,000.

 9                    THE COURT:  Okay.

10                    THE WITNESS:  Some of these claimants,

11    their claims are more than 200 -- I mean more than

12    $100,000.  The total amount that has been approved

13    exceeds the $250,000 limit.  That's why they're

14    paying out on a 34 or 35 percent payment.  We still

15    have more -- a few more claims that are going to

16    have to be considered by the Board, the Lawyers'

17    Fund.

18                    THE COURT:  Okay.

19                    THE WITNESS:  And that may affect --

20    there is some residual that they're holding back so

21    that they can pay the rest of it out when all the

22    claims have been looked at.

23                    THE COURT:  Okay.  General, sorry for

24    butting in here.

25                    But when did you start this
```

| | |
|---|---|
| 1 | investigation on Mr. Allman? When was the first |
| 2 | complaint filed? And it looks like it goes all the |
| 3 | way up here to -- the last disbarment, I believe, |
| 4 | was 7/30/18. |
| 5 | THE WITNESS: Yes, sir. I cannot tell |
| 6 | you when the first complaint came in to the Board. |
| 7 | That would be looked at by the investigative side. |
| 8 | It would have been at least several months before |
| 9 | the first petition was filed. |
| 10 | THE COURT: Okay. Go ahead, General. |
| 11 | BY GENERAL DEAN: |
| 12 | Q.      And the first petition was March of '16, I |
| 13 | think. Would that -- does that sound right? |
| 14 | A.      Yeah, I can tell you. The first petition |
| 15 | was March 2, 2016. So we would have gotten |
| 16 | something back into the 2015 time frame. |
| 17 | THE COURT: Okay. Go ahead, General. |
| 18 | BY GENERAL DEAN: |
| 19 | Q.      All right. Did we go through the results |
| 20 | of these three petitions? I think you did say |
| 21 | conditional guilty pleas to two of them. |
| 22 | A.      Right. There were conditional guilty pleas |
| 23 | to two of them. There was a hearing panel decision |
| 24 | of disbarment in the third. |
| 25 | Q.      The conditional guilty plea, what's that |

1    conditioned on?

2    A.       That is conditioned upon the approval of

3    the hearing panel, the Board, and ultimately the

4    Supreme Court, and effectively only the Supreme

5    Court's decision is when the discipline is imposed.

6    Q.       So that condition, has it been met?  Have

7    those guilty pleas been accepted all the way up the

8    chain to the Supreme Court?

9    A.       Yes, sir.  Otherwise you wouldn't have the

10   order from the Supreme Court.

11   Q.       There's been some talk about the

12   receivership of Mr. Allman's practice.  Who filed

13   for the receivership to get going?

14   A.       The Board filed the initial petition to

15   seek appointment of a receiver in Sumner County, and

16   the rationale for that is that we were receiving a

17   number of phone calls and complaints about not being

18   able to reach Mr. Allman, not being able to get

19   access to their files from the clients.  And I had

20   had some preliminary discussions with Mr. Allman and

21   ultimately counsel that he retained about getting

22   those matters -- getting the files handed over.  The

23   numbers became so much that apparently it just was

24   overwhelming whoever was trying to help him

25   accomplish what needed to be accomplished.

1    So we went ahead and filed for the
2 receivership so that the clients could have someone
3 they could actually call and talk to and who could
4 take possession of whatever was in the office and
5 start to timely get matters to the client.
6 Q.    Before the first order of disbarment hit,
7 was there any attempt to suspended Mr. Allman's
8 license?
9 A.    Well, yes, before the first disbarment
10 there was as part of that first petition that I
11 filed.  That was on, I think, seven complaints.  The
12 next supplemental petition I filed in that case was
13 the Rosa Ponce case which looked like it had -- it
14 looked like it was a theft case of a settlement, and
15 once I saw that, then I went ahead and brought the
16 petition for temporary suspension under the 12.3 --
17 Rule 9 Section 12.3 allows us to seek an immediate
18 suspension of a lawyer for misappropriation or
19 representing a substantial harm to the public.  And
20 with a theft case we needed to move forward because
21 the disciplinary case I had was going to take many
22 months, if not longer, to resolve.
23 Q.    And, in fact, that was borne out.  I think
24 they start in '16 and they -- the disbarments don't
25 occur until '18.  Does that sound right?

| | |
|---|---|
| 1 | A.         Correct.  And really because the numbers of |
| 2 | complaints that came in that became a part of the |
| 3 | petition made it last longer, because every time I |
| 4 | file a supplemental Mr. Allman would have 20 days to |
| 5 | respond and answer, and then we'd start that |
| 6 | discovery process for that section.  And to get the |
| 7 | case ready I had to have all the cases ready to go. |
| 8 | Q.         How was Mr. Allman on responding to the |
| 9 | complaints to the Board when he was given the |
| 10 | opportunity to do so? |
| 11 | A.         In the initial numbers we were getting some |
| 12 | responses back from Mr. Allman with information, |
| 13 | promises about getting documents to us that would |
| 14 | satisfy us about the retainers and where they were, |
| 15 | the work being done.  That was -- part of the |
| 16 | defense was, I'm talking to these clients; I'm doing |
| 17 | what I need to do.  It's all a misunderstanding, and |
| 18 | the money is where it's supposed to be, and I've |
| 19 | done the work and I've earned the fee. |
| 20 | And we would be asking, well, give us some |
| 21 | proof of that, and his lawyers were working on that, |
| 22 | promised it to us.  We never received any of that, |
| 23 | and then the numbers began to grow pretty quickly |
| 24 | and it just became bigger. |
| 25 | And, of course, the Ponce case was really a |

| 1  | major focus of mine and that was in that -- that |
|----|---|
| 2  | came up pretty quickly in the supplemental, and I |
| 3  | wanted to see proof of the 24-and-change-thousand |
| 4  | that was supposed to be in his trust account or in a |
| 5  | check written to Ms. Ponce and delivered to her. |
| 6  | And that promise was made over and over again, never |
| 7  | saw that money.  That's what led to the suspension |
| 8  | order. |
| 9  | THE COURT:  And when was his first |
| 10 | suspension? |
| 11 | THE WITNESS:  The temporary |
| 12 | suspension, Your Honor, was -- let me find it -- |
| 13 | September 9 of 2016. |
| 14 | THE COURT:  Okay. |
| 15 | THE WITNESS:  And, of course, there is |
| 16 | a mechanism under that rule that allows the lawyer |
| 17 | to seek to dissolve that at any time and -- |
| 18 | THE COURT:  Dissolve the suspension? |
| 19 | THE WITNESS:  Correct. |
| 20 | THE COURT:  Okay. |
| 21 | THE WITNESS:  There was discussions |
| 22 | about that being forthcoming and that was also part |
| 23 | of, well, please show me where the money is, and if |
| 24 | you show me the money is in trust or has been |
| 25 | delivered, then, of course, we would not stand -- we |

| 1 | would let the temporary suspension be dissolved, we |
| 2 | wouldn't oppose that, and that never occurred. |
| 3 | THE COURT: Did the temporary |
| 4 | suspension ever become a more permanent thing? |
| 5 | THE WITNESS: What happens in those is |
| 6 | when we resolve the first petition for discipline, |
| 7 | then that temporary suspension is dissolved in that |
| 8 | order. So it is replaced with the disbarment. |
| 9 | THE COURT: So the temporary |
| 10 | suspension was in effect from 9/9/16 until the first |
| 11 | disbarment on 6/19/18? |
| 12 | THE WITNESS: I believe so, and I |
| 13 | believe that the order should reflect -- I need to |
| 14 | make sure if it reflects that it was dissolved. |
| 15 | Yes, sir, on page 2 of that order, Paragraph Number |
| 16 | 3, the order of temporary suspension entered |
| 17 | September 9, 2016 is hereby dissolved. |
| 18 | THE COURT: So can you tell me what a |
| 19 | temporary suspension means? |
| 20 | THE WITNESS: It means that the lawyer |
| 21 | must -- is no longer able to practice law -- |
| 22 | THE COURT: Okay. |
| 23 | THE WITNESS: -- effective typically |
| 24 | that day except for existing clients, and then that |
| 25 | lawyer has 30 days that he can continue to represent |

```
 1   those existing clients, but he cannot take any new
 2   cases as of the day of the suspension.
 3                THE COURT:  Okay.
 4                THE WITNESS:  And it's designed there
 5   to allow the lawyer time to file their petition to
 6   dissolve the temporary suspension and get it set
 7   aside before a number of factors and then conditions
 8   kick in that the lawyer must follow.
 9                THE COURT:  Okay.  Go ahead, General.
10                GENERAL DEAN:  Judge, can I see that
11   bundle?
12                THE COURT:  Yes.  Exhibit Number 2?
13                GENERAL DEAN:  Yes, sir.
14                THE COURT:  Yes, sir.  (Passes
15   document.)
16                GENERAL DEAN:  Thank you.  Thank you,
17   Judge.  I wanted to make sure the order of
18   suspension was amongst those and it is.
19                THE COURT:  Okay.
20   BY GENERAL DEAN:
21   Q.        So when you're suspended from the practice
22   of law, as far as new clients, soliciting business
23   to perform legal services, can you do that?
24   A.        For Mr. Allman's purposes on September 9th
25   when that order came down, he was to immediately --
```

could no longer take on new cases and he had a few
days to a few weeks to do certain things, like he
had ten days to send out letters to his current
clients and tell them I've been temporarily
suspended. He had 20 days in which he had to file
motions with the court to withdraw on all of his
pending cases, and then he had, I think, 30 days in
which he could wrap things up.

Also, in that 20-day period he was supposed
to then remove himself from his office after that
20th day, and he could no longer be in his office,
could no longer be where the practice of law is
ongoing.

THE COURT: Well, let me just follow
up there. What problems then did you have, if any,
after suspension on 9/9/16 with him following the
procedure that you've set forth?

THE WITNESS: I'll start out with what
it looked like, because at the end of the day I have
-- I'll have to back up a little bit.

THE COURT: Okay.

THE WITNESS: When we first got this
we had -- he had a lot of clients, well over 200,
and I was hearing maybe well over 300 clients, and
his current counsel said he also had at least one or

| 1 | two cases that he was trying that were pending and |
| 2 | were ready to be tried in that 30-day period.  So he |
| 3 | was focused primarily on trying to get that one or |
| 4 | two cases tried.  I think they were in federal |
| 5 | court. |
| 6 | And his position was, I really don't |
| 7 | have enough time to sit down and write the letters |
| 8 | to every client that I have at this moment.  There's |
| 9 | just so much to do to get ready for trial.  So with |
| 10 | his -- with our -- with my permission, we weren't |
| 11 | really focussed on that 20-day period or 10-day |
| 12 | period to get the letters out. |
| 13 | THE COURT:  Okay. |
| 14 | THE WITNESS:  Go ahead and get the |
| 15 | practice -- go ahead and get your case tried.  Get |
| 16 | the letters out when you can, but let's do a good |
| 17 | faith effort to get them out as soon as you get the |
| 18 | cases wrapped up. |
| 19 | As part of his requirement under Rule |
| 20 | 9, he is supposed to then turn around and prove to |
| 21 | us that he has withdrawn from cases, that he has |
| 22 | written the letters.  We never got that proof and |
| 23 | did not get any of that proof until after I had |
| 24 | filed the criminal contempt alleging that he had |
| 25 | failed to meet the requirements of his temporary |

