1       IN THE CRIMINAL COURT FOR SUMNER COUNTY, TENNESSEE

2                         AT GALLATIN

3

4       STATE OF TENNESSEE            )
                                     )
5                                    )    NO. CR875-2017
        vs.                          )        CR133-2020
6                                    )        CR548-2017
                                     )
7       ANDY LAMAR ALLMAN            )

8

9       _____

10

11                  TRANSCRIPT OF PROCEEDINGS

12                       April 3, 2020

13                      VOLUME II OF II

14

15

16      _____

17

18          THE HONORABLE DEE DAVID GAY PRESIDING

19

20

21

22

23                   LORI C. BICE, LCR
                    Criminal Justice Center
24                   117 W. Smith Street
                  Gallatin, Tennessee 37066
25                   (615) 414-8993

```
 1              A P P E A R A N C E S :

 2

 3   FOR THE STATE:

 4           Thomas Boone Dean
             Assistant District Attorney General
 5           Office of the District Attorney General
             113 West Main Street, Third Floor
 6           Gallatin, Tennessee 37066

 7           Katherine Brown Walker
             Assistant District Attorney General
 8           Office of the District Attorney General
             113 West Main Street, Third Floor
 9           Gallatin, Tennessee 37066

10

11   FOR THE DEFENDANT:

12           Gary D. Copas
             Attorney at Law
13           P.O. Box 190137
             Nashville, Tennessee 37219

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
15              I N D E X
                                                    PAGE
16
     WITNESSES
17
     RUSSELL WILLIS
18      Direct Examination by General Dean          32
        Cross-Examination by Mr. Copas              58
19      Redirect Examination by General Dean        85
        Recross-Examination by Mr. Copas            86
20
     NANCY CORLEY
21      Direct Examination by Mr. Copas             94
        Cross-Examination by General Dean           98
22
     JIM EDWARDS
23      Direct Examination by Mr. Copas            104
        Cross-Examination by General Dean          107
24

25
```

```
                    I N D E X
                                              PAGE

WITNESSES
```

MARIO HERRERA (via telephone)
  Direct Examination by General Dean          118
  Cross-Examination by Mr. Copas              129
  Redirect Examination by General Dean        149
  Recross-Examination by Mr. Copas            151

MARK SMITH (via telephone)
  Direct Examination by General Dean          159
  Cross-Examination by Mr. Copas              161

RIELLY GRAY
  Direct Examination by General Dean          167
  Cross-Examination by Mr. Copas              189

RULING                                        230

```
 1                    E X H I B I T S
 2      No.                Description                    Page
 3       1        Transcript                              26
 4       2        Order of Enforcement                    36
 5       3        Amended Order of Enforcement            86
 6       4        Affidavit                               93
 7       5        Letters                                 93
 8       6        Chancery Court transaction list        164
 9       7        Agreed Final Order from Chancery       165
10                Court
                  CPA report                             167
11       8
                  Money Flow Chart from estate of        175
12       9        Brenda Sue Ingram
13      10        Money Flow Chart from estate of        175
                  Jane Ellen Denney
14
        11        Copy of check/deposit                  189
15
        12        Copy of text messages                  205
16
        13        Dismissal order                        207
17
        14        Secretary of State information         207
18                on Human Resource/Labor
                  Consultants, LLC
19
20
21
22
23
24
25
```

Lori C. Brice, LCR

```
 1                    (The following proceedings came on to
 2      be heard on Friday, April 3, 2020, beginning at
 3      approximately 10:10 A.M., before the Honorable Dee
 4      David Gay, Judge, to wit:)
 5                    THE COURT:  Thank you, everybody.  Be
 6      seated, please.  Let's get Mr. Allman out and we'll
 7      be ready to go, and then we can make this telephone
 8      call.
 9                    And while we're waiting, I need to get
10      something off my desk and I'll be right back.
11                    Okay.  Before we use the telephone
12      here, I've been advised to tell Mr. Allman and
13      Mr. Copas, Mr. Allman, when you meet with Mr. Copas,
14      you're supposed to wear a mask, and if that is not
15      done and if that will not be done, we will not let
16      you do that.  Do you understand, Mr. Copas?
17                    MR. COPAS:  Yes, Your Honor.
18                    THE COURT:  We're following these
19      procedures from the jail.  We went outside the box
20      and did something to accommodate you.  I'm not going
21      to have this anymore.
22                    MR. COPAS:  I understand, Your Honor.
23                    THE COURT:  General, whenever you're
24      ready.
25                    GENERAL DEAN:  Yes, sir.  We can call
```

```
 1    Mr. Herrera.  Based on my conversation with him
 2    yesterday, he should be available on his cell phone.
 3                 THE COURT:  Okay.
 4                 GENERAL DEAN:  Do you still have that
 5    number?
 6                 Mr. Copas, we called him yesterday to
 7    make sure it worked, and it worked but I had to get
 8    pretty close to the mic and speak up.  So just be
 9    aware.  He had --
10                 THE COURT:  General, how do you spell
11    his name?
12                 GENERAL DEAN:  Judge, I have it as
13    Mario, M-a-r-i-o, Herrera, H-e-r-r-e-r-a.
14                 Does that sound right?
15                 The TBI agent is shaking her head,
16    so --
17                 THE COURT:  And where does he live?
18    In Florida?
19                 GENERAL DEAN:  He lives in Florida,
20    yes, sir.
21                 THE COURT:  Okay.
22                 (Phone call is made to Mr. Herrera.)
23                 MR. HERRERA:  Hello.
24                 GENERAL DEAN:  Hello, Mr. Herrera.
25                 MR. HERRERA:  Yes, sir.
```

```
 1              GENERAL DEAN:  Is this Mario Herrera?
 2              MR. HERRERA:  Hello?
 3              GENERAL DEAN:  Hello.  Is this Mario
 4    Herrera?
 5              MR. HERRERA:  Yes, sir.
 6              GENERAL DEAN:  Is this the same
 7    Mr. Herrera who has spoken to law enforcement about
 8    Andy Allman?
 9              MR. HERRERA:  Yes, sir.
10              GENERAL DEAN:  All right.
11    Mr. Herrera, I think we're going to swear you in if
12    you will hold on just a second.
13              MR. HERRERA:  Yes, sir.
14              THE COURT:  Mr. Herrera, can you hear
15    me?  I'm Judge Gay.
16              MR. HERRERA:  Yes, sir.
17              THE COURT:  Would you please raise
18    your right hand?
19              (Mr. Herrera is sworn by the Court.)
20              THE COURT:  General, you may proceed.
21    ///
22    ///
23    ///
24    ///
25    ///
```

| | |
|---|---|
| 1 | MARIO HERRERA, |
| 2 | after having first been duly sworn, was examined and |
| 3 | testified as follows: |
| 4 | DIRECT EXAMINATION |
| 5 | BY GENERAL DEAN: |
| 6 | Q.      Mr. Herrera, I want to make sure initially |
| 7 | that you understand our situation.  We are in a |
| 8 | courtroom right now in an active hearing.  You are |
| 9 | under oath.  So I know from your perspective, |
| 10 | you're, you know, who knows where talking on a cell |
| 11 | phone, but this is part of a formal proceeding under |
| 12 | oath.  So act accordingly.  No cursing.  Not that I |
| 13 | expect that from you, but we have a judge; we have |
| 14 | Mr. Allman and his attorney in the room.  So be very |
| 15 | accurate and clear in your answers.  If you don't |
| 16 | understand any question from either of us, feel free |
| 17 | to ask for us to clarify that, okay? |
| 18 | A.      Yes, sir. |
| 19 | Q.      Okay.  Where do you live right now, |
| 20 | Mr. Herrera, what state? |
| 21 | A.      Florida. |
| 22 | Q.      Was there a time that you lived in Sumner |
| 23 | County, Tennessee? |
| 24 | A.      Yes, sir.  I lived there all the way to |
| 25 | 2016. |

```
 1   Q.        Mr. Herrera, when you were -- due to your

 2   connections in Sumner County, did you ever have a

 3   need to hire an attorney to help you with something?

 4   A.        Yes, sir, my divorce.

 5   Q.        A divorce.  And what attorney did you

 6   select?

 7   A.        Andy Allman.  Andy Allman.

 8   Q.        Can you tell me how you ended up getting

 9   connected with Mr. Allman?

10   A.        I went to work -- I went to church --

11             THE COURT:  Hold on just a second.

12             THE WITNESS:  -- with his grandma, his

13   mother, and his father.

14             GENERAL DEAN:  Hold on just a second,

15   Mr. Herrera.  We have a technical difficulty.  I'll

16   get you to repeat that in just a minute, but hold

17   on, please.

18             THE COURT:  Okay.  The question was

19   how did you come around to hire Andy Allman.  If you

20   could ask him that.

21   BY GENERAL DEAN:

22   Q.        So once again, I'm sorry for the technical

23   issues, Mr. Herrera.  We're trying to work through

24   this.  This is not normal for us.

25             How is it that you got connected with Andy
```

```
 1    Allman as an attorney?

 2    A.      Through his mother.

 3    Q.      How so?  How did you know her?

 4    A.      We went to church together, and Andy

 5    Allman's grandma and his father.

 6    Q.      So based on that connection did you have

 7    conversations with Mr. Allman and did he end up

 8    representing you?

 9    A.      Yes.

10    Q.      So initially what did he represent you --

11    what did he work on?  What project legally did y'all

12    have to deal with?

13    A.      He started representing me on my divorce

14    case.  That's the first one.

15    Q.      Okay.  And did that --

16    A.      After --

17    Q.      Go ahead.

18    A.      After my divorce -- after my divorce he

19    represented me, and there was a -- I was in court

20    the same time as him for my child support and he

21    helped me out with that, and then when my divorce

22    was final in 2013, that's how he helped me out.

23            After that I -- he helped me out with an

24    issue with Brenda not giving me all my tools after

25    my divorce.
```

```
 1   Q.        All right.  So -- go ahead.

 2   A.        Mr. Allman, he -- what happened was I went

 3   to court without a lawyer against my wife for

 4   $100,000 worth of tools.  I went to court and I won

 5   the case.  After that -- after that Brenda Herrera

 6   got a lawyer.  So that's how Andy Allman got

 7   involved, because I called him up and asked him if

 8   he could help me out with the case.

 9   Q.        And on the issue of the divorce and the

10   property dispute about the tools, he represented

11   you, and did you get satisfactory results from that?

12   A.        Yes, because Andy didn't want to fight the

13   case.  So I agreed to give her half of the $120,000

14   that -- that came from a house that me and Brenda

15   Herrera owned together, $120,000, and that money

16   went to the court system.

17   Q.        All right.

18   A.        So after that --

19   Q.        All right.  Let me get this straight.  So

20   we talked about property being a dispute over tools,

21   but there was a house involved then?

22   A.        Yes, that was the divorce.

23   Q.        All right.  And did you guys reach an

24   agreement on the house between the two attorneys?

25   A.        The house got sold.
```

```
1    Q.       Okay.

2    A.       And the courthouse got the money.

3    Q.       All right.  And you said that was about a

4    $120,000 home?

5    A.       Yes, sir.  And she got $60,000, and I was

6    supposed to get $60,000.

7    Q.       When would this have been, what general

8    time frame, that the house would have been sold and

9    the money distributed?  When was it planned to

10   happen?

11   A.       My divorce was done in 2013.  My dispute

12   with Brenda was in 2014.  That's when we -- I

13   decided to give her $60,000, that I agreed to give

14   her 60,000 and I got 60,000.  And then Mr. Allman,

15   all this time he was just telling me a lot of lies

16   about me getting the money, getting the money,

17   getting the money, that I'm working on it, I'm

18   working on it, and finally he just told me that it

19   would be better for me to wait until my daughter

20   turned 18 years old.

21   Q.       To wait until your daughter turned 18.

22   When was that supposed to happen?

23   A.       In 2019.

24   Q.       Okay.  So when 2019 came and your daughter

25   turned 18, did you continue to talk with Mr. Allman?
```

```
 1   A.        I called him August the 3rd -- around the
 2   15th I called him because my daughter graduated May
 3   2019.  She turned 18 August the 3rd.
 4   Q.        You were the third?  I don't understand.
 5             COURT REPORTER:  August the 3rd.
 6   BY GENERAL DEAN:
 7   Q.        Oh, August the 3rd?
 8   A.        That's when my daughter turned 18.  So I
 9   called him about two weeks later.
10   Q.        Okay.  So what did he --
11   A.        And --
12   Q.        What did he tell you?
13   A.        I called him about two weeks later and I
14   asked him, I said, brother, it's time for you to
15   help me get the money out.  And he said, absolutely.
16   I'll get to work on it.
17             And from that point all the way through
18   January he was just giving me a lot of -- a lot of
19   the runaround.  I'm working on it; I'm going to the
20   court to get paperwork and all this, but I knew
21   something was wrong, and I started investigating it
22   myself.
23             And so I called the child support office.
24   All this time I'd been trying to get in contact with
25   somebody up there and nobody would give me a
```

```
 1   straight answer.  So the child support told me,
 2   Mario, you are clear on your child support.  You
 3   don't owe any arrearage or nothing.  Two weeks later
 4   I was supposed to get the child support stop
 5   payment, but instead of getting that, I got a bill
 6   for $22,000.
 7   Q.      Now, this is from the child support people?
 8   A.      From the child support people.
 9   Q.      Gotcha.
10   A.      All this -- so I called Andy and I told him
11   that, and he said, no, don't worry about it; I'll
12   fix it; I will work it out.  And I said, okay, not a
13   problem.
14   Q.      When you got this information about child
15   support saying you owed money and you contacted
16   Mr. Allman for advice, did he say, wait a minute,
17   Mr. Herrera; I can't talk to you; I'm no longer a
18   license attorney?  Did he say anything like that?
19   A.      Not at all.
20          MR. COPAS:  Judge, I object to the
21   leading question from the State --
22          THE WITNESS:  Not at all.  He did
23   never mention that he could not talk to anybody.  He
24   acted like he was my lawyer.
25          THE COURT:  I'll overrule that.
```

1    There's really not another way to do it.

2              Go ahead.

3    <u>BY GENERAL DEAN</u>:

4    Q.      Mr. Herrera, did you say you had these

5    continuing conversations with Mr. Allman --

6    A.      I did.

7    Q.      -- through that year, 2019, and did you say

8    into 2020?

9    A.      I did, yes, sir. I have text messages from

10   him and every time I text messaged he would call me

11   too.

12   Q.      All right. Now, during this time did he

13   ever say that he was claiming all that money as a

14   fee?

15   A.      Repeat that question, please.

16   Q.      Sure. During this time before the end of

17   the story that we haven't gotten to yet, up to you

18   finding out from child support that they said you

19   owed 22,000, did Mr. Allman ever say to you, hey,

20   Mario, that money is gone; that was my fee?

21   A.      No, sir. And he was telling me that he was

22   working on it like there was nothing wrong. He was

23   just -- he would tell me, I will go next week to the

24   court and just like that. He kept telling me that.

25   Q.      So, Mr. Herrera, you received this notice

1  from child support that you owed money.  You've been
2  talking to Mr. Allman about it.  What happens at
3  that point?
4  A.        I got the letter.  I sent it to him, and
5  then I also -- I called the child support.  Thank
6  God that Ms. Stephanie picked up the phone and
7  started talking to me and she said you do owe the
8  money, and I said to her, if I owe the money, I'll
9  pay for it, but I'll prove to you that I do not owe
10 the money.  And she was willing to help me out, and
11 I was helping her out.  We had a long conversation.
12        And then at the end of our conversation I
13 said to her, I want you to know that I have a
14 lawyer.  And she said, I would love to talk to your
15 lawyer, and she said, who's your lawyer.  And I
16 said, Andy Allman.  And she said, you don't know
17 what's going on?  I said, no, ma'am.  And she
18 started telling me about Andy Allman, and I said,
19 well, I didn't know that.  So that's how she was --
20 she's like, let me look into your case more deep.
21        She went to the courthouse and got the
22 final paper that was -- that Andy Allman went to
23 court without my knowledge in December of 2014 and
24 got the check written to him and Mario, which I
25 didn't know that because I didn't have a copy of

