```
IN THE CRIMINAL COURT FOR SUMNER COUNTY, TENNESSEE
                    AT GALLATIN


STATE OF TENNESSEE          )
                            )
                            )   NO. CR875-2017
vs.                         )       CR133-2020
                            )       CR548-2017
                            )
ANDY LAMAR ALLMAN           )
```

---

TRANSCRIPT OF PROCEEDINGS

April 2, 2020

VOLUME I OF II

---

THE HONORABLE DEE DAVID GAY PRESIDING

LORI C. BICE, LCR
Criminal Justice Center
117 W. Smith Street
Gallatin, Tennessee 37066
(615) 414-8993

*Exhibit H*

```
 1   90-day window.  We're looking at a 90-day window,
 2   and the risk to the public in this 90-day window, to
 3   me, is not great enough in this 90-day window to
 4   outweigh the benefit of having the house arrest at
 5   this time based on the nature of this case and the
 6   fact that we've got -- we've got -- all the gears
 7   are running hard right now to try this case in
 8   August.
 9              And the Nashville case, it's going to
10   be tried in July, and the outcome from that case may
11   make the point of house arrest moot.  I don't know.
12   But, again, we're looking at a very small window
13   here, Your Honor, and that's -- I think that needs
14   to be weighed heavily.  Thank you, Your Honor.
15              THE COURT:  All right.  I want to
16   thank the attorneys for your professionalism, the
17   way you presented your proof, and how you've handled
18   this whole hearing for two days.  I didn't know much
19   of anything about this case and I've learned pretty
20   much the last couple of days.  I've never seen
21   anything like it.
22              And let me temper my comments here.
23   I'm making my rulings and statements according to
24   the evidence that I've heard the last couple of
25   days.  I'm not making any final judgment.  I'm
```

1  called upon to rule on a motion to reduce bond. I'm
2  called upon to rule on a motion to revoke the bond.
3  And to that extent we have had a lot of evidence
4  introduced, and my comments are a reflection on the
5  evidence that has been presented to me up to this
6  time and point in this particular case. I know
7  there's more to come, more to hear, but I am limited
8  to what I've heard up to this point along with the
9  legal issues.
10             We'll start with the statute in the
11 motion to reduce -- in the motion to revoke the bond
12 and the motion to reduce the bond. We will take
13 them altogether because a lot of the issues are the
14 same. But on the Burgins issue, as I said
15 yesterday, 40-11-141, it authorizes the trial judge
16 to hold a defendant without bail pending trial,
17 without release if the defendant violates a
18 condition of the release or is charged -- and
19 "charged" is the key word there in the statute --
20 charged with an offense committed during the
21 defendant's release.
22             Now, Burgins says if the trial court
23 finds that the State has shown by a preponderance of
24 the evidence that the defendant has violated a
25 condition of the release and committed a criminal

offense while on bond, the trial judge may either revoke bail and hold the defendant until trial to continue bail -- or continue bail with a possibility of additional conditions or an increased bond amount.

The first thing I want to comment on is the proof that I have heard today about the crime that was committed while the defendant was on bail. And in this particular matter the evidence I've heard is overwhelming. We've heard from the defendant [sic] by phone in Florida, Mr. Herrera. We went through his history, and it sounds like a lot of what's gone on with these 30, 29, 28 cases that we have pending in this court. We have pending three counts of theft over a thousand dollars, 12 counts of theft over 2500, two counts of theft over $60,000, two counts of theft over $10,000, seven counts of falsely representing himself as a lawyer, one count of impersonating a licensed professional, and one count of practicing without a license. And then we've got another C felony with Mr. Herrera and another issue about holding himself out as a lawyer.

Now, same MO. The victim was going through a divorce. He retained Mr. Allman. I don't know where -- anywhere here, according to his

testimony, there was ever any comment or language about a fee, and I know that's what an attorney works for, but according to the testimony there was none. He was satisfied with the results of the divorce, and then the house got sold and he was to get one half of the $120,000.

Now, it looks like from the proof today that the defendant -- or excuse me, the victim, there was an order to return this money to the defendant [sic] when the divorce was final. We heard the -- we've got a copy of that order, 2014. The next day the defendant cashed this check and placed it into his account and then he wrote a check and put it in another account.

Mr. Herrera testified from 2014 until 2/5/20, six years, he had not received anything. He began calling the defendant -- and I think it's pretty credible that he was told by the defendant to call or check on it when his daughter was about -- was past age 18. And on 5/20/19 was her graduation. On 8/3/19 was her birthday, and he called two weeks later to get the money, and from that period of time on until he talked to Stephanie Boiano at the DA's office he was under the impression, still after five years, that he was going to get his money. He

didn't know that it had already been taken care of.

