IN THE UNTED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

**FILED**

JUL 0 2 2021 DB

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN.

| | |
|---|---|
| **ANDY L. ALLMAN**<br>Petitioner<br><br>vs.<br><br>**SONNY WEATHERFORD,**<br>**SHERIFF OF SUMNER**<br>**COUNTY, TN**<br>Respondent | )<br>)<br>) **Docket No. 3:21-cv-00267**<br>) **From the Tennessee Court of Criminal**<br>) **Appeals No. M2021-00196-CCA-R8-CO**<br>) **Sumner County Criminal Court Cases:**<br>) **No. 2017-CR-548**<br>) **No. 2017-CR-875**<br>) **No. 2020-CR-133**<br>)<br>)<br>) |

**PETITIONER'S REPLY**
**TO RESPONDENT, SONNY WEATHERFORD'S,**
**RESPONSE TO MOTION FOR IMMEDIATE RELEASE**

Comes now Petitioner, Andy L. Allman, and files his reply to Respondent, Sonny

Weatherford's, response to the Motion for Immediate Release.

On June 23, 2021, this Court entered an Order giving the Respondent ten (10) additional

days to submit responses. Day ten will be July 3rd, making their actual deadline July 6th given

the holiday; and a ruling on the motions coming in "due course." Respondent filed pleadings on

July 1, 2021.

The only allegations of theft from clients and unauthorized practice of law since

Petitioner's conditional entry of plea to disbarment deals specifically with Mario Herrera. After a

two (2) day hearing, the State failed to prove by a preponderance of the evidence crimes

committed or that Petitioner was a serious threat to the public or a flight risk.

1

**The State failed to prove by a preponderance of the evidence theft pursuant
to T.C.A. 39-14-13**

The Trial Court revoked Defendant's bond even though it had heard no evidence as to the work done by Petitioner but stated: "and there's no way any fee for what he did would amount to the $59,000 he took". Petitioner was paid a fee from his trust account of $54,269.03 on December 15, 2014. (Transcript of Proceedings 4/2 - 4/3/2020 page 241 line 9 -10, Exhibit C – Petitioner's Motion to Review and it's attached exhibits as follows: Herrera Fee Check Exhibit 3). Petitioner handled Mr. Herrera's divorce issues, real property and tool issues, child support and visitation issues. (Transcript of Proceedings 4/2 – 3/2020 pages 120 – 121, 134 – 135). An Agreed Final Order was entered December 12, 2014 in the divorce court resolving all issues between Mr. Herrera and his ex-wife to that point. (Exhibit C- Petitioner's Motion to Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4). Mr. Herrera agreed with all of the terms of this Agreed Final Order including the disbursement by the Clerk and Master to Petitioner and Mr. Herrera the sales proceeds from the sale of the marital residence to pay Petitioner for the legal services he rendered to Herrera. (Transcript of Proceedings 4/2 – 3/2020 pages 136, 138-139, 144-145; Exhibit C -Petitioner's Motion to Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

The State held in its possession the entire Herrera file and audio recordings of conversations between Petitioner and Mario Herrera wherein he, Herrera, acknowledges owing money for services rendered but that he, Herrera, didn't think that much work had been done. (Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Declaration of Gary Copas paragraphs 19, 20, 21 Exhibit 1; Transcript of Conversations between Petitioner and Mario Herrera audio recording #2 page 4 line 8 – page 6 line 13 Exhibit 2. This audio recording

was not disclosed by the State to the Petitioner prior to the revocation hearing. Transcript of Proceedings 4/2-3/2020 page 151- 156). Mr. Herrera testified he understood money would be dispersed by the Clerk & Master when this Agreed Final Order was entered (Transcript of Proceedings 4/2 – 3/2020 page 139) and, further, that the money for Petitioner's services would come from the sale proceeds of the marital residence, *to wit*:

> Q: Well, I mean, there was a discussion that he was going to prepare a bill, was there any - - any statements made for what the bill would be for?
>
> A: He mentioned for him being my lawyer all this time.
>
> Q: All the time that he had been your lawyer that is what the bill would be for?
>
> A: Yes
>
> Q: Okay
>
> A: Him being my lawyer
>
> Q: Correct. When - - at the time he said he'd prepare a bill, was there any - - and again, you said you didn't - - you couldn't afford an attorney previously. Was there any discussion as to how that bill would be paid?
>
> A: That's when he mentioned Mr. Powers that he was going to get Mr. Powers the bill. That way it comes off that amount of money.
>
> Q: Okay. So your understanding was the bill would be paid off of the sales money, but you would have to go through Mr. Powers to do it? That's your understanding?
>
> A: Yes.