```
 1   suspension order.  As part of that process and
 2   getting to the final end of the criminal contempt,
 3   his lawyer produced a number of the green cards
 4   showing that a number of letters had gone out.
 5               Now, all this time we're getting phone
 6   calls from their clients -- from his clients.  We've
 7   also spoke to some of the associates who were in his
 8   firm at the time when it was closing up, and every
 9   indication we had was that a number of his clients
10   had not heard he'd been suspended, had not received
11   any letter, and they only learned about it because
12   it was on TV.
13               But, ultimately, I think he made a
14   good faith effort to send out a number of those
15   letters.  I don't know that every client -- I'm sure
16   every client didn't get them, and I don't know when
17   they were sent, if they were just weeks after he got
18   through trying the case or months after he got
19   through trying the case.
20               THE COURT:  Okay.
21               THE WITNESS:  But part of that
22   criminal contempt was withdrawn based upon the
23   showing from his lawyers that he had sent out 60 or
24   70, 80 certified letters and the green cards were in
25   their possession.
```

Lori C. Brice, LCR

1     THE COURT: Okay. What other

2  suspension problems?

3     THE WITNESS: Well, it was discovered

4  that he continued to engage in the unauthorized

5  practice of law after he was temporarily suspended.

6  We had several people who said they had phone calls

7  with him, who said they had meetings set up with

8  him. Ultimately, we had at least two or three of

9  those people that we made a part of the criminal

10 contempt. Two of those, one of which was

11 Ms. Smelser --

12     MR. COPAS: Your Honor, I'm going to

13 object to the hearsay.

14     THE COURT: I will overrule. Reliable

15 hearsay is admissible under Burgins. Also under

16 Rule 104 for motions of this type it's admissible.

17 We don't want to have a jury trial before we have a

18 jury trial. So I will overrule that objection.

19     Go ahead.

20     THE WITNESS: One of them was

21 Ms. Smelser and one was Ms. Kelley. We made --

22 those two, I know, are part of the criminal contempt

23 for unauthorized practice of law. Mr. Allman took

24 fees of $4500 from each of them in November of 2016.

25 These were new clients and he was unable to take any

| 1 | new clients after September 9 of 2016.

2           THE COURT: General, are any of those

3 -- either of those two clients listed in the

4 indictment?

5           GENERAL DEAN: They are.

6           THE COURT: Okay. Go ahead.

7           THE WITNESS: That -- I never received

8 the affidavit that he was supposed to file with us.

9 That's not all that uncommon from lawyers, but

10 they're supposed to file affidavits swearing that

11 they have complied with the conditions of the

12 temporary suspension, they've written the letters,

13 they've withdrawn from all the cases, they have

14 notified opposing counsel. I never received that

15 affidavit, and I never received any of the filings

16 that he had withdrawn from cases.

17           I do know in the federal court system

18 that Judge Crenshaw, who was presiding judge, put

19 down an order for all the cases that were pending in

20 the federal court, which is somewhere around 35 or

21 40, that just took him out of each of those cases.

22           THE COURT: So he had 30 to 35 cases

23 in federal court, and Judge Crenshaw ordered him to

24 withdraw on those cases or prohibited him from

25 practicing law? What was the order?

```
 1              THE WITNESS:  I believe the order
 2  specifically said that he is removed from the case
 3  and the cases are continued for x number of days to
 4  allow the client to obtain new counsel or proceed
 5  pro se.
 6              THE COURT:  Okay.  Go ahead, General.
 7              Well, before we get to that, what
 8  other suspension issues?  You talked about contempt.
 9  Did you file a contempt?
10              THE WITNESS:  Yes, sir, I did file a
11  contempt petition against Mr. Allman.  It had
12  somewhere around -- ultimately about 25 particular
13  charges against him.  Most of those charges were due
14  to his failure to notify clients about his
15  suspension and to provide the documentary
16  information showing he'd done that, and I had a
17  number of clients who were going to come and testify
18  to that.  I had about 10 or 12 clients who were
19  going to come and testify to that.
20              Ultimately when he showed me the green
21  cards, we elected at that point to remove those from
22  the petition.  Ultimately we ended up settling the
23  matter on two counts, both Ms. Smelser and
24  Ms. Kelley.  That's how we resolved it.  So it went
25  from 25 allegations to being resolved for a plea to
```

```
 1   the two counts.
 2              THE COURT:  And what was the
 3   disposition?
 4              THE WITNESS:  He was found to be in
 5   criminal contempt.  He pled nolo to both those
 6   matters.  The Supreme -- well, the special master
 7   appointed by the Supreme Court found that he ought
 8   to serve 10 days for each offense, be fined $50 for
 9   each offense, and to serve those 20 days
10   consecutively.  The Supreme Court reviewed that and
11   agreed with it and entered the order.
12              THE COURT:  When was that petition
13   entered -- or the judgment entered on the contempt?
14              THE WITNESS:  That would be the
15   criminal contempt order which is -- was entered
16   October 23, 2018.  It's Board Number 2017-2748.
17              THE COURT:  All right, General.  Now,
18   I think I'm done.  You can get back to where you
19   are.  Go ahead.
20   BY GENERAL DEAN:
21   Q.       In the process here has Mr. Allman -- in
22   the process -- I'm sorry -- at the Board, the
23   process that you were dealing with, has Mr. Allman
24   consistently had one attorney and things gone
25   smoothly in that regard, or has he -- or not?
```

A.          He started out, I believe, with Mr. Jay
Longmire who contacted me to -- in regards to the
first petition and, I think, even the supplemental
petition with Ms. Ponce, and then Mr. Longmire
withdrew and Mr. Will Hawkins took over.  And I know
Mr. Hawkins well, and he was working hard on trying
to get me the information with Ms. Ponce and her
$24,000-and-some-change settlement money.
Ultimately, as the cases grew, the clients -- the
complaints grew and Mr. Hawkins withdrew.

          I believe at that point Mr. Blackburn, Gary
Blackburn, came on board and handled matters up
through the first hearing that I had on the second
petition I filed.  Ultimately, though, Mr. Blackburn
withdrew, and I believe then Mr. Alex Little and
Mr. Dale Bay became counsel of record in the
matters, and Mr. Little handled the criminal
contempt.  Mr. Bay was working on all the
disciplinary cases that we had, which was all three
petitions at that point in time were pending, and
then I believe Mr. Little withdrew at the end of
criminal contempt matter, Mr. Bay withdrew, and the
matters were resolved with pleas and hearing the
panel decision in one case.  And once the
disbarments were entered, there's been no more

| | |
|---|---|
| 1 | counsel involved as I recall it. |
| 2 | Q. When we talk about the amount of |
| 3 | restitution that is attached to the disbarment |
| 4 | orders, I want to make sure we're clear about what |
| 5 | that number represents and what it does not |
| 6 | represent. So if I was Ms. Smelser and I paid |
| 7 | Mr. Allman $4500 in a retainer fee -- and I don't |
| 8 | remember if that's how much she paid. That's the |
| 9 | standard number. So I'm just using this as an |
| 10 | example -- $4500, and hired him to represent her in |
| 11 | some cause of action worth an unknown figure, maybe |
| 12 | zero, maybe a million dollars, just an unknown, when |
| 13 | you guys calculated restitution, is she compensated |
| 14 | at all for the loss of the cause of action that she |
| 15 | might have had that she was hiring Mr. Allman to |
| 16 | represent her on? |
| 17 | A. She would not be compensated for whatever |
| 18 | the value of her underlying case claim would be |
| 19 | worth. We focussed on the fee received by the |
| 20 | lawyer, or perhaps maybe the restitution might |
| 21 | contain the fee that the client had to pay the next |
| 22 | lawyer because of the misconduct of the first |
| 23 | lawyer. |
| 24 | So in Ms. Smelser's case she did receive -- |
| 25 | she did pay a $4500 fee to Mr. Allman, and the |

1   restitution for her would be the $4500.

2   Q.        Okay.  Thank you, sir.

3             THE COURT:  Okay.  Mr. Copas, you may

4   cross-examine.

5                     CROSS-EXAMINATION

6   BY MR. COPAS:

7   Q.        Mr. Willis, Gary Copas.

8   A.        Nice to see you.

9   Q.        Nice to see you, sir, yes, sir.  I've had a

10  lot of cohorts and friends or whatever pass through

11  your domain.

12            What I want to do is try to make sure we

13  have a clear picture about the Board's involvement

14  in things of this nature.  I'm talking about this

15  criminal court.

16  A.        Yes, sir.

17  Q.        And you made the comment about 208

18  complaints being filed, and you did make a comment

19  about -- you spelled out 79 different complaints in

20  a pleading.  You had listed 79 of them?

21  A.        Yes, sir.

22  Q.        Are each of these items, these 79 items, do

23  they identify an ethics violation?

24  A.        I'd have to go back and look at the

25  petition to really tell you.  The petition I filed

| | |
|---|---|
| 1 | was probably about a foot thick, but I can't say |
| 2 | that every one of them listed a particular in -- for |
| 3 | each claim. |
| 4 | Q.      Well, what I'm leading up to is this, is I |
| 5 | just want to make sure when we talk about |
| 6 | complaints, we're talking about ethic violations and |
| 7 | not individuals.  In other words, an individual |
| 8 | could file a complaint and it could maybe list four |
| 9 | ethics violations or whatever? |
| 10 | A.      Correct.  When I say 79, that's 79 people, |
| 11 | clients in Mr. Allman's situation.  There were 79 |
| 12 | complainants who have made complaints.  There might |
| 13 | be only one ethics violation or may have three or |
| 14 | four of five in there. |
| 15 | Q.      And that -- I mean, the Court's already |
| 16 | heard it and we've heard it before from Ms. Rielly. |
| 17 | She said in her investigation she came across 70 |
| 18 | different individuals making complaints.  So that's |
| 19 | consistent with that. |
| 20 |         The other thing is that we're dealing with |
| 21 | ethics violations, and of course I -- every attorney |
| 22 | at one point in time has had somebody walk in the |
| 23 | door and say, I want to sue this attorney for |
| 24 | malpractice because he violated this ethic rule, and |
| 25 | I have to tell them that a violation of an ethic |

| | |
|---|---|
| 1 | rule is not in and of itself grounds for |
| 2 | malpractice. |
| 3 | A.        Correct. |
| 4 | Q.        And I want to make sure -- in fact, I |
| 5 | thought you -- in reading this transcript from the |
| 6 | receivership proceedings you made a statement here |
| 7 | which reflects my understanding of it myself |
| 8 | forever.  You state that the Board doesn't deal with |
| 9 | the legal aspects.  It deals with the ethics.  We |
| 10 | don't deal with the determination of what interest |
| 11 | Mr. Allman or other lawyers may have in their cases, |
| 12 | whether they engaged in misconduct or whether they |
| 13 | earned a fee or not earned a fee, or got a lien or |
| 14 | don't have a lien.  All those legal matters are not |
| 15 | dealt with in your enforcement of ethics; correct? |
| 16 | A.        Typically not.  I mean, only if it's an |
| 17 | ethical violation, you're seeking a lien on |
| 18 | something you have no right to seek. |
| 19 | Q.        Correct. |
| 20 | A.        A meritless claim. |
| 21 | Q.        But in and of itself the ethics violations |
| 22 | would stand alone without anything else.  It's not |
| 23 | in and of itself a legal matter.  As far as the |
| 24 | Board's concerned it needs to be addressed in some |
| 25 | venue. |