| | |
|---|---|
| 1 | that or nothing. And Ms. Stephanie, she was able to |
| 2 | get a paper and prove to me and to herself that I |
| 3 | didn't owe the money and that Andy Allman had taken |
| 4 | my money without me knowing in all these years. |
| 5 | Q. Mr. Herrera, once you became aware of a few |
| 6 | more facts, did you have conversations with |
| 7 | Mr. Allman, and did you make -- did you record those |
| 8 | conversations? |
| 9 | A. Yes, I did record them because I wanted to |
| 10 | catch him in the lie that he was still lying after I |
| 11 | found that out -- all that out, and I called him up |
| 12 | and he was just acting like nothing. And then |
| 13 | finally I couldn't handle it no more, and I |
| 14 | confronted him over the phone, and then he's like, |
| 15 | well, Mr. Powers has your money. And I'm like, oh, |
| 16 | now somebody has the money. That's when I told him |
| 17 | that I knew everything about what he was doing bad. |
| 18 | And he's like, well, I'll get ahold of Mr. |
| 19 | Powers. That way he can give you your money, and I |
| 20 | did not believe him one time. So I got in contact |
| 21 | with Mr. Powers myself and he was able to tell me |
| 22 | that there was no money in his account at all to pay |
| 23 | me my money. So, basically, he stole the money. |
| 24 | Q. Okay. When you say Mr. Powers, are we |
| 25 | talking about Dennis Powers, the receiver? |

```
 1   A.        The receiver, yes, sir.

 2   Q.        Mr. Herrera, back in 2015 were you aware

 3   that Mr. Allman got ahold of your money and took it

 4   for his own purposes?

 5   A.        No, sir, because December of 2014 he went

 6   to court without my knowledge.  And my knowledge

 7   right now is that I went to Central America to do

 8   mission work and when I came back I asked him about

 9   what was going on with my money and he still said,

10   you know, the courthouse has the money.  The

11   courthouse has the money.  That was his answer.  The

12   court has the money.  I'm working on it.

13   Q.        To this day, Mr. Herrera, have you received

14   even one dime of the money from the sale of your

15   marital home?

16   A.        No, sir, not even a penny.

17             GENERAL DEAN:  That's all, Judge.  Oh,

18   I do have one other thing.

19   BY GENERAL DEAN:

20   Q.        Mr. Herrera, in the -- your copies of your

21   -- recordings of your phone calls, did you provide

22   those to law enforcement?

23   A.        I did, yes, sir.

24   Q.        And copies --

25   A.        Text messages and voice recorder.
```

```
 1   Q.        That was my next question.  Your text
 2   messages, did you provide those to the TBI as well?
 3   A.        Yes, sir.
 4   Q.        All right.  Thank you, sir.  You're going
 5   to have some questions from Mr. Allman's attorney,
 6   okay?
 7   A.        Yeah.
 8   Q.        So stay on the line.
 9             THE COURT:  Mr. Herrera, this is Judge
10   Gay.  You're going to be questioned now by Mr.
11   Allman's attorney, Mr. Gary Copas, and let me remind
12   you, sir, you are still under oath.
13             THE WITNESS:  Yes, sir.
14             THE COURT:  Mr. Copas.
15                   CROSS-EXAMINATION
16   BY MR. COPAS:
17   Q.        Mr. Herrera, it just so happened I had an
18   enlisted Navy man during my Vietnam era, last name
19   Herrera, and I thought a lot of him.  I hope we're
20   all in the same family here, and I'm just trying to
21   get as much information as I can in that I've
22   stepped into this case after the fact.  And so the
23   only thing I know is what I can gather from the
24   record and hope to learn something from our
25   examination today.
```

```
 1              I guess on the get-go, Mr. Herrera, what --
 2    have you paid Mr. Allman any money at all for his
 3    services?  I want to make sure I understand that.
 4    A.        I can barely hear you, sir.
 5    Q.        I'm sorry.  Have --
 6    A.        Can you repeat that question, please?
 7    Q.        Have you paid Mr. Allman any money or any
 8    consideration of any kind to him for his services?
 9    A.        No, sir, not a penny.  He did not ever ask
10    me for -- to pay one penny because the divorce case
11    was supposed to be free because I know his mom, but
12    we never talked any about how much he was going to
13    charge me, no, sir.
14    Q.        Okay.  How do I contact or who do I talk to
15    that can corroborate or verify that the
16    understanding was it was to be free?
17    A.        His mother.
18    Q.        Anybody else?
19    A.        What, sir?
20    Q.        Was there any other -- did anybody else --
21    you're saying his mother said it would be free.  Did
22    Mr. Allman ever say it would be free?
23    A.        No.  They never said it was free, no, sir,
24    but she was saying, you know, he would help me out.
25    Q.        So you took -- I mean, I don't want to put
```

```
 1   words in your mouth, but when she said that

 2   Mr. Allman would help you out, you understood that

 3   to be free?

 4   A.        Yes, sir.  I would like for you to know

 5   that I don't mind paying Mr. Allman for the work

 6   that was done.

 7   Q.        In other words --

 8   A.        I had that in my mind, but, yes, I can pay

 9   him.  I don't have a problem with that at all.

10   Q.        Well, today you just told me that you've

11   got no problem with him being paid.  Did you have

12   that same concept back when he was doing the work

13   that you were going to pay him?

14   A.        What?  Repeat that question for me, please.

15   Q.        Right now you just told me that you've got

16   no problem with him being paid.  Having said -- made

17   that statement, could you have made that statement

18   earlier besides just today?

19   A.        I never have made that statement because he

20   never asked me or nothing.  He would always act like

21   he was doing it for free.  So we never talked about

22   you're going to pay me this much money; if you get

23   this much money, I'm going to get paid this much

24   money, never, no, sir.

25   Q.        Now, you're under oath, and I want to give
```

```
 1    you time to think about this, but there was never
 2    any discussion about a fee of any kind until we just
 3    now made that question to you?
 4    A.        Repeat that question for me.
 5    Q.        There was never any time preceding today's
 6    date that there was any discussion of a fee being
 7    paid?  You have no knowledge of that?  You're under
 8    oath.
 9    A.        Yes, sir.  I do.  He never talked about
10    money, how much he was going to charge me.
11    Q.        Well, was the word "fee" ever discussed in
12    any communication or conversation at all preceding
13    today's date?
14    A.        I can barely understand you, sir.
15    Q.        Okay.  Let me say it again.  In 2012 -- the
16    entire year of 2012, that's when the divorce
17    started, did it not?
18    A.        Yes, sir.
19    Q.        Was there ever -- did the word "fee" ever
20    come up in any conversation or communication?
21    A.        No, sir.
22    Q.        In 2013 did it ever come up?
23    A.        No, sir.
24    Q.        In 2014?
25    A.        No, sir.
```

```
1    Q.        2015?

2    A.        No, sir.

3    Q.        2016?

4    A.        No, sir.

5    Q.        2017?

6    A.        No, sir.

7    Q.        2018?

8    A.        No, sir.

9    Q.        And 2019?  I'm including that up to

10   December of this past --

11   A.        No, sir.

12   Q.        So this is the first time that the word

13   "fee" has ever come up in your communications; is

14   that correct?

15   A.        Let me go back to 2019.

16   Q.        Okay.

17   A.        When I got Andy -- when I got Andy on the

18   voice recorder, he mentioned that he was going to

19   get with his tax preparation lady and she was going

20   -- she was going -- he was going to prepare a bill.

21   So in that recorder -- voice recording that I sent,

22   that's the only time that he mentioned that he was

23   going to charge me.  Besides that he had never

24   mentioned that.

25   Q.        And, again, you're making all these
```

```
 1   statements under oath?

 2   A.         Yes, sir, I do understand that I'm under

 3   oath.

 4   Q.         Getting back to the services that

 5   Mr. Allman provided up until -- let me take it back.

 6             During this period of time there was some

 7   child support issues also beside the tool issues; is

 8   that correct?

 9   A.         Yes, sir.

10   Q.         Anyway, Mr. Dean, when he talked to you

11   earlier, asked you questions and he mentioned the

12   divorce and tool issues, services being rendered,

13   but there was also services rendered concerning your

14   visitation and your child support; is that correct?

15   A.         I can barely understand you, my friend.

16   Q.         I'm sorry.  I'm sorry.  I probably backed

17   away --

18   A.         That's okay.

19   Q.         Besides the tool issues and the divorce

20   issues and property division, there was also

21   visitation issues and child support issues; is that

22   correct?  Child support and visitation issues were

23   also ...

24   A.         Yes, sir.

25   Q.         Okay.  So there were additional services
```

```
1    for those things besides what has been stated in the
2    other matters; is that correct?
3    A.        Yes, sir.
4    Q.        Okay.  On the order that went down in 2014
5    -- have you seen that order?
6    A.        In 2014?
7    Q.        Yeah.
8    A.        The order --
9    Q.        December --
10   A.        -- for --
11   Q.        December of 2014, have you seen that order?
12   A.        I seen that order after Ms. Stephanie sent
13   it to me --
14   Q.        Who is that?
15   A.        -- the last order.
16   Q.        Now, who is that?  Identify that person
17   again, please.  You said Stephanie?
18   A.        Ms. Stephanie from the child support is
19   the one who found that, that Allman went to court in
20   December of 2014, and I'd never seen a copy or
21   nothing until she showed it to me.
22   Q.        Did she -- did you visit her, did you hand
23   it to you, or did she mail it to you?  How did you
24   receive it?
25   A.        She emailed it to me.
```

```
1   Q.       Emailed it to you.  And then what was your
2   response to that when you contacted Mr. Allman?
3   A.       My response was that I cannot believe that
4   he would do that; one, he would go to court without
5   me knowing and, two, he would take the money and not
6   even tell me about it.
7   Q.       Now, the order itself -- was there anything
8   in the order there -- of course, the -- I think the
9   proceeds were issued to each attorney.  I guess the
10  Court wanted to make sure they were handled
11  properly.  But other than the checks being made out
12  to each attorney in the case along with their
13  client, was there anything else in that order that
14  you didn't agree with?
15  A.       No.  Because everything was split half and
16  half, and my child support, my arrearage, was paid
17  off on that.  So I agreed to that.  No, there was
18  nothing else.
19  Q.       So your major complaint in that regard is
20  not the order itself.  It's the fact that you were
21  never given notice of it?
22  A.       Yes, sir.  I never got a notice, no, sir.
23  Q.       After you received the order you said you
24  called Mr. Powers; is that correct?
25  A.       I called -- I called Andy and asked him --
```

| | |
|---|---|
| 1 | I called Andy and asked him two or three times in a |
| 2 | nice way where my money was, and then I told him |
| 3 | that I knew everything about him, and then he |
| 4 | finally said, well, the money, Mr. Powers has it. |
| 5 | And I'm not a lawyer. So I didn't |
| 6 | understand a whole lot. I can't read English or |
| 7 | write very good. So it was hard for me to |
| 8 | understand him, and then finally I said who is |
| 9 | Mr. Powers, and he told me, and then I had to find |
| 10 | out who Mr. Powers was. |
| 11 | Q. Well, I mean, did I -- I mean, I may have |
| 12 | made a mistake when I heard the testimony earlier, |
| 13 | but did you call Mr. Powers? |
| 14 | A. I did. Yes, I called Mr. Powers. |
| 15 | Q. And what did he tell you? |
| 16 | A. He told me that Andy had a lot of people |
| 17 | suing him, that it was over a million dollars of |
| 18 | money that people were suing him, and that there was |
| 19 | no money in the account to pay my part. |
| 20 | Q. Did Mr. Powers mention anything about you |
| 21 | having an attorney? |
| 22 | A. A what, sir? |
| 23 | Q. Did Mr. Powers bring up the subject of |
| 24 | whether or not you had an attorney to represent you? |
| 25 | A. He did. He said that I needed to get an |

| | |
|---|---|
| 1 | attorney if I wanted to go any further. |
| 2 | Q.      That's what Mr. Powers told you? |
| 3 | A.      Yes. |
| 4 | Q.      Okay.  Did you follow up on that advice? |
| 5 | Did you get an attorney? |
| 6 | A.      I have called some attorneys and basically |
| 7 | they laugh at me and they say if you have $300 an |
| 8 | hour to go after Allman -- because he doesn't have |
| 9 | any money.  So there's no point for me to help you |
| 10 | out with that. |
| 11 | Q.      And the attorneys that you talked with, did |
| 12 | any of them mention that they needed to make inquiry |
| 13 | with the receivership? |
| 14 | A.      What, sir? |
| 15 | Q.      Did any -- the attorneys that you |
| 16 | contacted, did they -- did you tell them about |
| 17 | Mr. Powers? |
| 18 | A.      No, sir. |
| 19 | Q.      Getting back to the order again, |
| 20 | Mr. Herrera, what stage of the proceedings after the |
| 21 | house was sold were you advised that the Court would |
| 22 | have to put down some kind of order or not?  Were |
| 23 | you aware of that? |
| 24 | A.      What, sir? |
| 25 | Q.      Were you aware that the Court would have to |

```
 1   -- in other words, I think your testimony earlier
 2   was, I believe, that the money from the sale was
 3   paid into the court; is that correct?
 4   A.        I knew that because when we sold the house,
 5   they showed me the check and said this money's
 6   going to the courthouse.
 7   Q.        Okay.
 8   A.        That's how --
 9   Q.        Okay.  So was it your understanding then
10   that you could not receive any money until the Court
11   issued an order?
12   A.        That's how it's supposed to be done, yes.
13   Q.        Okay.  And was there any discussions with
14   Mr. Allman when that order would be entered?
15   A.        From who?
16   Q.        From the Court.  In other words, your
17   understanding was the money would not be paid out of
18   court until the Court entered an order.  That was
19   your understanding; correct?
20   A.        I understand that they had to go to court,
21   yes.
22   Q.        Well, was there any discussions with
23   Mr. Allman as to when that order would be entered?
24   A.        That discussion with Mr. Allman came up
25   more than one time of me asking him about the money,
```

```
 1    when can we get the money, how can we get the money,
 2    and his answer was, I'm working on it.  The
 3    courthouse system has tied up your money.  That was
 4    his answer.
 5    Q.       So there was no discussions about any court
 6    date or any month or any time when the order would
 7    be entered?
 8    A.       No, sir.
 9    Q.       And I believe your testimony was you first
10    learned of Mr. Allman's suspension when?  When you
11    talked to Ms. -- what? -- Stephanie?
12    A.       That was in January, yes, sir.  That's when
13    I found everything out.
14    Q.       And that was January of 2000 what?
15    A.       2020.
16    Q.       2020.  Just this past January?
17    A.       Yes, sir.
18    Q.       And your conversation then was taped
19    thereafter?  You had a conversation after learning
20    from Ms. Stephanie about the suspension?
21    A.       The what, sir?
22    Q.       In other words, you had a conversation with
23    Mr. Allman after you received a report from
24    Ms. Stephanie that he was suspended?
25    A.       Yes, sir.
```

```
1   Q.        You called Mr. Allman; correct?

2   A.        Yes, sir.

3   Q.        And you recorded that conversation;

4   correct?

5   A.        Yes, sir.

6   Q.        And in the conv- -- and I've heard your

7   tape, Mr. Herrera, and I think I maybe filed with

8   the Court my statement from that tape, in part, with

9   the words that -- and, again, I'm taking just -- the

10  tape, I think, was very long, maybe 15 minutes long

11  or so.  So I'm just taking a little snippet out of

12  it, but I just want to relate that back to you.  I

13  heard the words spoken "if you are a lawyer, now

14  you're not a lawyer."  So I'm assuming that when you

15  said "now you are not a lawyer," it was responding

16  to having heard that he was suspended; is that

17  correct?

18  A.        That question was too long.  I can't

19  understand it.

20  Q.        I know it.  I have a bad habit of that.  I

21  apologize.

22            In the tape that I heard you mentioned the

23  words that Mr. Allman was not now a lawyer?

24  A.        Yes.

25  Q.        But what bothers me is how you -- is asking
```

```
 1   him to be your lawyer and then saying that he was
 2   not now your lawyer.  I'm confused about that.  Can
 3   you explain that?
 4   A.      Well, until the point I -- in January until
 5   the point I found out that he was suspended, I kept
 6   calling him or texting him and he was acting like my
 7   lawyer.
 8   Q.      Well --
 9   A.      It's as simple as that.  You know, he was
10   my lawyer until the point that I found out that he
11   was not supposed to be a lawyer.
12   Q.      Well, I mean, in that conversation I
13   thought I heard him recommend -- well, it may be in
14   the text messages.  I guess you also took text
15   messages -- that he recommended you contact Patrick.
16   Do you recall that?
17   A.      He recommended me?  No, sir, he never
18   recommended to talk to nobody.  He did mention the
19   name Patrick, yes.  He said I'll send Patrick to do
20   it.  I don't know who Patrick is.  Right now I don't
21   have any idea who Patrick is, but I heard that name,
22   yes, sir.
23   Q.      But you did not -- I mean, did you ask him
24   -- did you consent to him to do that or did he --
25   you knew he couldn't practice law and he was trying
```

```
1    to find a lawyer for you.  Did you insist that he do
2    something about it?
3    A.        I didn't understand the question.  I can't
4    hear you.
5    Q.        Well, I'm sorry.  I'm sorry.  I apologize.
6    He mentioned the name Patrick.  What was your
7    understanding when he mentioned the name Patrick?
8    A.        To me, it's I'll send Patrick who works for
9    me.  That's it.
10   Q.        Okay.
11   A.        I don't know who Patrick is.  At this point
12   he was still my lawyer.  You know, in my heart he
13   was still my lawyer because I didn't know that.
14   Q.        In your heart he was still your lawyer?
15   A.        Yes.
16   Q.        Let me ask you this.  During this time that
17   he was suspended, did he -- did you pay him any
18   money or do any services for him?
19   A.        Say that again, please.
20   Q.        During the time that he was suspended, did
21   you pay him any money?
22   A.        I never paid him any money, no, sir.
23   Q.        Was there ever any discussions about any
24   money being paid to him during this period he was
25   suspended?
```

```
 1   A.        When I found out that he was suspended, he
 2   did tell me that he was going to prepare a bill for
 3   me.  That was the first time he said that --
 4   Q.        A bill for --
 5   A.        -- and it's in the voice recording.  All of
 6   that is in the voice recording.
 7   Q.        Okay.  A bill for what?
 8   A.        For his services, and that's the first time
 9   I heard that he was going to do it.
10   Q.        And you understand this is a bill for the
11   divorce and everything?  Was that your
12   understanding?
13   A.        What, sir?
14   Q.        In other words, he had not submitted a bill
15   for the divorce case.  Was your understanding that
16   this bill would be for the divorce case?
17   A.        He never submitted a bill from -- by text
18   message, voice mail, or letter, nothing of that, for
19   the divorce or the child support or the tools.
20   Q.        Well, I mean, when there was a discussion
21   that he was going to prepare a bill, was there any
22   -- any statements made what the bill would be for?
23   A.        He mentioned for him being my lawyer all
24   this time.
25   Q.        All the time that he had been your lawyer,
```

```
1    that's what the bill would be for?

2    A.        Yes.

3    Q.        Okay.

4    A.        Him being my lawyer.

5    Q.        Correct.  When -- at the time he said he'd

6    prepare a bill, was there any -- and, again, you

7    said you didn't -- you couldn't afford an attorney

8    previously.  Was there any discussions as to how

9    that bill would be paid?

10   A.        That's when he mentioned Mr. Powers and he

11   was going to give Mr. Powers the bill.  That way it

12   comes off that amount of the money.

13   Q.        Okay.  So your understanding was the bill

14   would be paid off of the sales money, but you would

15   have to go through Mr. Powers to do it?  Is that

16   your understanding?

17   A.        Yes.

18   Q.        Mr. Herrera, the tape that you made of your

19   conversation, has anybody else heard that tape

20   besides the State?

21   A.        No, sir, just me and the State.

22   Q.        In other words, when I say "State," I'm

23   talking about the district attorney's office and the

24   TBI.

25   A.        Yes, sir.
```

```
 1   Q.        Did anybody assist you in preparing the
 2   tape?
 3   A.          No, sir.  I figured it out myself.  It was
 4   very hard on me, but I did it.
 5   Q.          In what form did you submit the tape to the
 6   State in?  Was it by electronic computer transfer,
 7   email, or was it by a physical hard copy?
 8   A.          Electronic.
 9   Q.          Electronic.  I mean, was it in -- the
10   format of the electronic recording, was it on a
11   cassette tape of some kind or was it through an
12   email transaction?
13   A.          It was on an email -- email or text.
14   Q.          Did anybody assist you in preparing the
15   email transmission?
16   A.          No, sir.
17   Q.          Mr. Herrera, just a few more questions.
18   And we're doing this by telephone and we've tried to
19   do this in such a manner that it would be the same
20   as if you were right here now sitting with us.  Is
21   there anybody else present with you at this time?
22   A.          Right now, no, sir.
23   Q.          And are you holding any notes in your hands
24   or have you referred to any notes?
25   A.          No, sir, I can't write.
```