Now, his credibility is borne out by text messages I see that Mr. Allman is carrying out a charade, a lie, and a fraud, and according to the testimony of Mr. Herrera he didn't say he couldn't practice law; he didn't say what his fee was; he said he was working on it as if nothing was wrong.

Now, conclusion, you've got the check, you've got the money trail, and all the evidence from the bank. I find by a preponderance of the evidence the testimony has shown that he committed a theft and that he held himself out as an attorney.

Now, in considering that, I must consider now whether the bond should be increased, whether the bond should be left the same with different conditions and so forth. And I look at different factors that the Supreme Court has set out and the Court wants me to look at 40-11-118 in considering what to do here, in considering danger to the community, in considering the likelihood that he will not show up for trial. Those are the two concerns that we have.

Sometimes we focus only on whether or not the defendant is going to show up, but case law, statutory law shows that there's that second factor

here. You know, it's about that public out there, the safety to the public, and one of the things I've got to consider is 40-11-118, and we've gone through those.

The first factor here, the defendant's length of residence in community is good. He's been here his life -- entire life. His employment status history, financial condition, that's not good. Any way you stretch it it's not good. His law firm went through receivership. Claims against him from at least 222 clients total $1.1 million. There's evidence that he's having difficulty paying a mortgage. There's evidence that one time he filed bankruptcy, although that was dismissed. So the financial condition, employment status, not good, not good.

Family ties and relationships, I looked at all the letters. They are good. He is married a second time, got two children from his first marriage, and he's been married this time six years, and that is fine.

I've got a concern with the next condition, his reputation, his character, and his mental condition. I think the overall reputation is poor; character, poor.

```
 1                 Mental condition, I'm going to be
 2  honest with you.  That really bothers me.  What in
 3  the world is going on here from a man that had a
 4  good practice, a good reputation, no issues,
 5  suddenly in a period of time we've got a major
 6  meltdown that affects all of Middle Tennessee where
 7  his clients reside?  Up to this point, I have had no
 8  explanation as to what was going on.
 9                 I do not accept the premise from
10  Mr. Willis that things got out of hand.  There is
11  too much here in the record putting off clients,
12  neglecting clients.  Yes, that's ethical situations,
13  but then we move to lying to clients, shifting money
14  that the defendant is not entitled to, and at least
15  at this point in time we've got 222 claims,
16  $1.1 million, and that just doesn't happen by
17  accident.  It doesn't.  Mr. Allman is too sharp an
18  individual to fail accidently to this extent, and I
19  don't know what is going on with him mentally.  I've
20  got a major concern there, and I don't have any
21  explanation, and we'll wait, I guess, to the trial,
22  but up to this point there is no excuse from what I
23  have seen from the evidence of anything.  I
24  understand that we might have issue with some
25  retainers and I'll get to that in a minute, but the
```

overall situation really disturbs me.

Prior criminal record and record of appearance at court proceedings, good. Apparent probability of conviction, strong.

Now, Mr. Copas talked about some of the retainer claims, and I don't know what's going to become of them. The same MO, same thing, it's, I don't give a rip about these clients and I'm not going to take care of them; I'm not going to answer them; I'm going to lie to them; I'm going to put them off. I'm going to be the same way with the Board of Professional Responsibility. And he was disbarred three times over the way that he conducted business. Unbelievable. That is completely unbelievable.

If you consider the strength of the proof here, you go through all those retainer cases and you wonder what's going on. How can you have, what is it, 23, 20 people have this kind of an issue with this defendant?

And then look what we've got in addition to that. You've got these cases with theft of funds. They're not retainer cases. Rosa Ponce, $14,694. Floyd Kenneth Sutton, $16,433. Same story, same plan, going to get my money. No, you're

```
 1  not.  Mr. Allman has taken it.  Sorry.  I'll put you
 2  off, I'll not answer you, and I'll just let things
 3  fly.
 4              Client estate funds.  $108,077 of
 5  Brenda Sue Ingram, no explanation.  Estate of Jane
 6  Ellen Denney, $106,403, no explanation.
 7              And then the testimony we heard on the
 8  motion to sever, that poor lady on that estate down
 9  in Nashville, you cannot help but get emotional,
10  Mr. Allman, at $230,000 that was hers that you took.
11  No explanation.  The proof is strong, very strong.
12  The likelihood of conviction in over 50 percent of
13  these cases is great.
14              Now, I don't know -- that's another
15  thing that bothers me about Mr. Allman.  He seems
16  not to let anything affect him.  He's every second
17  looking to correct his attorney or write things
18  down, or whatever, but I have not heard anything,
19  and I just don't know what's going on mentally
20  there.
21              Now, the case is strong, and in
22  considering the public safety here, you've got to
23  look at the fact that Ms. Cheryl Garrett said, are
24  you still my lawyer?  Yes.
25              You've got to look -- here he is in
```