(Transcript of Proceedings 4/2 – 3/2020 page 144 -145).

It is important to note that Petitioner continued doing work for Mr. Herrera between January 2015 and September 2016 and Herrera admits that Petitioner told him that he, Petitioner, would have to prepare a bill to send to the receiver (Transcript of Proceedings 4/2 – 3/2020 page 144 -145). Russ Willis testified that if a client called Petitioner during his suspension, it was not improper for Petitioner to say the receiver had to be contacted. (Transcript of Proceedings 4/2-3/2020 page 73).

3

The State has failed to prove by a preponderance of the evidence, pursuant to *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015), theft pursuant to T.C.A. 39-14-103. The uncontradicted evidence, including the exculpatory audio recordings and case file of Mr. Herrera withheld from Petitioner prior to the hearing, shows:

a. Petitioner performed legal services for Mr. Herrera prior to his suspension and Mr. Herrera was satisfied with the results; (Transcript of Proceedings 4/2-3/2020 Pages 120 – 121, 134 – 135, 233).

b. An Agreed Final Order was filed in his domestic relations case, the terms of which he agreed to; (Transcript of Proceedings 4/2-3/2020 page 136; Exhibit C -Petitioner's Motion for Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

c. This Order set forth that proceeds from the sale of the marital residence, held by the Clerk and Master, would be disbursed to Petitioner and Mr. Herrera to meet his legal fees; (Transcript of Proceedings 4/2-3/2020 pages 144 – 145; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Agreed Final Order Exhibit 4).

d. The Clerk disbursed the check to Petitioner and Mr. Herrera pursuant to the Agreed Final Order that was then deposited into Petitioner's trust account from which he was paid; (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Herrera Fee Check Exhibit 3).

e. Mr. Herrera admits he owed Petitioner for his services, but now some four (4) years later, and just after he received a letter from the State alleging he owed over $21,000 in back child support, didn't think that much work had been done. At most, the State has produced by a preponderance of the evidence a fee dispute. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #2 page 4 line 8 – page 6 line 13 Exhibit 2. This audio recording was not disclosed by the State to the Petitioner prior to the revocation hearing; Transcript of Proceedings 4/2-3/2020 pages 144 -145, 151–156, 177-178).

T.C.A. 39-14-103 defines theft as: "A person commits theft of property if, with the intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property **without the owner's effective consent.**" (emphasis added)

4

Mr. Herrera attempted to testify that all the work done by Petitioner prior to September 16, 2016

was free. Under cross-examination he admitted it wasn't, *to wit;*

> Q: Was there any other — did anybody else — you're saying his mother said it would
> be free. Did Mr. Allman ever say it would be free?
> A: No. They never said it was free, no, sir, but she was saying, you know he would help
> me out.

(Transcript of Proceedings 4/2 – 3/2020 pages 151 - 156; Exhibit C - Petitioner's Motion for

Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and

Mario Herrera audio recording #2 page 4 line 8 – page 5 line 24 Exhibit 2. This audio recording

was not disclosed by the State to the Petitioner prior to the hearing. Transcript of Proceedings 4/2

– 3/2020 pages 151 - 156).  Tennessee Bureau of Investigation agent Gray testified that the

check made out to Petitioner and Mr. Herrera from the Clerk and Master of Sumner County was

deposited into Petitioner's trust account. (Transcript of Proceedings 4/2-3/2020 pages 181 –

182).

### The State failed to prove by a preponderance of the evidence Petitioner represented himself as a lawyer pursuant to T.C.A. 23-10-108

The State further alleges that Petitioner's communications with Mr. Herrera after

September 2016 constitutes a violation of TCA 23-3-108, representing himself as a lawyer. The

State was in possession of audio recordings between Petitioner and Mario Herrera, that took

place **prior to Petitioner's indictment**, wherein he, Herrera, states:

**"…. if you are a lawyer, which now you're not…"**

(Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of

Conversation between Petitioner and Mario Herrera audio recording #1 page 14 line 23 - 24

5

Exhibit 5). Mr. Herrera acknowledges being told by Petitioner about his suspension and

receivership. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows:

Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 5

lines 6 – 10, page 13 lines 17 – 24 Exhibit 5).