```
 1   A.        Typically we would leave that to the trial
 2   court to work through and figure out what fee, if
 3   any, belonged to Mr. Allman.
 4   Q.        And I want to make sure that -- we've heard
 5   so much here.  At some point in time after you have
 6   -- in the ligation end of it at some point in time
 7   you take the complaint, whatever it is, to a panel?
 8   A.        Correct.
 9   Q.        And, in fact, the panel, I guess, you might
10   say is a tribunal of the Supreme Court.  I mean,
11   it's a venue that receives everything that goes up
12   to the Supreme Court for the final orders of
13   whatever may be done.
14   A.        It is the administrative process that the
15   Court has set up through Rule 9.  They have -- at
16   least in Sumner County, they pick a number of
17   lawyers at any given time to serve on a panel and
18   from that panel we would randomly pick out of a hat
19   three names, and if they don't have a conflict, they
20   would serve as the tribunal to hear whatever
21   petition is filed against Mr. Allman.  The next
22   petition we filed had a different panel.
23   Q.        Okay.  That's what I'm leading up to.  When
24   you file a petition, that is -- is that the
25   commencement of a proceeding being shifted over to a
```

```
 1  panel?
 2  A.        That is when the panel is picked, correct.
 3  That's the -- if I were in a trial court, circuit
 4  court, it'd be the complaint, and that's when you
 5  pick which court you're going to be in and we'd have
 6  them -- we have a panel that serve as the judges.
 7  Q.        And when you said that you filed a
 8  supplemental petition recently ...
 9  A.        I filed the fourth disciplinary complaint
10  because we received more complaints from new people
11  after these other three petitions were done with.
12  So now we have a fourth petition that's currently
13  pending that has 14 different complainants in it.
14            THE COURT:  You said 14?
15            THE WITNESS:  14 different
16  complainants.
17            THE COURT:  Okay.
18  BY MR. COPAS:
19  Q.        And you identified that.  You said a
20  supplemental petition?
21  A.        Well, I filed a petition that had 13 and
22  then we had -- we got one more complainant in
23  earlier this year that resulted in a petition that
24  was filed -- a supplemental petition of that case.
25  Q.        Okay.
```

```
1    A.        So that one petition now has a 13-count
2    petition and a one-count petition.
3    Q.        Okay.  The initial petition that went to a
4    panel, does that panel still maintain jurisdiction
5    of that initial petition?
6    A.        Yes, sir.  It's all -- all 14 are heard by
7    the same panel.
8    Q.        In other words, there's been no
9    adjudication coming out of the panel yet on all
10   those petitions?
11   A.        Right.  In fact, that matter stayed pending
12   the outcome of the criminal trial.  I believe -- I
13   believe some time this month Mr. Allman and I were
14   supposed to get back with the panel to report on the
15   progress made in this case.
16   Q.        When you get -- when you come up with this
17   restitution, is there any -- is it reduced to an
18   enforceable judgment?
19   A.        It is in the order of enforcement by the
20   Supreme Court.  I have yet to see any third party
21   beneficiary of that be able to go to the circuit
22   court clerk's office or chancery -- clerk and
23   master's office and get a garnishment and collect on
24   it.  I don't think the Court has --
25   Q.        So, to me, the -- I see the restitution
```

1   amount put down here.  In my mind it becomes

2   something that's got to be addressed if you ever get

3   reinstated.

4   A.      Correct.  That's the enforcement mechanism

5   from the Board's standpoint is if a lawyer wants to

6   come back from a suspension or a disbarment whenever

7   their time is up, part of that reinstatement is

8   going to be you have to pay whatever restitution has

9   been ordered, and that's where we get the

10  cooperation of the lawyer at that point.

11  Q.      It's got to be worked out, in other words?

12  A.      Correct.

13  Q.      Now, the -- another statement that was made

14  -- you made a profound statement in the -- in this

15  proceeding, the receivership.  And the other sort of

16  profound statement, I think, was made by the

17  receiver, saying that the receivership is like an

18  estate bankruptcy, and the estate is the law

19  practice.  So in the law business, if you will,

20  whatever existed at that time, they took it over,

21  took all the accounts, took all the files, took

22  everything.  Does the Board -- do they become a

23  claimant in that receivership?

24  A.      Well, the Board doesn't have any claim

25  other than the cost bill that was part -- we

1  generate a cost bill.  We charge the exorbitant fee

2  of, I think, $40 or $50 an hour for our time, but

3  that's the only claim that we would have.

4         The Lawyers' Fund, which is a separate

5  board, I think by also the order of enforcement as

6  well as the rules set by the Supreme Court, they

7  have the right for whatever payment they made to

8  recoup that from Mr. Allman.  So if there's some --

9  if Chancellor Oliver decides that Mr. Allman should

10  receive some of the money that is sitting in the

11  receivership, then the Lawyers' Fund would, I think,

12  step in between the Court and Mr. Allman and make

13  their assertion they are entitled to be repaid for

14  what they've already paid out.

15  Q.     Well, my -- now, my reading of this is that

16  when the receiver took over the business, if you

17  will, any income on there that's accounts receivable

18  -- what I'm trying to say is if there's any cases

19  ongoing, that after the fees are paid out in those

20  cases, I mean, and the client -- whatever fees are

21  paid out, if there's any earned fee in those cases

22  that the -- that the law business would have been

23  entitled to at the time the receiver took over,

24  earned fees, if you will, then that's held by the

25  receiver to pay out to any claimants that come in

1  there, make a claim.

2         And what I'm leading up to is this

3  restitution demand would not prejudice these clients

4  coming in and getting money from the receiver that

5  the receiver would be holding when all of this is --

6  all these cases are finally litigated and settled?

7  A.        Well, I would certainly defer to Judge --

8  to Chancellor Oliver and how he's going to do it,

9  but I think there are going to be several different

10 people coming in to make a claim.  There will be the

11 receiver himself making a claim for his expenses and

12 fees that he's incurred.  The Lawyers' Fund will be

13 coming in to say that they've made certain payments

14 to certain claimants on behalf of Mr. Allman.

15        I don't know if the Board will be making a

16 claim to try to get their cost bills paid.  I

17 seriously doubt that the Board would do that

18 considering the fact that there will be probably a

19 number of claimants like Ms. Brown and others who

20 are going to want to come in and try to get more

21 compensation for the loss because nobody is being

22 fully compensated by the Lawyers' Fund.

23 Q.        In other words, we -- there's not going to

24 be that much there, you think, possibly to fight

25 over, so to speak?

| | |
|---|---|
| 1 | Q.        Correct. |
| 2 | A.        -- along with whatever factors might also |
| 3 | come into play. |
| 4 | Q.        In other words, I guess what I'm trying to |
| 5 | say is there's got to be a determination of an |
| 6 | unearned fee at some point in time and some |
| 7 | mechanism in order to -- throws that obligation on |
| 8 | that lawyer to separate that fee at that moment and |
| 9 | put it into his trust account? |
| 10 | A.        Well, typically what you're looking at is |
| 11 | -- and the ethic rules require if you're going to |
| 12 | charge a nonrefundable fee so that it is earned upon |
| 13 | receipt, it has to be in writing, signed by the |
| 14 | client.  It has to be, you know, clear and clean so |
| 15 | that the client understands that when I pay my |
| 16 | money, it's gone and it's useable by the lawyer |
| 17 | immediately.  Everything else goes into trust until |
| 18 | the lawyer earns it. |
| 19 |          Now, the lawyer will have to come in and |
| 20 | prove to us or prove to the Court that I have worked |
| 21 | hard enough to reasonably charge the fee and I can |
| 22 | remove it from my trust account.  So there's a |
| 23 | combination of ethics and legalities that mix. |
| 24 | Q.        Correct.  And, gee, I don't have the |
| 25 | Supreme Court case in front of me, but where the |

| | |
|---|---|
| 1 | A. Well, what it is, there's going to be more |
| 2 | hands out than can be compensated fully. |
| 3 | Q. And I guess I'm going back to my first |
| 4 | question where you said that the ethic violations |
| 5 | are not legal matters, and you got me thinking there |
| 6 | about earned fees and unearned fees. So the Board |
| 7 | doesn't determine earned fees and unearned fees, but |
| 8 | yet -- I know the Board does -- I mean, the bars do |
| 9 | have mediators that come and try to mediate things |
| 10 | of that nature. Give me your expertise about earned |
| 11 | fees and -- you may not have any, but anyway, is |
| 12 | there -- |
| 13 | A. Well, I mean, the part that the Board |
| 14 | usually looks at with unearned fees is -- or earned |
| 15 | fees is whether they -- where they should be, should |
| 16 | they be in your trust account or not, and what do |
| 17 | the facts tell us. And the Courts also look at the |
| 18 | fees and decide what's to be awarded, what's a |
| 19 | reasonable fee, but the ethic rules do cover |
| 20 | unreasonable fees, improper fees -- |
| 21 | Q. They have a guideline. In fact, I've used |
| 22 | that when I've gotten fees in minor cases, |
| 23 | settlements. |
| 24 | A. And that's what the Court uses too, is that |
| 25 | 10-factor -- |