Lori C. Bice, LCR

```
 1  Q.        Okay.

 2  A.        It's very hard for me.  What takes two

 3  seconds takes me an hour.  It's -- I can't spell.  I

 4  can't write or read.

 5  Q.        Very good.  Just give me a few minutes.

 6  I'll be right back.

 7  A.        Yes, sir.

 8                 (Mr. Copas confers with defendant.)

 9  BY MR. COPAS:

10  Q.        Mr. Herrera, getting back to your

11  conversation with Stephanie to where you first

12  learned, you're saying, that he was suspended -- did

13  I make that statement correctly?

14  A.        Yes, sir.

15  Q.        And about what date was that?  Can you tell

16  me?

17  A.        What was the question?

18  Q.        The date that Stephanie told you that

19  Mr. Allman was suspended.

20  A.        Yes, sir.  The date?

21  Q.        Yes.

22  A.        I'm going to say -- I don't have the exact

23  day, but I'm going to say between the 15th and the

24  28th of January.

25  Q.        Of what year?
```

```
 1   A.        2020.

 2   Q.        Did Mr. Allman at any time previous to that

 3   date represent to you that he was suspended or could

 4   not practice law anymore?

 5   A.        No, sir, he never mentioned that.

 6   Q.        Again, I want to make sure we don't have

 7   any misunderstanding, but the word "suspension" was

 8   never mentioned by Mr. Allman prior to that date?

 9   A.        No, sir.

10   Q.        Was there any indication from Mr. Allman

11   that his business was no longer operating, that he

12   could not be a lawyer --

13   A.        No, sir.

14   Q.        -- prior to that date?

15            And did he at any time prior to that date

16   recommend you to talk to Mr. Powers or to

17   Mr. Patrick?

18   A.        He would mention that the money's in the

19   court system.  He never mentioned to talk to

20   Mr. Powers or nothing, no.

21   Q.        And when you say "court system," what

22   particular case would that be?

23   A.        I really don't know what specific.  He just

24   mentioned court system.

25   Q.        So you cannot -- when he said "court
```

```
 1   system" to you, that was a general statement that
 2   wasn't identifying any particular court?
 3   A.       In my opinion it was the court system in
 4   Gallatin.  That's the only one I know, and him being
 5   my lawyer representing me, I believed him.
 6               MR. COPAS:  Your Honor, I can't think
 7   of any more at this moment.
 8               THE COURT:  Any other questions,
 9   General?
10               Okay.  Mr. Copas is finished with his
11   questions.  Now Assistant District Attorney Thomas
12   Dean will ask you another few questions.  So let me
13   remind you again you are still under oath.  Thank
14   you.
15               THE WITNESS:  Yes, sir.
16               THE COURT:  General, go ahead.
17                   REDIRECT EXAMINATION
18   BY GENERAL DEAN:
19   Q.       Mr. Herrera, I just want to be clear.
20   We've got two recorded phone calls with Mr. Allman
21   that you recorded; is that correct?
22   A.       Yes, sir.
23   Q.       In the second recorded call Mr. Allman
24   starts talking about submitting a bill; is that
25   correct?
```

| | |
|---|---|
| 1 | A.      Yes, sir. |
| 2 | Q.      Okay.  In the first recorded call did he |
| 3 | talk anything, that you recall, about his fee or |
| 4 | submitting a bill? |
| 5 | A.      Not in the first one, no.  He doesn't |
| 6 | mention nothing about a bill. |
| 7 | Q.      Where does he indicate -- does he indicate |
| 8 | your money's gone or that it's been spent or that it |
| 9 | is safe somewhere?  What does he tell you? |
| 10 | A.      He would tell me that the money's safe, you |
| 11 | know, that I would have to go to court to be able to |
| 12 | get the money. |
| 13 | Q.      Did he ever tell you in any conversation |
| 14 | that he had already spent the money, that he spent |
| 15 | it years before, basically as soon as he got his |
| 16 | hands on it? |
| 17 | A.      No, sir, he never mentioned that. |
| 18 |             GENERAL DEAN:  That's all I have, |
| 19 | Judge. |
| 20 |             THE COURT:  Okay.  Mr. Herrera, |
| 21 | Mr. Copas wants to ask a question in regard to that |
| 22 | area.  You're still under oath. |
| 23 |             Go ahead, Mr. Copas. |
| 24 | /// |
| 25 | /// |

| | |
|---|---|
| 1 | <u>RECROSS-EXAMINATION</u> |
| 2 | <u>BY MR. COPAS</u>: |
| 3 | Q.     Mr. Herrera, having heard the statement |
| 4 | here about another recording, this first recording |
| 5 | tape of whatever, do you have possession of that? |
| 6 | A.     Repeat that question, please. |
| 7 | Q.     On the first call that you recorded, did |
| 8 | you furnish that recording to the State? |
| 9 | A.     I did, yes, sir. |
| 10 | Q.     On the second recording that you mentioned, |
| 11 | did you furnish that recording to the State? |
| 12 | A.     Yes, sir. |
| 13 | Q.     And bear with me.  Just please help me.  On |
| 14 | your first recording just give me a summary of the |
| 15 | conversation in the first recording. |
| 16 | A.     (Witness makes no verbal response.) |
| 17 | THE COURT:  Mr. Herrera, can you hear |
| 18 | the question? |
| 19 | THE WITNESS:  No, sir.  I -- |
| 20 | THE COURT:  Ask the question again |
| 21 | louder, Mr. Copas. |
| 22 | MR. COPAS:  I'm sorry. |
| 23 | <u>BY MR. COPAS</u>: |
| 24 | Q.     I'm sorry, Mario.  On the first recording |
| 25 | when did that occur? |

Case 3:21-cv-00267  Document 11-2  Filed 04/21/21  Page 41 of 134 PageID #: 872
151

```
 1   A.        The first recorded what, sir?

 2   Q.        When did you make the first recording,

 3   about what date?

 4   A.        I'm going to say in March.  I don't know

 5   the exact day.

 6   Q.        Are you talking about March of this year?

 7   A.        What, sir?

 8   Q.        March of 2020?

 9   A.        2020, yes.

10   Q.        That was the first recording; correct?

11   A.        Yes, sir.

12   Q.        Do you --

13   A.        February or March.  It's one of the two,

14   February or March.

15   Q.        Do you recall what day of the week it was?

16   A.        No, sir.  I talked to him too many times

17   and I really don't know -- recall.  All I know is

18   it's going to be between February and March 2020.

19   Q.        Okay.  On the second recording when was

20   that done?

21   A.        It's in the same period, February or

22   beginning of March.

23   Q.        Well, how many days after the first

24   recording?  Do you have any recollection of that?

25   A.        I'm going to say a few days, only a few
```

```
 1   days.
 2   Q.       And, again, on the first recording was
 3   there any discussions about the receivership?
 4   A.       On the second recording?
 5   Q.       The first recording.
 6   A.       The first.  I don't recall.
 7   Q.       Well, let me ask you this.  Having made a
 8   recording on the first recording, for what reason
 9   did you call back and make another recording as far
10   as just a few days after that?  What made you call
11   back a few days later?
12   A.       The first recording was because I knew he
13   was lying to me and I wanted to catch him.  And he
14   was supposed to talk to me -- he was supposed to
15   talk to me a few days later.  He said, I'm going to
16   go to the courthouse and I'm going to get some
17   paperwork ready.  So I'll talk to you in a few days.
18   That's why the first recording -- I made that first
19   recording to catch him in a lie, and then when he
20   told me that he was going to go to the courthouse
21   and get some paperwork ready, I wanted to catch him
22   the second time to tell me a lie.
23   Q.       Okay.  So this -- the first recording you
24   called him?  On the first recording did he -- did
25   you make the call or did he make the call on the
```

```
1   first one?

2   A.        No.  He called me.  I -- he called me.

3   Q.        On the first recording?

4   A.        He -- both of them he called me and that's

5   when I recorded him.

6   Q.        Okay.  And on the second recording, did you

7   call him or did he call you?

8   A.        He called me and I didn't answer and I

9   called him back.  That way I can start recording

10  him.

11  Q.        And I don't believe I -- I don't think I

12  heard the second recording.  The State provided me

13  one which pretty much mirrors the first recording,

14  what you just mentioned.  Tell me what was in the

15  second recording, if you can, to the best of your

16  recollection.

17  A.        The second recording was just to ask him

18  about my case and everything, and he was going to

19  Clarksville to do some work, and I was just talking

20  regular, and that's when I asked him nicely where my

21  money was and I asked him again.  And I think the

22  third time I asked him where my money was and I told

23  him that I knew what was going on, and that's when,

24  you know, I pretty much confronted him.

25  Q.        Well, just what you just stated to me, I --
```

```
 1   whatever I stated earlier I've got to correct.

 2   That's the tape the State provided me, was the one

 3   about the trip to Clarksville, but I don't -- on the

 4   first recording -- you know, I don't want to belabor

 5   it, but yet I need to have as much information about

 6   that recording as I can.

 7           Again, on the first recording what -- and

 8   you're telling me that Mr. Allman made that call to

 9   you on the first recording; correct?

10   A.        On the first recording, yes, sir, he called

11   me.

12   Q.        And do you recall what that conversation

13   was about again?  Can you discuss it with me in some

14   form or fashion?

15   A.        No, sir, because I was so nervous talking

16   to him knowing that he was lying to me.  I do not

17   recall the whole conversation of either one.

18   They're too long and I'm nervous just thinking that

19   he's lying to me and to other people and just

20   knowing that that money, it could have put me in a

21   better place, because my mother is sick in Central

22   America and I can't buy her medicine because of him.

23           So I was so nervous just trying to hold

24   back and try to get his lies on those.  It's so

25   hard.  So I do not recall the whole thing, the whole
```

```
 1   conversation.  I would have to listen to the
 2   conversation and the conversation is there.
 3   Q.      But you did provide that tape to the State
 4   and TBI; correct?
 5   A.      Yes.
 6           THE COURT:  He's answered that about
 7   four times.  Okay.  Anything else?
 8           MR. COPAS:  No.
 9           GENERAL DEAN:  Judge, I have nothing
10   further for Mr. Herrera.
11           THE COURT:  Okay.  Hold on just a
12   second.
13           Okay.  Mr. Herrera, this is Judge Gay.
14           THE WITNESS:  Yes, sir.
15           THE COURT:  The attorneys are
16   finished, and I want to thank you for taking your
17   time to testify in this proceeding this morning.
18   You may be excused, sir, and you may hang up.  Thank
19   you.
20           THE WITNESS:  Thank you.
21           THE COURT:  Okay.  We've been here
22   awhile.  Let's take about ten minutes.
23           General, you've got another witness,
24   and I think you wanted to review something before
25   you went further; is that correct?
```

```
 1              GENERAL DEAN:  Yes, I have some
 2   documents to submit.  I have a brief -- I'd like to
 3   add a witness in light of the fact that this
 4   receivership money has come into question so much
 5   yesterday.
 6              THE COURT:  Sure.  Sure.  I'll hear
 7   anything anybody wants to put in front of me.
 8              GENERAL DEAN:  Just a brief phone call
 9   with the clerk and master.  I talked to him this
10   morning.  He can tell us how much is in the fund and
11   whether any of that money came from an existing
12   account at Allman & Associates or --
13              THE COURT:  Okay.
14              GENERAL DEAN:  So it won't take very
15   long.
16              THE COURT:  Okay.  Let's take about
17   ten minutes.
18              (Recess taken.)
19              THE COURT:  Thank you.  Everybody be
20   seated, please.  Let's bring Mr. Allman in.
21              All right.  General, call your next
22   witness.
23              GENERAL DEAN:  Judge, what I would
24   like to do is call the clerk and master --
25              THE COURT:  Sure.
```

```
 1              GENERAL DEAN:  -- for just a couple of
 2   questions, and he's told me he's available.
 3              THE COURT:  Good.  Go ahead.
 4              (General Dean calls Mr. Smith.)
 5              MR. SMITH:  Hello?
 6              GENERAL DEAN:  Hello.  Mark?
 7              MR. SMITH:  Yes, sir.
 8              GENERAL DEAN:  We have you on speaker
 9   in the courtroom, and we will need to swear you in.
10   And then we have Mr. Allman and his attorney here,
11   the judge here, and the usual suspects of other
12   folks.  Can you hear me okay?
13              MR. SMITH:  I can hear you fairly
14   well.  It's -- there's kind of an echo.  It sounds
15   like you're in a well, but I can understand you.
16              GENERAL DEAN:  Okay.  Great.
17              THE COURT:  Okay.  Mark, this is Judge
18   Gay.  Can you hear me?
19              MR. SMITH:  Yes, sir.
20              THE COURT:  Would you please raise
21   your right hand?
22              MR. SMITH:  Yes, sir.
23              (Mark Smith is sworn by the Court.)
24              THE COURT:  Thank you, sir.  Now
25   Mr. -- General Dean will ask you some questions and
```

```
 1   then Mr. Copas will ask some cross-examination

 2   questions.  Thank you for being available.

 3               General.

 4               MR. SMITH:  Yes, sir.

 5               GENERAL DEAN:  Judge, may I approach

 6   the bench?

 7               THE COURT:  Yes.

 8               GENERAL DEAN:  Let me ask -- let me, I

 9   guess, ask a couple of questions first.

10                    MARK SMITH,

11   after having first been duly sworn, was examined and

12   testified as follows:

13                 DIRECT EXAMINATION

14   BY GENERAL DEAN:

15   Q.        Mr. Smith, could you identify yourself,

16   please?

17   A.        Yes, sir.  My name is Mark Smith and I am

18   the Clerk and Master for the Chancery Court for

19   Sumner County, and I have held that position since

20   July of 2016.

21   Q.        Mr. Smith, are you aware of a fund that is

22   held by the clerk and master's office relating to

23   the receivership of the law firm of Andy Allman &

24   Associates?

25   A.        Yes, sir, I am.
```

```
 1   Q.       Did you send down a couple of sheets of
 2   paper that give some information about that account?
 3   A.       Yes, sir, I did.
 4               GENERAL DEAN:  Judge, may I approach?
 5               THE COURT:  You may.
 6   BY GENERAL DEAN:
 7   Q.       Mr. Smith, could you tell us what these
 8   sheets are?
 9   A.       There's one sheet that is called the case
10   transaction list that was printed out this morning
11   that shows all transactions that took place in the
12   case as far as monetarily, starting when the case
13   began on December 27th of 2016, up to the last time
14   any funds were taken out of the registry of the
15   clerk and master's office, and that was on the check
16   on January the 15th of 2020.
17               The other sheet is the trial balance sheet
18   which shows as of today how much money we are
19   maintaining in the court.
20   Q.       And is that figure accurate as of today?
21   A.       I'm sorry.  I didn't understand you.
22   Q.       My apologies.  Is that figure reported on
23   that second sheet accurate as of today?
24   A.       Yes, sir, it is.
25   Q.       Mr. Smith, my other question other than the
```

| | |
|---|---|
| 1 | current balance that you've answered is this money |
| 2 | that is being held by chancery court on behalf of |
| 3 | the receivership, did any of the money currently |
| 4 | being held come from any of the existing accounts of |
| 5 | Allman & Associates or from Andy Allman prior to the |
| 6 | establishment of the receivership? |
| 7 | A.        No, they did not. |
| 8 |               GENERAL DEAN:  Judge, those are the |
| 9 | only questions I have for the clerk and master. |
| 10 |               THE COURT:  All right.  Mr. Copas, you |
| 11 | may cross-examine, sir. |
| 12 |               MR. COPAS:  Thank you. |
| 13 |               CROSS-EXAMINATION |
| 14 | BY MR. COPAS: |
| 15 | Q.        Mr. Smith, Gary Copas. |
| 16 | A.        Yes, sir. |
| 17 | Q.        I haven't had an opportunity to meet you. |
| 18 | It's been a while since I've been here in Sumner |
| 19 | County.  So anyway, it's my pleasure.  Thank you. |
| 20 |               My understanding is there was an order that |
| 21 | went down in the conservatorship to where the |
| 22 | chancellor directed that the receiver would take |
| 23 | custody of all accounts and all property of the |
| 24 | business; is that correct? |
| 25 | A.        Yes, sir.  That's my understanding.  Let me |

1    -- I can pull that up and actually look at the

2  order if you want me to.

3  Q.      Well, I mean, I've already seen it. So

4  that's -- I mean, I believe that's the first

5  paragraph as far as what the Court directed. But

6  that's your understanding, too, is the same as my

7  understanding; is that correct?

8  A.      Yes, sir.

9  Q.      Did -- Mr. Powers was appointed receiver;

10 correct?

11 A.      That is correct.

12 Q.      And as far as you know, he's acted pursuant

13 to that order that went down?

14 A.      I'm sorry. Could you repeat that?

15 Q.      I'm sorry. I mean, as far as you know,

16 Mr. Powers has, in fact, taken custody of all

17 accounts and all property of Mr. Allman at the time

18 that order was entered?

19 A.      That is correct.

20 Q.      Are you aware of any accounts that

21 Mr. Powers has opened up himself as a receiver on

22 behalf of the receivership?