1    2017.  The TBI is serving search warrants.  He's
2    been suspended for years.  TBI called, talked to his
3    mother and wife, and he says, I'm unavailable.  I'm
4    meeting with a client.  There's a lot to what the
5    General says that nothing is going to stop him.
6    What's house arrest going to do to him if he's got a
7    phone?
8                Considering the safety of the public,
9    Russ Willis, unbelievable.  I don't know how the
10   Board of Professional Responsibility got it all
11   together.  They did a very good job in going through
12   these cases and presenting these different petitions
13   and trying to protect the public from an attorney
14   that appeared to be out of control.  Contempt,
15   receiverships, temporary suspension.  Three
16   petitions, 208 claims; the fourth petition pending,
17   14; 222 claims.  Now, some of these things were gone
18   through.  Some were eliminated, but that's where we
19   stand right now.
20                And I don't care how you want to spin
21   this, you can't spin it.  From the end of 2015 until
22   7/30/2018, there was this area where I don't know
23   what's going on with the practice of law with
24   Mr. Allman and his life.  It affected state trial
25   courts, it affected federal courts and -- to the

1  tune of $1.1 million. That does not include the
2  causes of actions that were destroyed, lost, or
3  other areas.
4              6/19/18, the first disbarment;
5  7/13/18, the second disbarment; 7/30/18, the third
6  disbarment, and yet we heard the testimony today
7  from Mr. Herrera. It doesn't appear that Mr. Allman
8  gives a rip about the rule of law, about discipline,
9  or about following orders that anybody wants to make
10 about his practice of law. And you want to see
11 behind the damage that is done, it's like Sherman
12 going through Georgia, destruction.
13             The complaints, the millions of
14 dollars, so bad that the Board had to file a
15 petition for receivership. Mr. Willis stated that
16 the numbers became so great they were overwhelming.
17 His response initially, promises about getting the
18 documents, I'm talking to my clients, all a
19 misunderstanding. And it's all about earning fees.
20 All I can say is what I've heard up to this point,
21 baloney.
22             We've got a situation where Mr. Allman
23 was so bold as to continue to practice law to where
24 with his dealings with Smelser and Kelley he was
25 held in contempt in the proceedings by the Board of

```
 1   There is no excuse, no excuse.
 2              And I've considered reducing the bond.
 3   I've considered adjusting the bond.  I have kept all
 4   my options open through this hearing, but I can't
 5   help but think in the short period of time and the
 6   damage that's done and whether or not anybody will
 7   ever recover, and the fact that he makes bond and he
 8   goes out and continues indicates to me that Sherman
 9   is still continuing through Georgia and destruction
10   is still going on while the defendant was out on
11   bond.  I don't know what else we can do but put
12   somebody out on bond with restrictions, and to
13   violate the law and to be an attorney and to do this
14   intentionally goes straight to the heart of justice,
15   and it goes straight to the heart of safety of the
16   public from attorneys that might possibly be
17   criminals.  We still have a way to go yet.  But,
18   again, I'm only commenting and referring to the
19   proof I've heard to this point.
20              Mr. Allman, based on everything that I
21   have just said, based on the restrictions and the
22   law as laid out by Burgins, I find that there is a
23   preponderance of the evidence that you've committed
24   two crimes, one while you were out on bond and the
25   other one was part of a fraud and cover up and
```

```
 1   Professional Conduct [sic], 10 days for each charge.
 2   That didn't stop him.  It didn't stop him one bit.
 3   He's still going on, and before he was arrested
 4   there's no telling what he was doing, but we do know
 5   that he was still leading Mr. Herrera on, and
 6   leading him to believe that his case was still
 7   pending, that he still mattered, not knowing that
 8   Mr. Allman pocketed the money four or five years
 9   ago.  And there's no way any fee for what he did
10   would amount to the $59,000 that he took.
11               Now, we've got to protect the public
12   from many things.  We've got to protect the public
13   right now from this virus.  We've got to protect the
14   public right now from violent crimes and repeat
15   offenders.  Every 50 minutes somebody is killed on a
16   highway by somebody driving under the influence,
17   killed in this country.  There are all kinds of
18   dangers.
19               You look at the public.  Do you
20   remember what was said in the Declaration of
21   Independence?  Life and liberty and the pursuit of
22   happiness.  Anybody that's been touched as a client
23   under these circumstances has been devastated and
24   the proof shows that while the defendant was on bond
25   he continued his deceptive practices and fraud.
```

```
1    continuation of a crime that you committed some time
2    ago.  You are a danger to the public if you are out.
3    Your bond is revoked, sir, and you will be held in
4    custody until this trial.  That will be the order of
5    the Court.
6                 Anything else that we need to take up?
7                 GENERAL DEAN:  No, sir.
8                 THE COURT:  We may be in recess.
9                 (Proceedings concluded at 3:15 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```