Tennessee Bureau of Investigation agent, Reilly Gray, testified at the revocation hearing

that charges were brought against Petitioner for unlawfully and falsely holding himself out to be

a lawyer to Mario Herrera in violation of T.C.A. 23-3-108 because Petitioner had been in

communication with Mario Herrera and that Petitioner was not supposed to have any

communications with his clients at all after his suspension in September 2016 from the practice

of law. (Transcript of Proceedings 4/2-3/2020 pages 204 - 205). This is clearly contradicted by

the direct instructions of Russ Willis, Disciplinary Counsel for the Tennessee Board of

Professional Responsibility, given in October 2016 that if Petitioner did not communicate with

his clients after his suspension and give them whatever information they needed that Petitioner

would be subject to further disciplinary actions. Will Hawkins testified by affidavit that he was

Petitioner's attorney in the fall of 2016 and had continuous contact with Russ Willis while

handling the Board matters for the Petitioner and more specifically that:

> On or about October 6, 2016, Mr. Willis told me that many of Mr. Allman's
> clients were contacting him (Mr. Willis), and that he (Mr. Willis) was telling them
> to call Mr. Allman. Mr. Willis explained that, after the clients would not be able
> to reach Mr. Allman, they would call Mr. Willis again. Mr. Willis asked me to
> tell Mr. Allman to talk to his clients, calm them down, and give them the
> information they needed. Mr. Willis stated that, if Mr. Allman did not talk to his
> clients, more investigations would be opened against him. I advised Mr. Allman
> of Mr. Willis's instructions on October 6, 2018.[1]

---

[1] Paragraph 10 states that Mr. Hawkins informed Petitioner of this on October 6, 2018. This is in error in that Mr.
Hawkins informed Petitioner of this on October 6, 2016, the same day Mr. Willis communicated it to him.
Furthermore, Mr. Hawkins had withdrawn from the representation of the Petitioner by January 2017. (Transcript
of Criminal Contempt Proceedings 8/8/2018 pages 20-26, Exhibit 7)

6

(Transcript of Proceedings 4/2-3/2020 page 91; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Affidavit of Will Hawkins paragraph 1-3 Exhibit 6). Russ Willis testified at the Criminal Contempt Hearing that Mr. Hawkins' affidavit was accurate. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/18 pages 9-10, 21-26 Exhibit 7).

Furthermore, on January 4, 2017, a receivership for Petitioner's law practice was put into place by the Sumner County Chancery Court. At the hearing the Receiver testified that he had a conflict which negated his ability to initiate or participate in the entering of attorney-client agreements for substitute counsel since Petitioner would be owed fees at the resolution of his clients' cases that received settlement or verdict. Furthermore, according to the testimony of the Receiver and the Petitioner, the Receiver was sending every client of Petitioner a letter informing them of the receivership and why it was necessary, and that Petitioner would need to keep the Receiver apprised of who had retained counsel and who had not. Both of these issues required ongoing direct contact between Petitioner and his clients. Russ Willis, attorney for the Board of Professional Responsibility, was present and did not object. Russ Willis did testify at the April 2nd and 3rd revocation hearing that the Petitioner had made the good faith effort to contact all of his clients of the suspension as required by the suspension order. The Chancery Court also ordered the Receiver to **"notify all clients represented by attorney Andy L. Allman of the appointment of the Receiver attorney."** (Emphasis added) (Transcript of Proceedings 4/2-3/2020 pages 51,73-74; Exhibit C - Petitioner's Motion Review and it's attached exhibits as follows: Transcript of Receivership Proceedings 1/4/2017, Pages 2, 6-8, 15-16 Exhibit 8;

Affidavit of Will Hawkins paragraphs 1-10 Exhibit 6; Order for Appointment of Receiver

Attorney Exhibit 9).

Also found in the transcripts of the audio recordings, Petitioner had the following

exchange with Mr. Herrera:

> Mario: Well, yesterday I was driving. I didn't pay too much attention to what you told me. But you told me my petition, what? What happened with my – – yesterday.

> Andy: No, nothing. I said I was sending Patrick up there to look at the file and get copies of the **appeal you sent in** and asked them what the next steps are to get this rolling. (Emphasis added)

> Mario: Okay.

> Andy: But I just tried to call Patrick not 10 minutes ago and I left him a voicemail to call me.

(Exhibit C - Petitioner's Motion to Review and it's attached exhibits as follows: Transcript of

Conversation between Petitioner and Mario Herrera audio recording #1 page 2 line 21 – page 3

line 4 Exhibit 5). On the recording, Petitioner informs Mr. Herrera that he, Petitioner, was going

to send Mr. Parker to go and look at Mr. Herrera's child support file and get copies of the appeal

Mr. Herrera sent in and find out the next steps. (Exhibit C - Petitioner's Motion to Review and

it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario

Herrera audio recording #1 page 2 line 21- page 3 line 4 Exhibit 5).