```
 1  │ Supreme Court talked about retainers.
 2  │ A.        Probably the Connie Reguli case --
 3  │ Q.        Correct.
 4  │ A.        -- would be the one I would think of.
 5  │ Q.        Right.
 6  │ A.        That's one of them.
 7  │ Q.        And maybe -- my recollection -- I could be
 8  │ wrong on this, but that the money received -- in
 9  │ other words, most attorneys and even everybody I
10  │ know of on retainer fees, whatever they get in
11  │ retainer fees, they pay income tax on that, whatever
12  │ comes into, you know, their hands.  But the -- but
13  │ that particular case my recollection is that if
14  │ there is an agreement that that fee will be billed
15  │ against, it becomes what the Court -- the Supreme
16  │ Court calls a secured retainer, and that money the
17  │ Court has specifically stated that that's not
18  │ attorney property.  That's client property.
19  │ Otherwise a retainer is client property, which leads
20  │ me to a situation that -- on the very beginning, on
21  │ the get-go it's not requir- -- I mean, it's not
22  │ earned -- it's not -- the unearned part is not
23  │ determined at that moment, but once it is, you have
24  │ to do something with it.
25  │           I guess the -- I guess a practical matter,
```

```
 1   there's no way under the sun that you could probably
 2   take a $5,000 retainer and it not -- except in a
 3   criminal case, of course, to where you're bound to
 4   that court for the most part.  There is no -- you
 5   know, as a practical matter in a civil case, a
 6   $5,000 -- you know, a $25,000 retainer would not
 7   really cover any kind of initial work that an
 8   attorney does.  In essence there is going to be some
 9   unearned fee money involved in the 25,000.  So I
10   guess it's a gray area.  I'm trying to cross that
11   bridge.  I'm having a hard time getting there.
12           And having handled employment type cases, I
13   know that there is an administrative process you go
14   through to where in some cases the case is settled;
15   there's no money coming in; that's it.  You know,
16   there's no other money -- no money to get, and that
17   retainer tries to cover your time in that
18   administrative process.
19           THE COURT:  Mr. Copas, ask a question,
20   please.
21           MR. COPAS:  I'm sorry, Your Honor.  I
22   guess I get to talking too much.
23           THE COURT:  That's okay.
24           MR. COPAS:  I'm sorry.
25   ///
```

| | |
|---|---|
| 1 | <u>BY MR. COPAS</u>: |
| 2 | Q.        Let me -- you mentioned that you -- a lot |
| 3 | of clients have not heard anything at all except |
| 4 | what they saw in the paper? |
| 5 | A.        Yes, sir.  I -- |
| 6 | Q.        Did that precipitate the receivership? |
| 7 | A.        That was part of that process of the fact |
| 8 | being that clients -- both the associates at the |
| 9 | firm were reporting to me that clients were coming |
| 10 | in and they thought they had meetings set up with |
| 11 | Mr. Allman because they had spoken to him and they |
| 12 | were trying to get their file and then the |
| 13 | difficulties -- a lot of clients calling saying, I |
| 14 | can't get a return phone call and what I did get was |
| 15 | empty; I need my file. |
| 16 |           And so I turned and would make the request |
| 17 | of Mr. Hawkins who was primarily the person at that |
| 18 | point in time that you need to get these files out; |
| 19 | please work on that.  And the phone calls kept |
| 20 | coming and then Mr. Hawkins withdrew.  So at that |
| 21 | point the receiver seemed like the best route to go |
| 22 | and the Board agreed and I filed the matter. |
| 23 | Q.        And then the receiver makes a statement |
| 24 | here that -- first of all, there was an order |
| 25 | appointing him receiver and told him to take |

```
 1  possession of all the accounts and files and
 2  everything?
 3  A.      Correct.
 4  Q.      And then during the receivership hearing,
 5  the -- Mr. Powers made a statement that he looked at
 6  the hard drive and pulled off 230 files?
 7  A.      I think -- I don't remember whether that
 8  was something he pulled off the hard file or whether
 9  that was what Mr. Allman gave him, but, yes, it
10  looked like there was -- I think from the receiver's
11  standpoint there were 230 files.
12  Q.      Anyway I can tell you that my information
13  is that the hard drive has got approximately 230
14  files.  That was Mr. Powers' testimony.
15  A.      Right.
16  Q.      And that we started the process of --
17  you've got here a goal is to find attorneys for all
18  these people that don't have one, and that he had
19  already gone through the Ds and the Es at that
20  moment and was still continuing on.  So we are
21  assuming that most everybody -- all the clients on
22  those hard drives or whatever -- had reached out to
23  -- the receiver had reached out to them.
24          And I gather also from this process -- was
25  it -- is it -- I'm assuming that if any client
```

```
 1   contacted Mr. Allman that -- if they had not
 2   received anything from the receiver, they should
 3   contact the receiver because he was having a time
 4   trying to get everything together?
 5   A.        Correct.  And at that point I think the
 6   receiver was -- had the possession of -- or should
 7   have had possession of everything.  I know there was
 8   difficulty with the TBI had possession of his server
 9   for a while.
10   Q.        Well, what I'm getting at is that there was
11   contact with clients after his suspension.  I'm
12   trying to show that there was -- that the only thing
13   really that he could do was to at least communicate
14   to these clients that if they'd not received the
15   information from the receiver, they needed to
16   contact that receiver and confirm whether or not
17   they had an attorney.
18   A.        Well, certainly from the Board's
19   perspective if clients called Mr. Allman to inquire
20   about their case, it was not improper for him to say
21   please call the receiver --
22   Q.        Okay.  That's what I'm getting at.
23   A.        That's -- if that's what you're getting at.
24   Q.        Yeah.
25   A.        That's not the unauthorized practice of law
```

1 | from the Board's perspective.

 2 | Q.      Okay.

 3 | A.      If you go beyond that and start talking

 4 | about let me tell you what we need to do next, or

 5 | here's what we're going to be doing -- and I had a

 6 | number of people make that allegation to me.

 7 | Q.      In other words, ethically you can't do

 8 | that?

 9 | A.      Ethically, once you are suspended --

10 | Q.      Correct.

11 | A.      -- after that 30 days runs and you've got

12 | -- you should have withdrawn from the case, the

13 | client should know that you're not the lawyer.  And

14 | there's nothing improper with, you know, giving the

15 | information to the new lawyer or providing the

16 | client with their file, but don't continue to act

17 | like the lawyer in the ongoing case.

18 | Q.      Thank you.

19 |         THE COURT:  General, anything else?

20 |         GENERAL DEAN:  No, sir.

21 |         THE COURT:  I've got a couple of

22 | questions.  Mr. Willis, thank you for spending the

23 | afternoon with us.  How long have you been with the

24 | Board of Professional Responsibility?

25 |         THE WITNESS:  It's been eight years

1    this past February.

2              THE COURT:  And what are your -- well,

3    what is your title?

4              THE WITNESS:  I am currently the

5    deputy chief disciplinary counsel.

6              THE COURT:  And what do your duties

7    consist of?

8              THE WITNESS:  I litigate all the

9    formal petitions and oversee a group of four other

10   lawyers who do the same thing.

11             THE COURT:  Okay.  Now, in looking at

12   cases here, we've got a total of -- or complaints --

13   222, and that includes the fourth petition that's

14   pending.  My notes show that investigation into

15   complaints probably began somewhere around the end

16   of 2015.  And then we have the disbarment July 30,

17   2018, close to three years.  Does this fourth

18   petition extend the time past 7/30/18?

19             THE WITNESS:  It depends on how it's

20   going to be resolved.  If it's resolved with a

21   private -- with a public censure, then it wouldn't

22   be anything that would extend the time for him to --

23   if you're talking about the five-year --

24             THE COURT:  No.  What I'm talking

25   about is the length of time that he might have been

Lori C. Brice, LCR

| 1 | involved in unethical conduct. And your |
| 2 | investigation on this beginning around the end of |
| 3 | 2015 to 7/30/18, these 14 complaints that came in, |
| 4 | do they go past the period of time of 7/30/18, or |
| 5 | were they all generally within this period and it |
| 6 | just came up late? |
| 7 | THE WITNESS: I would have to go back. |
| 8 | I did not look at that particular petition, but I |
| 9 | would tell you that generally speaking they're going |
| 10 | to be cases that were back in the 2015, '16, and '17 |
| 11 | time frame. |
| 12 | THE COURT: Okay. Very good. Thank |
| 13 | you. |
| 14 | In the investigation of these |
| 15 | complaints, what different courts were Mr. Allman |
| 16 | involved in that were affected? |
| 17 | THE WITNESS: The courts that I know |
| 18 | of would be the federal district courts and the |
| 19 | Davidson County Circuit Court, and I believe there |
| 20 | was maybe one in Sumner County that cases all got |
| 21 | removed. |
| 22 | THE COURT: Okay. So you're talking |
| 23 | about state trial courts -- |
| 24 | THE WITNESS: Yes, sir. |
| 25 | THE COURT: -- and district court and |

```
 1   the federal court.  Okay.

 2              THE WITNESS:  I believe there may have

 3   been one Texas court too.

 4              THE COURT:  Okay.  What's the status

 5   of the receivership now?

 6              THE WITNESS:  It's still ongoing.  I

 7   don't know when it's going to be resolved.  I would

 8   like to think that sometime this year all the

 9   matters will be ripe and that Mr. Powers can present

10   the ultimate -- the final accounting to Chancellor

11   Oliver and submit his fees and people can make

12   claims if they're going to make them.

13              THE COURT:  Now, all of these files

14   that were given to the receiver, have they been

15   turned over to law enforcement for investigation

16   purposes?