23 A.      To my understanding he has not opened up

24 any accounts of his own from the monies from

25 Mr. Powers. There have been times that he has come

| | |
|---|---|
| 1 | into court to ask for a payment for expenses, but he |
| 2 | has no account of his own that I'm aware of. |
| 3 | Q.       In other words, no account on behalf of the |
| 4 | receivership? |
| 5 | A.       That's my understanding, yes, sir. |
| 6 | Q.       And is there any information at all that |
| 7 | you received as to when he -- when he took |
| 8 | possession of the accounts at the time that the |
| 9 | receivership gave him custody of those accounts, is |
| 10 | there any record on how much money was in those |
| 11 | accounts? |
| 12 | A.       I do not have that information, sir. |
| 13 | Q.       Where would that information be if we |
| 14 | wanted that information? |
| 15 | A.       Mr. Powers would have that.  I have had |
| 16 | conversations with him concerning that, but I'm not |
| 17 | aware and I have not seen any of it myself. |
| 18 | Q.       Let me just, if I may, just give you a |
| 19 | hypothetical.  Is it possible that Mr. Powers could |
| 20 | have just frozen those accounts or -- in other |
| 21 | words, where those accounts could be held by the |
| 22 | bank in abeyance and not paid out? |
| 23 | A.       I'm sorry.  You'll have to repeat that.  I |
| 24 | didn't understand it. |
| 25 | Q.       I'm giving you a hypothetical.  That's all. |

| | |
|---|---|
| 1 | I'm just trying to find out is it possible that the |
| 2 | -- whatever accounts that the business had -- the |
| 3 | Allman law office business, whatever accounts that |
| 4 | business had, is it possible that Mr. Powers could |
| 5 | have given an order or notified the banks just to |
| 6 | freeze those accounts and put a hold on them? |
| 7 | A.      I do not know because I was not actively |
| 8 | involved in the case. |
| 9 | Q.      Okay.  That's very good.  Thank you. |
| 10 | THE COURT:  Anything else, General? |
| 11 | GENERAL DEAN:  Nothing further, Your |
| 12 | Honor. |
| 13 | THE COURT:  Okay.  Mr. Smith, thank |
| 14 | you, sir, for taking your time to testify in this |
| 15 | proceeding.  You may be excused, sir.  Thanks again. |
| 16 | THE WITNESS:  Thank you. |
| 17 | THE COURT:  Yes, sir. |
| 18 | THE WITNESS:  Goodbye. |
| 19 | GENERAL DEAN:  Judge, I would move |
| 20 | that those documents be entered as an exhibit. |
| 21 | THE COURT:  It'll be Exhibit Number 6, |
| 22 | Collective Exhibit Number 6. |
| 23 | (Exhibit 6 received into evidence.) |
| 24 | THE COURT:  General, call your next |
| 25 | witness. |

| 1 | GENERAL DEAN: Your Honor, I would |
| 2 | like to submit to the Court a certified copy -- I |
| 3 | think it's actually a copy of a certified copy, but |
| 4 | be that as it may, of the agreed final order in the |
| 5 | Mario Herrera divorce case. |
| 6 | THE COURT: It'll be Exhibit Number 7. |
| 7 | (Exhibit 7 received into evidence.) |
| 8 | THE COURT: Okay. Give me just a |
| 9 | second, General. |
| 10 | GENERAL DEAN: Yes, sir. |
| 11 | THE COURT: Okay, General. Thank you. |
| 12 | GENERAL DEAN: Your Honor, to give the |
| 13 | best sort of scope of coverage of the case in |
| 14 | general, the State would like to tender the report |
| 15 | of our expert CPA, Jennifer Stalvey. It covers in |
| 16 | particular some -- it covers everything. So it's |
| 17 | basically a snapshot of our case, but it's got a |
| 18 | particular section related to the theft of trust |
| 19 | funds in the very end, and before that, the theft |
| 20 | from Ms. Smelser and Ms. Kelley that are the two |
| 21 | that Russ Willis talked about where money was taken |
| 22 | by Mr. Allman after -- months after his suspension. |
| 23 | We believe that summary will help the Court |
| 24 | determine the likelihood of success on the merits |
| 25 | and we'd like to tender it to the Court. |

| | |
|---|---|
| 1 | THE COURT:  Okay.  Any objection? |
| 2 | MR. COPAS:  Your Honor, I don't want |
| 3 | to waive any rights as far as this document goes at |
| 4 | trial.  And my understanding is that the exhibits |
| 5 | allowed under the revocation statute, if you will, |
| 6 | is sort of akin to sentencing reports, that evidence |
| 7 | can be brought in that would be comparable that |
| 8 | would be on a sentencing report, but you can bring |
| 9 | in hearsay if it's reliable.  So I've got no |
| 10 | objection, Your Honor, to it, but I don't want to -- |
| 11 | THE COURT:  Very well.  That's |
| 12 | understood. |
| 13 | MR. COPAS:  But I don't want to waive |
| 14 | any objection at trial.  And the Court's already |
| 15 | made the statement that the jury would not see this |
| 16 | report, and just based on that representation |
| 17 | I'll -- |
| 18 | THE COURT:  Sure.  And we have -- I |
| 19 | think I heard a motion earlier and it's already been |
| 20 | marked.  We did something on February 17 -- excuse |
| 21 | me, February 7 and this was admitted as an exhibit |
| 22 | at that time, and I will make this Exhibit Number 8, |
| 23 | and it will go to the relevant issues on the bond |
| 24 | issues that I must consider today under Burgins and |
| 25 | 40-11-118.  Thank you, sir.  You do not waive any |

```
 1    objections at any other hearing concerning this

 2    document.

 3                    MR. COPAS:  Thank you, Your Honor.

 4                    THE COURT:  Sure.

 5                    (Exhibit 8 received into evidence.)

 6                    THE COURT:  General, anything else?

 7                    GENERAL DEAN:  No.  Well, not in that

 8    regard.  I would ask the -- the State calls Rielly

 9    Gray with the TBI as a witness, Your Honor, and

10    she's here in person.

11                    THE COURT:  Very good.  And while

12    she's going up to the stand, would you please spell

13    her full name?

14                    GENERAL DEAN:  R-i-e-l-l-y G-r-a-y.

15                    THE COURT:  Thank you.

16                         RIELLY GRAY,

17    after having first been duly sworn, was examined and

18    testified as follows:

19                    DIRECT EXAMINATION

20    BY GENERAL DEAN:

21    Q.       I know you were being sworn, but did you

22    hear me spell your name, Agent Gray?

23    A.       Yes.

24    Q.       Did I do it correctly?

25    A.       I believe.  The last name is G-r-a-y.  I
```

```
 1   didn't catch that so ...

 2   Q.        I got it right this time, I think.

 3   A.        Yes.

 4                 THE COURT:  Okay.

 5                 GENERAL DEAN:  That's been a problem

 6   for me, Judge, in certain emails.

 7                 THE COURT:  Okay.

 8                 GENERAL DEAN:  So I hope I got it

 9   right.

10   BY GENERAL DEAN:

11   Q.        Agent Gray, could you identify yourself and

12   tell me where you work?

13   A.        Yes.  I am a special agent criminal

14   investigator assigned to the Tennessee Bureau of

15   Investigation Criminal Investigation Division in

16   Middle Tennessee.

17   Q.        Have you been involved in the case

18   investigating Mr. Allman?

19   A.        Yes, I am the lead investigator.

20   Q.        Did you investigate allegations relating to

21   people who said they had paid a retainer fee and

22   didn't get enough work done?

23   A.        Yes.

24   Q.        Did you also investigate allegations of

25   theft of certain funds that were to be held by
```

1    Mr. Allman in trust?

2    A.        Yes.

3    Q.        Could you tell us in summary about the

4    cases involving trust funds?  And I'm not at this

5    point talking about Mr. Herrera, just the four from

6    the old days, the first two indictments in this

7    case.

8    A.        Yes.  There are four main accounts that

9    were to be held in trust by Mr. Allman.  The first

10   and oldest case of which is that of client Rosa

11   Ponce.  She had retained Mr. Allman initially in

12   2012 in a lawsuit against her employer.  At that

13   time in 2012 she paid Mr. Allman a retainer fee, I

14   believe, of $4500 that he deposited into his

15   operating account.

16            In 2015 that case settled and Ms. Ponce was

17   to receive a settlement check for that case.  A

18   check was made out to specifically Mr. Allman for

19   approximately over $15,000 that he deposited, and

20   then a separate check was issued specifically to

21   Rosa Ponce in 2015 that Mr. Allman also deposited

22   into his account, and then to date no funds have

23   been issued to Rosa Ponce regarding that settlement.

24   She was not aware of that settlement until her tax

25   return was filed and she was notified at that time.

```
1   Q.       What sort of time frame -- do you recall
2   what time frame that those payments were deposited
3   by Mr. Allman?
4   A.       Yes.  I believe the payments were made out
5   in March of 2015.
6   Q.       And when you talk about what's in the bank
7   records, did you do subpoenas and search warrants
8   for bank records?
9   A.       Yes, I did.
10  Q.       Did you do it for every known account of
11  Mr. Allman or Mr. Allman & Associates?
12  A.       Yes, that I was aware of.
13  Q.       And when you talked about seeing checks
14  being deposited, was that based on your review of
15  his own bank records?
16  A.       Correct.
17  Q.       How about Floyd Sutton?  And I have it as
18  Floyd.  It might be like Kenneth Floyd Sutton.
19  A.       Yes.
20  Q.       Do you recall that situation?
21  A.       Yes.  The case of Kenneth or Ken Sutton
22  that I know the client to be, he had retained
23  Mr. Allman to handle a child support case of his
24  here in Sumner County, at which time, I believe, in
25  June of 2015, Mr. Sutton retained Mr. Allman and
```

```
1   paid him a $4,000 retainer fee.

2          Then later in May of 2016 Mr. Sutton paid

3   Mr. Allman $12,000 in cash in which he did receive a

4   receipt for by Mr. Allman and retained himself, and

5   that $12,000 was given to Mr. Allman to be held in

6   trust for that child support case.  That same day,

7   which would have been May 26th of 2016, that cash

8   was deposited into Mr. Allman's personal bank

9   account.  That same day a $12,000 payment was made

10  by Mr. Allman for his credit card payment which was

11  a personal credit card.

12  Q.      The other two trust cases from the original

13  couple of indictments here in 2017, the indictments

14  anyway, what do they involve?  Just pick one and

15  let's talk about it.

16  A.      Yes.  The first, which is also the oldest,

17  would be the estate of Brenda Sue Ingram and that

18  estate was handled by Mr. Allman in 2014.  The

19  recipient of that estate was to be Ms. Ingram's son,

20  known as Gage Dycus, who was a minor at the time.

21  And so his father, Kevin Dycus, was to handle those

22  funds and wished those funds to be held in an

23  account until Gage was of age to spend those funds.

24               GENERAL DEAN:  Your Honor, may I

25  approach?
```

```
 1                    THE COURT:  You may.
 2                    GENERAL DEAN:  Mr. Copas, this is the
 3     chart relating to the Dycus case.
 4                    THE COURT:  Thank you, sir.
 5     BY GENERAL DEAN:
 6     Q.        Special Agent, was there a chart prepared
 7     based on what the bank records from Mr. Allman and
 8     his company showed?
 9     A.        Yes, there was.
10     Q.        And this chart, did it accurately reflect
11     the money flow as demonstrated from the bank
12     records?
13     A.        Yes, it does.
14     Q.        Is that chart the document that I have
15     handed you now?
16     A.        It is.
17     Q.        Could you tell us what it shows?
18     A.        Yes.  At the top center of this shows the
19     date of March 14th of 2014.  This is a
20     representation of the check made from Metropolitan
21     Life Insurance Company on behalf of the estate of
22     Brenda Sue Ingram for a total of $108,000 -- over
23     $108,000 that was then issued to Michael Kevin Dycus
24     for Gage Charles Dycus on the 17th of March.  That
25     check was then turned over -- signed over to
```

| | |
|---|---|
| 1 | Mr. Allman in which he deposited that on the 17th |
| 2 | day of March into his trust account, and it gives |
| 3 | the account number there. |
| 4 | Then from that center account it shows |
| 5 | where those payments were then fed out to, and you |
| 6 | can see that funds were made to loan payments, |
| 7 | Mr. Allman's operating account, Mr. Allman's |
| 8 | personal bank account. And then there at the bottom |
| 9 | center it shows that zero dollars were given to the |
| 10 | recipient of the Brenda Sue Ingram estate. |
| 11 | Q. The bank records did not demonstrate any |
| 12 | payments to Kevin Dycus or Gage Dycus? |
| 13 | A. No. |
| 14 | Q. So in summary where did the money go? |
| 15 | A. In summary it shows here that around -- |
| 16 | over $20,000 went to Allman's personal bank account. |
| 17 | From there it was then fed into other personal |
| 18 | expenses such as food, clothing, his own personal |
| 19 | child support payments. |
| 20 | There was also another 81- -- over $81,000 |
| 21 | that went into Mr. Allman's operating account. That |
| 22 | was then made out to several business expenses, one |
| 23 | of which is BlueCross BlueShield. There is also a |
| 24 | payment of a large sum that goes out to the Smith |
| 25 | Group, which as I understand was a marketing firm |

| | |
|---|---|
| 1 | that Mr. Allman used to further his marketing of |
| 2 | Allman & Associates.  And then there was over $5,000 |
| 3 | that was made to loan payments of Mr. Allman's. |
| 4 | Q.        So pursuant to the records as summarized in |
| 5 | this chart, over what time period was the |
| 6 | $108,077.08 spent? |
| 7 | A.        This shows that the deposit was made on |
| 8 | March 17th of 2014, and these were funneled out |
| 9 | through April 7th of the same year.  So less than a |
| 10 | month's time frame. |
| 11 | Q.        Special Agent Gray, I think we have one |
| 12 | more of the original trust cases to talk about. |
| 13 | A.        Yes. |
| 14 | Q.        Tell us in summary about that. |
| 15 | A.        That was the estate of Jane Ellen Denney in |
| 16 | which there were supposed to be four recipients of |
| 17 | that trust account, and that, I believe, was |
| 18 | initiated in 2015, in March of that year, and |
| 19 | Mr. Allman was the executor of that trust account. |
| 20 | He came into possession of those funds, which was |
| 21 | over $119,000, which he held in a separate account |
| 22 | that he created just for that trust fund. |
| 23 |                   GENERAL DEAN:  Your Honor, may I |
| 24 | approach? |
| 25 |                   THE COURT:  You may. |

```
 1              GENERAL DEAN:  Mr. Copas, this is the
 2    chart on the Denney case.
 3              THE COURT:  Let me make the prior
 4    chart on the estate of Brenda Sue Ingram, money
 5    flow, that will be Exhibit Number 8 and this will be
 6    Exhibit Number 9.
 7              GENERAL DEAN:  Yes, sir.
 8              COURT OFFICER:  It will be 9 and 10,
 9    Judge.  Number 8 was ...
10              THE COURT:  8 is this?
11              COURT OFFICER:  Yes, sir.
12              THE COURT:  Good.  We'll put an
13    exhibit number on this.  That's 9.  That's 10.
14              (Exhibit 9 received into evidence.)
15              (Exhibit 10 received into evidence.)
16              THE COURT:  Go ahead, General.
17    BY GENERAL DEAN:
18    Q.        Can you identify this document, please,
19    Special Agent Gray?
20    A.        Yes.  This is the money flow chart from the
21    estate of Jane Ellen Denney.
22    Q.        Now, this money, I think you mentioned,
23    went into a special fund just for the estate.  It
24    didn't go originally into any of Mr. Allman's
25    accounts?
```

A.          Correct.

Q.          What happened to it once it went into this special Jane Ellen Denney estate fund?

A.          Yes.  I'm not sure if I misspoke earlier on the date, but it is October 8th of 2015.  This shows that Hallmark Title Company issued a check to Mr. Allman for over $119,000 that then he placed into a separate account that gives the account number there, and it was specifically titled for the Jane Ellen Denney estate.

Then throughout the course of several days that followed, a total of over $91,000 was placed into Allman's trust account which then was paid out to various other clients of Mr. Allman's.  A total then of over $28,000 was sent into his operating account which then went to other business and personal expenses paid out.  And you can see at the center bottom there is zero dollars that were paid out to the four recipients of the Jane Ellen Denney estate trust.

Q.          So what period of time pursuant -- according to the bank records did this money get into the account and was then spent in these various means by Mr. Allman?

A.          This was just over a period of, say, a

1   month or a month and a half.  The original funds

2   were deposited on October 8th of 2015, and the

3   account was essentially drained as of November 23rd

4   of 2015.

5   Q.        After the charges filed in 2017 through the

6   Sumner County Grand Jury that I'm sort of referring

7   to as the old charges, the first two indictments

8   against Mr. Allman, did you become aware of another

9   potential trust fund case?

10  A.        Yes, I did.

11  Q.        Since you had already subpoenaed

12  Mr. Allman's bank records -- well, let's talk about

13  what the allegations were.  What allegations were

14  you investigating relating to the new situation?

15  Who did it involve?

16  A.        The current -- or most recent allegations

17  involved a man by the name of Mario Herrera who had

18  been a former, and possibly still current, client of

19  Mr. Allman's.

20  Q.        And what were you -- what was alleged to

21  have occurred?