Agent Gray testified that the text messages between Petitioner and Mario Herrera

constituted holding himself out as a lawyer. These text messages show Petitioner gathering

documents to assist Patrick Parker and prepare time slips for work Petitioner performed between

January 2015 and September 2016 to prepare a bill. (Transcript of Proceedings 4/2 – 3/2020

pages 144-145, 200 – 203; Exhibit C - Petitioner's Motion to Review and it's attached exhibits

as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #2

8

page 2 line 6 – line 25, page 4 line 8 – 16 Exhibit # 2. This audio recording was not disclosed by the State to the Petitioner prior to the hearing. Transcript of Proceedings 4/2 – 3/2020 pages 151 – 156).

T.C.A. 23-3-108 defines falsely representing self as a lawyer as "it is unlawful for any person, either directly or indirectly, falsely to advertise the person as, or hold the person out as, a lawyer." Clearly Petitioner had not performed any legal services for Herrera during his suspension, was reaching out to engage Patrick Parker to handle, and Herrera knew Mr. Parker was an attorney who worked for Petitioner. (Transcript of Proceedings 4/2 – 3/2020 page 142-143, 204; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Conversation between Petitioner and Mario Herrera audio recording #1 page 2 line 21 – page 3 line 4, page 14 line 17 – page 15 line 21 Exhibit 5).

In view of the foregoing, Petitioner has been denied disclosure of evidence, especially exculpatory evidence, a meaningful opportunity to be heard and present this evidence, the right to confront and cross exam witnesses, and the right to make meaningful arguments in his defense in violation of *State v. Burgins,* 464 S.W.3d 298 310-311 (Tenn. 2015). The State failed to prove by a preponderance of the evidence, under *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015), that the Petitioner held himself out as a lawyer to Mr. Herrera or communicated with him about his case in violation of T.C.A. 23-1-108. The uncontradicted proof is that Petitioner was communicating with his clients at the direction of Russ Willis with the Board of Professional Responsibility under the threat of more disciplinary action being taken against him if he did not and that the Petitioner provided no legal services to Herrera after his suspension. Mr. Herrera acknowledges on the recording that Petitioner told him of the suspension, and further, the

9

Receiver was ordered by the Chancery Court to notify all of Petitioner's clients about the Receivership and why it was necessary.

On July 17, 2017, the Tennessee Board of Professional Responsibility filed petitions for criminal contempt against Petitioner. The Board's petition included criminal charges alleging Petitioner "willfully, knowingly and intentionally held himself out as an attorney to the public, engaged in unauthorized practice of law, failed to notify his clients of his suspension, and failed to return unearned fees" (i.e. theft of retainer fees). The Board amended its petition in October 2017. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Special Master's Report and emails between Gary Blackburn and the Special Master Exhibit 10).

On January 22, 2018, the Board tried Petitioner in front of Special Master Matt Sweeney *in absentia* of Petitioner and his Counsel violating Petitioner's clearly established due process right to be present at his own trial and his duly established Sixth Amendment right through the Fourteenth Amendment that in all "criminal prosecutions, the accused shall have a right... to be confronted with the witnesses against him". Article 1 Section 9 of the Tennessee Constitution; *State v. Muse*, 962 S.W. 2d 764 (1998); *Watson et. Al. v. State*, 61 S.W. 2d 176 (1933); *Pointer v. Texas,* 380 U.S. 400 (1965); *Boykin v. Alabama*, 365 U.S. 238 (1969). Petitioner never waived his rights. The Special Master convicted Petitioner of 139 charges of criminal conduct and sentenced him to 480 days incarceration. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Special Master's Report and emails between Gary Blackburn and the Special Master Exhibit 10). The Trial Court relied on this in revoking Petitioner's bond. (Transcript of Proceedings 4/2 – 3/2020 page 239-240). The Tennessee Supreme Court set aside this conviction finding multiple constitutional violations and ordered a new trial.

10

On August 3, 2018, Petitioner's Counsel, Alex Little, sent a letter to Sandy Garrett, Chief Disciplinary Counsel to the Board of Professional Responsibility. Attached to the letter was a motion to disqualify Russ Willis as prosecuting attorney and the affidavit of Will Hawkins. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Alex Little letter to Sandy Garrett 8/3/18 Exhibit 11). Petitioner provided to the Board the affidavit of Will Hawkins **memorializing Mr. Willis's own statements** that if Petitioner did not communicate with his clients and give them what they wanted after he was suspended, he, Willis, would "open more investigations against him". (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/2018 pages 7 – 10, 20 – 26 Exhibit 7; Transcript of Criminal Contempt Proceedings 8/30/2018 pages 8 – 12 Exhibit 12; Affidavit of Will Hawkins Exhibit 6). This letter explained in detail how the Board was seeking to:

1. Prosecute and jail Petitioner for doing what the Board had instructed him to do in relation to communication with his clients;