17              THE WITNESS:  I don't know if they

18   were turned over for investigation.  I believe that

19   they -- that the TBI got the servers first and then

20   Mr. Allman got them back and Mr. Powers then

21   received them from either his lawyers or from the

22   TBI.  I don't recall.

23              THE COURT:  These are amazing numbers.

24   You've got 222 complaints.  You've got $1,100,000

25   in restitution which doesn't cover a loss of a cause
```

| 1 | of action over a period of time '15, '16, '17, |
| 2 | possibly three years. Did Mr. Allman ever explain |
| 3 | what was going on here? |
| 4 | THE WITNESS: Initially, I think -- I |
| 5 | got a pretty good sense of what the response was and |
| 6 | was going to be every time I spoke with Mr. Allman. |
| 7 | Primarily it was these clients don't know what |
| 8 | they're talking about, I've got their case handled, |
| 9 | or they're -- I've spoken to them and they're |
| 10 | withdrawing their complaint. And that was sort of |
| 11 | the theme all the way through the cases. |
| 12 | THE COURT: Did anybody ever withdraw |
| 13 | their complaint? |
| 14 | THE WITNESS: There may have been one |
| 15 | person of the 222 so far that said, I'm okay. |
| 16 | THE COURT: Okay. |
| 17 | THE WITNESS: I know there were some |
| 18 | initially that we were involved in that got their |
| 19 | money back. There was a -- the very first few who |
| 20 | were able to get a payment kept them from making |
| 21 | claims with us but, ultimately, they would make -- |
| 22 | you know, they ultimately came to us with a |
| 23 | complaint. |
| 24 | And in all fairness to Mr. Allman |
| 25 | there are some of these complaints that initially |

1  were dismissed that aren't a part of this complaint.

2  We had other complaints that got dismissed, and

3  that's pretty common of this.

4            THE COURT:  Okay.  Well, looking at

5  the figures here, in your eight years have you ever

6  had an investigation of a lawyer as massive as this?

7            THE WITNESS:  Not in numbers, no.

8  There's certainly been some pretty big theft cases

9  in Tennessee, and not all of these, I think, are,

10  quote, theft cases, but there are a lot of

11  no-work-being-done allegations.  So, you know, from

12  a Board perspective, a lawyer takes their retainer

13  and then doesn't do any work.  That looks like an

14  unfair fee and a fraudulent, maybe,

15  misrepresentation type of thing.

16            THE COURT:  Okay.

17            THE WITNESS:  But there were a number

18  of theft cases in this -- in these 222 cases.

19            THE COURT:  Do you know or did anybody

20  do an investigation as to where all this money went?

21            THE WITNESS:  We try.  The difficulty

22  in this particular case was that there was rarely

23  ever a written response back to us with the details

24  and the information that we would ordinarily get.

25  So with Ms. Ponce, who had the $24,000 settlement

| | |
|---|---|
| 1 | check, there was never any proof -- never any bank |
| 2 | statement given to us that showed the money was |
| 3 | promised to be coming. |
| 4 | Ultimately, we subpoenaed his bank |
| 5 | records. That was done in the investigative side. |
| 6 | I don't recall what the outcome -- or what those |
| 7 | bank records show, but when you get into a case like |
| 8 | this where there's a lot of $4500 numbers and |
| 9 | they're not showing up in the bank statements and we |
| 10 | think they ought to be in the bank statements, we -- |
| 11 | it's our view that when you've got the $4500 |
| 12 | retainer, he'd done no work for the client yet. It |
| 13 | should be put into the trust account, and then from |
| 14 | there when he did the work he could take the money |
| 15 | out. |
| 16 | When we got the bank records, there |
| 17 | were very few $4500 that we could actually look at |
| 18 | and match up with all these different numbers. So |
| 19 | that's -- it looked like to us that money was not |
| 20 | going in where it ought to go, and for us that's a |
| 21 | misappropriation. He may well have earned it a |
| 22 | month or two or three later, and that's the sort of |
| 23 | proof we would depend upon Mr. Allman to give us and |
| 24 | that's what we would be asking for, and that was |
| 25 | never shown to us. So we went forward with the |

```
1   petitions with only one side of the story, and
2   that's the clients'.
3               THE COURT:  And what was his response?
4   What was his defense when you tried the one petition
5   in front of the panel?
6               THE WITNESS:  Well, I went to
7   Lawrenceburg, I believe, to try that case and
8   Mr. Blackburn and Mr. Allman declined to participate
9   in that matter.
10              THE COURT:  What do you mean "declined
11  to participate"?
12              THE WITNESS:  Well, it was set for
13  trial and Mr. Blackburn -- as I recall,
14  Mr. Blackburn called me and said, I don't plan to be
15  there.  So I went down and tried it based upon --
16              THE COURT:  Okay.  They declined to
17  participate and it resulted in a disbarment?
18              THE WITNESS:  Yes, sir.  And I did
19  have one person who drove, I think, from Wilson
20  County.  A client came down and she testified at the
21  hearing.
22              THE COURT:  You've got a lot of
23  experience here, Mr. Willis, with investigations and
24  attitudes and actions of attorneys.  Can you tell me
25  what in the world has gone on here?
```

```
 1              THE WITNESS:  I can't tell you with
 2    any certainty, Judge, because I'm only reading the
 3    tea leaves.  It looked like -- and I've known
 4    Mr. Allman from a reputation standpoint prior to all
 5    this happening, and I have a number of friends like
 6    Mr. Longmire who knew him well.  He had a good
 7    reputation.  He did good work.  He got some good
 8    results for clients, and then it looked like perhaps
 9    he just tried to grow his practice, got overwhelmed,
10    got behind, and to make ends meet began to take
11    money in and promise to do the work but couldn't
12    keep up, because it's really him and some really
13    young lawyers who you can't turn loose to do this
14    type of work without being overseen, and he just ran
15    into that problem.  And then instead of stopping
16    and admitting it, he just continued to take in more
17    to try to keep the practice going, and then the
18    cards fell and people started to complain.  And the
19    initial people got money back and so they were
20    satisfied, but the rest of them couldn't get ahold
21    of him and couldn't get their money back, and
22    complaints started to fall in pretty quickly with
23    us.
24              THE COURT:  Okay.  Mr. Willis, you've
25    been invaluable helping me to try to get some of
```

```
 1   this together.

 2              Any questions from any of the

 3   attorneys?

 4              MR. COPAS:  Your Honor, I --

 5              THE COURT:  Mr. Copas, go ahead.  Go

 6   ahead.

 7              GENERAL DEAN:  Judge, can I borrow

 8   Exhibit 2 while he's --

 9              THE COURT:  Yes, sir.

10              GENERAL DEAN:  I'm sorry to keep

11   borrowing that from you.

12              THE COURT:  It's all right.

13              GENERAL DEAN:  Thank you.

14   BY MR. COPAS:

15   Q.      I guess every attorney at one time has

16   received some complaint they've got to respond to,

17   and it seems like the common one we always see is

18   the word "diligence," that the -- that, you know,

19   that you've not been diligent.  And what's the fine

20   line between not being diligent and not doing the

21   work?  I mean, after -- you know, if I've ever had

22   one said lack of diligence, after they heard what I

23   do, then they came back and said, you know, we don't

24   -- we don't want to proceed.

25              But, you know, sometimes an attorney's work
```

```
 1   log can be so heavy that it's hard for him to -- you
 2   don't look at diligence as being able to respond to
 3   something within 30 days or 60 days.  It may be
 4   three months before he can get going down the pike.
 5           What's the line between diligence and not
 6   doing the work?  That's what I'm -- it may be an
 7   impossible question to answer, but I'm just feeding
 8   it out to you.
 9   A.      Well, I think in general it's going to be
10   factually driven.  If I've got a deadline to file my
11   motion and I don't file it and I missed the
12   deadline, and I'm not in the hospital, I'm not in a
13   coma, that's probably a diligence problem.  If the
14   client's called you three times today and you've
15   talked to them twice already and you wait until a
16   couple of days later to call them, that's probably
17   not a diligence issue unless it's extraordinarily
18   important that there -- you know, that you've got an
19   offer on the table that's going to expire at noon
20   tomorrow and you're not calling your client with it
21   immediately.  That's probably a diligence problem.
22   But it's factually driven, I think.
23   Q.      Well, I guess what I'm trying to say is
24   that the Board -- you're concerned with the ethics
25   of it, which is diligence, and the legal part of it
```

1    is concerning whether or not that you've taken money

2    knowing that you can't do all the work.

3    A.       Well, I think that's an ethical issue too.

4    If you're taking --

5    Q.       Well --

6    A.       -- money you know you're not going to --

7    Q.       Right.

8    A.       -- then you're telling a client I've got

9    you covered and you know you don't, I think that's

10   probably a misrepresentation and deceit.

11   Q.       So it's -- again, it's a fact situation?

12   A.       It's a fact situation, clearly.

13   Q.       Thank you.

14            GENERAL DEAN:  Just very briefly,

15   Judge.  Oh, I'm sorry.  He's --

16            THE COURT:  Go ahead, General.  I'll

17   let him come back up if he has another question.

18                  REDIRECT EXAMINATION

19   BY GENERAL DEAN:

20   Q.       Mr. Willis, was there a -- one of the

21   orders of enforcement, was there an amended order

22   that was ultimately filed to substitute?

23   A.       Yes, there was.

24            GENERAL DEAN:  Okay.  Judge, the

25   amended order was not in here.  I have a certified

```
 1    copy of it.  So I'd either like to add it to Exhibit
 2    2 or make it its own exhibit just for completeness
 3    sake.
 4                    THE COURT:  Okay.  Let's make that
 5    Exhibit Number 3.
 6                    (Exhibit 3 received into evidence.)
 7                    GENERAL DEAN:  Thank you, Judge.
 8                    THE COURT:  Any other questions,
 9    Mr. Copas?
10                    MR. COPAS:  I guess one more -- sorry,
11    Your Honor.
12                    THE COURT:  That's okay.
13                    MR. COPAS:  One more question.
14                        RECROSS-EXAMINATION
15    BY MR. COPAS:
16    Q.        I guess for the most part, I mean, most
17    attorneys put in something in there about
18    nonrefundable except in certain cases we can't do
19    that, domestic cases.  But in all of my employment
20    law cases -- and when I read his contract too, and
21    it sort of had the same language, is that the
22    retainer -- it doesn't say the retainer will be
23    refunded, but it does say that whatever attorney fee
24    comes out -- whatever the contingency fee turns out
25    to be, if there's recovery, you'll be given credit
```

| | |
|---|---|
| 1 | for the retainer.  Is that -- is that considered to |
| 2 | be ... |
| 3 | A.       Well, as I remember Mr. Allman's litigation |
| 4 | agreement, it was a combination of a contingency fee |
| 5 | and then this flat fee of $4500 if he has to do |
| 6 | something on the administrative side to then bring |
| 7 | the lawsuit, and that was an EEOC.  And so as I |
| 8 | recall it, it doesn't say it's nonrefundable, which |
| 9 | if it's going to be nonrefundable, it has to say it. |
| 10 | Q.       Well, in all my -- looking at all the |
| 11 | discovery I've been given, I saw some statement you |
| 12 | made sometime saying it was a flat fee, the 4500? |
| 13 | A.       It looks like it's a flat fee contract to |
| 14 | me, which under my theory what I've used in all my |
| 15 | cases was that when he took the money from the |
| 16 | client, it had to go into trust, and then whenever |
| 17 | he did the work that was necessary, if it was, then |
| 18 | he could then remove the $4500 from the trust |
| 19 | account and put it in his operating account. |
| 20 | Q.       Okay.  That -- I don't want to put words in |
| 21 | your mouth.  You said that's your interpretation of |
| 22 | his contract? |
| 23 | A.       That was my view of it.  That's how I -- |
| 24 | Q.       That was your view? |
| 25 | A.       Yes, sir. |