22  A.        The allegations were that originally

23  Mr. Allman handled a divorce case for Mr. Herrera.

24  This dated back, I think, as early as 2012, but

25  funds had been given to Mr. Allman in 2014 on behalf

| 1 | of Mr. Herrera to which he had not received those |
| 2 | funds to the date of my interview which occurred on |
| 3 | February 25, 2020. |
| 4 | Mr. Herrera also explained that since that |
| 5 | time he had received a letter from the child support |
| 6 | division in Sumner County stating that he owed |
| 7 | upwards of over $21,000 in child support.  He then |
| 8 | again reached out to Mr. Allman and had been in |
| 9 | communication with him as recent as a period of |
| 10 | August of 2019 through February of 2020 in which |
| 11 | Mr. Allman had alleged that he would be assisting |
| 12 | Mr. Herrera with that case and also drafting an |
| 13 | appeal for him in that case. |
| 14 | Q.       What sort of communication -- did you see |
| 15 | or hear any communications between the two? |
| 16 | A.       Yes.  Mr. Herrera provided me with several |
| 17 | text messages between him and Mr. Allman dating back |
| 18 | to August 5th of 2019, upward to February 20th of |
| 19 | 2020.  And in those text messages there were several |
| 20 | references that Mr. Allman made to helping |
| 21 | Mr. Herrera draft an appeal, and those spanned that |
| 22 | course of text messages. |
| 23 | There were also two recorded phone |
| 24 | conversations that Mr. Herrera made between him and |
| 25 | Mr. Allman.  The first dated February 28th of 2020, |

```
 1    and the second dated March 2nd of 2020.

 2    Q.         So after reviewing these two recorded calls

 3    and the text messages and interviewing Mr. Herrera,

 4    did you or another TBI agent present this matter to

 5    the Sumner County Grand Jury?

 6    A.         Yes, correct.

 7    Q.         Now, the theft event relating to

 8    Mr. Herrera is pre-arrest.  It is something that

 9    happened in 2015; is that correct?

10    A.         Yes.  It occurred in December of 2014.

11    Q.         The practicing law without a license

12    allegation, is that time frame after he had been

13    arrested and made bond on the first two indictments?

14    A.         Yes.  Correct.

15    Q.         And you mentioned some text messages that

16    you focussed on when deciding to bring that charge;

17    is that correct?

18    A.         Yes.

19    Q.         Did you already cover those to your

20    satisfaction, or did we summarize those already in

21    your testimony that -- the ones that led you to feel

22    like he was still acting as an attorney?

23    A.         Yes.  The first text messages I received

24    were dated August 5th of 2019.  During that same

25    month in August Mr. Herrera sent Mr. Allman a
```

1  screenshot of the letter he had received from child
2  support stating that he owed the money.  Mr. Allman
3  at that time said, we will appeal it.

4      There was also texts that were dated in
5  October of 2019 where the letter was sent again to
6  Mr. Allman, a screenshot from child support, to
7  which Mr. Allman said, you have already received
8  this.  We will go after them.

9      And then there was another, I guess, text
10 message dated in November of 2019 where Mr. Allman
11 asked Mr. -- or Mr. Herrera asked Mr. Allman, hey,
12 brother, we need to do something about this case.
13 Mr. Allman replied, I'm on it.

14      And then as recent as January of 2020,
15 Mr. Herrera sent Mr. Allman another copy of a letter
16 and Mr. Allman replied, you have already covered
17 yourself on this.  We will go after them.

18 Q.      In all of these text messages and recorded
19 calls did Mr. Allman ever say, wait a minute, Mario;
20 I'm suspended from the practice of law; you're going
21 to have to get another attorney; I cannot help you
22 with this?

23 A.      No.  There was no evidence of any
24 conversations like that.

25 Q.      After you -- while -- during your

```
 1   investigation of Mr. Herrera's situation, did you
 2   review the bank records to see if there was any
 3   money that went in in relation to the sale of a home
 4   in Mr. Herrera's divorce?
 5   A.      Yes.
 6   Q.      Was there paperwork that shed light on that
 7   situation?
 8   A.      Yes.  I believe Mr. Allman was banking at
 9   Pinnacle Financial Partners at that time, and there
10   was evidence within those records that showed on the
11   bank statements the deposit of those funds and then
12   no withdrawal made to Mr. Herrera at that bank or
13   any subsequent bank accounts that Mr. Allman had
14   after that time frame.  And then it also produced a
15   copy of that check that was written to Mr. Allman,
16   and then Mr. Allman had also written himself a check
17   titled in the memo "Herrera fee" that he had made
18   out to himself.
19              GENERAL DEAN:  May I approach the
20   bench and the witness?
21              THE COURT:  Yes, sir.
22   BY GENERAL DEAN:
23   Q.      Special Agent Gray, let's take these just
24   one at a time.  Can you identify this bundle first
25   of all?
```

1  A.      Yes.  This is everything in regards to the

2  Pinnacle Bank account, which would have been

3  Mr. Allman's trust account, and the checks that

4  related to Mr. Herrera.

5  Q.      All right.  Let's take it a page at a time.

6  What's the first document that came from the bank

7  record here on top?

8  A.      This first document is a copy of the check

9  that was made out from the Sumner County Chancery

10  Court that totals over $59,000 paid to the order of

11  Mario Herrera and Andy Allman as his attorney.

12  Q.      Does this image include the back of the

13  check?

14  A.      Yes.  It shows a signature of an

15  endorsement by Mr. Mario Herrera and Mr. Allman.

16  Q.      The next page, what does that tell us?

17  A.      This is a copy of the deposit slip to where

18  Mr. Allman would have deposited that same check into

19  his IOLTA account or also known as a trust account

20  for Andy Allman & Associates.

21  Q.      So that 59,000 went into the bank into

22  Mr. Allman's trust account?

23  A.      Yes.

24  Q.      What does the next page show?

25  A.      The next page is a description of the

1    statement of the account for the IOLTA account of

2    Mr. Allman for Allman & Associates from Pinnacle

3    Financial Partners that shows the deposit of the

4    check previously mentioned that was made on

5    December 16th of 2014.

6    Q.        And that's -- when we see the credit

7    transactions and those deposits listed there, which

8    one is it that we're focussing on right now?

9    A.        This is the third deposit of $59,969.11.

10   Q.        And it went in, according to this

11   statement, on what day?

12   A.        December 16th of 2014.

13   Q.        Does this statement give any indication of

14   the beginning balance of that account that month?

15   A.        Yes.  The beginning balance as of

16   December 2nd of 2014, was a zero balance.  The

17   ending balance was issued on December 31st of 2014,

18   which was $145.98.

19   Q.        So other than perhaps $145.98, did

20   Mr. Herrera's money remain in this account after

21   December 31, 2014?

22   A.        No, it did not remain in that account as of

23   the same day that it was deposited.

24   Q.        All right.  That takes us to the next page

25   then.  You said the money did not remain in the

| | |
|---|---|
| 1 | account even right at the beginning when it was put |
| 2 | in.  What does this next page show us? |
| 3 | A.        The next page is a copy of a check that |
| 4 | Mr. Allman made to himself from his IOLTA account |
| 5 | and this check was dated on December 15th of 2014, |
| 6 | which was the day prior to the deposit of the |
| 7 | initial check from chancery court in which |
| 8 | Mr. Allman places in the memo line "Herrera fee." |
| 9 | Q.        And how much did he -- in addition to |
| 10 | writing "Herrera fee" on the check to himself, how |
| 11 | much did he write the check to himself for? |
| 12 | A.        This is for $54,269.11. |
| 13 | Q.        What happened to that check Mr. Allman |
| 14 | wrote to himself for $54,000 plus? |
| 15 | A.        That check was then deposited into |
| 16 | Mr. Allman's operating account for Allman & |
| 17 | Associates and then was subsequently spent out to |
| 18 | other various sources. |
| 19 | Q.        So after we get the check he wrote to |
| 20 | himself, that next page, what does that show? |
| 21 | A.        This is a copy of the checking deposit slip |
| 22 | that Allman provided for that check that was dated |
| 23 | December 16th of 2014, that shows the same amount |
| 24 | for that check of $54,269.11. |
| 25 | Q.        So you said the $54,000 was deposited into |

| | |
|---|---|
| 1 | his operating account? |
| 2 | A. Correct. |
| 3 | Q. What is the last page we looked at in this |
| 4 | bundle? |
| 5 | A. This is a copy of the operating account for |
| 6 | Allman & Associates from Pinnacle Financial Partners |
| 7 | where it shows the deposit on December 16th of 2014, |
| 8 | of the $54,269.11. |
| 9 | Q. Now, I should say there are other deposits |
| 10 | going into these accounts as well as that; correct? |
| 11 | A. Correct. |
| 12 | Q. Let's look at this account, this last page |
| 13 | here. Does it show the beginning balance of the |
| 14 | operating account in December of 2014? |
| 15 | A. Yes. The beginning balance as of |
| 16 | December 2nd of 2014, is listed as zero dollars. |
| 17 | Q. You said the 54,000 went in about the |
| 18 | middle of the month? |
| 19 | A. Correct. |
| 20 | Q. What's the ending balance, which they have |
| 21 | as December 18th of 2014? |
| 22 | A. The ending balance is listed as $4,337.10. |
| 23 | Q. Do we have charges pending in the old |
| 24 | indictments for the practice of law by someone -- by |
| 25 | Mr. Allman after he was suspended? |

```
 1   A.        Yes, we do.

 2   Q.        Were there any other recorded phone calls

 3   relating to his practice of law from that first

 4   group of the two indictments?

 5   A.        Yes.  There was a recorded phone call

 6   between Mr. Allman and a former client known as

 7   Cheryl Garrett.

 8   Q.        And in that call what does Ms. Garrett

 9   press Mr. Allman for and what does he say?

10   A.        Ms. Garrett had found out through another

11   means, which I believe was the news, of Mr. Allman's

12   suspension.  So she had questioned him as to the

13   status of her case and what needed to be done.  She

14   specifically asked Mr. Allman at that time, which

15   was dated after his suspension -- she asked him

16   specifically are you still my lawyer as of this date

17   on this call and to which Mr. Allman replied yes.

18   Q.        And that was in -- do you remember what day

19   that was?

20   A.        It was, I believe, sometime in 2016, but

21   this was after the suspension.

22   Q.        Okay.  Are you aware -- one of the factors

23   in a bond consideration is financial stability.  Are

24   you aware of any problems with Mr. Allman and making

25   payments on his house?  I should say have you
```

| | |
|---|---|
| 1 | executed search warrants on Mr. Allman's house? |
| 2 | A.        Yes.  I have executed search warrants |
| 3 | initially in the investigation as early as January |
| 4 | 2017, and then the more recent search warrants were |
| 5 | executed on both March 9th and 10th of 2020. |
| 6 | Q.        Did you indicate -- or did you discover any |
| 7 | indications that he was behind on payments of his |
| 8 | house during the execution of those search warrants? |
| 9 | A.        Yes.  There was evidence of mortgage |
| 10 | statements that showed that he had not been making |
| 11 | his mortgage payments, I believe, as old as January |
| 12 | of this year. |
| 13 | Q.        Now, speaking of search warrants, let's |
| 14 | talk about your experience a little bit in the first |
| 15 | round of search warrants back in 2017. |
| 16 | A.        Yes. |
| 17 | Q.        Did you at that time execute some search |
| 18 | warrants on Mr. Allman's house? |
| 19 | A.        Yes. |
| 20 | Q.        And when you did so, when you arrived was |
| 21 | he there? |
| 22 | A.        He was not. |
| 23 | Q.        Now, would this be after his suspension |
| 24 | from the practice of law? |
| 25 | A.        Yes. |

Q.      What did you do to contact him to get his
-- to serve him with the search warrant and get his
cooperation, if possible, relating to the search
warrant?
A.      Yes.  At the time no contact had been made
with Mr. Allman to attempt an interview or to make
any communication.  So we would have liked to have
-- Mr. Allman to have been present during that
search warrant to attempt an interview as well as
for him to be present for the search warrant itself.

        Myself and several other agents made
attempts to knock on the door at Mr. Allman's
residence and no one came to the door after a very
lengthy period of time.  At that time I then called
Mr. Allman on his personal cell phone number.  There
was no answer.  I then reached out to his wife,
Sonia Allman, and as well as his mother, Gloria
Moore.  At that time I made connection with Gloria
Moore.  She stated that she was not sure how she
would reach Mr. Allman but she would try to.

        At some point later I did receive a call
from Mr. Allman himself.  I asked him if he would
come back to his residence.  At that time he stated
that he was unavailable, that he was actually
meeting with a client.  And at that time I told him

| | |
|---|---|
| 1 | that we had a search warrant for his residence and |
| 2 | it was in his best interest if he returned to the |
| 3 | residence at that time and he agreed to do so. |
| 4 | Q.      And he told you he was meeting with a |
| 5 | client? |
| 6 | A.      Yes. |
| 7 | GENERAL DEAN:  Judge, I think I have |
| 8 | -- that's all I have for this witness. |
| 9 | THE COURT:  Thank you. |
| 10 | Mr. Copas, you may cross-examine, sir. |
| 11 | You can come over here if you want to so you can be |
| 12 | close to Mr. Allman. |
| 13 | MR. COPAS:  If I may, Your Honor, I |
| 14 | believe the State's pretty much introduced all |
| 15 | exhibits that they gave me; is that correct, |
| 16 | Mr. Dean? |
| 17 | GENERAL DEAN:  I believe so, yes, sir. |
| 18 | THE COURT:  Hold on just a second.  We |
| 19 | did not do an exhibit for the disposition of the |
| 20 | $59,000, that packet.  That will be Exhibit |
| 21 | Number 11. |
| 22 | (Exhibit 11 received into evidence.) |
| 23 | (The Court confers with the court |
| 24 | officer.) |
| 25 | MR. COPAS:  The reason I asked that, |

| | |
|---|---|
| 1 | Your Honor, I was going to make some questions about |
| 2 | the text messages. |
| 3 | THE COURT:  Okay. |
| 4 | MR. COPAS:  I don't know if that's |
| 5 | been -- |
| 6 | THE COURT:  No, we don't have any |
| 7 | documents as to the text messages. |
| 8 | MR. COPAS:  I would like after I |
| 9 | finish my examination to -- |
| 10 | THE COURT:  Sure. |
| 11 | MR. COPAS:  -- submit this to the |
| 12 | Court. |
| 13 | THE COURT:  We will make that an |
| 14 | exhibit after you're done. |
| 15 | GENERAL DEAN:  And, Mr. Copas, to be |
| 16 | clear, I think there's 25 or 26 text messages.  I |
| 17 | only had a handful when I sent them to you.  So if |
| 18 | you just have six or so, I want to make sure you |
| 19 | know that there are more somewhere.  That's not what |
| 20 | I had in hand when I provided -- |
| 21 | MR. COPAS:  Well, I'm just going to |
| 22 | ask the witness her conception of what she looks at |
| 23 | right now, knowing there may be more. |
| 24 | GENERAL DEAN:  Yeah.  I just wanted to |
| 25 | make sure -- I didn't realize there were more at the |

```
 1    time I sent them.
 2               MR. COPAS:  Thank you.
 3                    CROSS-EXAMINATION
 4    BY MR. COPAS:
 5    Q.       I guess last time -- Ms. Gray; correct?
 6    A.       Mm-hmm.
 7    Q.       -- I think I got your bio and everything.
 8    So I'm not going to go there.  The first time you
 9    got involved in this case, you said, was the Ponce
10    case, Ponce, the first -- that was the triggering
11    mechanism to start the investigation?
12    A.       No.  I would not say that was the
13    triggering mechanism for the investigation.  There
14    had been several allegations that had come forward,
15    and Ms. Ponce was just one of those.
16               THE COURT:  Yeah.  And I think, just
17    to help you out here, the way I understood it, the
18    General was asking him -- asking her about a
19    specific area, the trust fund thefts --
20               MR. COPAS:  Correct.
21               THE COURT:  -- and that's where she
22    started.  It doesn't necessarily mean that was first
23    in time.
24               MR. COPAS:  I understand now.
25               THE COURT:  Okay.
```

```
 1   BY MR. COPAS:

 2   Q.        Well, Mr. -- and you've been present in the

 3   courtroom during all the proceedings on these

 4   motions; correct?

 5   A.        Yes.  Correct.

 6   Q.        And you heard Mr. Willis' testimony that

 7   the -- the first time the Board considered that

 8   there may be a criminal act or whatever was on the

 9   Ponce event.

10   A.        Yes, correct.

11   Q.        Did Mr. Willis contact you?

12   A.        No.  I am not sure if he had had any

13   communication with the district attorney's office at

14   that point, but my specific division works off the

15   request of the district attorney, and that's how we

16   initially became involved.

17   Q.        In your investigation you were able to make

18   determinations as to what was going on, if you want

19   to call it that, what was happening with the monies

20   and whatever, and I just want to somehow get your

21   source for that information.  And you said that on

22   the Ponce case that she was not aware of the

23   settlement until her tax return came in?

24   A.        Correct.

25   Q.        And, of course, that's like a -- like you
```

| | |
|---|---|
| 1 | said, a factual allegation, and that information was |
| 2 | determined by your interview of her? |
| 3 | A.        Yes.  I had interviewed her, I believe, in |
| 4 | December of 2016. |
| 5 | Q.        Was there any interview of anybody else or |
| 6 | any information that would contradict that to where |
| 7 | she was -- maybe was aware of it before that return? |
| 8 | A.        No, sir. |
| 9 | Q.        Did you discuss any -- did you interview |
| 10 | any of the parties involved in that particular claim |
| 11 | of hers that she was -- for that money? |
| 12 | A.        In these particular cases where there's a |
| 13 | settlement, to my knowledge, it would be rare that a |
| 14 | company that actually participated in that |
| 15 | settlement would disclose information about that. |
| 16 | So there was no attempt to interview her employer at |
| 17 | that time who had issued the settlement check, but I |
| 18 | did receive the petitions that Mr. Willis spoke |
| 19 | about in this testimony that were from the Board of |
| 20 | Professional Responsibility as well as Ms. Ponce |
| 21 | provided a copy of her file that she had been given |
| 22 | by Allman & Associates upon its closing.  And there |
| 23 | was also the bank account records that showed the |
| 24 | check of Ms. Ponce coming into the accounts but no |
| 25 | check being issued out. |

```
 1   Q.        And so that would be the only sources that
 2   you're aware of now for the information that you
 3   derived for this case?
 4   A.        There would also be a copy of whatever file
 5   Mr. Allman had on his server that was seized by the
 6   TBI.
 7   Q.        Do you recall there being anything on his
 8   server about that?
 9   A.        I do believe that he did have some
10   documents in relation to her case.
11   Q.        And if I may sort of continue on and go on
12   the Sutton situation, you interviewed Mr. Sutton;
13   correct?
14   A.        Correct.
15   Q.        And the information you relayed today in
16   this testimony, was it from that interview?
17   A.        That was that interview as well as I also
18   interviewed Mr. Sutton's ex-wife who would have been
19   the recipient of any funds from that child support
20   case, and she had not received any funds at that
21   time.
22   Q.        And then on the Ingram estate, Mr. Dyc- --
23   well, you know, Mr. Dycus, the father, if you
24   will --
25   A.        Yes.
```

| | |
|---|---|
| 1 | Q.        -- did you interview him? |
| 2 | A.        I did. |
| 3 | Q.        And the statement you made about that |
| 4 | particular account, what's happened, came from that |
| 5 | interview? |
| 6 | A.        Yes.  He provided the same information that |
| 7 | he had given to Mr. Allman to be included in his |
| 8 | case file as well as email correspondence between |
| 9 | Mr. Allman and himself.  And then later on in the |
| 10 | investigation I believe Mr. Dycus had inquired about |
| 11 | that account to which Mr. Allman had also sent him a |
| 12 | screenshot via text message of an account, which we |
| 13 | later found out was actually a screenshot of the |
| 14 | Jane Ellen Denney account and not the Brenda Sue |
| 15 | Ingram account.  So he had falsified or |
| 16 | misinterpreted those account records to Mr. Dycus. |
| 17 |        Also, further into the investigation which' |
| 18 | led into the end of 2016, early portion of 2017, |
| 19 | Mr. Dycus' son, Gage Dycus, had actually gone to a |
| 20 | rehabilitation center for personal issues to which |
| 21 | Mr. Dycus further inquired about the funds from the |
| 22 | Ingram estate to help pay for those rehabilitation |
| 23 | costs, and Mr. Allman had corresponded with him, |
| 24 | continuing to say that the money was on hand and |
| 25 | that he would get it to them. |

```
 1              He also issued a check to the
 2     rehabilitation center that he hand-delivered,
 3     allegedly, because it was not postal stamped to
 4     Mr. Dycus' home address, in upwards of over $15,000
 5     for that rehabilitation cost.  And that check was --
 6     at that time we had those account records and we
 7     knew there were no funds to support that check.
 8     Q.       Was there another attorney involved on that
 9     particular estate case, the Dycus?
10     A.       Not that I'm aware of.  I will say there
11     may have been an initial attorney that did advise
12     Mr. Dycus to seek someone, I guess, to handle the
13     account.  I'm not sure who that was.  I can't
14     recall.
15     Q.       Well, the attorney that handled the Ingram
16     estate --
17     A.       Yes, somebody handled that separately --
18     Q.       Right.
19     A.       -- and Mr. Dycus, the goal was to retain
20     Mr. Allman to be able to place those funds in an
21     account to gain interest for Gage Dycus.
22     Q.       And you did not interview that attorney?
23     A.       No, I did not.
24     Q.       On the Denney estate, my understanding, you
25     made a statement, I think, that the -- that
```

1   Mr. Allman was the executor of that estate?

2   A.      Yes.  Correct.

3   Q.      Did you review the record -- the court

4   records on that estate?