2. Prosecute and jail Petitioner for failing to timely notify his clients of his suspension even though Russ Willis had suspended the notice requirement under Rule 28;

3. Prosecute and jail Petitioner even though the communications, which were exculpatory, between Russ Willis and Will Hawkins had been destroyed by the Board of Professional Responsibility;

4. Use the criminal contempt proceeding to obtain a quick "conviction resulting in jail time for Mr. Allman.";

5. Prosecute and jail Petitioner without probable cause;

6. Prosecute and jail Petitioner based upon unsupported allegations that Petitioner failed to return unearned fees; and

7. Prosecute and jail Petitioner for willfully failing to remove indicia as an attorney while also taking the position that he could not set foot in his office and the fact that Russ Willis knew there were licensed attorneys still in the office working on cases.

11

(Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Alex Little letter to Sandy Garrett 8/3/18 Exhibit 11). This letter concludes by informing Mrs. Garrett that if the Board did not dismiss the criminal contempt petition, Petitioner's Counsel would file:

1. A motion to recuse Russ Willis;

2. A motion to dismiss based upon entrapment, estoppel, and prosecutorial misconduct;

3. An injunction in Federal Court seeking notice of procedures;

4. A Rule 11 motion seeking attorney's fees for the frivolous charges.

(Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Alex Little letter to Sandy Garrett 8/3/18 Exhibit 11).

All criminal charges against Petitioner, with the exception of two, were dismissed, the Board citing it had no probable cause to prosecute Petitioner. Petitioner entered a no contest plea to two charges regarding Wanda Kelley and Lisa Smelser in lieu of a trial. (Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Transcript of Criminal Contempt Proceedings 8/8/2018 pages 7 – 10, 20 – 26 Exhibit 7; Transcript of Criminal Contempt Proceedings 8/30/2018 pages 8 – 12 Exhibit 12; Response of Board of Professional Responsibility to Special Masters Report Exhibit 13; Affidavit of Will Hawkins Exhibit 6).

The State seized from Petitioner his laptops, hard drives and USB drives containing these client records on March 9 and 10, 2020 and did not provide them to him prior to the hearing in violation of *Brady v. Maryland,* 373 U.S. 83 (1963) and *State v. Burgins,* 464 S.W. 3d 298, 310-311 (Tenn. 2015) and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Trial Court's use of these proceedings from the Tennessee Board of Responsibility not only required Petitioner to prove his innocence but to do so without his

12

evidence. The State's prosecution of Petitioner under indictments 2017-CR-548 and 2017-CR-875 for willfully, knowingly, and intentionally holding himself out as an attorney to the public, theft of retainer fees and engaging in the unauthorized practice of law is for essentially the same conduct. Exhibit F – Indictments 2017-CR-548 and 2017-CR-875).

Counsel for the Board of Professional Responsibility, Russ Willis, testified that the Board in no way made a determination as to whether a crime had been committed in relation to the disciplinary petitions. In fact, when questioned by the Trial Court, Russ Willis testified not to any criminal intent on behalf of Petitioner, but that his practice experienced such an explosive growth due to successful results he simply became overwhelmed. (Transcript of Proceedings April 2-3, 2020 pages 59-61, 67-69, 86-88, 235-236 exhibits 2 and 3 to the transcript; Petitioner's Motion to Review, exhibit 8 Transcript of the Receivership Proceedings 1/4/17 page 5).

In addition, Petitioner has gone into great detail and documentation as to how the restitution schedules are neither accurate nor reliable because the Board failed to investigate the complaints. (Amended Petition for Habeas Corpus and Immediate Relief paragraphs 78 – 94, Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Emails between Russ Willis and Alex Little Exhibit 16; Transcript of Criminal Proceedings 8/8/18 page 9 – 10 Exhibit 7; Alex Little letter to Sandy Garrett Exhibit 11). Petitioner has also set out the basis for the conditional pleas to disbarment based upon the Board forcing a separate hearing for each person listed on the schedules and his lack of resources to defend. (Amended Petition for Habeas Corpus and Immediate Relief paragraphs 95 – 101).

13

**Bail revocation implicates substantial liberty interest** protected under the Fourteenth Amendment and article I, section 8 of the Tennessee Constitution. *State v. Burgins,* 464 S.W. 3d 298 (Tenn. 2015); *Morrissey v. Brewer*, 408 U.S. 471 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973). A liberty interest rises to this level when a person, once deprived of that interest, will be "condemned to suffer grievous loss." *Burgins citing Morrisey,* 408 U.S. at 481.