```
1    Q.        And just for the record, is there any
2    opinion rendered by the Board as to how fees like
3    that are to be handled?
4    A.        I don't know if there's a formal ethic
5    opinion or not that covers that particular issue.  I
6    don't know.  I didn't do the research beforehand to
7    let you -- if I'd known what you wanted I could have
8    maybe looked at all the --
9    Q.        Well --
10   A.        -- formal --
11   Q.        -- if I may make this request if the -- if
12   you find something like that, could you send it to
13   me?
14   A.        Sure.
15   Q.        Thank you.
16             THE COURT:  Okay.  Mr. Willis, thank
17   you, sir.  I know you're very busy.  You may be
18   excused.
19             THE WITNESS:  Thank you very much.
20             THE COURT:  Yes, sir.
21             Let's take a recess here.  What I'd
22   like to do -- how many witnesses do you have?
23             GENERAL DEAN:  Judge, I have two more,
24   one by phone.
25             THE COURT:  I know.  I'm not thinking
```

```
 1   about --

 2               MR. COPAS:  Judge, I have two members

 3   of the bar.  They'll be very short.

 4               THE COURT:  Okay.  What I'm going to

 5   do is I want to hear the live witnesses that are

 6   here next, and then we'll see where we are on the

 7   time.  We might have to go over until tomorrow

 8   morning.

 9               MR. COPAS:  Your Honor, if I may, if

10   he could retrieve something from --

11               THE COURT:  Yeah.  If he needs to

12   retrieve something, that's fine.  We'll go through

13   that during this recess.

14               MR. COPAS:  Thank you.

15               THE COURT:  Thank you.

16               (Recess taken.)

17               THE COURT:  Thank you, everybody.  Be

18   seated, please.

19               Okay.  General, you can call your next

20   witness.  Before you do that, General, let me ask

21   you how do you plan on a telephone conference with

22   this witness?

23               GENERAL DEAN:  Judge, the only thing I

24   can do is go over speakerphone and we've got it set

25   up to where he can do it over the court system.
```

```
 1                    THE COURT:  Good.  Good.  So you've
 2   got that covered.
 3                    GENERAL DEAN:  I don't know about him
 4   hearing us.
 5                    COURT OFFICER:  He should be able to
 6   hear us just fine.
 7                    GENERAL DEAN:  Through the
 8   microphones?  We should have tried that out.  I
 9   didn't think to.  We called to make sure it could
10   call, and he called me and he could hear me just
11   fine, but I don't know that I paid much attention
12   about the other way.
13                    THE COURT:  Okay.
14                    GENERAL DEAN:  We can try it.
15                    THE COURT:  Well, go ahead and call
16   your witnesses here.
17                    GENERAL DEAN:  Did -- well, Judge, I
18   was going to hold my -- this is my officer --
19                    THE COURT:  Sure.
20                    GENERAL DEAN:  -- and I was going to
21   hold her until last.
22                    THE COURT:  Okay.  That's fine.
23                    GENERAL DEAN:  Now, he's got some live
24   witnesses that are here.
25                    THE COURT:  Okay.
```

1  GENERAL DEAN:  And we've also got --

2  for purposes of possible bond supervisor, Ms. Meyer

3  from community corrections is here.  I've got her

4  number if we want to let her go and just --

5  THE COURT:  I don't know if we're

6  going to be finished today, Ms. Meyer.  Why don't

7  you go ahead and leave and we'll get in touch with

8  you, okay?

9  MS. MEYER:  Okay.  I left my number

10  just in case.

11  THE COURT:  Okay.  Thank you.

12  MS. MEYER:  Thank you.

13  THE COURT:  Okay.  Mr. Copas, call

14  your witnesses here.

15  MR. COPAS:  Yes, Your Honor.

16  Mr. Willis mentioned Attorney Hawkins --

17  THE COURT:  Yeah.

18  MR. COPAS:  -- and I've tried to call

19  him and he didn't return my calls, but I've got an

20  affidavit.

21  THE COURT:  Sure.  Sure.  We'll make

22  that Exhibit Number 4.

23  MR. COPAS:  Correct, Your Honor.

24  THE COURT:  General, have you seen

25  that?

```
 1                    GENERAL DEAN:  No, sir.

 2                    THE COURT:  We need to make a copy for

 3      the General.

 4                    I understood the Governor has ordered

 5      everybody to stay at home except for essentials now.

 6      Is that correct?  He did it this afternoon?

 7                    GENERAL WALKER:  I received an e-mail,

 8      Your Honor.

 9                    THE COURT:  Yeah.  You can't go out

10      unless it's for something essential now.

11                    GENERAL WALKER:  It remains in effect

12      until April 14.

13                    GENERAL DEAN:  Mr. Copas, these are my

14      copies?

15                    MR. COPAS:  Yeah.

16                    GENERAL DEAN:  Thank you.

17                    MR. COPAS:  Your Honor, just -- these

18      are the copies of family and relatives, members --

19                    THE COURT:  Okay.  We'll make copies

20      of those.

21                    MR. COPAS:  This is the original.

22      That's for the Court.

23                    THE COURT:  Okay.  We need copies of

24      those for the attorneys?

25                    MR. COPAS:  No, Your Honor.  We've got
```

```
 1   copies.
 2              THE COURT:  Oh, you've got copies.
 3   Okay.  Make a copy for me -- no.  No.  That's the
 4   exhibit itself.  Okay.  Where is the Exhibit Number
 5   4 from Mr. Hawkins?  All right.  Make that Exhibit
 6   Number 4 and make this Collective Exhibit Number 5.
 7              (Exhibit 4 received into evidence.)
 8              (Exhibit 5 received into evidence.)
 9              THE COURT:  Okay.  Mr. Copas, you call
10   any witnesses that you have here.
11              MR. COPAS:  I have Nancy Corley, Your
12   Honor.
13              THE COURT:  All right.  Sure.
14              MR. COPAS:  She's been around a
15   long --
16              THE COURT:  Yeah, I know Ms. Nancy.
17              MR. COPAS:  I'm going to be careful
18   what I say because I've been around a long --
19              THE COURT:  I understand.  Ladies can
20   get upset.
21   ///
22   ///
23   ///
24   ///
25   ///
```