5   A.      Yes, I did.

6   Q.      Did you find any claims against the estate

7   or any expenses or attorney fees or anything of that

8   nature?

9   A.      There were some expenses because there was

10  the sale of the home, and I believe there had to be

11  work done to the home to prepare it for sale.  So

12  there were some expenses there.  There was also

13  expenses that were to be paid out to, I believe,

14  Henderson Memorial Gardens [sic] for funeral costs

15  to be paid out from the estate.

16  Q.      Did you have any evidence that the executor

17  paid out any of those expenses?

18  A.      He did pay out some over a period of time

19  and -- but not all of those expenses were paid.

20  Q.      So if there's a record on how much expenses

21  were paid, would that be in the court records, or

22  who would have that record?

23  A.      Those would be in the bank account records

24  as to what was paid out from that estate account.

25  Q.      If those expenses were paid by another --

1   some other separate account, though, you wouldn't

2   know about that; correct?

3   A.        I would not, but I interviewed the person

4   that was over that account at Henderson Memorial

5   Gardens and they provided their evidence of those

6   accounts at that time.  And then I also believe

7   there was -- I don't want to misspeak, but maybe a

8   nursing facility or an assisted living home that

9   Ms. Denney had lived in prior to her death that

10  expenses had to be paid out to.  And I interviewed

11  that individual over that account as well, and they

12  provided their records as well as we also have the

13  HUD statement from the sale of the home and all of

14  those account records detailing that transaction.

15  Q.        And so all of those expenses came out of

16  the -- it came out of the account that Mr. Allman

17  held as executor?

18  A.        The only expenses that were paid out, which

19  were not all of the expenses that were due, was paid

20  out of Mr. Allman's account.  If any other -- if any

21  other payments were made personally by a family

22  member, then that was out of the goodness of their

23  heart to rectify those account records.

24  Q.        My understanding of the -- the

25  legislature's tried to define the law business or,

```
1   you know, what -- how do you define yourself
2   conducting yourself as a lawyer, and it's giving un-
3   -- without the authority you're giving advice, legal
4   advice, for a consideration.  In Mr. Herrera's
5   situation is there any evidence at all that any
6   money was made to Mr. Allman for whatever he may
7   have rendered in -- to Mr. Herrera?
8   A.      Is your question was there any money paid
9   out to Mr. Herrera by Mr. Allman?
10  Q.      No.  By Mr. Herrera to Mr. Allman was there
11  any consideration paid for whatever he did for him?
12  A.      No.  There's no evidence of, say, a
13  retainer fee or any fee paid to Mr. Allman to obtain
14  him as counsel.
15  Q.      Was there any evidence of any promise to
16  pay a fee?
17  A.      No.
18  Q.      And I guess just -- I'm going to hand you
19  these text messages that we just now discussed and
20  just ask you to look over them and if -- I don't
21  know how to do this, but if you could -- any message
22  there that you interpret as being facts of
23  representing himself as a lawyer --
24          THE COURT:  Okay.  Let the record
25  reflect here, so we know what we're looking at,
```

| | |
|---|---|
| 1 | we're talking about the text messages between |
| 2 | Mr. Herrera and Mr. Allman. |
| 3 | MR. COPAS:  I'm sorry, Your Honor.  I |
| 4 | should have -- |
| 5 | THE COURT:  That's okay.  I wanted to |
| 6 | be sure for the record so I can understand it too. |
| 7 | Now, the question was is there any |
| 8 | evidence in these text messages that she has been |
| 9 | shown where Mr. Allman holds himself out or |
| 10 | represents himself as an attorney; is that correct? |
| 11 | MR. COPAS:  Correct.  Yes, Your Honor. |
| 12 | THE COURT:  Okay. |
| 13 | BY MR. COPAS: |
| 14 | Q.      Let me further add there, Ms. Gray, that |
| 15 | the reason I show those to you is I thought your |
| 16 | testimony earlier -- I may have been wrong -- that |
| 17 | the text messages show him practicing law or -- I |
| 18 | don't want to use that -- well, maybe I can use that |
| 19 | term, "practicing law."  But, anyway, if you could |
| 20 | just -- having looked at those text messages, if you |
| 21 | could just give me the dates of those messages that |
| 22 | you used to make that determination. |
| 23 | THE COURT:  Well, first of all, let's |
| 24 | kind of lay a foundation here.  What period of time |
| 25 | are we talking about here, Mr. Copas, and how many |

| | |
|---|---|
| 1 | text messages are there? |
| 2 | MR. COPAS: Well, let me make one |
| 3 | other -- further question. |
| 4 | BY MR. COPAS: |
| 5 | Q. You made a comment that you looked at text |
| 6 | messages for Mr. Herrera to determine that in these |
| 7 | communications that he was practicing law -- acting |
| 8 | as a lawyer. Those text messages I just now handed |
| 9 | to you, are those the same ones that you testified |
| 10 | to earlier or are they not? That's my question. |
| 11 | A. Yes, these are the same text messages. |
| 12 | THE WITNESS: And I'm not sure |
| 13 | specifically, Your Honor, how many messages there |
| 14 | are, but there are six pages of screenshots. |
| 15 | THE COURT: Okay. Thank you. |
| 16 | BY MR. COPAS: |
| 17 | Q. And if you could just peruse those messages |
| 18 | and give us the earliest date on those messages and |
| 19 | the latest date, the earliest and the latest as far |
| 20 | as the time frame. |
| 21 | A. The earliest date on the first page is |
| 22 | August 20th of 2019. And then the last one, it does |
| 23 | not have a year date, but from my recollection -- |
| 24 | from what I believe, this is January 21st of 2020 on |
| 25 | the last message. |

```
 1   Q.        And then could you indicate to us which of
 2   those messages that you interpreted as being holding
 3   yourself as a lawyer?
 4   A.        I will just read some of them.  I'm not
 5   sure -- that would be the -- up to the Court to
 6   decide if he was representing himself as a lawyer,
 7   but from what I believe, and myself and the district
 8   attorney's office believe, the first message here
 9   Mr. Herrera -- this is sometime, I guess, dating
10   prior to August 20, 2019.  Mr. Herrera states, "How
11   are you, my brother?  How are we looking today on my
12   case?"
13             Mr. Allman replies, "I'm good.  I've been
14   through the whole file.  Gonna run by the clerk's
15   office Monday and Tuesday.  I found everything I was
16   looking for except time records.  Let's talk Monday.
17   Today gas -- or, I'm assuming has -- gotten away
18   from me."
19             THE COURT:  Are you saying, Mr. Copas,
20   that that does not prove that he's holding himself
21   out as a lawyer?  What are you saying?
22             MR. COPAS:  Well, I just -- I mean,
23   Your Honor, I guess I could -- I won't go any
24   further than that.
25             THE COURT:  Okay.  I mean, gee whiz.
```

```
 1              MR. COPAS:  But the part that -- well,
 2   I guess what I'm trying to say, Your Honor, is that
 3   there's nothing in those tapes about any -- she's
 4   already testified there was no money paid or no
 5   promise to pay money, and I'm just trying to --
 6              THE COURT:  I know, but that might be
 7   some kind of Black's dictionary definition of lawyer
 8   and practicing law and holding yourself out to be an
 9   attorney, but this is a criminal statute, and it's
10   clearly defined.
11              MR. COPAS:  Well, I just -- in the
12   same section of the code I was referring to another
13   statement --
14              THE COURT:  Go ahead.  Ask any
15   question you want to.
16              MR. COPAS:  No.  I think we've gone
17   far enough, Your Honor.
18              THE COURT:  Okay.
19              MR. COPAS:  I don't mean to --
20              THE COURT:  No.  That's fine.  I just
21   couldn't follow the line of questioning that you
22   were going through here.
23   BY MR. COPAS:
24   Q.      But that's -- I mean, in essence what you
25   just stated was pretty much the character of the
```

```
 1   text messages that held himself out as an attorney
 2   when he made those representations?
 3   A.        Yes.  And he later states that he will help
 4   him draft an appeal.
 5   Q.        Okay.  I guess -- I don't know how this
 6   fits, but, anyway, did Mr. Allman draft an appeal?
 7   A.        Not that I'm aware of.
 8   Q.        Okay.  And I guess the same question I
 9   asked about Mr. Herrera I guess I must ask you for
10   Ms. Garrett.  Is there any evidence -- other than
11   her tape when she asked him are you still my lawyer,
12   was there any evidence that he was rendering any
13   service to her in that tape?  I guess you have that
14   tape, do you not?
15   A.        I do, and you should as well.
16   Q.        Okay.  But was there -- is there anything
17   in that tape to show that Ms. Garrett paid him any
18   money or had -- there was any promise that he should
19   be paid for any kind of services?
20   A.        Yes.  She had paid him a $4500 retainer
21   fee.
22   Q.        While he was suspended?
23   A.        No.  This was prior to his suspension, but
24   he continued to represent himself as her lawyer
25   after his suspension.
```

```
 1   Q.        Okay.

 2   A.        And I will also add that this was after the

 3   30-day time period that Russ Willis had explained

 4   that he was given to let his clients know.  So he

 5   should not have been talking to Ms. Garrett at all

 6   at that point.

 7                MR. COPAS:  Your Honor, I don't think

 8   I have any further questions.

 9                THE COURT:  Okay.  General, anything

10   else?

11                GENERAL DEAN:  No, sir.

12                THE COURT:  Okay.

13                MR. COPAS:  I'll add this --

14                THE COURT:  Do you want to make that

15   an exhibit?

16                MR. COPAS:  Yes, Your Honor.

17                THE COURT:  All right.  Hold on.

18   Let's see.  That will be 12.

19                (Exhibit 12 received into evidence.)

20                THE COURT:  You may be seated.  Thank

21   you, Special Agent Gray.

22                General, anything else?

23                GENERAL DEAN:  No further proof, Your

24   Honor.

25                THE COURT:  Okay.
```

```
 1              MR. COPAS:  Your Honor, I have two
 2   exhibits that my client would --
 3              THE COURT:  Sure.  Sure.  Do you want
 4   to just stand up and tell me what they are for the
 5   record there?
 6              MR. COPAS:  Your Honor, the --
 7              THE COURT:  Go to the microphone.
 8   General -- show the General first what they are, and
 9   then go to the microphone.
10              (Mr. Copas confers with General Dean.)
11              MR. COPAS:  Although I'm -- well, of
12   course, this was not -- these cases have been
13   dismissed and the other case is not in this record.
14   So I would like to --
15              THE COURT:  So what is that document
16   that you're presenting?  Could you just --
17              MR. COPAS:  This is an order -- I'm
18   sorry, Your Honor.  This is an order that the Court
19   entered that -- pursuant to the announcement that we
20   made back on June 14, 2019, in the other case that
21   there was four of those retainer cases that were
22   going to be dismissed.
23              THE COURT:  Okay.
24              MR. COPAS:  And --
25              THE COURT:  But we've still got 200 --
```

```
 1   22 pending.
 2              MR. COPAS:  I know, Your Honor.
 3              THE COURT:  Okay.
 4              MR. COPAS:  And this is the Secretary
 5   of State information for a company called Human
 6   Resource and Labor Consultants that Mr. Allman has
 7   been operating since he's been suspended or
 8   whatever.
 9              THE COURT:  Okay.  The dismissal
10   letter will be 13, and the document showing his
11   employment will be 14.
12              MR. COPAS:  Well, it's a dismissal
13   order.  I'm sorry.
14              THE COURT:  Yes, sir.  Dismissal
15   order.
16              (Exhibit 13 received into evidence.)
17              (Exhibit 14 received into evidence.)
18              THE COURT:  Let me look at this.
19   Okay.  We've made these Exhibits 13 and 14.
20              Any other proof you want to offer,
21   Mr. Copas?
22              MR. COPAS:  No, Your Honor.
23              THE COURT:  Let me tell you where we
24   are now.  I'm going to ask you some questions as
25   attorneys, as officers of the Court.  Instead of
```

```
1   having to put on testimony regarding certain aspects
2   of 40-11-118, I'm just going to ask you, and that's
3   the way we've done this, and if you don't want to
4   respond, fine, but the answers here should be pretty
5   easy.
6               The first thing we look at in
7   40-11-118, the defendant's length of residence in
8   the community.  Is that lifetime?
9               MR. COPAS:  Yes, Your Honor.
10              THE COURT:  I mean, that's what we're
11  looking at here.  These are the type of questions.
12              Now, defendant's employment status and
13  history and financial condition.  Mr. Copas?
14              MR. COPAS:  Well, his employment
15  condition is he's doing some consultant work to
16  different -- I think he's got four different
17  companies that he's doing employee handbooks for and
18  helping human resources for those companies and
19  their employment protocol.
20              THE COURT:  Okay.  Do we have any
21  finance information on how much he's made?
22              MR. COPAS:  No, Your Honor.  He just
23  got -- I know -- well, let me say this, Your Honor.
24  He has paid -- he has paid for my services on our
25  agreement, but the money came dripping out of a
```

```
 1   faucet and not in a stream, and I know that his
 2   financial condition is fairly tight.
 3                THE COURT:  Okay.  That's good enough.
 4                GENERAL DEAN:  Judge, on -- as far as
 5   Factor Number 2, financial condition and employment
 6   status, the State would just emphasize that the law
 7   firm that he ran was -- had to go into receivership.
 8   We've discussed the funds that have been collected
 9   by the chancery court are not his money.  They are a
10   fund that will be paid to whichever claimants have
11   their hand out first, I suppose, between the $1.1
12   million of people on the disbarment orders and the
13   money owed to the Board of Professional
14   Responsibility to the receiver himself, Dennis
15   Powers.
16                So there was no money from the firm
17   that has been shown to have been provided to the
18   receiver.  The money that's there is spoken for many
19   times over, and Mr. Allman ran his business into
20   receivership, and we think that factors into his
21   financial condition and his employment status.
22                MR. COPAS:  Your Honor, could I add
23   something?
24                THE COURT:  Yes, sir.
25                MR. COPAS:  I don't know where this
```

| | |
|---|---|
| 1 | fits in the scheme of things but the -- but in these |
| 2 | cases that other attorneys have picked up and they |
| 3 | have turned to Mr. Allman for information and |
| 4 | advice -- and just from my own personal experience, |
| 5 | Your Honor, I don't do that much employment work and |
| 6 | when it gets -- when I get in the federal court |
| 7 | system and I'm going to try to track down what the |
| 8 | cases are doing as far as settlement negotiations, I |
| 9 | do review the records of the court and I do come |
| 10 | across cases with Mr. Allman as attorney.  In fact, |
| 11 | that's the only time I heard the name, and he -- and |
| 12 | I have myself looked into his files, whatever he is |
| 13 | doing in those cases, for advice for what I'm doing. |
| 14 | So I guess you might say, Your Honor, he is helping |
| 15 | these clients that he no longer has indirectly by |
| 16 | trying to assist the attorneys handling the cases at |
| 17 | the time. |
| 18 | THE COURT:  Okay.  All right.  Third, |
| 19 | easy, family ties and relationships.  I think he's |
| 20 | married.  How many children? |
| 21 | MR. COPAS:  Two, Your Honor, and I |
| 22 | believe the statements that were submitted, both of |
| 23 | those daughters have submitted -- |
| 24 | THE COURT:  Yeah.  And let the record |
| 25 | reflect I want to tell you-all I've read every |

```
 1   letter that you've submitted.  I read them last
 2   night.
 3                 Married two times, two children.  How
 4   long has he been married?
 5                 MR. COPAS:  Six years, Your Honor.
 6                 THE COURT:  Okay.  Any other
 7   marriages?
 8                 MR. COPAS:  One prior marriage.
 9                 THE COURT:  Okay.  Are the two
10   children products of this marriage or the prior
11   marriage?
12                 MR. COPAS:  Both children are the
13   prior marriage.
14                 THE COURT:  Okay.  Very good.
15                 Okay.  This is left for argument here,
16   reputation.
17                 I've heard your argument about
18   reputation.
19                 I know your argument, General.
20   Character.
21                 One thing I want to look at, mental
22   condition.  Any medical -- any psychological
23   disorders, mental health disorders?
24                 MR. COPAS:  He is under prescribed
25   medication for anxiety.
```

```
 1                    THE COURT:  Okay.  Any prior drug or
 2    alcohol usage or abuse?
 3                    MR. COPAS:  No, Your Honor.
 4                    THE COURT:  Okay.  General, I assume
 5    he has no prior criminal record.
 6                    GENERAL DEAN:  I'm aware of none, Your
 7    Honor.
 8                    THE COURT:  Okay.  And there are no
 9    records of flight or failure to appear or anything
10    of that nature; correct?
11                    GENERAL DEAN:  That is correct.
12                    THE COURT:  All right.  Again, 7
13    addresses the prior record.  Let me see.
14                    MR. COPAS:  Could I make a comment on
15    that too?
16                    THE COURT:  Yes, sir, by all means.
17                    MR. COPAS:  In the transcripts of
18    proceedings for the receivership, it does show that
19    Mr. Allman appeared pro se, did not get an attorney,
20    and did not oppose anything that was done in that
21    regard and tried to cooperate.
22                    THE COURT:  Okay.  And I know the
23    arguments here, but I'd like just to hear a little
24    bit, don't need to go into totally -- the General
25    has spent pretty much all day going into this
```

```
 1   particular factor, and it appears to be strong at
 2   this point, nature of the offenses, apparent
 3   probability of conviction, and likely sentence.
 4            General, these are D felonies, C
 5   felonies, and a B felony; is that correct?
 6            GENERAL DEAN: Yes, sir. I believe
 7   there's two Bs. The Dycus case was 109,000. The
 8   Denney estate was 119-. Then we have two Cs, Floyd
 9   Sutton and Rose Ponce. And then we have a
10   collection of Ds and Es, and I think even a
11   misdemeanor in there somewhere.
12            THE COURT: Okay. General, do you
13   want to comment? I'm interested in what you're
14   thinking about this. I know what Mr. Willis said
15   yesterday and I know what Mr. Copas was emphasizing,
16   but we're talking massive issues here -- and I want
17   you to address this too, Mr. Copas -- how in the
18   world can somebody with the character of Mr. Allman
19   let all of this slide and not take care of any of
20   these clients and actually lie to them? General?
21            GENERAL DEAN: Judge, I'm not sure
22   what to tell you. I usually don't spend a lot of
23   time on the probability of conviction when we have
24   these sort of hearings, but the theft by Mr. Allman
25   is so naked. You've got his own -- the main witness
```