Even if the State had proven its case by a preponderance of the evidence, the Trial Court should have implemented non-financial alternatives pursuant to T.C.A. 40-11-115, 40 – 11-116 and 40 – 11- 118 such as release on own recognizance, house arrest, into the care of some qualified person or organization, or imposing reasonable restrictions on activities, movements, associations and/or residences of Petitioner as it did in granting Petitioner's furloughs. *State v. Burgins,* 464 S.W. 3d 298 310-311 (Tenn. 2015).  Under the United States Constitution, a State may detain a person prior to trial only if after robust procedures, it finds that the defendant poses severe risk to the public or the risk of flight cannot be mitigated with less restrictive alternatives. *United States v. Salerno*, 481 US 739,750 (1987) The least restrictive conditions of release should be set to protect both a defendant's fundamental liberty interest and State's interest in assuring his presence at court and protecting the public safety. *Hill* at 8.  There is simply no evidence Petitioner poses a flight risk or severe risk to the public.

If the State's position is that pre-trial release is not an option because the Petitioner is too dangerous or is a risk of flight, it must satisfy this Court that no condition, or combination of conditions, could possibly assure his appearance at trial or the safety of the public. *Salerno* 481 US 750. A combination of conditions includes GPS monitoring device, reporting to Community Corrections, house arrest, orders preventing contact with persons, etc. as used during Petitioner's previous furloughs. There is simply no showing that Petitioner poses a severe risk of threat to the

14

safety of individuals or the community or is a risk of flight that no condition of relief can dispel. *Salerno* at 755.

   *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015) is clear, before incarceration, that the Court should implement **non-financial conditions** of release that ensure Petitioner's appearance at trial and the public's safety even if the Petitioner's bond is revoked. These conditions were put in place during all of Petitioner's furloughs and were successful. Petitioner lacks the resources to post yet another bond. (Transcript of In-Court Proceedings 10/5/2020 pages 16-18; Transcript of Ex-Parte Proceedings 10/5/2020 pages 12,19; Transcript of Proceedings 4/2 – 3/2020 pages 186, 235). (*See* Footnote 4).

  Pursuant to T.C.A. 40-11-118 (b) factors, Petitioner should be released on his own recognizance with GPS monitoring and daily reporting to Community Corrections pending trial:

  a. Petitioner has been a lifelong resident in the community. (Transcript of Proceedings 4/2 – 3/2020 pages 94 – 98, 103 – 107; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows: Letters in Support of Release Exhibit 17. These letters were admitted without objection.);

  b. Petitioner has always been employed or been an employer in the community and had started a new company prior to April 2020.

  c. Petitioner has deep family ties in the community dating back to June 6, 1969, the date of his birth;

  d. Petitioner has no mental impairment and his reputation and character have been affected by what is before the Court and been published by the news media and on social media;

  e. Petitioner has no prior criminal record, has never missed a court date, and has not attempted to flee;

  f. Petitioner's revocation charge is a non-violent offense and the record now shows a weak probability of conviction;

15

g.  Two distinguished members of the bar and numerous family members vouch for Petitioner's reliability. (Transcript of Proceedings 4/2 – 3/2020 pages 94 – 98, 103 – 107; Exhibit C - Petitioner's Motion for Review and it's attached exhibits as follows:  Letters in Support of Release Exhibit 17. These letters were admitted without objection.);

h.  Over 85% of all charges of theft and knowingly, willfully, and intentionally holding himself out as a lawyer have been dismissed. (*See* paragraph 92)

Denial of a defendant's liberty in the form of pre-trial detention requires a showing that no conditions of release can reasonably assure the safety of the community, or any person, and that the detainee poses an immitigable risk of flight or danger to the community that outweighs the defendant's interest in pre-trial liberty. *U.S. v. Salerno,* 481 US 739 (1987). Post revocation, Petitioner has completed 15 days of furlough on house arrest with GPS monitoring and daily reporting to Community Corrections to prepare for trial without fleeing or being a danger to the public.[2] There is no evidence justifying Petitioner's pre-trial detention.

Furthermore, Petitioner posted a 25,000 bond and a $200,000 bond for indictments 2017-CR-548 and 2017-CR-875, not just a $25,000 bond.  (*See* Amended Petition for Habeas Corpus and Immediate Relief paragraph 12).

Respondent's argument that Petitioner has not exhausted his State Court remedies ignores the overwhelming evidence of violations of his constitutional rights found by the Trial Court, fails to address the issues raised by this Court in two (2) orders, and is, frankly, bizarre.  The Respondent hinges his "failure to exhaust" argument on the assertion that Petitioner did not seek review in the Tennessee Supreme Court within fifteen (15) days of the Tennessee Court of

---

[2] Petitioner had been approved for another 7 days of furlough from November 22 – 28, 2020, the week prior to his last trial date of November 30, 2020.  This furlough was cancelled when the Trial Court continued the trial *sua sponte* without Petitioner's attendance at the hearing. Petitioner was not permitted to attend the conference with the State and counsel, Gary Copas, when this decision was made.  The Trial Court was going to require Petitioner be incarcerated during the trial despite his status as "co-counsel" under hybrid representation.