```
                            NANCY CORLEY,
    called as a witness, having been duly sworn, was
    examined and testified as follows:
                        DIRECT EXAMINATION
    BY MR. COPAS:
    Q.        State your name for the record.
    A.        Nancy Corley.
    Q.        Nancy, you are an attorney --
    A.        Yes.
    Q.        -- in Tennessee, and you reside in
    Hendersonville?
    A.        Now, yes.
    Q.        And we've crossed paths a few times in
    Nashville?
    A.        Yes.
    Q.        And you -- and we were opposing paths, you
    might say at that moment?
    A.        Yes.
    Q.        But anyway you -- most of your practice has
    been in Nashville?
    A.        I do civil litigation.
    Q.        And as far as in the community here you
    have served an elective office?
    A.        I was a county commissioner for 16 years.
    Q.        And you have been active in the community
```

| | |
|---|---|
| 1 | as far as public interest groups, if you will, that |
| 2 | helps to carry on the activities of the county and |
| 3 | whatever? |
| 4 | A.        I'm on the board of Children Are People, |
| 5 | Salvus Center, Women's Political Collaborative, |
| 6 | League of Women Voters, a lot of stuff. |
| 7 | Q.        And the reason I'm -- and I appreciate you |
| 8 | being here under the circumstance with what's going |
| 9 | on with all the orders coming from the Supreme |
| 10 | Court. |
| 11 | A.        I'm trying not to touch anything. |
| 12 | Q.        We just heard a statement from Mr. Willis. |
| 13 | When the Court asked Mr. Willis do you have an |
| 14 | explanation for what's happened here, and he made |
| 15 | the comment about the practice -- Mr. Allman was |
| 16 | overwhelmed with his practice and what -- got in a |
| 17 | situation to where he just couldn't pull the plug on |
| 18 | it and then -- anyway, the plug has been pulled. |
| 19 | We're here. |
| 20 |         And what I want the Court to hear from you |
| 21 | is what you've observed.  How long have you known |
| 22 | Mr. Allman and how have you observed his |
| 23 | participation with the community before all this |
| 24 | happened? |
| 25 | A.        I was friends with Andy's father and his |

| | |
|---|---|
| 1 | mother, Gloria.  Gloria and Alan, we were friends |
| 2 | back when my husband and I first got married and |
| 3 | moved here and moved to Hendersonville.  So I've |
| 4 | basically known Andy almost all of his life.  He's |
| 5 | the same age as my children.  So they all went to |
| 6 | high school together.  But he and I really got to |
| 7 | know each other when I taught him in law school, and |
| 8 | so -- |
| 9 | Q.        Is this the Nashville School of Law? |
| 10 | A.        Yes.  I taught him at the Nashville School |
| 11 | of Law, and after that we -- our relationship |
| 12 | changed from rather than me being friends with his |
| 13 | parents that Andy and I became friends under |
| 14 | different -- as colleagues and friends at a |
| 15 | different level.  So I referred cases to him.  He |
| 16 | and I have tried cases with each other. |
| 17 | And when they implemented the mandatory |
| 18 | electronic filing in federal court, I basically |
| 19 | associated Andy with the cases that I had that |
| 20 | required -- employment law cases that had to go to |
| 21 | federal court because I'm not -- at that time I was |
| 22 | not a fan of computers.  So it's kind of a joke. |
| 23 | Q.        In other words you had -- I guess you might |
| 24 | say you had a trusting business relationship with |
| 25 | him? |

| | |
|---|---|
| 1 | A.        He was a good lawyer.  He took care of his |
| 2 | cases.  He knew what he was doing.  As I said, he |
| 3 | and I worked together on cases, employment cases, |
| 4 | and I started referring cases to him when I quit |
| 5 | doing them because he knew what he was doing. |
| 6 | Q.        There's been -- of course you've not been |
| 7 | present here in the courtroom.  There has been |
| 8 | discussions about a house arrest situation. |
| 9 | A.        I'm sorry? |
| 10 | Q.        Him being under house arrest with a |
| 11 | monitor.  Is the public -- is there any kind of risk |
| 12 | that you're -- are you aware of any risk that he |
| 13 | would be to the public under house arrest? |
| 14 | A.        I can't envision that Andy would flee the |
| 15 | jurisdiction of the court.  He's got a wife here, |
| 16 | his children are here, his -- you know, his roots |
| 17 | are here.  So if he were going to run, I think he'd |
| 18 | have run a long time ago.  So I can't see that he's |
| 19 | any risk in that respect. |
| 20 | Q.        If he was under any kind of real |
| 21 | restrictions in that house arrest situation where he |
| 22 | could not have any communications or contact with |
| 23 | the outside world at all, do you think he could live |
| 24 | up to that? |
| 25 | A.        I would not see any reason why not.  I |

| | |
|---|---|
| 1 | would -- I don't know any reason why he wouldn't do |
| 2 | that. |
| 3 | Q.       He's proud of the fact that you sponsored |
| 4 | him to the Supreme Court? |
| 5 | A.       Yes, I am.  He was a good lawyer.  He was |
| 6 | an excellent student.  He was a good lawyer.  You |
| 7 | know, obviously I thought he took care of his |
| 8 | clients, or I wouldn't have sent my clients to him |
| 9 | and I wouldn't have associated him in cases.  It's |
| 10 | just ... |
| 11 | Q.       Thank you. |
| 12 |         THE COURT:  Okay.  General, any |
| 13 | questions? |
| 14 |         CROSS-EXAMINATION |
| 15 | BY GENERAL DEAN: |
| 16 | Q.       You said Andy was a good lawyer.  When were |
| 17 | you dealing with him as an attorney? |
| 18 | A.       When they -- I know we -- after they did |
| 19 | the mandatory electronic filing in federal court, |
| 20 | then when I had an employment case, that was the |
| 21 | person I would send them to.  So whenever -- |
| 22 | Q.       What time frame, though, are we talking |
| 23 | about that that -- |
| 24 | A.       How long have they had electronic filing in |
| 25 | federal court?  Probably -- I know it's been longer |

| | |
|---|---|
| 1 | than probably 10 years. So maybe 15 years. |
| 2 | Q. So -- |
| 3 | A. I'm trying to remember where my office was |
| 4 | when he and I were doing cases together. |
| 5 | Q. Okay. So we're talking about your |
| 6 | experiences with Mr. Allman as a practicing attorney |
| 7 | were 10 or 15 years ago? |
| 8 | A. No. That's when -- I'm trying to answer |
| 9 | when I started referring cases to him. |
| 10 | Q. Okay. |
| 11 | A. So I say he was a good lawyer because he's |
| 12 | not currently a lawyer so -- but, you know, the |
| 13 | whole time that he was actively practicing I had no |
| 14 | reason to doubt that he was a good lawyer. |
| 15 | Q. Were you familiar with the number of bad |
| 16 | checks he was writing to people? |
| 17 | A. No. |
| 18 | Q. Were you familiar with any times that his |
| 19 | home has gone close or into foreclosure in recent |
| 20 | years? |
| 21 | A. I am on some of that after he was no longer |
| 22 | practicing law. I did know that there was some |
| 23 | difficulty with that. |
| 24 | Q. Are you familiar with him having filed |
| 25 | bankruptcy? |

```
 1   A.         I understand that he did, but I thought it
 2   was -- I don't think that -- not discharged, but it
 3   was --
 4   Q.         It was dismissed.  Now, I'm not trying to
 5   make it more than it is, but he did file for
 6   bankruptcy.
 7   A.         I understand, yes.  I mean, I know that
 8   from --
 9   Q.         Okay.
10   A.         -- street rumor and hearsay.
11   Q.         Well, with your knowledge of Mr. Allman
12   back in March of 2014, do you have any knowledge of
13   him receiving 109,000 -- approximately $109,000 that
14   was to be held in trust for a young man named Gage
15   Dycus that came from his mother's estate?
16   A.         The only thing I know about that is street
17   rumor and, you know, comments that people have made
18   and, you know, I don't know anything personally.
19   It's all hearsay, I guess.
20   Q.         So you don't know whether Mr. Allman took
21   that money that's owed and spent that trust money?
22   A.         No, I do not know.  I would be disappointed
23   and surprised to find that he did, frankly.
24   Q.         If he did take 109,000 in trust money from
25   Kevin Dycus and 119,000 from another estate and
```

| 1 | 230,000 from another estate, that would indicate |
| 2 | that maybe your current assessment of Mr. Allman |
| 3 | might not be complete, might be a little flawed. |
| 4 | Would you agree with that? |
| 5 | A.      If it turns out that he did those things, I |
| 6 | would be very sad and disappointed.  I can't think |
| 7 | of another word for it.  I would just be really sad |
| 8 | and very disappointed that it all happened. |
| 9 | Q.      Are you aware of cases -- or clients Wanda |
| 10 | Kelley and Lisa Smelser who he solicited a retainer |
| 11 | from several months after he was suspended? |
| 12 | A.      I've never heard their names.  No, I don't |
| 13 | know anything about that. |
| 14 | Q.      Are you aware of a client named Mario |
| 15 | Herrera that Mr. Allman took $59,000 of his trust |
| 16 | money and did not hold it in trust but took it as |
| 17 | his own back in 2014, '15? |
| 18 | A.      I have heard the name.  I've heard the |
| 19 | story.  I don't know anything about it obviously |
| 20 | personally.  I do know who that person is. |
| 21 | Q.      Have you had any conversations with |
| 22 | Mr. Allman about it? |
| 23 | A.      Yes. |
| 24 | Q.      What did he say about it? |
| 25 | A.      He -- that at the time he was trying to |

| | |
|---|---|
| 1 | basically help the guy out because it's a |
| 2 | no-good-deed-goes-unpunished kind of a situation. |
| 3 | Q.      Okay.  Did he have -- did he provide you |
| 4 | any explanation as to why Mr. Herrera's $59,000 |
| 5 | would be spent by Mr. Allman virtually the same day? |
| 6 | A.      I have no knowledge of that. |
| 7 | Q.      Okay.  Are you aware of Mr. Allman |
| 8 | continuing to talk to Mr. Herrera and give him legal |
| 9 | advice up to and including this year? |
| 10 | A.      I understand that he had conversations with |
| 11 | him, but I don't know anything about him giving him |
| 12 | legal advice except I'm not -- you know, get -- you |
| 13 | need to get a lawyer.  I don't know if that's legal |
| 14 | advice. |
| 15 | Q.      Judge Wheatcraft used to say that the best |
| 16 | judge of future behavior is people's past behavior. |
| 17 | Would you agree with that adage? |
| 18 | A.      To some extent.  I always think, you know, |
| 19 | there's redemption. |
| 20 | Q.      Agreed.  Thank you. |
| 21 |         THE COURT:  Anything else? |
| 22 |         Ms. Corley, thank you for coming.  And |
| 23 | that's C-o-r-l-e-y.  That's how you spell it, |
| 24 | Miss Court Reporter. |
| 25 |         THE WITNESS:  Yes. |

```
 1              THE COURT:  Thank you.  You may be
 2   excused.
 3              THE WITNESS:  I don't normally come to
 4   your court.
 5              THE COURT:  I know you don't.
 6              THE WITNESS:  I know.  This is a new
 7   experience.
 8              THE COURT:  It's a new experience.
 9   And much less as a witness.
10              Call your --
11              THE WITNESS:  Well, that's even worse.
12              THE COURT:  No kidding.
13              THE WITNESS:  I gave a deposition one
14   time, and when I got done, my lawyer said it was the
15   worst deposition he had ever had a client give in
16   his whole life.
17              THE COURT:  It's difficult for
18   attorneys to be witnesses.
19              Call your next witness.
20              MR. COPAS:  Jim Edwards.
21   ///
22   ///
23   ///
24   ///
25   ///
```

```
 1                      JIM EDWARDS,

 2   called as a witness, having been duly sworn, was

 3   examined and testified as follows:

 4                   DIRECT EXAMINATION

 5   BY MR. COPAS:

 6   Q.        Please state your name for the record.

 7   A.        I'm Jim Edwards.

 8   Q.        Mr. Edwards, you're an attorney here in

 9   Lebanon?

10   A.        Yes, sir.

11   Q.        And how long have you been practicing?

12   A.        Since 2017.

13   Q.        Okay.  And you know Mr. Allman.  And let me

14   say this also if you can hear me.  Is that when all

15   this stuff started -- when I stay stuff, all the

16   things we've been hearing here.  You've been

17   representing Mr. Allman in different matters; is

18   that correct?