1    against Mr. Allman is his own bank records, and his

2    own bank records show that this money would come in,

3    these large sums of money, and it would just be gone

4    within weeks.  Sometime it would take more than a

5    month for the big figures.

6                    I remind the Court that there is --

7    the Court, Your Honor, has heard from Cathy Brown.

8    That is the victim in the Davidson County case --

9                    THE COURT:  $230,000.

10                   GENERAL DEAN:  $230,000 theft from

11   trust money is pending in Davidson County as well

12   separate from all of these offenses.

13                   The number of counts is extreme.  The

14   number of victims are quite numerous, although we

15   only have a fraction of the number that Mr. Willis

16   had to deal with with the Board.  We have focussed

17   on the -- to us what appears to be very

18   straightforward theft of trust monies for purposes

19   of demonstrating probability of conviction.

20   Certainly we know that the whole full trial will be

21   more appropriate to determine, you know, whether a

22   crime has occurred, but for purposes of

23   demonstrating probability we focussed on the trust

24   accounts because they are so aptly demonstrated by

25   his bank records and because they seem to match up

1   with the experience of Mr. Herrera which is the

2   newest of these trust counts.  That would be our

3   fifth trust account theft here in Sumner County.

4                We also thought it was important to

5   Ms. Kelley and Ms. Smelser, having paid him

6   retain- -- they're so-called retainer cases, not

7   trust cases.  We're talking about Ms. Kelley is

8   counts 20 and 21 of Case 548.  Ms. Smelser is count

9   22 and 23.  Both of those dates of offense are in

10  November, months after he's suspended, and both

11  involve them paying him retainer fees.  So you talk

12  about holding yourself out as an attorney, here we

13  are after the suspension order and these ladies are

14  both paying him at his request retainer fees of, I

15  think, 4500 in one and 2500 in another.

16               THE COURT:  And, General, correct me

17  if I'm wrong -- and, Mr. Copas, you can address this

18  in your argument here -- he was held in contempt in

19  the Board of Professional Responsibility

20  litigation --

21               GENERAL DEAN:  For those same --

22               THE COURT:  -- for those particular

23  counts; is that correct?

24               GENERAL DEAN:  That is correct.

25               THE COURT:  So we've got additional

```
 1    proof other than documents or testimony there.

 2            Go ahead.

 3            GENERAL DEAN:  So, Judge, we -- I

 4    mean, our position is this is a massive fraud

 5    perpetrated on dozens and dozens of people all over

 6    Middle Tennessee, and we have this group here

 7    represented by -- in our particular criminal counts

 8    that involves not just taking retainer fees and not

 9    -- allegedly not doing the work, but we're talking

10    about taking retainer fees after being suspended.

11    We're talking about dealing with Mr. Herrera, saying

12    we're going to get things done, we're going to take

13    care of things, and I've been reviewing the file,

14    continuing to hold himself as an attorney not only

15    after being suspended, not only after being

16    disbarred, not only after being indicted for these

17    same sort of offenses.  The State's position is

18    nothing will stop Mr. Allman except incarceration,

19    we believe.  That is why we filed the motion to

20    revoke his bond.

21            THE COURT:  Okay.  And we'll get to

22    this later, General, when I hear your argument.

23    Basically the State's argument is he's a danger to

24    society?

25            GENERAL DEAN:  Yes.
```

1   retainer cases and about the practice of law issue.
2   Those two legal concepts, I think, are -- can be --
3   there's probability -- I mean, I believe I can
4   somehow obtain some positive results for my client
5   on those two issues.  However, there's more --
6   there's so much in the basket, Your Honor, that the
7   probability of half of them not going down may be
8   high and the probability of the other half may not
9   be.
10                So I -- frankly, Your Honor, the way
11  that I have worked all the cases I've handled, civil
12  and criminal, whatever's been -- is try to discuss
13  the goal of my client, what is that goal, and not
14  get tied up in procedure but try to achieve that,
15  whatever it may be.
16                I have tendered the house arrest
17  situation, knowing the likelihood that has -- some
18  control has got to come down based on what the
19  State's trying to show.  And, frankly, the house
20  arrest situation is -- maybe is selfish on my part.
21  I mean, that's -- I have a strong interest for that,
22  not so much for my client but just for me getting
23  through all this situation through -- come August.
24  And when I suggested that, I also was agreeable to
25  the strongest restrictions that the Court could

| | |
|---|---|
| 1 | THE COURT:  Okay. |
| 2 | GENERAL DEAN:  We believe that every |
| 3 | authority that has attempted to get him to stop has |
| 4 | been totally ineffective.  Mr. Allman is going to do |
| 5 | what he wants.  That has been demonstrated.  It |
| 6 | doesn't matter what the Board says.  It doesn't |
| 7 | matter what the Supreme Court says.  There's no |
| 8 | reason to think it matters what you or I might say, |
| 9 | Judge.  It didn't matter that he was on bond when he |
| 10 | was covering up for his theft with Mr. Herrera and |
| 11 | making these statements about helping with appeals |
| 12 | and such.  We believe he's caused an extraordinary |
| 13 | amount of damage to a lot of people and that that |
| 14 | damage is going to continue with who knows else as |
| 15 | long as he is walking around. |
| 16 | THE COURT:  Thank you, General. |
| 17 | All right.  Mr. Copas, I'm interested |
| 18 | in, getting back to the nature of the question, the |
| 19 | apparent probability of conviction and likely |
| 20 | sentence.  That's what I'm asking you to address. |
| 21 | I'll ask for your argument later here. |
| 22 | MR. COPAS:  Well, Your Honor, based on |
| 23 | the facts before the Court now, I mean, the |
| 24 | probability, I'd have to say, is pretty strong.  The |
| 25 | -- and I still take the strong view about the |

```
 1   impose on that house arrest.  The only thing I would
 2   have on it, I've just got to have access to my
 3   client in order to get this -- prepared for this
 4   case.
 5              And another thing, Your Honor, the --
 6   and, you know, I have been in contact with the State
 7   about any kind of offer or whatever, and I'm trying
 8   to explore all avenues, and I'm going to need some
 9   -- I'm going to need some time to reach that, and
10   the house arrest situation would really enhance that
11   opportunity, but anyway.  I just -- that's about all
12   I've got to say, Your Honor.  I don't --
13              THE COURT:  Okay.  Thank you.  I
14   appreciate it.
15              What I'm going to do is we're going to
16   break here for an hour, come back at 2:05, 2:10.
17   I'll hear your arguments on the law and then I'll
18   rule.  I want to go through some of these documents
19   that have just been submitted, especially the text
20   messages.  Anything else?
21              MR. COPAS:  Your Honor, we'd like to
22   ask to go into the conference room, but he's got to
23   have a mask and gloves.  So I don't know what to do.
24              THE COURT:  We can't do that unless he
25   wears a mask and he didn't do it.
```

```
 1                    MR. ALLMAN:  I mean, I'll wear a mask.
 2    I don't mind.
 3                    THE COURT:  Well, I mean, we did that
 4    once before.  What do we need to talk about?
 5                    MR. ALLMAN:  I never got a mask or
 6    gloves.
 7                    THE COURT:  That's not what I've been
 8    told.
 9                    COURT OFFICER:  Mr. Copas was supposed
10    to have a mask and gloves on while he was in there,
11    not Mr. Allman.
12                    THE COURT:  Okay.  Was he given a mask
13    and gloves?
14                    COURT OFFICER:  He was --
15                    MR. COPAS:  No, Your Honor, he wasn't
16    given one but, I mean, I'll make sure --
17                    COURT OFFICER:  Not Mr. Allman.
18    Mr. Copas is supposed to wear --
19                    MR. COPAS:  Right.
20                    COURT OFFICER:  Were you given
21    anything this morning?
22                    MR. ALLMAN:  No, sir.
23                    COURT OFFICER:  Not you, Mr. Allman.
24    Mr. Copas, were you given a mask to wear?
25                    MR. COPAS:  Well, yeah.  I put the
```

1  gloves on and had --

2              THE COURT:  You had it on?

3              MR. COPAS:  Yes, Your Honor.

4              THE COURT:  Well, did you give me the

5  wrong information?

6              COURT OFFICER:  I didn't give any

7  information.  All I know is that Mr. Allman doesn't

8  have to wear it and Mr. Copas does.

9              THE COURT:  Okay.

10             MR. COPAS:  Okay.  I don't know what

11 the rule is, but I --

12             THE COURT:  Okay.  Okay.  How long do

13 you need to meet?

14             MR. COPAS:  I don't know, Your Honor.

15 I just ...

16             THE COURT:  Okay.  You can meet back

17 here in this room.  Conditions must be followed, and

18 we'll come back at 2:05 to hear your arguments on

19 Burgins and 40-11-118.

20             GENERAL DEAN:  Judge, just to kind of

21 bring some focus because we have introduced a lot of

22 paperwork for the Court, I introduced the whole CPA

23 report because I felt weird about giving parts of a

24 report and, you know, people could say, well, you're

25 -- you know, you're not showing the whole thing.  So

| | |
|---|---|
| 1 | I introduced the whole thing, but it is in the very |
| 2 | end that it talks about -- the end of the report, |
| 3 | page 31 and further, that summaries the Rose Ponce |
| 4 | and Kelley and the ones that -- |
| 5 | THE COURT:  I'm familiar, General. |
| 6 | I've looked over that. |
| 7 | GENERAL DEAN:  Okay.  I didn't want |
| 8 | you to spend a lot of time on the first part. |
| 9 | THE COURT:  No.  I thank you.  Thank |
| 10 | you. |
| 11 | We will be in recess. |
| 12 | (Recess taken.) |
| 13 | THE COURT:  Thank you for patience and |
| 14 | waiting.  We talk to the Supreme Court two times a |
| 15 | week about the status of the pandemic and how it |
| 16 | affects the operation of the courts.  We had over |
| 17 | 150 trial judges on a conference call, and it's |
| 18 | major and everybody seems to be doing what needs to |
| 19 | be done, and we're just wading through it the best |
| 20 | that we can. |
| 21 | So what I'm ready to do now -- and, |
| 22 | again, thank you for your patience -- I want to hear |
| 23 | your arguments.  We've got a motion to reduce the |
| 24 | bond and then we've got a Burgins motion. |
| 25 | I'll let you have two arguments, |

Mr. Copas.  You may go first.

2                MR. COPAS:  I guess on the motion to

3   revoke bond, Your Honor, again, I think we're right

4   where I anticipated -- I hoped we would be at, and

5   that's where the Court's going to have to -- where

6   the Court has pretty much opened -- the Supreme

7   Court has opened the door and given the trial judge

8   all the discretion that it wants and wants to

9   exercise to try to come out on how to handle, under

10  that particular statute, a situation to where you

11  have, quote, preponderance of the evidence showing

12  commission of an offense while out on bond.

13                The -- I guess -- I made a comment

14  and, to me, it's not so much for my client.  It's

15  looking out for myself in a way because I -- I mean,

16  I've got -- I'm the one carrying the load on this

17  thing as far as bringing it to trial in August.

18                And I guess a good analogy to use

19  possibly -- I don't know, but it seems like when

20  you've been practicing 40 years, you've got a story

21  about everything.  But I did have a case once to

22  where it involved a lot of work and discovery, and I

23  became a material witness in the case and I had to

24  step out of it.  Anyway, Lew Conner, he took my

25  place and I never will forget being in his office,

1   him sitting at the head of the table and me next to

2   him and he had some attorneys there across from him,

3   and he told each attorney you take this box, you

4   take that box.  And I'm a sole practitioner, and I'm

5   going to be faced with a whole bunch of boxes.

6                   THE COURT:  Would you excuse me just a

7   minute?  I need to sign this order for our drug

8   court.  She's been waiting on me a couple of days.

9                   Go ahead, Mr. Copas.

10                  MR. COPAS:  And you might say I don't

11  have a -- I don't have an office staff -- well, they

12  sold the building I was in downtown.  Frankly, Your

13  Honor, I've been working out of my house since that

14  time, so -- but I -- of course, I do have access to

15  different lawyers', whatever, facilities, but ...

16                  I mean, the Court's got to impose some

17  kind of -- some kind of restriction upon the

18  situation based on its discretion in this.  And,

19  again, I keep going back to the house arrest, and

20  that -- and I'm trying to weigh in my mind, a house

21  arrest, I mean, how can it benefit everybody to some

22  extent?  How can it benefit the whole system?  And

23  it -- in essence it's giving him incarceration to

24  where I've got access to my client in a 24/7

25  situation and access to his records and -- which I

| | |
|---|---|
| 1 | hope to get possession of pretty quick -- and trying |
| 2 | to reconstruct on some of these cases the issues |
| 3 | that's going to come up at trial. |
| 4 | And as any trial attorney knows, you |
| 5 | know, there are -- you look -- you come up with 200 |
| 6 | different issues that you've got to look at, but you |
| 7 | don't know which of those 200 is going to be at the |
| 8 | trial.  You've got to be prepared for all of them. |
| 9 | The -- and I see no reason why -- of |
| 10 | course, the house arrest, there would be a monitor |
| 11 | put on Mr. Allman to where he could not leave the |
| 12 | house without it being notified [sic] by somebody |
| 13 | very quickly.  And his restrictions on that |
| 14 | connecting to the outside world whatsoever, if |
| 15 | there's any way to monitor that, I am open for the |
| 16 | Court for that to be done. |
| 17 | And then there's -- he does have -- I |
| 18 | mean, I've noticed in my visits to the house or |
| 19 | whatever, been around, he does have a young daughter |
| 20 | that is going through some very emotional |
| 21 | experiences right now and that emotional support for |
| 22 | her would be there if he was under house arrest. |
| 23 | Anything I can do to make the house |
| 24 | arrest work I will, and I have -- I mean, there is a |
| 25 | history in this county where a judge just gave me a |

|    |                                                                  |
|----|------------------------------------------------------------------|
| 1  | furlough order to take a prisoner out here and take              |
| 2  | him to rehab in Pittsburg.  So, I mean, I've been                |
| 3  | trusted with a prisoner situation before, and                   |
| 4  | anything I can do in this situation I'll likewise be            |
| 5  | diligent in doing that also.                                    |
| 6  | On the motion deal, we've got a                                 |
| 7  | $2,500,000 bail.  Your Honor, to me, it's just                  |
| 8  | excessive on its face, which, you know, if we                   |
| 9  | address that, then we're going to -- there's going             |
| 10 | to be a bail set in answer to that, but what I want            |
| 11 | to do is I want to do all we can to get this thing             |
| 12 | moving to be over with for the benefit of the public          |
| 13 | and the courts and everybody.  I guess that's where           |
| 14 | I'm at, Your Honor.  That's ...                                 |
| 15 | THE COURT:  Okay.  You'll get another                          |
| 16 | argument here.                                                   |
| 17 | General, Burgins, and it looks like --                         |
| 18 | You can correct me if I'm wrong,                               |
| 19 | Mr. Copas, you're not really arguing that there's             |
| 20 | not a preponderance of evidence that -- there is a            |
| 21 | preponderance of the evidence that the defendant has          |
| 22 | been charged with a crime.  Your argument kind of             |
| 23 | rests on a result from that finding of house arrest,          |
| 24 | if I understand you correctly.                                  |
| 25 | MR. COPAS:  Your Honor, it goes to the                         |

| | |
|---|---|
| 1 | bottom of that opinion to where the Court there at |
| 2 | the end says that the Court can then -- |
| 3 | THE COURT:  Right.  I understand. |
| 4 | MR. COPAS: -- do anything it really |
| 5 | wants to do, so ... |
| 6 | THE COURT:  Okay.  General Dean, |
| 7 | Burgins, plus please comment on house arrest. |
| 8 | GENERAL DEAN:  The State opposes house |
| 9 | arrest.  Mr. Allman can do quite a bit of damage, |
| 10 | even if we were to assume that he would obey the |
| 11 | terms of house arrest, by getting on the phone, |
| 12 | continuing to cover up for past crimes as he did |
| 13 | with Mr. Herrera and commit new crimes as he did |
| 14 | with Mr. Herrera.  So the State opposes any sort of |
| 15 | release. |
| 16 | We believe it's clear that he |
| 17 | committed a crime while on bail.  He had stolen from |
| 18 | Mr. Herrera beginning back on the day he decided to |
| 19 | write himself a $54,000 check the day he received |
| 20 | Mr. Herrera's money, and he really continued that |
| 21 | theft on by lying to Mr. Herrera to continually |
| 22 | cover up for that theft as we have mentioned in the |
| 23 | indictment in count 2 of the new case against |
| 24 | Mr. Allman. |
| 25 | I would point out as far as committing |

| | |
|---|---|
| 1 | crimes while on bond, we didn't charge him with the |
| 2 | statute that says he practiced law.  We charged him |
| 3 | with the statute that he falsely held himself out to |
| 4 | be a lawyer, 23-3-108. |
| 5 | And when I think about that statute |
| 6 | and his actions and conversations with Mr. Herrera |
| 7 | that have been testified to and selected text |
| 8 | messages provided to the Court, I remember Russ |
| 9 | Willis' conversation about even during the time of |
| 10 | the suspension, much less disbarment, but the |
| 11 | suspension order, you're not even supposed to go |
| 12 | into your law office.  You are supposed to take |
| 13 | every action to make sure there's no confusion with |
| 14 | anyone that you're an attorney. |
| 15 | And Mr. Allman has absolutely and |
| 16 | completely failed to obey those restrictions which |
| 17 | dovetails what we're saying is that he cannot be |
| 18 | trusted to not prey upon other members of the |
| 19 | public.  He cannot be trusted to do anything that |
| 20 | doesn't suit him.  We don't know that there's any |
| 21 | reason to suspect that he will come to court if it |
| 22 | doesn't suit him to come to court, because |
| 23 | restrictions previously imposed on him have failed |
| 24 | to keep his actions within the straight and narrow. |
| 25 | He has been charged with an offense. |

People Public delay

1    It was committed during his release.  He's engaged

2    in this conduct with Mr. Herrera and with conduct in

3    front of this Court.  The Court is aware of how many

4    different attorneys we've had parade through here.