16

Criminal Appeals denial pursuant to Tenn. R. App. P. 8. As this Court has expressly held, "in Tennessee, pursuant to Tennessee Supreme Court Rule 39, presentation of claims to the Tennessee Court of Criminal Appeals is sufficient for exhaustion" for purposes of 2241 petitions filed by pre-trial detainees. *Hill v. Hall*, 3:19 -cv-00452, at page 12 (M.D. Tenn. 10/7/19, J. Aleta Trauger); *citing Adams v. Holland*, 330 F. 3d 398, 403 (6th Cir. 2003); *Cole v. Lester*, 3:12-cv-00704 (M.D. Tenn. 1/13/15 J. C. Campbell)

Respondent's second argument is equally without merit. Petitioner has set out previously that he and Mr. Copas have no separate agreement for the Tenn. R. App. P. 8 process. Petitioner has made multiple unsuccessful requests of Mr. Copas to file the motion. Hybrid representation is Petitioner's only vehicle to file said motion. Hybrid representation was granted by the Trial Court when it found that Petitioner's 6th Amendment was being violated due to pretrial motions/pleadings not being filed and a lack of adequate trial preparation.

Furthermore, Respondent argues that Petitioner is a threat to the public but completely ignores the fact that Pet. had completed fifteen (15) days of furlough with GPS monitoring and daily reporting to Community Corrections without any incident. The Trial Court had granted an additional five (5) days of furlough just prior to his previous trial date in November 2020, furlough that was cancelled when the trial was continued. (*See* Amended Petition for Habeas Corpus and Immediate Relief paragraphs 107-109, 115-116, 120).

Pre-trial detention denies a defendant his liberty. *Hill v. Hall*, 3:19-cv-00452 at pages 11-14 (M.D. Tenn. 10/7/19, J. Aleta Trauger); *State v. Burgins*, 464 S.W. 3d 298 (Tenn. 2015). Pre-trial release enables a defendant to stay out of jail until a verdict of guilty has been returned, thus permitting the unhampered preparation of a defense. Pre-trial detention is only appropriate when

17

there has been a specific finding that additional bail conditions will not ensure the defendant's appearance at trial or protect the public's safety. *Burgins* at 310-311. Petitioner's successful completion of furloughs further shows he is no risk of flight or serious risk to the public.

Cases in which a petitioner cannot raise his or her habeas claims create, or at least implicate, grave constitutional claims. *Rodriguez v. Artuz*, 990 F. Supb. F. 2d 275, 282 (S.D.N.Y. 1998, J. Sotomayor); *Martinez-Villareal v. Stewart*, 118 F. 3d 628, 832 (9th Cir. 1997). This Court exists to protect the constitutional rights of those who appear before it. *Botempo v. Fenton*, 692 F. 2d 954, 958 (3rd Cir. 1982); *State v. Franklin*, 714 S.W. 2d 252, 261 (Tenn. 1986). Thus the question is not "what is the legal basis for immediate release pending disposition," but instead, "what action must this Court take to alleviate, if not obviate, the continuing violation of Petitioner's constitutional rights?" The Trial Court has already found a violation sufficient to warrant post-conviction relief. The Respondent concedes it is impossible for Petitioner to comply with the State Courts' procedure. (Respondent's Memorandum in Support of Motion to Dismiss page 2)

A principle aim of the Writ is to provide for swift judicial review of restraints on liberty. *Peyton v. Rowe*, 391 U.S. 54, 63 (1968). For more than 50 years, judicially created procedural/remedial devices to protect a person's rights (i.e. immediate release pending final disposition) have been woven into the very fabric of habeas corpus. As such, this Court has inherent authority to issue interlocutory orders within habeas corpus proceedings. *Ragbir v. Homan*, 923 F. 3d 53, 62 (2nd Cir. 2019) (Issuing preliminary injunction as interlocutory order)

Habeas corpus "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose – the protection of individuals against erosion of

their right to be free from wrongful restraints upon their liberty. *Hammond v. Lenfest*, 398 F. 2d 705, 710 -711 (2nd Cir. 1968). Habeas corpus must retain its ability to cut through barriers of form and procedural mazes to give remedy. *Harris v. Nelson*, 394 U.S. 286, 290-291 (1969) (The Supreme Court creating a discovery vehicle in habeas corpus proceedings where one was not provided by rule or statute to protect a petitioner's rights.); *Rowe v. Peyton*, 383 F. 2d 709,716 (4th Cir. 1967) (Creating a judicial procedural device not found in rule or statute where habeas corpus can be used to attack the legality of state sentences to be served in the future to protect a petitioner's rights.)