19   A.        Civil matters, yes, sir.

20   Q.        And so we've got an attorney-client

21   situation here.  I'm not going to go into that

22   period of time, and I'm going to sort of approach it

23   in the same manner that I did with Ms. Corley.  And

24   Mr. Willis that was here, when he was asked by the

25   Court, you know, what happened here, and he talked
```

| 1 | about Mr. Allman's practice sort of escalating, if |
| 2 | you will, because of it -- apparently because of his |
| 3 | reputation or whatever, but he just got overwhelmed |
| 4 | with cases that he could not handle and his |
| 5 | personnel was not versed well enough to handle it |
| 6 | without being managed, and that Mr. Allman just |
| 7 | could not pull the plug on it and tried to make it |
| 8 | keep going, if you will. |
| 9 | And as I told Ms. Corley the plug has now |
| 10 | been pulled, and I asked her her knowledge of |
| 11 | Mr. Allman before all this started, in other words, |
| 12 | in the precondition whenever he was not under any |
| 13 | obligation to pull a plug, which is not now anymore. |
| 14 | How long have you known Mr. Allman? |
| 15 | A. I remember the year that he ran for state |
| 16 | representative. I don't remember how far back that |
| 17 | was, but I'm going to say it was back into the -- |
| 18 | prior to 2000, maybe as far back as, you know, like |
| 19 | 1989, somewhere back in then, I guess. |
| 20 | Q. I mean, did you -- you knew of him, of |
| 21 | course, then. Did you know him personally? |
| 22 | A. Well, I just knew of him from that, and |
| 23 | then, you know, I've met with him a couple of times, |
| 24 | and I think I contributed to his campaign, if I |
| 25 | recall correctly. |

```
1   Q.        Well, before all his happened here, had you
2   received any reports, anything that would cast
3   doubts with you about his abilities and his honesty
4   and all that stuff?
5   A.        No.  I mean, everything I knew about him
6   and everything and all my engagement with him was
7   that he was a very competent lawyer, knew what he
8   was doing.  In fact, my wife even had a case, a
9   wrongful termination case, which Mr. Allman handled
10  for her, and I thought he did it quite competently.
11  At the time I was not a lawyer.  And I think he
12  would have been successful with it but for his
13  suspension by the Board.
14  Q.        Well, I mean, again, asking sort of the
15  same questions I asked Ms. Corley, if he was under a
16  house arrest situation and under restrictions that
17  he would have no contact with the outside world --
18  in other words, essentially he would be in the same
19  position he is here now but he would be inside his
20  home where he can at least try to help manage his
21  family affairs and everything -- what -- is there
22  any -- do you have any reason to believe he wouldn't
23  -- that he would not comply with any kind of
24  restrictions of that nature?
25  A.        I have -- I absolutely believe he would
```

1    comply with whatever restrictions were placed on

2    him.  There's no doubt in my mind about that.  In

3    fact, I don't know why anybody would even think he's

4    a flight risk.  If he wanted to flee, he'd have done

5    that years ago.

6    Q.        Thank you.

7              THE COURT:  General, you may

8    cross-examine.

9                    CROSS-EXAMINATION

10   BY GENERAL DEAN:

11   Q.        Mr. Edwards, my name is Thomas Dean.  I'm

12   with the Sumner County District Attorney's office.

13   A.        Nice to meet you, sir.

14   Q.        You too.  Are you aware that Mr. Allman was

15   suspended from the practice of law originally in

16   September of 2016?

17   A.        My wife received a letter.

18   Q.        Good.  Do you know if everybody received a

19   letter?

20   A.        As far as I know they did, but I don't have

21   knowledge of the individual cases.

22   Q.        How about in November of '16, are you aware

23   of -- and let me preface this because I know you

24   represent Mr. Allman on some civil case, and I am

25   not by any of my questions trying to get into some

| | |
|---|---|
| 1 | sort of privileged conversation.  So I'm not sure |
| 2 | how to approach this but to ask my questions -- |
| 3 | A.        Sure. |
| 4 | Q.        -- and if you feel like I'm -- the answer |
| 5 | would require you to divulge privilege, then you |
| 6 | just say so, because I have no idea what you've |
| 7 | talked with him about and what you haven't, but I'm |
| 8 | going to ask you basically the same questions I |
| 9 | asked the other character witness and then, you |
| 10 | know, certainly I'll respect any claim of privilege |
| 11 | that you have. |
| 12 | A.        Okay. |
| 13 | Q.        So he was suspended.  You're aware of that |
| 14 | in particular because your wife got a letter.  Are |
| 15 | you aware of him after the suspension soliciting a |
| 16 | retainer fee to represent a lady named Wanda Kelley? |
| 17 | A.        I'm not aware of that. |
| 18 | Q.        Are you aware of him soliciting and |
| 19 | receiving a retainer fee from a lady named Lisa |
| 20 | Smelser in December of '16? |
| 21 | A.        I'm not aware of that. |
| 22 | Q.        Are you aware of the case involving the |
| 23 | Gregory estate in Nashville, Cathy Brown and her |
| 24 | sister being the beneficiaries of that estate? |
| 25 | A.        I have some awareness of that, and I think |

| | |
|---|---|
| 1 | any questions you might want to ask me about, they |
| 2 | would be privileged in nature. |
| 3 | Q. Okay. I will move beyond that. How about |
| 4 | the Denney estate here in Sumner County? This would |
| 5 | have dated from 2015. |
| 6 | A. I don't know anything about that case. |
| 7 | Q. Okay. You're not aware that his bank |
| 8 | records -- whether his bank records would show |
| 9 | $119,000 given to him to hold in trust which he |
| 10 | immediately spent? |
| 11 | A. I'm not aware of that. |
| 12 | Q. How about the Rose Ponce case where he |
| 13 | settled a case, and Ms. Ponce never got her portion |
| 14 | of the fee? Are you aware of that? |
| 15 | A. I'm not -- excuse me. I'm not aware of |
| 16 | anything about that case. |
| 17 | Q. How about Floyd Sutton who gave him |
| 18 | $12,000 to hold pending the appeal of a child |
| 19 | support matter and Mr. Allman, according to bank |
| 20 | records, spending that, are you familiar with that? |
| 21 | A. No, sir. |
| 22 | Q. How about money that was -- from the estate |
| 23 | of a deceased lady named Ingram that's for the |
| 24 | benefit of a young man named Gage Dycus, $109,000 |
| 25 | that was given to Mr. Allman to hold in trust and |

| | |
|---|---|
| 1 | that he immediately spent, do you have information |
| 2 | about that other than privileged? |
| 3 | A.        No, sir. |
| 4 | Q.        How about Mr. Mario Herrera, $59,000 that |
| 5 | was received to be held in trust by Mr. Allman, are |
| 6 | you familiar with that? |
| 7 | A.        No, sir. |
| 8 | Q.        Are you familiar with Mr. Allman having |
| 9 | continued conversations with Mr. Herrera up to and |
| 10 | including through this year? |
| 11 | A.        No, sir. |
| 12 | Q.        Are you familiar with the bad checks that |
| 13 | Mr. Allman has written to various and sundry clients |
| 14 | and others? |
| 15 | A.        No, sir. |
| 16 | Q.        Are you familiar with the bad checks that |
| 17 | he wrote to his own employees so that they would |
| 18 | have to line up at the bank and the first person |
| 19 | might get their money, and the last one might not? |
| 20 | A.        I am not. |
| 21 | Q.        Are you familiar with him filing |
| 22 | bankruptcy? |
| 23 | A.        I heard at one time he did, but I don't |
| 24 | know anything about the case. |
| 25 | Q.        Do you know if his house has gone into |

```
 1   foreclosure since this case has been pending?
 2   A.        I've only heard talk.  I don't know
 3   anything directly myself.
 4   Q.        Okay.
 5             GENERAL DEAN:  Judge, I have no
 6   further questions.
 7             THE COURT:  Anything else?
 8             MR. COPAS:  No, sir.
 9             THE COURT:  Thank you, Mr. Edwards.
10   You may be excused, sir.
11             THE WITNESS:  Thank you.
12             THE COURT:  Any other witnesses?
13             MR. COPAS:  No, Your Honor.
14             THE COURT:  General, how long is
15   Mr. Herrera -- do you anticipate taking?
16             GENERAL DEAN:  Well, I didn't time
17   myself.  I probably talked to him today over the
18   phone just to walk through everything and we didn't
19   really go through question and answer -- I just sort
20   of skimmed through it and heard his side of it.
21   That probably took 20 to 25 minutes.
22             THE COURT:  Okay.  Would you rather
23   hear his testimony now or tomorrow?  What is more
24   convenient for him and you?
25             GENERAL DEAN:  I'm willing to do
```

```
 1  whatever is more convenient for him.  I'm fine.  I
 2  don't even know what time it is.
 3              THE COURT:  That's an hour behind.
 4  We're running about a quarter of 5:00 right now.
 5              GENERAL DEAN:  And he's on eastern
 6  time.
 7              THE COURT:  Okay.
 8              GENERAL DEAN:  That much we were able
 9  to establish.  I'd love to do it if he's available
10  just to get it done, Judge.  But we could try him.
11  If he's not available, do it tomorrow, but the court
12  reporter may give me a dirty look.
13              THE COURT:  She's been here all day.
14  Let's start tomorrow at 10:00 o'clock.
15              GENERAL DEAN:  That's fine.  If Your
16  Honor doesn't mind, I'll give him a quick call to
17  make sure he can be available tomorrow morning.
18              THE COURT:  That will be fine.
19              GENERAL DEAN:  Did you say 10:00?
20              THE COURT:  10:00.
21              Mr. Copas, are you available tomorrow
22  morning at 10:00?
23              MR. COPAS:  Yes, Your Honor.  With
24  that in mind, before we adjourn for the day if I
25  could have some kind of private meeting with my
```

```
 1   client someplace and get as much information about
 2   Mr. Mario.  I haven't had a chance to really get the
 3   whole --
 4              THE COURT:  Sure.  That'll be fine.
 5              Any problem with their meeting in the
 6   conference room back here or somewhere else?
 7              COURT OFFICER:  Well, I could have
 8   Mr. Allman placed back in holding and they could use
 9   one of the attorney booths back there and be able to
10   talk.
11              THE COURT:  Would that be okay?
12              MR. COPAS:  Your Honor, I'd prefer if
13   we could --
14              THE COURT:  Well, the problem is the
15   logistics of getting somebody to do this.
16              MR. COPAS:  Well, I mean, to get -- if
17   I could have a deputy -- I don't mind having a
18   deputy --
19              THE COURT:  No.  No.  And I'm saying
20   that's the -- I don't know if we've got deputies to
21   do it.
22              COURT OFFICER:  My sergeant's going to
23   be very reluctant to let me stay over just to
24   supervise a meeting like that if it's not court
25   being in session.  I can ask him but --
```

```
 1              MR. COPAS:  Well, when you -- I'm
 2    sorry.
 3              THE COURT:  I'll tell you, let's do
 4    this.  If you could be here at about 8:30 in the
 5    morning, we'll give you the conference room.
 6              Can we do that?
 7              COURT OFFICER:  Me or Colin could be
 8    available for that for sure.
 9              THE COURT:  8:30 to 10:00 o'clock.
10              MR. COPAS:  Yes, Your Honor.  8:30.
11    Very good.
12              THE COURT:  8:30.  Check with Andrew
13    here.  We'll have one of these conference rooms set
14    up for you to spend an hour and a half with
15    Mr. Allman.
16              MR. COPAS:  Thank you, Your Honor.
17              THE COURT:  Thank you.  And we'll
18    resume at 10:00 o'clock in the morning with the
19    motions here.  Thank you.  Everybody may be excused.
20              (Proceedings respited at 4:47 P.M.,
21              to resume on April 3, 2020, at
22              10:00 A.M.)
23
24
25
```