5    I think he had four when he was dealing with the

6    Board.  We've had one of those same attorneys here

7    and three others, John Pellegrin; Alex Little, who

8    was also one of the members in front of the Board;

9    David Raybin in Nashville and I think briefly here;

10    and then now we've got Mr. Copas.  The age of the

11    case sort of speaks for the fact that it's been

12    really hard to get it up and tried.  We have not had

13    a smooth road.

14            So the State has some concerns mainly

15    about the fact that a new offense has been committed

16    while on bond for these major felony, numerous

17    charges, but we've also had trouble just orderly and

18    expeditiously progressing to trial, and we think

19    that factors in as well.

20            THE COURT:  Thank you, General.

21            All right.  Mr. Copas, you may finish

22    here.

23            MR. COPAS:  Your Honor, we're going to

24    have a trial in July in Nashville.  We've got one

25    here in August, and what we're looking at now is a

90-day window.  We're looking at a 90-day window,
and the risk to the public in this 90-day window, to
me, is not great enough in this 90-day window to
outweigh the benefit of having the house arrest at
this time based on the nature of this case and the
fact that we've got -- we've got -- all the gears
are running hard right now to try this case in
August.

                    And the Nashville case, it's going to
be tried in July, and the outcome from that case may
make the point of house arrest moot.  I don't know.
But, again, we're looking at a very small window
here, Your Honor, and that's -- I think that needs
to be weighed heavily.  Thank you, Your Honor.

                    THE COURT:  All right.  I want to
thank the attorneys for your professionalism, the
way you presented your proof, and how you've handled
this whole hearing for two days.  I didn't know much
of anything about this case and I've learned pretty
much the last couple of days.  I've never seen
anything like it.

                    And let me temper my comments here.
I'm making my rulings and statements according to
the evidence that I've heard the last couple of
days.  I'm not making any final judgment.  I'm

called upon to rule on a motion to reduce bond.  I'm
called upon to rule on a motion to revoke the bond.
And to that extent we have had a lot of evidence
introduced, and my comments are a reflection on the
evidence that has been presented to me up to this
time and point in this particular case.  I know
there's more to come, more to hear, but I am limited
to what I've heard up to this point along with the
legal issues.

We'll start with the statute in the
motion to reduce -- in the motion to revoke the bond
and the motion to reduce the bond.  We will take
them altogether because a lot of the issues are the
same.  But on the Burgins issue, as I said
yesterday, 40-11-141, it authorizes the trial judge
to hold a defendant without bail pending trial,
without release if the defendant violates a
condition of the release or is charged -- and
"charged" is the key word there in the statute --
charged with an offense committed during the
defendant's release.

Now, Burgins says if the trial court
finds that the State has shown by a preponderance of
the evidence that the defendant has violated a
condition of the release and committed a criminal

offense while on bond, the trial judge may either

2    revoke bail and hold the defendant until trial to

3    continue bail -- or continue bail with a possibility

4    of additional conditions or an increased bond

5    amount.

6              The first thing I want to comment on

7    is the proof that I have heard today about the crime

8    that was committed while the defendant was on bail.

9    And in this particular matter the evidence I've

10   heard is overwhelming.  We've heard from the

11   defendant [sic] by phone in Florida, Mr. Herrera.

12   We went through his history, and it sounds like a

13   lot of what's gone on with these 30, 29, 28 cases

14   that we have pending in this court.  We have pending

15   three counts of theft over a thousand dollars, 12

16   counts of theft over 2500, two counts of theft over

17   $60,000, two counts of theft over $10,000, seven

18   counts of falsely representing himself as a lawyer,

19   one count of impersonating a licensed professional,

20   and one count of practicing without a license.  And

21   then we've got another C felony with Mr. Herrera and

22   another issue about holding himself out as a lawyer.

23             Now, same MO.  The victim was going

24   through a divorce.  He retained Mr. Allman.  I don't

25   know where -- anywhere here, according to his

testimony, there was ever any comment or language about a fee, and I know that's what an attorney works for, but according to the testimony there was none. He was satisfied with the results of the divorce, and then the house got sold and he was to get one half of the $120,000.

Now, it looks like from the proof today that the defendant -- or excuse me, the victim, there was an order to return this money to the defendant [sic] when the divorce was final. We heard the -- we've got a copy of that order, 2014. The next day the defendant cashed this check and placed it into his account and then he wrote a check and put it in another account.

Mr. Herrera testified from 2014 until 2/5/20, six years, he had not received anything. He began calling the defendant -- and I think it's pretty credible that he was told by the defendant to call or check on it when his daughter was about -- was past age 18. And on 5/20/19 was her graduation. On 8/3/19 was her birthday, and he called two weeks later to get the money, and from that period of time on until he talked to Stephanie Boiano at the DA's office he was under the impression, still after five years, that he was going to get his money. He

1    didn't know that it had already been taken care of.

2              Now, his credibility is borne out by

3    text messages I see that Mr. Allman is carrying out

4    a charade, a lie, and a fraud, and according to the

5    testimony of Mr. Herrera he didn't say he couldn't

6    practice law; he didn't say what his fee was; he

7    said he was working on it as if nothing was wrong.

8              Now, conclusion, you've got the check,

9    you've got the money trail, and all the evidence

10   from the bank.  I find by a preponderance of the

11   evidence the testimony has shown that he committed a

12   theft and that he held himself out as an attorney.

13             Now, in considering that, I must

14   consider now whether the bond should be increased,

15   whether the bond should be left the same with

16   different conditions and so forth.  And I look at

17   different factors that the Supreme Court has set out

18   and the Court wants me to look at 40-11-118 in

19   considering what to do here, in considering danger

20   to the community, in considering the likelihood that

21   he will not show up for trial.  Those are the two

22   concerns that we have.

23             Sometimes we focus only on whether or

24   not the defendant is going to show up, but case law,

25   statutory law shows that there's that second factor

here.  You know, it's about that public out there,
the safety to the public, and one of the things I've
got to consider is 40-11-118, and we've gone through
those.

The first factor here, the defendant's
length of residence in community is good.  He's been
here his life -- entire life.  His employment status
history, financial condition, that's not good.  Any
way you stretch it it's not good.  His law firm went
through receivership.  Claims against him from at
least 222 clients total $1.1 million.  There's
evidence that he's having difficulty paying a
mortgage.  There's evidence that one time he filed
bankruptcy, although that was dismissed.  So the
financial condition, employment status, not good,
not good.

Family ties and relationships, I
looked at all the letters.  They are good.  He is
married a second time, got two children from his
first marriage, and he's been married this time six
years, and that is fine.

I've got a concern with the next
condition, his reputation, his character, and his
mental condition.  I think the overall reputation is
poor; character, poor.

1     Mental condition, I'm going to be

2  honest with you.  That really bothers me.  What in

3  the world is going on here from a man that had a

4  good practice, a good reputation, no issues,

5  suddenly in a period of time we've got a major

6  meltdown that affects all of Middle Tennessee where

7  his clients reside?  Up to this point, I have had no

8  explanation as to what was going on.

9         I do not accept the premise from

10  Mr. Willis that things got out of hand.  There is

11  too much here in the record putting off clients,

12  neglecting clients.  Yes, that's ethical situations,

13  but then we move to lying to clients, shifting money

14  that the defendant is not entitled to, and at least

15  at this point in time we've got 222 claims,

16  $1.1 million, and that just doesn't happen by

17  accident.  It doesn't.  Mr. Allman is too sharp an

18  individual to fail accidently to this extent, and I

19  don't know what is going on with him mentally.  I've

20  got a major concern there, and I don't have any

21  explanation, and we'll wait, I guess, to the trial,

22  but up to this point there is no excuse from what I

23  have seen from the evidence of anything.  I

24  understand that we might have issue with some

25  retainers and I'll get to that in a minute, but the

1    overall situation really disturbs me.

2           Prior criminal record and record of
3    appearance at court proceedings, good.  Apparent
4    probability of conviction, strong.

5           Now, Mr. Copas talked about some of
6    the retainer claims, and I don't know what's going
7    to become of them.  The same MO, same thing, it's, I
8    don't give a rip about these clients and I'm not
9    going to take care of them; I'm not going to answer
10   them; I'm going to lie to them; I'm going to put
11   them off.  I'm going to be the same way with the
12   Board of Professional Responsibility.  And he was
13   disbarred three times over the way that he conducted
14   business.  Unbelievable.  That is completely
15   unbelievable.

16          If you consider the strength of the
17   proof here, you go through all those retainer cases
18   and you wonder what's going on.  How can you have,
19   what is it, 23, 20 people have this kind of an issue
20   with this defendant?

21          And then look what we've got in
22   addition to that.  You've got these cases with theft
23   of funds.  They're not retainer cases.  Rosa Ponce,
24   $14,694.  Floyd Kenneth Sutton, $16,433.  Same
25   story, same plan, going to get my money.  No, you're

```
 1   not.  Mr. Allman has taken it.  Sorry.  I'll put you
 2   off, I'll not answer you, and I'll just let things
 3   fly.
 4              Client estate funds.  $108,077 of
 5   Brenda Sue Ingram, no explanation.  Estate of Jane
 6   Ellen Denney, $106,403, no explanation.
 7              And then the testimony we heard on the
 8   motion to sever, that poor lady on that estate down
 9   in Nashville, you cannot help but get emotional,
10   Mr. Allman, at $230,000 that was hers that you took.
11   No explanation.  The proof is strong, very strong.
12   The likelihood of conviction in over 50 percent of
13   these cases is great.
14              Now, I don't know -- that's another
15   thing that bothers me about Mr. Allman.  He seems
16   not to let anything affect him.  He's every second
17   looking to correct his attorney or write things
18   down, or whatever, but I have not heard anything,
19   and I just don't know what's going on mentally
20   there.
21              Now, the case is strong, and in
22   considering the public safety here, you've got to
23   look at the fact that Ms. Cheryl Garrett said, are
24   you still my lawyer?  Yes.
25              You've got to look -- here he is in
```

| 1 | 2017.  The TBI is serving search warrants.  He's |
| 2 | been suspended for years.  TBI called, talked to his |
| 3 | mother and wife, and he says, I'm unavailable.  I'm |
| 4 | meeting with a client.  There's a lot to what the |
| 5 | General says that nothing is going to stop him. |
| 6 | What's house arrest going to do to him if he's got a |
| 7 | phone? |
| 8 | Considering the safety of the public, |
| 9 | Russ Willis, unbelievable.  I don't know how the |
| 10 | Board of Professional Responsibility got it all |
| 11 | together.  They did a very good job in going through |
| 12 | these cases and presenting these different petitions |
| 13 | and trying to protect the public from an attorney |
| 14 | that appeared to be out of control.  Contempt, |
| 15 | receiverships, temporary suspension.  Three |
| 16 | petitions, 208 claims; the fourth petition pending, |
| 17 | 14; 222 claims.  Now, some of these things were gone |
| 18 | through.  Some were eliminated, but that's where we |
| 19 | stand right now. |
| 20 | And I don't care how you want to spin |
| 21 | this, you can't spin it.  From the end of 2015 until |
| 22 | 7/30/2018, there was this area where I don't know |
| 23 | what's going on with the practice of law with |
| 24 | Mr. Allman and his life.  It affected state trial |
| 25 | courts, it affected federal courts and -- to the |

1   tune of $1.1 million.  That does not include the
2   causes of actions that were destroyed, lost, or
3   other areas.
4                   6/19/18, the first disbarment;
5   7/13/18, the second disbarment; 7/30/18, the third
6   disbarment, and yet we heard the testimony today
7   from Mr. Herrera.  It doesn't appear that Mr. Allman
8   gives a rip about the rule of law, about discipline,
9   or about following orders that anybody wants to make
10  about his practice of law.  And you want to see
11  behind the damage that is done, it's like Sherman
12  going through Georgia, destruction.
13                  The complaints, the millions of
14  dollars, so bad that the Board had to file a
15  petition for receivership.  Mr. Willis stated that
16  the numbers became so great they were overwhelming.
17  His response initially, promises about getting the
18  documents, I'm talking to my clients, all a
19  misunderstanding.  And it's all about earning fees.
20  All I can say is what I've heard up to this point,
21  baloney.
22                  We've got a situation where Mr. Allman
23  was so bold as to continue to practice law to where
24  with his dealings with Smelser and Kelley he was
25  held in contempt in the proceedings by the Board of

1    There is no excuse, no excuse.

2              And I've considered reducing the bond.

3    I've considered adjusting the bond.  I have kept all

4    my options open through this hearing, but I can't

5    help but think in the short period of time and the

6    damage that's done and whether or not anybody will

7    ever recover, and the fact that he makes bond and he

8    goes out and continues indicates to me that Sherman

9    is still continuing through Georgia and destruction

10   is still going on while the defendant was out on

11   bond.  I don't know what else we can do but put

12   somebody out on bond with restrictions, and to

13   violate the law and to be an attorney and to do this

14   intentionally goes straight to the heart of justice,

15   and it goes straight to the heart of safety of the

16   public from attorneys that might possibly be

17   criminals.  We still have a way to go yet.  But,

18   again, I'm only commenting and referring to the

19   proof I've heard to this point.

20              Mr. Allman, based on everything that I

21   have just said, based on the restrictions and the

22   law as laid out by Burgins, I find that there is a

23   preponderance of the evidence that you've committed

24   two crimes, one while you were out on bond and the

25   other one was part of a fraud and cover up and

1  Professional Conduct [sic], 10 days for each charge.
2  That didn't stop him.  It didn't stop him one bit.
3  He's still going on, and before he was arrested
4  there's no telling what he was doing, but we do know
5  that he was still leading Mr. Herrera on, and
6  leading him to believe that his case was still
7  pending, that he still mattered, not knowing that
8  Mr. Allman pocketed the money four or five years
9  ago.  And there's no way any fee for what he did
10  would amount to the $59,000 that he took.

11           Now, we've got to protect the public
12  from many things.  We've got to protect the public
13  right now from this virus.  We've got to protect the
14  public right now from violent crimes and repeat
15  offenders.  Every 50 minutes somebody is killed on a
16  highway by somebody driving under the influence,
17  killed in this country.  There are all kinds of
18  dangers.

19           You look at the public.  Do you
20  remember what was said in the Declaration of
21  Independence?  Life and liberty and the pursuit of
22  happiness.  Anybody that's been touched as a client
23  under these circumstances has been devastated and
24  the proof shows that while the defendant was on bond
25  he continued his deceptive practices and fraud.

```
 1    continuation of a crime that you committed some time
 2    ago.  You are a danger to the public if you are out.
 3    Your bond is revoked, sir, and you will be held in
 4    custody until this trial.  That will be the order of
 5    the Court.
 6                  Anything else that we need to take up?
 7                  GENERAL DEAN:  No, sir.
 8                  THE COURT:  We may be in recess.
 9                  (Proceedings concluded at 3:15 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REPORTER'S CERTIFICATE

2        I, Lori C. Bice, Licensed Court Reporter

3   for the State of Tennessee, hereby certify that I

4   reported the foregoing proceedings at the time and

5   place set forth in the caption thereof; that the

6   proceedings were stenographically reported by me;

7   and that the foregoing proceedings constitute a true

8   and correct transcript of said proceedings to the

9   best of my ability.

10        I FURTHER CERTIFY that I am not related to

11   any of the parties named herein, nor their counsel,

12   and have no interest, financial or otherwise, in the

13   outcome or events of this action.

14        IN WITNESS WHEREOF, I have hereunto

15   affixed my official signature this 10th day of May,

16   2020.

17

18

19

20

21        _____

22        LORI C. BICE, LCR
          STATE OF TENNESSEE
23        LCR No. 036, Expires 6/30/2020

24

25