Since the Writ, as it is known today, is almost entirely the product of judicial innovation and adaptation to fit new situations and newly felt needs, "judges should not hesitate to take further steps to adapt it to meet yet another need which is present, urgent and recognized." *Rowe* at 716; *Affirmed Peyton v. Rowe,* 391 U.S. 54, 63 (1968). The very nature of the Writ demands that it be administered with the "initiative and flexibility" essential to ensure that miscarriages of justice are surfaced and corrected. *Harris* at 290- 291. The demand for speed, flexibility and simplicity has been clearly evident in the long line of Supreme Court decisions regarding habeas corpus. *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973).

Petitioner's trial dates in 2020 were March 16, August 24, October 5, and November 30 and all were continued at the eleventh hour. Petitioner's new trial date is set for November 1, 2021. Petitioner began the challenge to his incarceration on December 15, 2020, shortly after his last trial date. Petitioner did not receive the Trial Court's Order denying his Tenn. R. App. P. 8 Motion until March 19, 2021. Every day that passes is another day of trial preparation lost and reaffirms the Trial Court's finding of a constitutional violation "sufficient" to warrant post-conviction relief.

19

The law abhors a right without a remedy. *Rowe* at 716. This Court holds within its judicial heritage the mandate of a continuing evolution of remedial processes to right asserted wrongs. *Id* at 717. The Writ cannot be constrained by the "technical limitations arising out of state court procedural requirements." *Id* at 713-714.

Enforced delay from lack of remedy creates a grievous loss to the Petitioner as he will lose the only means by which he may substantiate his claim of innocence. *Id* at 715. Justice delayed for "want of a procedural, remedial device" is justice denied. *Id*.

Respectfully, further delay in the resolution of Petitioner's Habeas Corpus Petition or Motion for Immediate Release deepens the effects of his constitutional violations; the right to a fair trial, right to effective counsel, and due process and equal protection under the 14th Amendment. The record is clear, the Trial Court found a violation of Petitioner's 6th Amendment Right sufficient to warrant post-conviction relief. (Transcript of the October 5, 2020 Ex-Parte Proceedings pages 20 – 21, Transcript of the October 5, 2020 In-Court Proceedings pages 4-5). Petitioner's 6th Amendment issue has not improved. (Exhibit 1) The time for unhampered preparation of defense is being irretrievably lost with his continued pre-trial detention even though the record demonstrates Petitioner poses no risk of danger to the public nor is he a risk of flight. *Stack v. Boyle*, 342 U.S. 1, 4, 8 (1951). It further denies him free access to his trial preparation materials. (Exhibit K to the Amended Petition for Habeas Corpus) *United States v. Salerno*, 481 U.S. 739, 750, 755 (1987); *Atkins v. Michigan*, 644 F. 2d 543, 549 (6th Cir. 1987). Exhibit 1 attached hereto shows some of the material to be used by Petitioner to prepare for trial. It does not show the vast amount of files and records stored on Petitioner's network server needed to prepare but that he has no access to. This exhibit was entered into evidence at the November 2, 2020 hearing in the Trial Court. Since the inception of the State's prosecution,

20

149 charges of criminal conduct have been dismissed, twelve (12) in Sumner County, eight (8) dismissed since the revocation of Petitioner's bond. (*See* Amended Petition for Habeas Corpus paragraphs 108 and 109). Petitioner did not file this Motion for Immediate Release seeking the complete restoration of his liberty but seeks liberty with limitations pending final disposition of hos petition as his trial date is rapidly approaching. Immediate relief in the form of release with GPS monitoring and daily reporting to Community Corrections is necessary to stem the continuing violation of Petitioner's rights.

# EXHIBIT 1





Respectfully submitted,

Andy L. Allman
Petitioner
117 W. Smith Street
Gallatin, TN 37066

## **CERTIFICATE OF SERVICE**

I hereby certify that this Reply to Respondent's Response to Motion for Immediate Release has

been served via U.S. Mail on the 4th Day of July, 2021 addressed to:


Leah May Dennen
Sumner County Law Department
355 N. Belvedere Dr.
Room 303
Gallatin, TN 37066

Thomas B. Russell
Gullett, Sandford, Robinson & Martin, PLLC
150 Third Ave. S.
Suite 1700
Nashville, TN 37201

Andy L. Allman